**STATE OF NORTH DAKOTA**

**COUNTY OF MORTON**

**IN DISTRICT COURT**

**SOUTH CENTRAL JUDICIAL DISTRICT**

| | |
|---|---|
| BAPTKO, Inc.; and Robert Kupper,<br><br>     Plaintiffs,<br><br>v.<br><br>FA ND CHEV, LLC; FA ND SUB, LLC; EAGAL3 LLC; EAGAL 4 LLC; PMKC Mandan LLP; Starion Bank; and Bravera Bank,<br><br>     Defendants. | CASE NO. 30-2025-CV-00652<br><br>**BRIEF IN SUPPORT OF DEFENDANTS FA ND CHEV, LLC, FA ND SUB, LLC, EAGAL3 LLC, AND EAGAL4 LLC'S JOINT MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT** |

[¶1]     Defendants FA ND CHEV, LLC, FA ND SUB, LLC, EAGAL3 LLC, and EAGAL4 LLC respectfully submit this Brief in Support of their Joint Motion to Dismiss Plaintiffs' Amended Complaint.

## INTRODUCTION

[¶2]     Having secured a flawed federal judgment, which is now on appeal, Plaintiffs BAPTKO, Inc. ("BAPTKO") and Robert Kupper ("Kupper") now attempt to circumvent and complicate the corresponding federal proceedings by launching this ill-conceived state court lawsuit. With their Amended Complaint, Plaintiffs seeks to unwind a valid, arms-length buy-sell transaction  concerning the two North Dakota automobile dealerships that BAPTKO , formerly known as Kupper Chevrolet, Inc. ("KCI"), sold to FA ND CHEV, LLC ("FA ND CHEV") and FA ND SUB, LLC ("FA ND SUB") (collectively, the "FA ND Entities") just over six years ago. Relying on conclusory allegations, BAPTKO and Kupper purport to state claims against each of the Defendants—including EAGAL3 LLC and EAGAL4 LLC (collectively, the "EAGAL Entities")—under the North Dakota Uniform Voidable Transactions Act, N.D. Cent. Code §§ 13-02.1-01, *et seq*. (the "UVTA"). Specifically, BAPTKO and Kupper claim that the FA ND Entities

**EXHIBIT 11**

sold the subject dealerships to the EAGAL Entities "with the actual intent to hinder, delay, or defraud Kupper and BAPTKO as creditors of FA ND CHEV and FA ND SUB."  (Amended Complaint and Jury Demand (herein, the "Amended Complaint") or "Am. Compl.") at p. 8, ¶ 28.) Now, Kupper and BAPTKO ask the Court to "[a]void[] … the subject transfers" *but only* "to the extent necessary to satisfy Kupper and BAPTKO's claims[.]" (*Id*. at pp. 9-10, ¶ 32.1.)

[¶3]    As set forth below, this action is not only procedurally inappropriate, but legally deficient. This case is a thinly veiled post-judgment collection tactic designed to circumvent the federal appellate process, despite the fact that the judgment in the underlying matter is currently pending before the Eighth Circuit. Plaintiffs' Amended Complaint fails to state a claim upon which relief can be granted and constitutes an impermissible collateral attack on federal court proceedings. Plaintiffs' attempts to paint an improper scheme orchestrated the FA ND Entities to defraud is unpersuasive. The Amended Complaint contains no specific allegations regarding fraudulent intent, self-dealing, or misuse of corporate form. Instead, it relies on boilerplate labels and conclusory claims, which are insufficient under North Dakota law to survive a motion to dismiss.

[¶4]    Specifically, Plaintiffs allege no facts here suggesting that the EAGAL Entities lacked good faith or failed to pay fair value for the dealerships, as is required to prevail on a UVTA against them. A review of the factual allegations of the Amended Complaint, in fact, demonstrate that the FA ND Entities sold the subject dealerships in accordance with ordinary commercial practice and in good-faith execution of their business affairs. Further, the Amended Complaint shows that the EAGAL Entities are good faith transferees protected from liability under N.D.C.C. § 13-02.1-08, and Plaintiffs' amended pleading is devoid of the specific facts necessary to support either actual or constructive fraud. For these reasons, the Amended Complaint, as filed against the

2

FA ND Entities and the EAGAL Entities, fails as a matter of North Dakota law, and, therefore, must be dismissed under N.D. R. Civ. P. 12(b)(6).

## FACTUAL BACKGROUND

A.    THE FEDERAL LAWSUIT AND JUDGMENT.

[¶5]    In late 2018, Foundation Automotive Corp. ("Foundation," and together with the FA ND Entities, the "Foundation Parties") agreed to purchase substantially all of the assets of Kupper Chevrolet, Inc. ("KCI") from Robert Kupper, including two car dealerships in Mandan, the related shops, and the goodwill associated therewith. The buy/sell transaction was completed via an executed Asset Purchase Agreement, dated November 28, 2018 (as so amended, the "KCI-APA"). (*See* Am. Compl. ¶¶ 11-13.)  After the asset purchase transaction closed on June 21, 2019, the FA ND Entities discovered that Kupper and BAPTKO—formerly KCI—breached their pre-closing representations and contractual obligations under both the APA and a related Noncompetition and Non-Solicitation Agreement.

[¶6]    On August 12, 2020, the FA ND Entities initiated litigation in the U.S. District Court for the District of North Dakota against Kupper and related entities, asserting claims for breach of contract, conspiracy, defamation, misrepresentation, among others—*FA ND CHEV, LLC, et al. v. Kupper, et al.*, Case No. 1:20-cv-00138  (the "Kupper Litigation").

[¶7]    On September 27, 2021, BAPTKO commenced a separate action in the U.S. District Court for the District of North Dakota against the Foundation Parties, seeking payment under the earnout provision of the KCI-APA—*BAPTKO, Inc. v. Foundation Automotive Corp., et al.* (the "BAPTKO Litigation," together with the Kupper Litigation, the "Consolidated Case"). (*See* Am. Compl. ¶ 18.) The district court (the "Federal Court") later consolidated the BAPTKO Litigation and Kupper Litigation.

[¶8]    Over the next several years, the parties engaged in contentious litigation in federal court, culminating in a judgment against the Foundation Parties. Following a seven-day jury trial and multiple dispositive rulings, the Federal Court entered judgment in favor of BAPTKO on November 7, 2024, in the amount of $3,000,000.00, plus prejudgment interest in the amount of $364,195.67 (the "Original Judgment"). (Am. Compl. ¶ 19.)

[¶9]    After consideration of the Foundation Parties motion for post-judgment relief, the Federal Court issued an Amended Judgment awarding BAPTKO and Kupper attorneys' fees in the amount of $1,085,186.44 and costs in the amount of $223,328.71, bringing the total federal judgment to $4,672,710.82, plus post-judgment interest (the "Federal Judgment"). (Am. Compl. ¶ 19.)

**B.    FEDERAL APPEAL CHALLENGES PLAINTIFFS' RIGHT TO COLLECT ON THE JUDGMENT, ESPECIALLY AS IT TO THE FA ND ENTITIES.**

[¶10]    On April 11, 2025, the Foundation Parties filed a notice of appeal to the United States Court of Appeals for the Eighth Circuit challenging the Federal Judgment (the "Federal Appeal," Case No. 25-1747).[1]

[¶11]    Critically, and relevant to the issue in this state court case, a significant component of the Federal Appeal directly challenges the Federal Judgment against the FA ND Entities specifically. The Federal Appeal raises substantial questions about whether BAPTKO proved which of the Foundation Parties, if any, are actually obligated to pay under the earnout provision

---

[1] Pursuant to N.D.R. Evid. 201, PMKC respectfully requests that the Court take judicial notice of the dockets concerning the underlying federal case, including the judgment entered in the Consolidated Case (Case Nos. 1:20-cv-00138 and 1:20-cv-00183) and the subsequent Federal Appeal pending before the United States Court of Appeals for the Eighth Circuit (Case No. 25-1741). These proceedings are central to Plaintiffs' claims and are referenced extensively in the Complaint. (*See* Am. Compl. ¶¶ 18–19.) Judicial notice of court filings is proper where, as here, the documents are matters of public record and directly relevant to the issues in dispute. Judicial notice is particularly appropriate because the federal proceedings impact Plaintiffs' asserted status as creditors, the alleged insolvency of the debtor entities, and the timing and legitimacy of the real estate transaction at issue.

of the APA. During the trial before the Federal Court, BAPTKO failed to establish that Foundation properly assigned its obligations under the earnout provision to the respective FA ND Entities. The Federal Court has also not made any finding that Foundation assigned the obligations relating to the earnout provision to the FA ND Entities.

[¶12]    This unaddressed issue has resulted in an ambiguous Federal Judgment that does not accurately reflect the Foundation Parties' respective responsibilities under the earnout provision. The Federal Appeal challenges not only the underlying liability determinations and damage calculations, but also the fundamental question of which entities, if any, should be liable for the earnout payments that form the basis of BAPTKO's Federal Judgment.

[¶13]    This jurisdictional and liability challenge, together with the comprehensive list of other issues raised on appeal, may very well result in either complete reversal of the Federal Judgment or a determination that BAPTKO cannot collect the Federal Judgment from the FA ND Entities—the very two entities that were involved in the December 2024 Eide Transaction.

[¶14]    If the Eighth Circuit determines that the FA ND Entities were improperly included in the Federal Judgment or that they have no liability under the earnout provision, Plaintiffs' entire theory for this fraudulent transfer action collapses. Plaintiffs would be seeking to unwind a transaction involving entities against whom they had no valid creditor rights, essentially using the judicial process to undo a legitimate business transaction based on a judgment that may not be collectible from the transferors.

C.    THE UNDERLYING BUSINESS TRANSACTION.

[¶15]    The transaction that BAPTKO now seeks to void involves the December 11, 2024 sale of automotive dealership assets (the "Mandan Dealerships") by FA ND CHEV and FA ND SUB to EAGAL3 and EAGAL4 pursuant to an Asset Purchase Agreement (the "Eide Transaction"). According to Derek Slemko, Foundation's Chief Financial Officer, Foundation

began exploring the potential sale of the Mandan Dealerships in early 2024 as part of a broader corporate strategy to refocus on core dealerships in key markets—a purpose that was unrelated to the Consolidate Case and arose well before the Federal Court ruled on dispositive motions and the Original Judgment was entered. (Am. Compl., Exhibit C, Declaration of Derek Slemko (the "Slemko Dec.") at pp. 1-2, ¶¶ 5-6.)  In short, "the decision to sell the Mandan Dealerships was made as a part of a strategic shift in" Foundation's "business approach" that was "initiated months before the Court entered judgment" in the Federal Court.  (*Id*. at p. 4, ¶ 20.)

[¶16]   As for the real estate associated with the Mandan Dealerships—which forms part of BAPTKO's fraudulent transfer allegations—was not owned by the Foundation Parties at the time of the December 2024 Eide Transaction. In 2023, Foundation entered into a real estate purchase agreement under which Foundation agreed to sell all of the real estate associated with the Dealerships to CARS-DB12 L.L.C. and CARS-DB5, L.P. (collectively, "CARS"). (*Id*. at p. 3, ¶ 18.) CARS operates under Capital Automotive Real Estate Services, Inc. ("Capital Automotive")—a business that specializes in sale-leaseback transactions, whereby automotive dealers sell their real estate to Capital Automotive and then lease it back, allowing dealers to tap into one hundred percent of the equity in their real estate while maintaining long-term operational control of their property.

[¶17]   Foundation completed this sale-leaseback transaction with CARS in 2023, well before any discussion of selling the two Mandan Dealerships began. (*See id*.) As a result, the Foundation Parties did not own the real estate at the time of the Eide Transaction in December 2024, and, therefore, was not entitled to and did not receive those proceeds. (*See id*.)

[¶18]   Despite attaching Mr. Slemko's declaration to their Amended Complaint, Plaintiffs' allegations regarding real estate transfers fail to acknowledge the relevant and material timeline

6

and ownership structure. Indeed, Plaintiffs' claim that "FA ND CHEV and FA ND SUB sold the real estate associated with the Mandan Dealerships to CARS-DB12 L.L.C and CARS-DB5, L.P., then back to FA ND CHEV and FA ND SUB from CARS-DB12 L.L.C and CARS-DB5, L.P., and was then assigned to PMKC" mischaracterizes the nature and timing of these transactions and ignores the legitimate business purposes of the 2023 sale-leaseback arrangement.

[¶19]   As to the dealership assets, on April 26, 2024, Foundation engaged Haig Partners, LLC—a third-party broker to market the sale of the Mandan Dealerships.  (Slemko Dec. at p. 2, ¶ 7.)

[¶20]   Following their engagement, Haig performed a professional valuation of the dealerships, which included a range for the collective goodwill value for the Dealerships between $22 million and $28 million. (*Id.*, ¶ 9.) Moreover, Haig discretely marketed the Mandan Dealerships to a limited number of qualified prospective buyers. (*Id.*, ¶ 10.)

[¶21]   The EAGAL Entities were not the only group to make an offer for the Mandan Dealerships—a point that Plaintiffs failed to allege in the Amended Complaint. Indeed, in July 2024 Foundation received an initial offer to purchase the Mandan Dealerships from a North Dakota-based dealership group. (*Id.*, ¶ 11.) After a period of negotiations, however, Foundation ultimately declined their offer—specifically because the offer for goodwill was too low, and, moreover, they had amended their offer to purchase to only include the Chevrolet Dealership. (*Id.*, ¶ 12.)  Simply put, Foundation passed on the deal because it did not make business sense for the company. (*See id.*)

[¶22]   Approximately two months later, in early September 2024, Eide Automotive expressed interest in purchasing the Mandan Dealerships. (*Id.*, ¶ 13.)  Soon after, Foundation began negotiations with the EAGAL Entities toward a potential transaction. (*Id.* pp. 2-3, ¶ 13.)

[¶23]   On September 19, the Foundation Parties executed and finalized a letter of intent for the EAGAL Entities to purchase the Mandan Dealerships. (*Id*. at p. 3, ¶ 15.) At the time, no money judgments had been entered against the FA ND Entities in the federal Consolidated Case.

[¶24]   The transaction was structured as an asset purchase, with all liabilities remaining with the Foundation Parties. All parties received full disclosure of the pending federal Consolidated Case, and the transaction was conducted with appropriate professional guidance including legal counsel and original equipment manufacturer approvals. The EAGAL Entities are sophisticated commercial purchasers associated with the established Eide Automotive Group.

**D.    BAPTKO'S TACTICAL POST-JUDGMENT DISCOVERY CAMPAIGN.**

[¶25]   Significantly, BAPTKO and Kupper were aware of the impending asset purchase transaction between the EAGAL Entities and the FA ND Entities immediately after the jury trial concluded on November 5, 2024.

[¶26]   Despite knowledge of the potential Eide Transaction before the Original Judgment was entered, BAPTKO waited until February 7, 2025—two months after the automatic stay on the Original Judgment expired on December 7, 2024—to serve written discovery purportedly to aid in execution of the judgment.

[¶27]   Internal correspondence and subsequent subpoenas, however, revealed that BAPTKO's actual purpose in the post-judgment discovery was to build a parallel fraudulent transfer case against the FA ND Entities and EAGAL Entities. For example, after receiving over 400 pages of documents from the Foundation Parties, BAPTKO responded not by pursuing garnishment or other direct execution methods on the bank accounts identified within the production, but by issuing subpoenas *duces tecum* to BMO Bank, N.A. ("BMO") for the FA ND Entities' respective bank accounts and for the purpose of obtaining documents related to the Eide Transaction.

[¶28]   After the Foundation Parties served their responses and objections to BAPTKO's discovery requests, BAPTKO artificially proceeded through the requires steps to seek judicial intervention—without any good faith effort to confer—and filed its motion to compel further discovery from the Foundation Parties on April 18, 2025.

[¶29]   BAPTKO moved to compel post-judgment discovery in Federal Court after the Foundation Parties' noticed their appeal—one that seriously challenges and endangers Plaintiffs' right to collect any judgment. This sequence suggests the discovery was not intended to facilitate collection of an enforceable judgment, but rather to develop factual support for collateral litigation.

[¶30]   These federal post-judgment proceedings remain pending before the Federal Court.

**E.    THIS STATE COURT ACTION.**

[¶31]   On May 23, 2025, Plaintiffs filed this state court action asserting claims under North Dakota's Uniform Fraudulent Transfer Act, seeking to void the December 2024 transaction and recover the transferred assets. This state court filing occurred approximately a month after the Foundation Parties filed their federal appeal to the Eighth Circuit and while Plaintiffs' post-judgment discovery motion remained pending before the Federal Court. With the submission of this state court case there are now three separate proceedings related to the same underlying judgment and assets: the federal appeal challenging the validity of the Federal Judgment, the federal post-judgment discovery motion seeking information about the same transaction challenged in this action, and this state court fraudulent transfer action seeking to void the transaction entirely.

[¶32]   This multiplicitous litigation strategy serves no legitimate judgment collection purpose but rather is designed to maximize pressure on Defendants and create maximum litigation costs and business disruption. Rather than allowing the Federal Court to address potential fraudulent transfer issues through its established post-judgment collection procedures, Plaintiffs

filed this separate state court action seeking identical relief. The Federal Court is fully capable of addressing any fraudulent transfer issues in connection with its post-judgment collection procedures, making this separate state court action unnecessary and duplicative. Plaintiffs' choice to pursue state court relief while federal collection proceedings remain pending demonstrates forum shopping rather than genuine collection efforts.

## LEGAL STANDARDS

### A.   MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM.

[¶33]   "A motion to dismiss under N.D. R. Civ. P. 12(b)(6) tests the legal sufficiency of the claim presented in the complaint." *Nandan, LLP v. City of Fargo*, 2015 ND 37, ¶ 11, 858 N.W.2d 892. Dismissal is proper under N.D. R. Civ. P. 12(b)(6) where the complaint fails to state a claim on which relief may be granted. *In re Estate of Nelson*, 2015 ND 122, ¶ 9, 863 N.W.2d 521. Stated differently, dismissal is appropriate where the Court "cannot discern a potential for proof to support" the claim. *See Albrecht v. Albrecht*, 942 N.W.2d 875, 877 (N.D. 2020).

[¶34]   In considering a motion to dismiss under Rule 12(b)(6), the Court "construe[s] the complaint in the light most favorable to the plaintiff and accept as true the well-pleaded allegations in the complaint." *Id.* at ¶ 5, 863 N.W.2d at 524.  Conclusory allegations, even if dressed in legal terminology, do not receive such deference. *Hennessey v. Milnor Sch. Dist.*, 2023 ND 147, ¶ 8, 994 N.W.2d 204, 207, *reh'g denied* (Aug. 25, 2023). As the *Hennessey* court noted:

> Rule 8 does not require the complaint to have detailed factual allegations, but allegations that are merely conclusory statements unsupported by factual allegations are not sufficient to state a cause of action. Well-pleaded factual allegations are entitled to an assumption of truth, but conclusions unsupported by factual allegations are not.

*Id*. (citations omitted). When fraud is alleged, Rule 9(b) imposes a heightened pleading standard: "a party must state with particularity the circumstances constituting fraud . . . ." N.D. R. Civ. P. 9(b).

[¶35]   For dismissal pursuant to Rule 12(b)(6), the Court may consider documents relied on, incorporated into, or otherwise integral to the complaint, even if they are not attached as exhibits, without treating the motion as a summary judgment motion. *See e.g., Riemers v. State ex rel. Univ. of N. Dakota*, 2007 ND APP 4, ¶ 8, 739 N.W.2d.

**B.      THE UVTA.**

[¶36]   Under the UVTA, "creditors have various remedies to avoid fraudulent transfers." *PHI Fin. Servs., Inc. v. Johnson Law Office, P.C.*, 874 N.W.2d 910, 914 (N.D. 2016). The statute "broadly separate[s]" fraudulent transfers "into two classifications: actual fraud and constructive fraud." *Farstveet v. Rudolph ex rel. Eileen Rudolph Estate*, 630 N.W.2d 24, 30 (N.D. 2001) (citing N.D.C.C. §§ 13-02.1-04 (actual) and 13-02.1-05 (constructive)). "A fraudulent transfer may be attacked under either theory." *Id*. "Actual or intentional fraud requires a showing of intent while constructive fraud requires a showing of inadequate consideration coupled with insolvency." *Id*.

[¶37]   The Amended Complaint makes clear that Plaintiffs' are operating only under a theory of actual fraud—i.e., § 13-02.1-04 claims.  The section specifically provides:

1.      A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

   a.      With actual intent to hinder, delay, or defraud any creditor of the debtor; or

   b.      Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction or the debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

N.D.C.C. § 13-02.1-04(1).  "In determining actual intent … consideration may be given" by the Court, "among other factors," to whether:

11

(a)    the transfer or obligation was to an insider;

(b)    the debtor retained possession or control of the property transferred after the transfer;

(c)    the transfer or obligation was disclosed or concealed;

(d)    before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(e)    the transfer was of substantially all the debtor's assets;

(f)    the debtor absconded;

(g)    the debtor removed or concealed assets;

(h)    the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(i)    the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(j)    the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(k)    the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

§ 13-02.1-04(2).

[¶38]    Because Plaintiffs are proceeding under a theory of actual fraud, they were required under Rule 9(b), N.D. R. Civ. P., to plead such allegations with particularity, *see Prod. Credit Ass'n of Mandan v. Olson*, 280 N.W.2d 920, 924 (N.D. 1979), identifying the specific facts supporting fraudulent intent—also known as "badges of fraud[.]" *See In re Hebert*, No. AP 21-07003, 2022 WL 1210662, at *12 (Bankr. D.N.D. Apr. 22, 2022); *In re Est. of Dionne*, 2009 ND 172, ¶ 14, 772 N.W.2d 891, 895; *see also* N.D.C.C. § 13-02.1-04(2) (setting forth the badges of fraud).

## **ARGUMENT**

### A.    THIS STATE COURT ACTION IS A PROCEDURALLY IMPROPER COLLATERAL ATTACK ON FEDERAL JURISDICTION.

[¶39]    Plaintiffs' fraudulent transfer theory is premised on a Federal Judgment that remains under direct appellate review. The Foundation Parties have appealed the Federal Judgment

to the Eighth Circuit, challenging, among other issues, whether the FA ND Entities were proper judgment debtors and whether any earnout obligations under the APA were assigned. These unresolved federal questions go directly to Plaintiffs' claimed status as "creditors" of the FA ND Entities—a status they must establish under N.D.C.C. § 13-02.1-04.

[¶40]   Federal courts retain jurisdiction to enforce or stay their own judgments during the pendency of an appeal. *See* Fed. R. Civ. P. 62; *see, e.g., Horn & Hardart Co. v. National Rail Passenger Corp*., 843 F.2d 546, 548 (D.C. Cir. 1988) (During appeal, the district court retains "inherent power to enforce its decrees and to make such orders as may be necessary to render them effective[.]") (citation omitted); Wright & Miller, § 3954 (5th ed.) ("The taking of an appeal does not by itself suspend the operation or execution of a district-court judgment or order during the pendency of the appeal."). Plaintiffs' choice to bypass federal post-judgment remedies and attempt to unwind the Eide Transaction in state court—while federal appellate and post-judgment collection proceedings remain pending—is an impermissible collateral attack on federal jurisdiction. This forum-shopping tactic disrupts comity and creates risk of conflicting rulings. The Amended Complaint should be dismissed for lack of subject-matter propriety.

[¶41]   Moreover, the Amended Complaint is the product of a post-judgment discovery campaign in Federal Court that was ostensibly aimed at execution on the Federal Judgment, but in substance served to construct the claims now alleged in this case. This misuse of Rule 69 procedures underscores the tactical, duplicative, and improper nature of this state court action.

**B.    PLAINTIFFS HAVE NOT PLEADED ACTUAL FRAUD WITH THE PARTICULARITY THAT RULE 9(B) REQUIRES.**

[¶42]   Even if the Court looks past the duplicative and wasteful nature of this concurrent proceeding to consider the merits, the Amended Complaint should nonetheless be dismissed because it does not meet the heightened pleading standard that Rule 9(b) requires .

13

[¶43]   Here, on its face, the Amended Complaint is devoid of the facts demonstrating the "badges of fraud" set forth under Section 13-02.1-04(2). Instead, Plaintiffs filled their pleading with only generalized and conclusory allegations, failing to specify the who, what, when, where, and how of the allegedly fraudulent transfers. (*See, e.g.,* Am. Compl. ¶¶ 25 (stating that "[t]he Eide Parties did not take the assets in good faith."), *id*. ¶ 26 (concluding that "[t]he Eide Parties did not take the assets for reasonably equivalent value."), *id*. ¶ 28 ("[t]he transfers of the real estate associated with the Mandan Dealerships … were made with the actual intent to hinder, delay, or defraud Kupper and BAPTKO…."), *id*. ¶ 29 ("[t]he transfers of the remaining non-real estate assets of Mandan Dealership … were also made with the actual intent to hinder, delay, or defraud Kupper and BAPTKO….").) Moreover, as for the subject transaction, the Amended Complaint does not even detail the consideration actually paid by the EAGAL Entities for the Mandan Dealerships, the EAGAL Entities' awareness of any pending judgment, or further how any alleged conduct (*see id*. at ¶ 31) raises to the level of intent.

[¶44]   Of equal significance, the undisputed timeline—which Plaintiffs notably avoid in their pleading—establishes that the Eide Transaction was planned and initiated months before the Federal Judgment was entered. Mr. Slemko's declaration—which, at this stage of the case must be accepted as true, *see In re Estate of Nelson*, 863 N.W.2d at 524—establishes that Foundation began strategic discussions about selling the Mandan Dealerships in early 2024 as part of a broader business initiative to focus on core markets.

[¶45]   Finally, the transaction was conducted for reasonably equivalent value, as evidenced by the professional valuation and arms-length negotiation process. Moreover, by the time negotiations started with the EAGAL Entities, Foundation had received and passed on a less lucrative offer from another North Dakota dealerships group—reinforcing the conclusion that the

14

Eide Transaction was not below the then-existing market value. The buyers, EAGAL3 and EAGAL4, are sophisticated commercial entities that conducted appropriate due diligence and received full disclosure of the pending Federal Litigation.

[¶46]    Generalized allegations do not suffice, and Plaintiffs' failure to plead particularized facts of fraudulent intent warrants dismissal of their actual fraud claims against the FA ND Entities and the EAGAL Entities.

## C.    THE AMENDED COMPLAINT ALLEGES NO FACTS DEMONSTRATING THAT THE FA ND ENTITIES RECEIVED LESS THAN REASONABLY EQUIVALENT VALUE.

[¶47]    Citing an informal conversation between executives that occurred in 2021, Plaintiffs claim that the Eide Transaction was a fraudulent transfer that should be voided, in part, because the EAGAL Entities paid, and the FA ND Entities received, an amount less than the reasonably equivalent value of the dealership assets. There is no discernable potential proof to support such a claim.

[¶48]    Here, the Amended Complaint acknowledges that the Mandan Dealership assets were professionally marketed, the Eide Transaction was executed at a price that was consistent with market appraisals (*see, e.g.,* Slemko Dec. at p. 3, ¶ 17), exceed the value of an initial offer made by another North Dakota-based dealership group, and with a well-known, third-party buyer. Additionally, the proceeds were used to pay third-party creditors, including floorplan lenders, transaction expenses, and secured obligations. (*See* Am. Compl. ¶ 24; *see also* Slemko Dec. at p. 4, ¶ 19.) The fact that the proceeds were used to pay existing creditors undermines any inference of fraud. Discharging secured obligations, paying floorplans, and covering transaction costs is consistent with ordinary course business conduct—not evidence of intent to defraud. Plaintiffs allege no facts contesting this process, the valuation, or the identity and status of any transferee, instead relying on speculative assertions of impropriety.

15

[¶49]   Nonetheless, Plaintiffs point to the October 2023 deposition testimony of Kevin Kutschinski— the Chief Executive Officer of Foundation—regarding a January 2021 verbal offer from Jesse Peterson—President and CEO of Eide Automotive Group—to purchase the Mandan Dealerships, as evidence that the transaction was not for fair market value.  This argument is fundamentally flawed.

[¶50]   First, the alleged offer, as described by Ms. Kutschinski, was made informally in January 2021, more than three years before the Mandan Dealership sale. It was also not in writing, was not supported by any contemporaneous documentation, and did not include any valuation of goodwill, intangibles, or asset appraisals. Such informal discussions—particularly those unaccompanied by due diligence or market testing—do not establish a reliable measure of value under the UVTA.

[¶51]   Just as important, Plaintiffs offer no factual basis to conclude that the market value of the Mandan Dealerships in 2021 was relevant—much less determinative—to their value in 2024. Unaccepted offers, particularly those that are stale or undocumented, do not constitute proof of market value. *See, e.g., Morgan v. Ackerman*, 964 S.W.2d 865, 869 (Mo. Ct. App. 1998) ("Market conditions and changing economic circumstances can render assets that had been valuable months or years earlier virtually worthless in the present, and vice versa."). "A wealth of authority teaches that when a willing buyer and a willing seller transact, both being at arms' length, neither being under compulsion to buy or sell, and both having reasonable knowledge of relevant facts, the sale price establishes fair market value." *In re Samson Res. Corp.*, No. 15-11934 (BLS), 2023 WL 4003815, at *25 (Bankr. D. Del. June 14, 2023), *cert. denied*, No. 15-11934 (BLS), 2024

16

WL 2390401 (D. Del. May 23, 2024).[2] *See Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002), *aff'd sub nom. In re USN Commc'ns, Inc.*, 60 F. App'x 401 (3d Cir. 2003) ("When sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight.").

[¶52]    Third, Plaintiffs fail to allege that the 2021 verbal offer was ever subject to negotiation or submitted as a bona fide purchase offer. Without a formal offer or competitive bidding process, there is no plausible inference that the FA ND Entities accepted a discounted sale. Mr. Slemko's declaration, in fact, establishes the opposite—that Foundation did not jump at the first offer made, but, rather, waited for a transaction that fell within the reasonable market expectations. Ultimately, the actual transaction with the EAGAL Entities was brokered, documented, and approved by OEMs, and included a structured valuation. Plaintiffs' reliance on Mr. Kutschinski's testimony given more than three years prior to the subject transaction underscores the speculative nature of their valuation theory and further confirms the absence of any pleading plausibly suggesting lack of equivalent value.

### D.    PLAINTIFFS HAVE FAILED TO PLEAD FACTS REGARDING DEBTOR INSOLVENCY.

[¶53]    Plaintiffs also attempt to support their claim by alleging that the FA ND entities are insolvent, citing to a portion of Mr. Slemko's declaration indicating that the FA ND Entities utilized proceeds from the Eide Transaction to discharge existing debts, which left only a "nominal"

---

[2] *Id.* ("[T]he gold standard for determining the value of an asset is to sell it in an open and fair market. A thing is worth what a willing buyer will pay to a willing seller following a proper marketing process. This standard places primacy on the reliability of a transaction where parties have evaluated risk and reward and placed their own money on the line. Buyers and sellers may be right or wrong about what the future may hold, but the value is fixed and conclusively established by the price paid at closing.")

amount for the business. Such an allegation, however, is insufficient to establish insolvency. By statute, "[a] debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets." N.D.C.C. § 13-02.1-02(1). The Amended Complaint contains no such evidence. That a seller is left with little cash following a transaction is not one and the same as insolvency under the UVTA. *See id*. Here, Plaintiffs allege no insolvency and plead no facts suggesting the FA ND Entities had no remaining assets, operations, or income. Plaintiffs' insolvency theory rests on a mischaracterization of financial consequences, not legal criteria.

[¶54]    The UVTA does not penalize debtors for paying existing creditors or conducting lawful business transactions. While Plaintiffs certainly take issue with the fact that the proceeds from the Eide Transaction were not used to satisfy the Federal Judgment, using funds to pay legitimately-incurred business debts, as opposed to satisfying a judgment, is not evidence of actual fraud.

### E.    THE EAGAL ENTITIES HAVE NO LIABILITY AS GOOD-FAITH PURCHASERS.

[¶55]    Regardless of any analysis or factual support that Plaintiffs may provide in the Amended Complaint, the Eide Transaction is, as a matter of law, not voidable because the EAGAL Entities purchased the Mandan Dealerships in good faith.

[¶56]    Specifically, the UVTA provides that "[a] transfer or obligation is not voidable under" Section 13-02.1-04 "against a person that took in good faith and for a reasonably equivalent value given the debtor…." N.D.C.C. § 13-02.1-08(1).   Under North Dakota law, "[g]ood faith means good faith; it means an honest intention to abstain from taking an unconscientious advantage of another, even through the forms and technicalities of the law." *Mueller v. Bohn*, 171 N.W. 255, 256 (N.D. 1919).

[¶57]    Here, there is absolutely no evidence that the EAGAL Entities entered into the Eide Transaction dishonestly or to take advantage or either BAPTKO or Kupper—neither of which had

any ownership interests in the Mandan Dealerships at the time of closing.  Similarly, Plaintiffs provide no explanation for why knowledge of a lawsuit—which is publicly available information, purchasing all of the FA ND Entities' assets—which were all used to operate the purchased dealerships, and, moreover, requesting contractual indemnity—a routine agreement provisions, constitutes evidence of the EAGAL Entities entering into the Eide Transaction in order to take conscious advantage of either BAPTKO or Kupper.  On this basis, the Court should dismiss the Amended Complaint as to the EAGAL Entities.

**F.     PLAINTIFFS HAVE NO RIGHT TO EXECUTE ON THE REAL ESTATE BECAUSE THE FA ND ENTITIES HELD NO OWNERSHIP INTEREST AT THE TIME OF TRANSFER**

[¶58]   Fraudulent transfer law does not permit a creditor to challenge a transfer of property that would not be subject to execution had it remained with the debtor. "[A] creditor may challenge a transfer for fraud only if the property would be subject to levy and execution if revested in the transferor." [A] creditor may challenge a transfer for fraud only if the property would be subject to levy and execution if revested in the transferor." *Farstveet v. Rudolph ex rel. Eileen Rudolph Est.*, 2000 ND 189, ¶ 29, 630 N.W.2d 24, 32 (*citing Jahner v. Jacob*, 515 N.W.2d 183, 186 (N.D.1994)).  This core limitation of the UVTA bars Plaintiffs' claims related to the real estate component of the Eide Transaction.

[¶59]   Here, the FA ND Entities were not the owners of the real estate associated with the Mandan Dealerships at the time of the December 2024 sale to the EAGAL Entities. As established in the Amended Complaint and supported by the declaration exhibit, the Foundation Parties sold the real estate to Capital Automotive's affiliated entities (CARS-DB12 LLC and CARS-DB5 LP) in 2023 as part of a standard, arms-length sale-leaseback transaction. That transfer predated both the Federal Judgment and the Mandan Dealerships sale by more than a year. After the 2023 sale,

19

the FA ND Entities leased the real estate from Capital Automotive and operated the Mandan Dealerships as tenants.

[¶60]   As a result, at the time of the Eide Transaction, the FA ND Entities had no title interest—only a leasehold interest subject to termination or assignment in accordance with the lease terms. Plaintiffs offer no facts suggesting that a leasehold estate was transferred in violation of any rights or that the lease itself was void or undervalued. Nor do they plausibly allege that a leasehold interest—if even assumed to be at issue—was of such value or structure as to qualify as a fraudulent conveyance.

[¶61]   Most importantly, because the FA ND Entities did not own the real estate at the time of the transaction, any reversion of that property would not be subject to execution or levy by Plaintiffs. *See* N.D.C.C. § 13-02.1-01(12) (defining "asset" as property of the debtor, "excluding property to the extent it is encumbered by a valid lien" or exempt from execution). Without an ownership interest, there is no asset within the scope of the UVTA. *See Farstveet.,* 2000 ND at ¶ 44, 630 N.W.2d at 35 (transfer of property not owned by debtor cannot be fraudulent as to creditor).

[¶62]   In sum, Plaintiffs have no enforceable interest in the real estate, no plausible basis for claiming a fraudulent transfer, and no legal standing to challenge the 2023 sale-leaseback. This component of the Amended Complaint fails as a matter of law.

## CONCLUSION

[¶63]   This lawsuit is procedurally improper, substantively deficient, and legally unsupportable. Plaintiffs fail to plead actionable fraud, whether actual or constructive, and target transferees who acted in good faith and paid fair value. This state court proceeding serves no valid enforcement purpose and undermines federal judicial authority. The Court should, therefore, dismiss the Amended Complaint in its entirety, with prejudice, and enter judgment in favor of Defendants FA ND CHEV, LLC, FA ND SUB, LLC, EAGAL3 LLC, and EAGAL4 LLC.

Respectfully submitted,

Dated:  June 27, 2025                    **LARSON · KING, LLP**

By *s/ Jack E. Zuger*
    Jack E. Zuger #06987
30 E. Seventh Street
2800 Wells Fargo Place
St. Paul, MN  55101
(651) 312-6500
jzuger@larsonking.com

*Attorneys for Defendants FA ND CHEV, LLC, FA ND SUB, LLC, EAGAL3 LLC, EAGAL4 LCC and PMKC Mandan LLP*