UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA


FA ND CHEV, LLC and FA ND                )
SUB, LLC,                                 )
                                          )
            Plaintiffs,                   )
                                          )
 vs.                                      )   File No. 1:20-cv-00138
                                          )
Robert Kupper; Bismarck Motor            )
Company; and BMC Marine LLC              )
d/b/a Moritz Sport & Marine,             )
                                          )
            Defendants.                   )


TRANSCRIPT OF DIGITAL RECORDING
OF OMNIBUS HEARING


Taken at
United States Courthouse
Bismarck, North Dakota
October 7, 2025


BEFORE THE HONORABLE CLARE R. HOCHHALTER
-- UNITED STATES DISTRICT COURT MAGISTRATE JUDGE --


Ronda L. Colby
220 East Rosser Avenue
Bismarck, ND  58501
701-530-2309
Proceedings recorded by digital recording, transcript produced
by computer-aided transcription.

APPEARANCES

Mr. Maxwell Shaffer
Ms. Kensye Wood
Leland Shaffer LLP
8694 East 28th Avenue
Denver, Colorado  80238

                                FOR THE PLAINTIFFS

              - - - - - - - - - -

Mr. Randall Bakke
Bakke Grinolds Wiederholt Attorneys
300 West Century Avenue
Bismarck, North Dakota  58502-04247

                                FOR THE DEFENDANTS

              - - - - - - - - - -

Certificate of Transcriber - Page 187

INDEX OF EXAMINATIONS

WITNESSES:                                                          PAGE

 DEREK SLEMKO
   Direct Examination By Mr. Bakke                                    11
   Cross-Examination By Ms. Wood                                      71
   Redirect Examination By Mr. Bakke                                  86

 ROBERT KUPPER
   Direct Examination By Mr. Shaffer                                 100
   Cross-Examination By Mr. Bakke                                    111
   Redirect Examination By Mr. Shaffer                              112

 KENSYE WOOD
   Direct Examination By Mr. Shaffer                                 113
   Cross-Examination By Mr. Bakke                                    122
   Redirect Examination By Mr. Shaffer                              153

(The above-entitled matter came before the Court, the Honorable Clare R. Hochhalter, United States District Court Magistrate Judge, presiding, commencing at 10:00 a.m., Wednesday, October 8, 2025, in the United States Courthouse, Bismarck, North Dakota.  The following proceedings were had and made of record by digital recording:)

---------------

THE COURT:  All right.  Good morning.  We're on the record in FA ND CHEV, LLC, and others v. Kupper and others, Civil 1:20-cv-138.

Counsel, please note your appearances, beginning with the BAPTKO counsel.

MR. BAKKE:  Good morning, Your Honor.  Randy Bakke on behalf of BAPTKO and Robert Kupper.

THE COURT:  All right.

MR. SHAFFER:  And good morning, Your Honor.  Maxwell Shaffer and Kensye Wood on behalf of FA ND CHEV, LLC, FA ND SUB, LLC, and Foundation Automotive Corp.  We also have Derek Slemko as the party representative here sitting with us at the counsel table.

THE COURT:  Slemko.  All right.

Mr. Bakke, you have others as well at counsel table?

MR. BAKKE:  Yes.  I have Mr. Robert Kupper here and one of our paralegals, Kate Finck.

THE COURT:  All right.  Good morning, all of you.  We

have this scheduled today for what's been characterized as an omnibus hearing in order to address a number of pending motions in the case.  Of course the case has been going on for some time.  And was tried to a jury and I believe is -- that judgment is on appeal, I believe, to the Circuit.

And during the course of proceedings post-appeal, there are efforts being made to -- for discovery in the case.  There are a number of motions pending, as I mentioned, including the Foundation Parties' motion for stay of discovery pending appeal.  Also a motion to enforce a protective order that's been in place and was amended, I think, in the civil case here.  And also BAPTKO's motion to compel, responses to discovery requests and for sanctions, and to be able to use documents and information obtained as part of its post-judgment prosecution in an effort to collect on a judgment that I think totals over $4 million or so with interest accruing.

Am I right, Mr. Bakke?

MR. BAKKE:  Yes, it's about 4.67 plus interest.

THE COURT:  Okay.  And have I characterized the pending motions?  I don't want to miss something, in other words, Mr. Bakke.  Can you think of anything else?

MR. BAKKE:  No, I think that's correct.

THE COURT:  Anything else, Mr. Shaffer?

MR. SHAFFER:  No, Your Honor.  I think you've accurately --

THE COURT:  Okay.  And I think I've gotten the information to the effect that there are witness and exhibit lists for each party and we have in mind taking testimony today.  We've got, I think, a fair amount -- at least by this Court's standards, a fair amount of time available but we're likely to be interrupted as well.  There are -- there's a rather robust criminal practice in this district.  Those cases often take precedence over whatever we may be doing on the civil side.

We have at least one criminal court hearing scheduled for later today, and we may get interrupted, as I say, from time to time with arrest warrants and the need for appearances.  I'm the only magistrate judge in the western division of North Dakota, so when some of those things arise, we have to stop or interrupt what we're doing to address them.  I just say that as a cautionary note.

I have looked at -- I appreciate the briefing, first of all, from both sides.  I appreciate it.  It's no surprise to me, you're all very experienced and really talented counsel, and I feel like I've been seeing your work product for years now, so I appreciate all of that.  I can't say that I get through every word, notwithstanding my best efforts, but I certainly get the gist of it.

And so what I'd like to do is just turn our attention to testimony, since our time can be limited somewhat today, and

hopefully in an effort to get through as much as we can. Again, I feel like I've got an understanding that you might otherwise give me through opening statements and the like so I think we can just skip ahead to presentations. I'm not real stuck on particular order. But, Mr. Bakke, I think you had asked for a hearing opportunity and so my inclination is to turn to you first and allow you to --

MR. BAKKE: Okay. Thank you, Your Honor. And we have paper copies of the exhibits.

THE COURT: Could you move your microphone a little bit closer, Mr. Bakke?

MR. BAKKE: Sure. Yes.

THE COURT: I -- I don't hear that well. Too much rock music and guns, I think, in my earlier years. And we, of course, want to make a good record of today's proceeding as well. So each of you will have these directional microphones in front of you. If you're speaking in the direction of the bulbous end of it, I'll be able to hear you and we'll be able to get a better recording.

Sorry to interrupt, Mr. Bakke. Go ahead.

MR. BAKKE: Okay. No problem. Is that better?

THE COURT: Yes, it is.

MR. BAKKE: Okay. Your Honor, we have exhibit binders both for the witness and for the Court. Can we provide those to you and put copies up at the witness stand?

THE COURT: Any objection, Mr. Shaffer? I was asking if Mr. Shaffer has any objection.

MR. SHAFFER: No objection, Your Honor. We actually also have the same binders from our side up there as well and would like to provide them to the Court and to the witness.

THE COURT: Any objection to that, Mr. Bakke?

MR. BAKKE: No, Your Honor.

THE COURT: Oh. We're off to a great start then. Both of those will be allowed, and I'll look forward to receiving them. Do we have exhibit numbers on them at all?

MR. BAKKE: We do and there's also the exhibit list for BAPTKO Kupper in the front of the exhibit binder both for the witness and for the Court.

THE COURT: And, Mr. Shaffer, you have these as well?

MR. SHAFFER: Yes, Your Honor. We have -- we have their -- copies of their exhibits and I believe they have copies of ours.

THE COURT: All right. And why don't we mark these -- I don't know where you've begun marking exhibits and the like, but I'd like to have them marked in some fashion.

Mr. Bakke, do you have a suggestion as to BAPTKO Exhibit 1, for example, or --

MR. BAKKE: Yes, Your Honor. I think if we just mark them in accordance with the exhibit lists starting at 1 and then they end at 36 as identified on the exhibit list, that

would be our preference, if that's acceptable to the Court.

THE COURT:  All right.  Mr. Shaffer, any problem with --

MR. SHAFFER:  No.  No objection to that, Your Honor, and I would just note that we also have premarked our Exhibits F1, for Foundation, all the way through F44 and those are both indicated by tab in the binder and on the exhibit list.

THE COURT:  It sounds like there may be no objection, frankly, to receiving each of these binders of exhibits.  Am I understanding that right, Mr. Bakke?

MR. BAKKE:  Yes.

THE COURT:  Mr. Shaffer?

MR. SHAFFER:  Yes, Your Honor.  With one point I might want to just address very quickly, if you might -- if I might be heard?

THE COURT:  Go ahead.

MR. BAKKE:  I think that -- I expect that the testimony and a lot of these exhibits are going to go through, today, some sensitive business information, Foundation information that's not public and that if it was made public, could be quite damaging to the business.  I was just curious --

THE COURT:  In what way?

MR. SHAFFER:  Well, the -- I expect that, with Mr. Slemko, that there's going to be testimony about the current financial condition of the business and particularly

how much debt the company might owe to one of their financing partners, it's a company called HPS.  If the information got out as far as how much money might be owed HPS, what the current relationship between HPS --

THE COURT:  Let me interrupt you there, Mr. Shaffer.

MR. SHAFFER:  Sure.

THE COURT:  We're talking about numbers that you prefer not to be included in a publicly filed document?

MR. SHAFFER:  Or that they might just be subject to a protective order that's currently in place, Your Honor, yes.

THE COURT:  Have you considered redacting the numbers themselves?  I'm not -- I'm not a fan of, frankly, keeping anything secret when we're in open court but --

MR. SHAFFER:  Certainly, and I guess --

THE COURT:  Other than, like, bank account numbers, social security numbers, the recipe for Coca-Cola, that kind of thing.

MR. SHAFFER:  And that's the exact example that I gave Ms. Wood coming over.  I wasn't going to come in here and tell you this is the -- this is the recipe for Coca-Cola.  But there is -- and it could be -- it could just be dependent on how it comes out in testimony, Your Honor.  I just wanted to flag it upfront.  I can address it if it comes in and perhaps give you more context.

THE COURT:  We can address it maybe at the conclusion

today, Mr. Shaffer, if you want to raise the issue again. Understanding that, if anything, I might be inclined to redact numbers, for example.

MR. SHAFFER: And I think that's perfectly -- that's perfectly fine by me. I just wanted to raise it at the beginning and see how you want to deal with it. And I'm happy to come back to it at the end.

THE COURT: All right. Anything else, Mr. Shaffer?

MR. SHAFFER: Nothing, Your Honor. We're ready to proceed.

THE COURT: So both all of these exhibits, those on behalf of Foundation and those on behalf of BAPTKO, as submitted in these binders will be received.

Mr. Bakke.

MR. BAKKE: Your Honor, at this time we'll call Mr. Derek Slemko.

THE COURT: Come on up, Mr. Slemko.

DEREK SLEMKO,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BAKKE:

Q.   Mr. Slemko, would you please state your full name for the record and your current work address?

A.   Derek -- Derek Slemko. Sorry. Derek Lee Slemko, Suite

105, Highland Cross -- at 211 Highland Cross Drive, Houston, Texas.

Q.   Okay.  And are you currently employed by Foundation; and if so, in what capacity?

A.   I am as a chief financial officer.

Q.   And what Foundation business entities are you the CFO for?

A.   Foundation Automotive Corp. and Foundation Automotive U.S. Corp.

Q.   Okay.  And are you also the CFO for Foundation Automotive ND SUB, FA ND SUB, and FA ND CHEV, LLC?

A.   Just to clarify, you're asking about only FA ND CHEV, LLC, and FA ND SUB, LLC?

Q.   Right.

A.   Because the first entity you listed, it doesn't exist.

Q.   Okay.  So F -- which of the two FA ND SUB, LLC, or FA ND CHEV, LLC, no longer exists?

A.   No.  Sorry.  The first one you listed which was Foundation Auto ND, that one doesn't exist.

Q.   I'm asking about FA ND CHEV, LLC, and FA ND Sub LLC, do they both exist?

A.   Yes.

Q.   Okay.  Did you have some role in providing financial oversight or CFO-like duties in relation to those two entities?

A.   Yes, but I was never the CFO.

Q.   Okay.  They had their own controller who reported to you

as the CFO of Foundation Automotive Corp. U.S.; correct?

A.    CFO of Foundation Automotive U.S. Corp., yes.

Q.    Okay.  And was or is the -- I'm going to call them the FA ND entities to speed this up, and what I mean by that is FA ND CHEV, LLC, and FA ND SUB, LLC.  You'll know what I'm talking about?

A.    That would be helpful, yes.

THE COURT:  What was the last one, Mr. Bakke, that you mentioned?  It sounds like "sube" to me.

MR. BAKKE:  Yeah, it's Subaru, S-U-B.

Q.    (MR. BAKKE CONTINUING)  You understand the named defendants --

A.    I understand.

Q.    -- defendants in this lawsuit by BAPTKO are FA ND CHEV, LLC, FA ND Sub, LLC, and Foundation Automotive Corp., an Alberta Canada business entity; correct?

A.    Correct.

Q.    So I'm asking you about what we're calling the FA ND entities which is FA ND SUB, LLC, and FA ND CHEV, LLC.  Okay?  And the controller -- those -- the FA ND entities just owned and operated the dealerships here in Mandan, North Dakota, the Subaru dealership and the Chevrolet dealership; correct?

A.    Correct.

Q.    And that's the ones that were purchased, the FA ND entities, from Mr. Kupper and BAPTKO back on June 21, 2019;

correct?

A.    The predecessor to BAPTKO, yes.

Q.    Okay.  And so you're the person from the Foundation entities -- and I'm talking about overall because Foundation Automotive U.S. Corp. owns 100 percent of the FA ND entities; correct?

A.    That's not technically correct.

Q.    Okay.  So what's technically correct?

A.    Foundation Automotive U.S. Corp. owns 100 percent of Foundation Auto Holdings, LLC.  Foundation Auto Holdings, LLC, owned 100 percent of the SUB entity, FA ND SUB, LLC, and 85 percent of FA ND CHEV, LLC.  However, the 15 percent interest that was not owned by Foundation Automotive U.S. Corp. was noneconomic.  So 100 percent of the economic value of FA ND CHEV attributed to Foundation Automotive U.S. Corp. through Foundation Auto Holdings, LLC.

Q.    Okay.  And when you say "noneconomic" what are you referring to there?

A.    The General Motors required that the dealer principal be a 15 percent minimum owner of the dealership; so we had to show the dealer principal as 15 percent owner but that interest was noneconomic.

Q.    Okay.  And who was that dealer principal?

A.    Originally it was Charles Kramer.

          THE COURT:  Let me stop you, Mr. Bakke, just to

remind you and others.  When you're speaking, it's very helpful if you can either move the mic closer or speak in the direction of it.  What happens sometimes is people are making notes and they're then looking down and saying something and it's no longer being picked up as accurately as it might otherwise and to the extent that any transcript needs to be produced, I'm telling you now that the court reporter will appreciate all our efforts to make sure that everything is picked up on this audio recording.  We've got a criminal trial going on next door so don't have access that we sometimes have to an actual in-court court reporter.  But go ahead, Mr. Bakke.

MR. BAKKE:  Sorry about that, Your Honor.

Q.    (MR. BAKKE CONTINUING)  And so was -- originally, 15 percent of the noneconomic owner of North Dakota Chevy was Charles Kramer, who was it after that?

A.    Kevin Kutschinski.

Q.    And does Mr. Kutschinski currently own 15 percent of the FA ND CHEV entity?

A.    Yes.

Q.    Okay.  And just so we can hopefully speed this up, I'd also like to use some shortened versions of some of the legal entity names for the new owners and operators of the Mandan and Subaru dealerships and you understand that they all have the name Eagal, E-a-g-a-l?

A.    Yes.

Q.   Okay.   And there's various Eagal entities who are identified as the owners and operators of the Mandan Subaru and Chevrolet dealerships currently; correct?

A.   Correct.

Q.   Okay.   So if I just call them the Eagal entities, you'll know what I mean?

A.   I will know.

Q.   Okay.

THE COURT:   Mr. Bakke, are these the entities that are referred to differently in your briefing?   Eide entities maybe?

MR. BAKKE:   Sometimes called the Eide entities, I was going to get to that next.

THE COURT:   Okay.   I'm sorry.

MR. BAKKE:   That's okay.

Q.   (MR. BAKKE CONTINUING)   And the Eagal entities are owned by, to your understanding, by a gentleman by the name of Jesse Peterson who also owns the Eide Ford dealerships in Bismarck Mandan; is that your understanding?

A.   That is.

Q.   Okay.   And so I may refer to them interchangeably as Eide entities or the Eagal entities.   You'll know what I mean?

A.   I will.

Q.   Okay.   And then I'm going to refer to Foundation at times. And when I say "Foundation," what I mean by that is, I mean all

three of the judgment debtors in this case, meaning the FA ND CHEV, LLC, FA ND SUB, LLC, and Foundation Automotive Corp. in Alberta Canada business entity.  You'll know what I mean?

A.    Yes.

Q.    Okay.  Now, you understand because you were at the entire jury trial in this case last October and November that BAPTKO Kupper has a judgment against the Foundation entities for approximately 4.67 million; correct?

A.    Correct.

Q.    Okay.  And you've known that since the -- the date the jury trial ended in early November 2024 because you were here when the jury rendered its verdict in this case; correct?

A.    Correct.

Q.    Okay.  And you were here when Judge Traynor, early in the trial, awarded judgment to BAPTKO in the amount of approximately $3.4 million, including interest on the earnout amounts; correct?

A.    I believe so.  I don't know what the proper terminology is but I recall that occurrence.

Q.    Okay.  And are you currently an officer of any of the Foundation entities, and let's start with the Foundation judgment debtors?

A.    Yes.  I'm the CFO of Foundation Automotive Corp.

Q.    Okay.  And are you also an officer of Foundation Automotive U.S.?

A.    Yes.

Q.    Okay.  The CFO; correct?

A.    Correct.

Q.    And are you the CFO of any other Foundation entities we haven't already identified?

A.    No.

Q.    Okay.  So you should be able to answer my questions here today in relation to not only the Foundation entities that are the judgment debtors, but also in relation to Foundation Automotive U.S. Corporation; correct?

A.    Correct.

Q.    Okay.  The first document I'd like to talk to you about in the binder before you, which is labeled BAPTKO Kupper's exhibits, is Exhibit 23.  Could you turn to that, please?

A.    (Examining.)

Q.    There's tabs on it.  You can go forward to 23, if you would?

A.    Okay.

Q.    Okay.  And that's a one-page document; correct?

A.    Correct.

Q.    Do you recognize that document?

A.    Yes.

Q.    Who prepared that document and when?

A.    Foundation prepared this document.

Q.    When you say "Foundation," specifically who at Foundation

prepared it?

A.    Samantha Wright.

Q.    And what is Samantha Wright's position at Foundation?

A.    She's the director of finance.

Q.    For Foundation Automotive U.S.?

A.    For Foundation Automotive, the whole entity, including Canada.

Q.    So both the Canadian entity, one of the judgment debtors, and also Foundation Automotive U.S.?

A.    Yeah.  Yes.

Q.    Okay.  Did you review this document, Exhibit 23?

A.    Yeah, I reviewed it.

Q.    Okay.  Did you approve it?

A.    I did.

Q.    Okay.  Did Mr. Kutschinski review Exhibit 23?

A.    I can't speak for him.

Q.    Okay.  Well, Mr. Kutschinski is the CEO of Foundation Automotive Corp., the Canadian entity; correct?

A.    Correct.

Q.    And he's the CEO of Foundation Automotive U.S. Corp. as well; correct?

A.    I have to check that one.  I -- I'd have to -- there's been some changes at the Foundation Automotive U.S. Corp. level.  I don't --

Q.    As of when?

A.   July -- July 27, I think it was.

Q.   Of 2025?

A.   2025.

Q.   Okay.  Well, was this document, Exhibit 23, prepared before July 27, 2025?

A.   Before.

Q.   Okay.  So at that time Mr. Kutschinski would have been the CEO of Foundation Automotive U.S.; correct?

A.   Correct.

Q.   Okay.  Would you have approved this document if you thought Mr. Kutschinski might disagree with it in any way?

A.   No.

Q.   And when was this prepared?

A.   This was prepared the day of or the day prior to closing.

Q.   Okay.  Okay.  And who provided the information to input onto Exhibit 23?

A.   It came from the closing statement that was signed by Foundation and the buyer, the Eagal entities.

Q.   Okay.  And did -- and did you provide this information to Ms. Wright?

A.   No.  It was from the closing -- the parties agreed to the allocation of the purchase price and that was used to populate this; so it came from the closing documents from the transaction.

Q.   Well, when you say "the parties agreed to this

allocation," to be clear, this was how the Foundation entities requested the monies being paid by the Eide entities to be allocated by the Foundation entities internally; correct?

A.    We're still talking about this document?

Q.    We are.

A.    And your question is -- can you repeat it?

Q.    Let me approach it a different way, Mr. Slemko.

The purchasers of the dealership, the Foundation entities, didn't have any input or say on how the Foundation entities distributed or spent the proceeds from the sales, did they?

A.    The Foundation entities weren't the purchasers, they were the sellers.

Q.    What I'm asking is the Eide entities who paid -- they paid the money to buy the two dealerships in Mandan; correct?

A.    Correct.

Q.    They didn't have any say or input on how the Foundation entities used that money or what it was spent on, did they?

A.    No.  The -- the proceeds were allocated based on their requirements we had in place to pay secured lenders.

Q.    Okay.  But the decision on how to allocate those proceeds from the sale of the Mandan dealerships was up to the Foundation entities; correct?

A.    Correct.  Pursuant to the credit agreements we had.

Q.    Okay.  Well, we'll get to that.

So on the top of this document, Exhibit 23, it is titled "Foundation Automotive Expected Mandan Proceeds Allocation."  Who is Foundation defining there as "Foundation Automotive"?

A.    Foundation Automotive U.S. Corp.

Q.    Okay.  Okay.  And you understand Foundation Automotive U.S. Corp. is not a judgment debtor in this case; correct?

A.    Correct.

Q.    Okay.  So what Foundation was planning to do before the closing on December 11, 2024, and what it did at that time of the closing is it paid the -- the proceeds for the FA ND entities to a third-party, Foundation Automotive Corp.; correct?

A.    No.  The proceeds were -- were swept from this entity.  We had a central cash system where all of the money went in and out of one account at Foundation Automotive U.S. Corp.  Foundation Automotive U.S. Corp. would transfer money into the dealership or it would transfer money out of the dealership, and the purpose was to zero balance the subsidiary accounts; so every night the accounts would balance to zero except for Foundation Automotive U.S. Corp. which would hold all of the cash for all of the entities.

Q.    I'm not asking about the purpose.  I just want you to answer my question.

        The money for the closing on the Mandan Dealerships,

which was in excess of $25 million on December 11, 2024; correct?

A.    Yes, it was.

Q.    Okay.  And that sale, to be clear, was for the purchase of the FA ND entities; correct?

A.    No, it was for the purchase of the assets of those entities.

Q.    Okay.  They were not -- the Eide entities, were not purchasing any assets of Foundation Automotive U.S.; correct?

A.    Well, they were in that the entities belonged to Foundation Automotive U.S. Corp. and the assets were inside those entities; so as a result, they are the assets of Foundation Automotive U.S. Corp.

Q.    But only to the extent of the FA ND entities?

A.    I'm not sure I agree with that.

Q.    The only assets they were getting was for the FA ND entities.  They weren't buying any other car dealerships or assets of any other car dealerships of the Foundation Automotive U.S.; correct?

A.    Correct.

Q.    Okay.  And, incidentally, today how many, in the U.S., automotive dealerships does Foundation Automotive U.S. have an interest or ownership in?

A.    Ten.

Q.    Okay.  And at the time of the trial in October or November

of 2024, how many dealerships did Foundation Automotive U.S. have interests in?

A.    23.

Q.    Okay.  So since the judgment in this case, Foundation has sold 13 dealerships throughout the U.S.; correct?

A.    Correct.

Q.    Okay.  Has any of that money been deposited in the judgment debtors' account to be set aside to pay the judgment that BAPTKO Kupper has of 4.67 million plus interest?

A.    No.

Q.    Okay.  Why not?

A.    Because it's been used to pay secure lenders who have put us in forbearance.  And we've been working through asset sales to delever and get back onside with our covenants or restructure the company in a fashion that makes it viable for the future.

Q.    Okay.  Turning back to Exhibit 23, you said that was prepared prior to the closing on December 11, 2024?

A.    This version is the final version.  It was the version that -- yes.  It was -- it was prepared right prior to closing.

Q.    Okay.  And so why was this document only provided to us, meaning BAPTKO Kupper, after this Court issued an order requiring Foundation to produce financial documents on, I believe it was, April 8, 2025?  Why was this withheld and not provided in our response to our written discovery request?

A.    Why was it -- because it's -- like, it's a business document that's not yet -- that BAPTKO's not a party to.  I don't -- why would it be provided to you?

Q.    Well, because there were written discovery requests we sent to all three of the judgment debtors in this case and this was not provided in response.  Instead we got an objection.  Did you --

A.    Well, there were concerns --

Q.    Did you see those --

A.    There were concerns --

THE COURT:  Only one at a time can speak.  Go ahead.

Q.    (MR. SHAFFER CONTINUING)  Okay.  My question of you is did you see those discovery requests when they were issued in early February 2025?

A.    Yes.  And there was concerns that --

Q.    That's my question.  That's my only question at this point.

Let's go back to Exhibit 23.  Let's go through this document.  We see here proceeds for goodwill of 11 million for Mandan Chevrolet and for -- the same amount for Mandan Subaru for a total of 22 million?

A.    Yeah.  Yes.

Q.    Okay.  And that -- that 22 million for goodwill would have been paid at the closing by the Eide entities on December 11, 2024; correct?

A.   Yes.

Q.   Okay.  And goodwill is a non-tangible asset meaning it's nonphysical assets?  It's not vehicles.  It's not real estate.  It's not equipment.  Correct?

A.   Correct.

Q.   Okay.  And then it also indicates that there were some other payments?

THE COURT:  Before you go on, Mr. Bakke, I'm wondering -- the witness testified earlier that the allocation of funds from the proceeds from these sales went in order of secured interests.  I'm wondering if you could just help me understand whether goodwill was an interest that BMO had a security interest in goodwill at that time.

MR. SHAFFER:  I can certainly ask that.  That's on my list.  But I can go -- I can go to that now.

Q.   (MR. BAKKE CONTINUING)   So on -- in response to the judge's question -- and let me try to articulate it as best I can -- was the goodwill amount, any of that 22 million, was any of that amount financed or subject to notes or mortgages when the sale occurred on December 11, 2024?

A.   Yes, it was.

Q.   Okay.  And turning the clock back to June 21, 2019, the goodwill that was paid to Mr. Kupper was $14 million at the closing; correct?

A.   At the closing, yes.

Q.   Okay.  And then fast-forward to December 11, 2024, a little over four years later, Foundation was receiving 22 million.  So 8 million more than what they paid Mr. Kupper for the goodwill; correct?

A.   Correct.

Q.   Okay.  So going back to June 21, 2019, how much of that goodwill amount, $14 million, was financed; and if so, with whom?

A.   At that time it was approximately 7 million financed by BMO, Bank of Montreal.

Q.   Okay.  And I'm assuming there would be notes or some other sort of document reflecting that loan back from June 21, 2019?

A.   Yes.

Q.   Okay.  And why has -- none of those notes or mortgages or any of those indentures been provided to us in response to our discovery request even up to this hearing today?

A.   Those loans no longer exist.  They were refinanced in 2022.

Q.   Regardless of whether they existed or not, they -- they existed back on June 21, 2019; correct?

A.   Correct.

Q.   Okay.  And so by -- by June of 2022, how much had the Foundation entities paid down on that $7 million -- what was it, a note?

A.   It was a credit facility.

Q.    Which credit facility?

A.    It was -- it was the Bank of Montreal acquisition facility.  It was a seven-year term loan at the time.

Q.    With BMO?

A.    At that time it was Bank of Montreal in Canada.

Q.    Which later changed their name to BMO?

A.    Correct.

Q.    Okay.  And so to my question, how much of that $7 million loan had been paid down before the refinance occurred in 2022?

A.    Around two and a half million.

Q.    So the -- at that point in time the outstanding amount due would have been about 4.5 million?

A.    That sounds about right.

Q.    Okay.  And then you said it got refinanced.  Who did it get refinanced with?

A.    HPS.

Q.    Okay.  And how much was that note or -- or written instrument for?

A.    So there were a couple of steps.  Would you like me to walk through them?

Q.    Sure.  Quickly.

A.    Okay.  So in March -- on March 31, 2022, there was a $79.5 million bridge facility to facilitate an acquisition at that time.  In June -- on June 24, 2022, we did a permanent term facility that replaced the bridge loan and added 120

million.  So we were at to about 208 -- 208 million total at that time, and that -- when we did the June transaction, we took out -- I don't know what else -- what other term to use but we took out all of the other lenders in the group and replaced them with HPS.  And BMO took on all of the floor plan lending at that time.  So we went from having seven different lenders to two.  And then in July of 2022, we borrowed another 16 million bringing the total to 224 million.

Q.    So the two lenders as of 2022 are BMO and HPS?

A.    Correct.

Q.    Okay.  And going back to the note for the 7 million back on -- in June of 2019, who -- who were the entities that had the obligation to pay that, what you call the seven-year term loan?

A.    Yeah, it was -- there were co-borrowers:  Foundation Automotive Corp., Foundation Automotive U.S. Corp., Foundation Auto Holdings, and then the FA ND entities, FA TX entities.  So the Henson dealerships -- and the -- sorry.  That was it at that time in 2019.  Yeah.

Q.    And so when you talked about 2.5 million got paid down over a period of roughly three years, who was paying that money down?  Was it the FA ND entities?

A.    Yes.

Q.    Okay.  So all this money from Day 1, when the dealerships were purchased from Mr. Kupper back in June of 2019, were

commingled between all these different Foundation entities; correct?

A.    Sorry.  What do you mean by "commingled"?

Q.    Monies were all put together and switched back and forth from each other's accounts.

A.    Correct.  Yeah.

Q.    Okay.  And that's been the practice the entire time is that the FA ND entities have commingled money with the Foundation Automotive U.S.?

A.    Substantially, yes.

Q.    Okay.  And the FA -- excuse me.  The Foundation Auto Holdings entity as well?

A.    Yes.

Q.    Okay.  And also with the Foundation Automotive Corp., the Canadian entity?

A.    No.

Q.    Okay.  So that's the only one that didn't commingle?

A.    It was separated by the border -- so the Canadian entities consolidated Canadian cash and the U.S. entities consolidated dollars.

Q.    Okay.  So any monies that were coming into or going out from the FA ND entities would not have -- have been transferred in or out by Foundation Automotive Corp., the Canadian entity?

A.    They would not have.

Q.    Okay.  Okay.  And then you talked about this -- this

refinance for very large dollar amounts in 2022.  Was -- was that a -- a note or what was the instrument or instruments called?

A.    It was a permanent term facility.

Q.    Permanent term what?

A.    Facility.

Q.    And that's in writing?

A.    Yes.

Q.    Okay.  And that hasn't been produced to us either; correct?

A.    If you say it hasn't.

Q.    I've never seen any loan, mortgage, note, anything at all produced for any time period in this case in response to our post-judgment discovery.  Are you aware of that?

A.    I am now.

Q.    Okay.  Okay.  And under this -- this note, we'll call it the 2022 notes.  You'll know what I mean?

A.    For that you're referring to the permanent term facility?

Q.    The refinance with HPS in 2022.  Can we just call those the 2022 notes?

A.    Sure.

Q.    Okay.  So the 2022 notes, what amount, if any, under those notes, were the FA ND entities liable for or obligated for?

A.    All of it.  They were guarantors.

Q.    Okay.  And was Mr. Kutschinski personally liable for any

of those notes, the 2022 notes?

A.    No.

Q.    Okay.  Was Mr. Kutschinski liable for the seven-year term loan entered into by the FA ND entities including these other Foundation entities you described?

A.    No.

Q.    Okay.  So in relation to the 2002 [sic] notes, was it the same entities that were responsible for payment as were responsible for the seven-year term loan?

A.    As well as every other subsidiary.

Q.    Okay.  Of Foundation?

A.    Of Foundation, yeah.

Q.    Okay.  Because what Foundation would do when it purchased each U.S. car dealership is it would set up a separate Foundation-related business entity; correct?

A.    Correct.

Q.    So then let's continue on with Exhibit 23.  There is a heading here under "Allocation of Net Proceeds."  Do you see that there?

A.    Yes.

Q.    Okay.  And "Allocation of Net Proceeds," does that mean where the money initially went after the payments made by the Eide entities for the dealerships in Mandan?

A.    Well, it's -- it's a summary of where the funds went.

Q.    Okay.  I think that's what I just said.

Okay.  So let's look at BMO --

THE COURT:  Just a point of clarification, Mr. Bakke.

Mr. Slemko, the money from the purchasers initially went to U.S. Corp. and then was allocated from that point to others?

THE WITNESS:  They initially went into the -- the ND entities were consolidated into FA U.S. Corp. and then paid to secured creditors of which the ND entities were guarantors.

THE COURT:  I'm having trouble understanding you, Mr. Slemko.  Could you state that again?

THE WITNESS:  Okay.  The initial --

THE COURT:  Maybe back up just a bit from your microphone and try -- okay.  Go ahead.

THE WITNESS:  Is that better?

THE COURT:  Speak loud.

THE WITNESS:  The initial funds went into the ND entities, were swept out by the cash consolidation through the Foundation Automotive U.S. Corp., and then paid to secured creditors of which the -- all of these entities were -- or were guarantors.

THE COURT:  Were there separate checks issued by the purchaser?

THE WITNESS:  They were wire transfers.

THE COURT:  Separate wire transfers?

THE WITNESS:  Correct.

THE COURT:  Did any of that money go to the U.S. Corp. directly?

THE WITNESS:  Not directly.

THE COURT:  Go ahead.

Q.   (MR. BAKKE CONTINUING)  Okay.  And following up on that, what you're saying is there would have been two separate wire transfers -- and we'll get to the BMO documents -- wire transfers into -- one to the FA ND CHEV, LLC, and the other payment to FA ND SUB, LLC; correct?

A.   Correct.

Q.   On December 11, 2024.

And just set down Exhibit 23 and we'll switch to -- just you can leave it out because we're going to come back to it.  And go to Exhibit 28.

A.   Okay.

Q.   Okay.  Exhibit 28, I'll tell you, are documents we received in response to two separate subpoenas we served on BMO Bank to try to find out where the monies went after it was deposited in the accounts of FA ND CHEV, LLC, and FA ND SUB following the closing payments on December 11, 2024.

And do you agree this -- this information, which is -- the bank information for the judgment debtors in this case was never provided to us, ever, in this case in response to our post-judgment discovery requests?

A.   Sorry.  I didn't quite catch the question.

Q.    Well, let me ask it to you a different way.  Do you see any Bates label on here that identifies this as a document that the judgment debtors in this case provided to us in response to post-judgment discovery requests?

A.    No.

Q.    Okay.  And so -- we've received a customer information sheet for various Foundation entities.  And do you agree each of these, what are identified as account owners -- all these Foundation entities have accounts, checking accounts, with BMO bank?

A.    Correct.

Q.    Okay.  So Foundation Automotive U.S., FA ND CHEV, FA ND SUB, and Foundation Auto Holdings?

A.    Yes.

Q.    Okay.  And Foundation has had those accounts, those separate accounts, for many years; correct?

A.    Correct.

Q.    And has them today?

A.    Correct.

Q.    And you can see they've given us, BMO Bank has given us the account numbers for these different account owners.  Do you have any reason to disagree with the BMO Bank information identifying the account numbers for each of these Foundation accounts?

A.    No.

Q.    Okay.  So if we turn to the second page -- and let me ask you, first of all, these are your own bank records for the Foundation entities; correct?

A.    Correct.

Q.    I'm assuming you would, as the CFO, have online access to these accounts 24/7; correct?

A.    I do.

Q.    Okay.  And I'm assuming you review them from time to time, the accounts, to see what money has come in, what money has gone out from these accounts?

A.    Daily.

Q.    Okay.  And do you receive monthly financial statements from BMO Bank for these accounts?

A.    Like bank statements, yes.

Q.    Okay.  And then as part of your CFO functions, do you or someone else reconcile these accounts on a regular basis?

A.    Daily.

Q.    Okay.  So do you have any explanation why these documents were never produced in response to Magistrate Judge Hochhalter's order requiring production of the Mandan closing documents and identifying where the money went?

A.    Because of concerns they would be used for other purposes like filing additional lawsuits.

Q.    Okay.  Trying to collect on the judgment that my clients have?

A.    More so filing additional lawsuits or using them in the additional lawsuits that were filed.

Q.    To try to get paid; correct?

A.    I'm not -- I don't know why you filed the other lawsuits. I --

Q.    Well, I'll tell you we filed a lawsuit in Texas and we filed a lawsuit in Morton County to try to enforce the judgment because Foundation never posted a bond in this case in relation to the judgment amount for the appeal as they promised to the Court they would do.  Were you aware of that?

A.    I don't know what you mean by "promise."  Yes, I'm aware we did not post a bond because it hasn't been required.

Q.    Okay.  Turning back --

THE COURT:  Mr. Bakke, before you turn your attention elsewhere, Mr. Slemko, who made the decision not to disclose those records?

THE WITNESS:  It was made jointly between us and our counsel.

THE COURT:  Pardon me?

THE WITNESS:  Like the company did.

THE COURT:  Who in the company?

THE WITNESS:  Who in the company?  That I don't know.

THE COURT:  How do you know the decision was made?

THE WITNESS:  Well, it was discussed between us and our attorneys.

THE COURT:  And who is "us"?

THE WITNESS:  Foundation, the company.  Me -- we have our internal counsel as well as -- I'm trying to recall how the decision was made.  I'm having a tough time recalling, ultimately.

THE COURT:  You were involved in the decision?

THE WITNESS:  I must have been.

THE COURT:  Who else?

THE WITNESS:  Our -- our internal counsel.

THE COURT:  Who else?

THE WITNESS:  I think -- I don't know if anyone else was involved.

THE COURT:  Was Mr. Kutschinski involved?

THE WITNESS:  I don't recall.

THE COURT:  So he may have been?

THE WITNESS:  I -- I believe he -- he was not involved in any of the discussions I'm aware of.

Q.   (MR. BAKKE CONTINUING)  And following up on that, Mr. Kutschinski, as the CFO of both the judgment debtors and of Foundation Automotive U.S., what -- what discussions was he involved with, with you or others at Foundation, where there was discussion about whether or not financial documents should be provided to us in response to our written discovery requests or any Court order in this case?

A.   You're asking what his involvement was?

Q.   Right.  I mean, he's the CFO.  The buck stops there; correct?

A.   He's the chief executive officer.

Q.   Or, I'm sorry, as the CEO, he's involved in major decisions such as decisions that would relate to a judgment against the judgment debtors in this case of almost $5 million; correct?

A.   He delegated that authority to myself and Mr. Dahlen.

Q.   Mister who?

A.   Dahlen.

Q.   Is that the inhouse counsel?

A.   Correct.

Q.   Okay.  So you're saying Mr. Kutschinski, to your understanding, wasn't aware of what financial information was or was not being provided in this case in response to post-judgment discovery requests or Court orders?

A.   We would have made him aware.

Q.   Okay.  Did he ever express any concern that these -- the bank records appeared to be directly relevant on the issue that we've been trying to chase down now for many months of where the money went from the sales of the Mandan Dealerships that occurred shortly after the judgment was entered in this case by a little over a month?

A.   With the judgment being appealed, we were of the mindset that we needed to let the appeal run its course before really

deciding or making a payment because it might get overturned.

Q.   Okay.  Well, let's -- let's go back to Exhibit 28.  Let's turn to the second page.  There we see the -- on December 11, 2024, there was a transfer from the account of FA ND SUB to Foundation Automotive U.S. Corp.; correct?

A.   Correct.

Q.   And that transfer out of the FA ND SUB account to Foundation Automotive U.S. Corp. was $11,539,727.59; correct?

A.   Correct.

Q.   Okay.  So that money, once -- and that transfer was done intentionally, wasn't it?

A.   It's the routine daily transfer of funds in and out.  If you showed the whole bank statement and every day, you would see funds coming in from Foundation Automotive U.S. Corp. and then funds coming out to Foundation Automotive U.S. Corp. depending on the activity of the day.

Q.   That's not my question.

You get the 11 million -- over $11 million from the Eide entities at the closing on December 11, 2024, and then immediately, the same day, it gets transferred to Foundation Automotive U.S.; correct?

A.   Correct.

Q.   That was an intentional transfer; correct?

A.   If routine is intentional, sure.  But it was a routine transaction.

Q.    Well, when you say "routine," somebody has to authorize that transfer from Foundation; correct?

A.    Yes.

Q.    Okay.  In other words, when money comes into FA ND SUB, it's not just an automatic without somebody authorizing it that each and every payment that comes into FA ND SUB automatically goes to Foundation Automotive U.S.; correct?

A.    That's incorrect, in a sense.  The sweep system was automatic, but when we went in to forbearance, it was turned off so we had to do it manually every day to ensure there were no overdrafts in any single account.

Q.    Well, when you say you went in to "forbearance," what are you referring to?

A.    Well, we were offside on all of our covenants with multiple lenders and we've been in forbearance since late 2023. So they forebeared on taking action to recover their debts that are due to give us time to work through this and delever and restructure the company.

Q.    And none of that was reported to us; correct?  To my client?

A.    I don't believe so.

Q.    Okay.  And is -- are any of the Foundation entities currently in bankruptcy?

A.    No.

Q.    Okay.  Have they ever filed for bankruptcy?

A.    No.

Q.    Have they ever had discussions about possibly going into bankruptcy?

A.    We've -- we've -- we've discussed it in terms of what the pros and cons of it could be if it -- if it was ever to a point where we needed to get protection from the lenders, but currently we're in forbearance and working with them on a solution.

Q.    So it -- Foundation has determined bankruptcy isn't necessary?

A.    At this time.

Q.    Okay.  And then you mentioned that there's been 13 dealerships sold, out of the 23 you still have 10.  What has that done to affect the financial picture of the Foundation entities overall?

A.    So when we -- when we embarked on this asset sale or asset rationalization, whatever you want to call it, we tried to really focus on dealerships that were underperforming, like the Mandan Dealerships, and certain dealerships in Texas and Tennessee that we could potentially get -- still get value for to help delever and also increase the overall profitability of the remaining entity.

Q.    That doesn't answer my question.  I'll approach it a different way.

      Is -- are the Foundation entities current on the

required payments under this HPS 2022 loan?

A.    No, we're not.

Q.    Okay.  So how far -- well, let me ask you this.  Has HPS indicated it intends to foreclose on any of those?

A.    No, they have not.

Q.    Currently is Foundation, through these ten dealerships, cash flowing?  They're making money at these ten dealerships?

A.    Yes.

Q.    Okay.  Do you know what -- if the Foundation ten dealerships were sold, how much money that might bring?  Do you have a range?

A.    It likely wouldn't be enough to pay the debt.

Q.    Okay.  Have you done any appraisal on those dealerships to find out?

A.    No.  But we did -- we did market one of them that we're keeping and it is significantly undervalued compared to what we paid for it.

Q.    And how about real estate?  Do these dealerships, any of them, own -- the ten remaining, own real estate?

A.    No, they do not.

Q.    Okay.  And the real estate has been sold?

A.    It's been sold to CARS.

Q.    Okay.  And when did that occur, was that all at the same time?

A.    It was in 2023.

Q.    I'm sorry?

A.    2023.

Q.    Okay.  Let's turn back to exhibit --

THE COURT:  Mr. Bakke, do you have quite a bit left or --

MR. BAKKE:  I --

THE COURT:  Why don't we take a break until 11:15 a.m.  That will give us about ten minutes for everybody to stretch and we'll be in recess until 11:15.

(Recess taken from 11:00 a.m. to 11:15 a.m.)

THE COURT:  Please be seated.  Thank you.

All right.  We're back on the record in FA ND CHEV, LLC, and other -- Kupper and others, Civil 1:20-cv-138, having taken a short break.

And Mr. Slemko is still on the stand and still under oath.  Mr. Slemko.

Mr. Bakke.

MR. BAKKE:  Thank you, Your Honor.

Q.    (MR. BAKKE CONTINUING)    So let's continue on, quickly, on Exhibit 28.  If we look at the next page, what would be the third page -- well, let me ask you this, first of all.  The monies that were paid by the entities on the date of the closing, December 11, 2024, were all the monies paid on that date to the FA ND entities by the Eide entities?

A.    On the dealership purchase, yes.  On the real estate side,

no, because they bought the real estate directly from CARS.

Q.   Right.  And I'm talking about this -- in excess of 25 million.  That was all received on December 11, 2024?

A.   Correct.

Q.   Okay.  And so if we turn to the next page on Exhibit 28, the third page, December 12, 2024, FA ND SUB makes a transfer to Foundation Automotive U.S., 730,179.73; correct?

A.   Correct.

Q.   Okay.  So that -- that couldn't have been just a sweep because you just told us all the money came in on December 11 and someone from Foundation must affirmatively decide a day later to take part of that money, about 730,000, and pay it to Foundation Automotive U.S.; correct?

A.   Well, I -- there is an $800,000 escrow that maybe didn't come in on the 11th, it may have come in on the 12th.  Now that I -- it was held by an escrow agent and that --

Q.   But you just said everything came in on December 11.  Are you just speculating now?

A.   No.  The money from the Eagal purchasers came in on the 11, but the 800,000 may have come in on the 12.

Q.   Well, turn to the last page of this Exhibit 28, on December 11, FA ND CHEV transferred $13,416,829.19 to Foundation Automotive U.S.; correct?

A.   Correct.

Q.   And, in fact, all that money that came in for the closings

got transferred to Foundation Automotive U.S. or some of these others show in Exhibit 28 also to Foundation Auto Holdings; correct?

A.    No, that's not correct.

Q.    Okay.  Well, if I look at what would be the fifth page in, I show a transfer on December 13 from FA ND SUB to Foundation Auto Holdings for 31,500?

A.    That was management fees.

Q.    Well, but -- but my question was there's money being transferred out to -- by the FA ND entities to Foundation Auto Holdings and this page confirms that; correct?  Regardless of what the purpose was.

A.    Well, if you don't care what the purpose was, yes, it was transferred out.

Q.    Okay. Okay.  And then are you aware -- and I'm looking -- you're familiar with the Asset Purchase Agreement that was entered into with BAPTKO Kupper by the Foundation entities; correct?

A.    From 2019?

Q.    Yes.

A.    Yes.

Q.    Okay.  And I'm -- I'm just going to read you part of that, just a short portion.  And essentially what it indicates that -- it says, subpart (e), on page 4 of the Asset Purchase Agreement, and that's subpart 2.1, the purchase price payment,

it indicates:  Notwithstanding the provisions of Item D, in the event the owners who own and control, the buyer no longer remain as majority owners and no longer retain the ability to control the buyer or any of its affiliates or no longer own or control directly or indirectly an entity which may then own or control the buyer or any of its affiliates or no longer own or control directly or indirectly an entity which then operates either one or both of the dealerships, the buyer shall be required to pay the seller the entire remaining balance of the maximum earnout amount subject to the subordination of the amount owed by the buyer to its lender attributed to the buyer's purchase of the dealership.

So what that says is if Foundation sells the dealerships, they have to, as part of that sale, make sure that the prior owner, in this case BAPTKO Kupper, is paid the full amount of the earnout; correct?

A.    No, that's not correct.

That clause says that if the dealership equity is sold.  That was not the case here.  The assets of the entity were sold, not the equity.

Q.    Well, when you say -- it doesn't say the equity but when you say --

A.    I'm pretty sure you read it that way.

THE COURT:  Hang on.  We can only have one person speak at a time.

And are you referencing an exhibit, Mr. Bakke?

MR. BAKKE: No. It's a trial exhibit. I believe it was 590 -- or I'm sorry. P2 was the exhibit number.

Q. (MR. BAKKE CONTINUING) But I'm curious about this statement by you. I don't understand when you say the Mandan Dealerships were underperforming. Because what we know, based on Judge Traynor's order awarding the earnout amount, and Foundation agreed with this prior to the trial, that it exceeded net income of $2.5 million each year of the dealership for the four years that Foundation owed the earnout for -- totaling $3 million; correct?

A. Which part of that question would you like me to answer first?

Q. Did they exceed $2.5 million between 2020 and 2023 -- for those calendar years, did they exceed 3 -- 2.45 million in that income from -- from the Mandan Dealerships?

A. Yes, but that can still mean underperformance.

Q. Okay. Yes answers my question.

And after that, once the earnout amount would have been paid for, which it never has, they continued to make net profit out of these dealerships; correct?

A. Not the amount that we would consider to be highly performing.

Q. Okay. But it's -- but it was still making profit?

A. I believe the Subaru was really struggling at the time we

decided to sell.

Q.    And in relation to that loan for the $7 million, that note that was entered into in June of 2019 that was paid down to 4.5 million, those payments were coming from the ND entities; correct?

A.    That's correct.

Q.    Okay.  So not only were they making profit, part of their expenses would have been to pay down the existing loan for the goodwill; correct?

A.    That's incorrect.  Principal payments are not an expense.

Q.    Okay.  But they were fully able to make those payments?

A.    Correct.

Q.    Okay.  Okay.  And I'm also curious, has there been discussion at Foundation why in, as an example, the state court lawsuit in Mandan that Foundation staffs everything that occurs in that case with three lawyers?

A.    Three?  I'm --

Q.    Yes, Ms. Woods, Mr. Shaffer, and a gentlemen by the name of Jack Zuger, an attorney from St. Paul, Minnesota.

A.    Right.  Because we needed local counsel.

Q.    Well, I guess if you're in dire financial straits, why are you manning these cases with up to three attorneys rather than one?  Has there been discussion about that?

A.    A lot.  Yes.

Q.    The forbearance documents that you talked about, that's in

writing; right?  You've received written communications on that?

A.    Multiple times.

Q.    Okay.  And none of that's been produced to us; correct?

A.    I -- I'm not -- I don't believe so.  I don't believe it was a request.

Q.    Okay.  Let's turn to Exhibit 18.

A.    Which of these do you need me to keep out?

Q.    I'm sorry?

A.    Do you need me to keep these out?

Q.    Yeah.  Just set them aside for now, please.  Thank you.

A.    18 you said?

Q.    Yes.

A.    Okay.

Q.    Okay.  And the first page of that document, Exhibit 18, indicates in the middle FA ND CHEV, LLC; is that correct?

A.    Correct.

Q.    And is this at least part of the 2023 federal tax return for FA ND CHEV, LLC?

A.    Yes.

Q.    Okay.  And let me ask you, for the Mandan Dealerships, were there distributions paid out by the FA ND entities to anyone?

A.    Only to Foundation Auto Holdings.

Q.    Okay.  And why were distributions being paid to Foundation

Auto Holdings?

A.    Because it was the owner of the dealership and was taking the profit.

Q.    Okay.  And then where did that money go from there?

A.    It would have been consolidated with Foundation Automotive U.S. Corp. and used to pay creditors.

Q.    Okay.  Well, I think what you're testifying to is none of the distributions would have been paid directly by the FA ND entities to Foundation Automotive U.S.?

A.    No, it would have followed the ownership chain.

Q.    Okay.  And was any of the money that got then transferred by Foundation Auto Holdings to Foundation Automotive U.S. paid out in distributions to any of the owners such as Mr. Kutschinski?

A.    No.

Q.    Okay.  Let's turn to, in this document, the Bates label FAC000239.

A.    This one?

Q.    I can't see quite that far but it should say -- the last Bates number is 239 on the bottom.

A.    Okay.

Q.    Are you there?

A.    Yes.

Q.    Okay.  And this is a summary of schedule K-1?

A.    Correct.

Q.    Okay.  And if we go down four lines, we say it's -- we see it says "Distributions Cash/Marketable Securities"; correct?

A.    Correct.

Q.    Okay.  And it shows in 2023, FA ND CHEV, LLC, paid distributions of $2,902,170?

A.    Correct.

Q.    Okay.  And contrary to the testimony you just provided, that was not paid to Foundation Auto Holdings; correct?

A.    Incorrect.  It was paid to Foundation Auto Holdings.  But for tax purposes, Foundation Auto Holdings, because it's 100 percent owned LLC out of Foundation Automotive U.S. Corp. is treated as a disregarded entity.  So everything that flows through Foundation Auto Holdings attributes directly to Foundation Automotive U.S. Corp.

Q.    Okay.  Well, who does the tax return indicate that distribution was paid to?  Does it say Foundation Automotive U.S. on the top?

A.    It does.

Q.    Okay.

A.    Because it was attributed there.

Q.    Okay.  And is that cash?

A.    Well, it was, in a roundabout way.  Because the cash is consolidated already at the Foundation Automotive U.S. Corp. level, at the end of the year we do a journal entry to divide it into what was distribution versus just a sweep account

balance.

Q.    Okay.  And that doesn't answer my question.

Was the distribution that was made by FA ND CHEV cash or was it some sort of other asset?  Was it vehicles?  Was it equipment?  Was it some tangible asset or was it just cash?

A.    Cash.

Q.    It was cash?

A.    Correct.

Q.    Okay.  And was that the first year of the tax returns? Between 2019 and 2023 shows this type of large cash distribution coming out of FA ND CHEV or FA ND SUB, LLC?

A.    I don't believe so.  I believe that '21 and '22 there would have also been distributions.

Q.    If the tax -- we've looked at the tax returns and we don't see that happening before 2023.  You disagree?

A.    I -- we were dealing with 30 entities and so asking a specific line item on a tax return for a specific entity in a specific year, I would need to look back.

Q.    Okay.  Okay.  Turning back to Exhibit 23, the expected Mandan proceeds allocation -- and, incidentally, before we go back to that, that 2023 allocation, the $2.9-million-plus taken out of Foundation ND CHEV and provided to Foundation Automotive U.S., was that done at year-end 2023?

A.    Well, no, like I just explained.  There was a journal entry done at the end of the year to memorialize it but the

cash was being taken out all year long.

Q.    Okay.  Including in December of 2023?

A.    I would have to go back and check.  But, yes -- oh.
Sorry.  The sweep occurs every day.

Q.    Okay.  So that's less than a year prior to this trial
which was obviously known about by Foundation for a number of
years; correct?

A.    Correct.  We didn't adjust our business practices because
of a trial.

Q.    And then in the fall, specifically October of 2023,
Foundation then sold the real estate that the FA ND entities
owned in Mandan; correct?

A.    In '23, correct.

Q.    Okay.  In the fall; correct?

A.    I believe it was July.

Q.    Okay.  And that was sold to these CARS entities; correct?

A.    Correct.

Q.    Okay.  So turning to Exhibit 23, the allocation of net
proceeds -- you have that in front of you?

A.    Yes.

Q.    Okay.  And on there it indicates HPS loans and there's an
allocation of $18 million; correct?

A.    Yes.

Q.    Okay.  And who made the determination prior to the closing
and at the closing on the sale of the Mandan Dealerships to

take $18 million of what had been paid and remove it from the accounts of the Foundation ND entities and instead deposit it into the account of Foundation Automotive U.S.?

A.    That wasn't a decision.  That was just a daily transaction that occurred.  Every day we put money in or take money out depending on the cash needs of the entity.  Money goes in; money comes out.

Q.    Okay.  So every day $18 million would get transferred automatically?

A.    No, it just so happened on that day when the transaction closed, there was funds in that account that got swept out.

Q.    Well, doesn't a transfer --

A.    But if you look on previous days, money was going in.  So it was just a daily transaction.  Money comes in; money goes out every day.

Q.    Okay.  So the $18 million, nobody approved transferring that money from the FA ND entities into the account of Foundation Automotive U.S., that's your testimony?

A.    There was no $18 million transfer from the FA ND entities into the Foundation Automotive U.S. Corp.  It would have been the balance available at that day that was transferred and it wouldn't have equalled 18 million.  It was 11-million-some number and 13-million-some number.  Those were the numbers that got transferred because it was what was remaining in the account at the end of that day.

Q.    Okay.  And that's on -- what we just went through on Exhibit 28, where we can see the amounts were transferred from FA ND SUB of the 11,539,727 and from FA ND CHEV to Foundation Automotive U.S. Corp. of 13,000,106 -- 13,416,829; correct?

A.    Correct.  And you'll notice those aren't the amounts that came into the account, they're different because there was other activity in the account that day.  All that got transferred out was what was remaining after all of the activity of the day.

Q.    Well, but we know those two transfers were made, which correspond to the closing monies paid by the Eide entities?

A.    They happened on that day.  But they're not the amount of the funds coming in.  They're different.  They're different because --

Q.    That wasn't my question.

It's money that came from the closing on the sales of the Mandan Dealerships; correct?

A.    Part of it is.

Q.    Okay.  The lion's share of it is; correct?

A.    On that day, yes.

Q.    Okay.  And then that money that was in Foundation Automotive gets paid by Foundation Automotive U.S. to pay down the HPS loans; correct?

A.    Correct.

Q.    Okay.  So the money comes out of the FA ND entity

accounts, goes to Foundation Automotive U.S., and then that third party, against whom the judgment debtors do not have a judgment, uses that money to pay down an obligation of Foundation Automotive U.S.; correct?

A.   Of which both dealerships were guarantors, yes.

Q.   And who decided on the $18 million amount?

A.   Okay.  Well, that is complicated.  It was a -- it was an agreement reached amongst all of the parties on the -- it's called a waterfall.  This allocation of proceeds is called a waterfall in banking terms.  And all of the parties had to approve it.

Q.   Well, when you say "all of the parties," who are all the parties?

A.   BMO, HPS, and, in this case, CARS.

Q.   And -- and Foundation?

A.   Yes.

Q.   Okay.  So is there some letter or written communication that exists that says BMO, HPS, and/or CARS are requiring $18 million be paid from the proceeds of the Mandan dealership sales?

A.   It would be -- it would be this waterfall, that would be the documentation.

Q.   Well, what I'm asking for is specifically did Foundation have something in writing from any of these parties, as you describe them, telling them we need you to pay $18 million from

the sale of the Mandan Dealerships?

A.    In one document, I don't believe so.  It would have been individual approvals.

Q.    But to be clear, what I'm trying to understand, is they came up -- these other parties came up with the number of 18 million specifically tied to the sale of the Mandan Dealerships; is that your testimony?

A.    No.  We came up with the $18 million number and had them approve it.

Q.    That's what I thought.  And so you're taking money out, $18 million -- the lion's share of what you got from the Eide entities -- and then you're paying down debt of Foundation Automotive U.S. instead of leaving that money in there to secure the judgment of BAPTKO Kupper even though there was no mandatory requirement by your lenders that you pay $18 million at that time; true?

A.    There was a mandatory requirement.  And I apologize.  It just occurred to me that the terms of the forbearance required that we sell assets and pay down the debt.

Q.    And $18 million was the number they assigned and specifically said for these Mandan Dealerships; are you changing your testimony on that?

A.    I'd have to go back and check the -- the -- what are they called?  Credit agreement amendments and waivers.  But I believe they -- there is a document in the closing books that

outlines the amount that would need to be repaid on closing. And I don't recall off the top of my head what it's called but there is a one-page document that goes into the closing book that says the amount that's going to be paid. And it's a consent. Apologies for not remembering. It's a consent.

Q.    And none of these waterfall documents, the forbearance documents, all of which are in writing, the -- the credit agreement, the waivers, the consent, as you call it, none of those were provided to us in response to our written discovery requests about loans, mortgages, notes, debts, of the judgment creditors in this case; correct?

A.    I thought some of those documents were provided but --

Q.    They were not.

A.    Okay.

Q.    We're hearing about it for the first time today.

A.    Oh.

Q.    Okay. You can understand how Mr. Kupper and BAPTKO would have wanted that information much earlier so they could have taken steps to try to sue the parties, the third party in this case, Foundation Automotive U.S., where the money was transferred from the FA ND entities to try to ensure payment; correct?

A.    I -- I don't understand because they're -- all the assets are subject to liens from secured creditors, but I do understand wanting to get paid.

Q.    Well, and, to be clear, in relation to the amounts due these lenders, is there going to be a document produced today through your legal counsel or by you which identifies that the number was 18 million that needed to be paid if the Mandan Dealerships were sold to the lenders?

A.    I think I'd have to discuss that with my counsel before determining that.

Q.    Do you have a document like that available to you that says --

A.    Do I have it with me today?

Q.    -- the number is $18 million that had to be paid?

A.    I don't.  I could access it but I do not physically have it.

Q.    Okay.  Now, in addition to the 25 million for the goodwill and the physical assets of the dealership, Foundation also owned the real estate for the Mandan Subaru and Mandan Chevrolet dealerships after Mr. Kupper sold in June of 2019; correct?

A.    Until they were sold to CARS.

Q.    Right, in the fall of 2023.  I think you said June or July.  Documents reflect October, but you think it's June or July?

A.    It was 2023.  So we did a lot of transactions that year.

Q.    Okay.  And in -- in terms of the documents we received -- I'm going to have you turn to Exhibit 16.

THE COURT: 16, Mr. Bakke?

MR. BAKKE: 16, Your Honor.

Q. (MR. BAKKE CONTINUING) I'm sorry. Instead look at Exhibit 15, first.

A. Okay.

Q. Okay. And I'd like you to turn, in Exhibit 15, to the page Bates -- Bates labeled FAC000110.

A. Okay.

Q. Okay. And that's a document called "Real Estate Purchase and Sale Agreement"; correct?

A. Correct.

Q. Okay. And that reflects that that's a sale between the CARS entities, who are the "Seller," and the FA ND entities who are described as the "Buyers"; correct?

A. Correct.

Q. Okay. And that's dated November 15, 2024; correct?

A. Correct.

Q. And that's approximately eight days after the judgment was entered in this case in federal court. Are you aware of that?

A. Yes.

Q. Okay. And what that reflects is that the CARS entities are selling the Mandan real estate for the Mandan Subaru location and the Mandan Chevrolet location back to the FA ND entities; correct?

A. Correct.

Q.    Okay.

A.    It's -- would you like me to explain that?

Q.    No.

A.    All right.

Q.    And so then as of that date until the closing on December 11, 2024, the Foundation ND entities are described as the buyers and they get an assignment from the CARS entities on December 11 for those real estate assets; correct?

A.    Correct.

Q.    Okay.  And if we turn to the page in Exhibit 16, and I'm going to ask you to go to FAC000125.

A.    Okay.

Q.    Are you there?

A.    I'm there.

Q.    Okay.  And that lists the dollar amounts for the Mandan real estates; correct?

A.    Correct.

Q.    Okay.  It's got Subaru of Mandan, 10,050,000; it's got Chevrolet of Mandan 5,375,000; Mandan Detail Center, 510,000; Dakota Collision, 1,958,000; correct?

A.    Correct.

Q.    And that's the real estate that's subject to this real estate purchase agreement, purchase and sale agreement we just went over Exhibit 15 starting on FAC000110; correct?

A.    Correct.

Q.    Okay.  And when I total that up, the total amount paid for the real estate by the Eide entities is 17,893,000.  Does that sound about right?

A.    That's what they paid to CARS, correct.

Q.    Okay.  And then in addition to that, we've got the 25-million-plus that was paid for the assets in goodwill of Mandan Subaru and Mandan Chevrolet; correct?

A.    Correct.

Q.    So the total amount that the Eide entities are paying for the real estate and for the assets of the dealership, the goodwill and the equipment and so on, the tangible assets, is in excess of $43 million total; correct?

A.    That's what they paid; correct.

Q.    Okay.  And then in relation to this assignment on the date of the closing, FA ND CHEV and FA ND SUB, transferred the ownership or the right to purchase the ownership, which they held at that time, which is after the judgment by my client, and they transferred the real estate to the Eide entities; correct?  Or PKMC which is owned by the Eide entities; correct?

A.    Foundation didn't own the real estate.

Q.    Well, the real estate purchase and agreement -- and sales agreement indicates otherwise?

A.    At no point in time did we own the real estate.  There was no closing under that APA.  It was assigned and then the real estate was closed on it.

Q.   Right, but they controlled it.  They controlled that real estate and they had to give an assignment to PKMC in order for that ownership interest to transfer to them on the date of the closing; correct?

A.   That sounds correct.

Q.   Okay.  They didn't hang on to the real estate to try to assure that Mr. Kupper and BAPTKO could collect on their judgment?

A.   There was nothing to hang on to.  We didn't own it.

Q.   Can you explain to me why your counsel in pleadings in this case, shortly following the judgment, represented to the Court that it intended to file a bond to assure the amount of the judgment owed BAPTKO Kupper if there was financial issues for the Foundation entities?

A.   My recollection was we were trying to assess whether posting a bond and what that amount might be would help with getting a stay.  That was my recollection.  Don't think it was ever a commitment to post a bond.

Q.   Well, are -- is Foundation telling this Court today that it would not be financially capable of getting a bond for the full amount of the judgment in this case, approximately $4.67 million?

A.   A bond of that amount would be a hardship at this point.

Q.   But Foundation could do it?

A.   No.

Q.    Okay.  Well, what exploration --

THE COURT:  I didn't hear the answer.

THE WITNESS:  No.

Q.    (MR. BAKKE CONTINUING)  What exploration has Foundation done with any bonding company or insurance company or a third party to see whether it would qualify for a bond to assure the payment of the judgment amount to BAPTKO Kupper should they prevail in the appeal?

A.    We've done a little bit of exploration.  Less so regarding this particular bond, but in other situations where a bond was required, even for smaller amounts, we've had to just post a deposit and those were small, like $65,000 deposits.

Q.    Okay.  That wasn't my question.

I'm asking about what has Foundation done in this case in relation to the judgment amount that BAPTKO Kupper has of $4.67 million to determine whether they can or cannot get a bond or otherwise assure payment of the judgment.

A.    There was a little bit of research done on the bond process back when it was something that was being explored.

Q.    Well, when you say "researched," describe what you mean by researched.

A.    I didn't do the research.

Q.    I'm sorry?

A.    I didn't do the research.

Q.    Who did the research and what did they do?

A.   I -- it was not a very long, lengthy process.  We determined that it wasn't a viable option; so I don't really recall the particulars.

Q.   Well, you say "we" determined it was not a viable option.  Who's we?

A.   The company.

Q.   Yeah, who in the company researched this?

A.   I don't -- the company didn't -- I don't recall.  It was -- it was in collaboration with counsel.  I don't recall specifically who did the research.

Q.   Okay.  So you can't identify a single person at Foundation?

A.   I'm -- I'm saying I don't recall specifically who did the research.

Q.   Well, did anybody tell you they called the bonding company or insurance company to try to explore whether Foundation qualified for a bond?

A.   I don't know if it got to that point.  I don't recall that.

Q.   Okay.  And in relation to these issues of notes and loans and so on that the FA ND entity were supposedly obligated for, can you explain to the Court why none of those notes or mortgages or anything like that are of record in Morton County where the physical assets are located and never were on file?

A.   I believe they were UCC filings in the county on those

assets, by multiple lenders.

Q.    Have you ever seen those UCC filings?

A.    I've seen the UCC filings.  I'm trying to recall if they specifically were done in Morton County.  But I -- that I don't recall.

Q.    Okay.  Let's turn back to Exhibit 23, the expected Mandan proceeds allocation.

A.    Okay.

Q.    Okay.  There's a heading under Allocation of Net Proceeds, BMO Real Estate Mortgages, and it lists an amount of $2,384,222; is that correct?

A.    Correct.

Q.    What's that for?

A.    They had required us to pay any priority collateral that they had on real estate mortgages that we had on other properties.

Q.    Well, was this to pay a real estate mortgage on the Mandan Chevrolet or Mandan Subaru?  And the reason I asked that is you've told this Court earlier that the Foundation entities no longer owned any real estate; correct?

A.    We didn't own any Mandan real estate, correct.

Q.    Okay.  So why would the -- why would there be a real estate mortgage allocating two point -- $3.84 million when there was no real estate mortgage specific to the Mandan properties and you're telling this Court Foundation didn't own

any real estate at the time of the closing or prior thereto; correct?

A.   I think your question is why are we paying real estate mortgages?

Q.   Well, aren't you telling the Court there wasn't any real estate loan owed in relation to the Mandan Dealerships as of the date of the closing?

A.   There was not a mortgage for the Mandan properties.  Those were all owned by CARS.  This repayment was for other properties that were owned by Foundation entities which BMO required, and you have their remaining priority collateral, after the inventory financing was paid off, to go towards those loans.

Q.   Okay.  And so what -- what Foundation did is they paid yet another third party, BMO, for indebtedness for real estate that was not related to the Mandan Dealerships in any way; correct?

A.   Correct.

Q.   Okay.

A.   Well --

Q.   Instead of keeping that $2,384,000 to pay a judgment against the FA ND entities that BAPTKO Kupper had; correct?

A.   We were required to pay them.

Q.   Well, no.  The other entities who owned that real estate, other Foundation entities were required to pay that, not the FA ND entities; correct?

A.    The transaction was only approved by the banks if we paid these amounts to them.  Otherwise they would not consent to the transaction and we would still, I guess, own the dealerships.

Q.    Well, but to be clear, these were not obligations of the FA ND entities, nor were they obligations of Foundation Automotive Canada; correct?

A.    They were.  Foundation Automotive Corp., the Canada entity you referenced, was a co-borrower on both loans.

Q.    Okay.

A.    The FA ND entities were guarantors.

Q.    Okay.  But I thought you told us earlier that no money got exchanged between Foundation Automotive Canada either way by the Foundation ND entities.  Is that wrong?

A.    No, but that wasn't what I was answering just previously.

Q.    So did you testify to that?  That there were no monies that were exchanged between Foundation Automotive Canada and the FA ND entities?

A.    There wasn't.

        MR. BAKKE:  Okay.  Your Honor, I'm just not sure how the Court wants -- how far --

        THE COURT:  How much do you have left of this witness?

        MR. BAKKE:  Well, Your Honor, so I would intend, if the Court thinks it's necessary, to go over the written discovery requests briefly to show we made all these discovery

requests long ago and they intentionally withheld highly pertinent information which would have allowed our client to protect himself.

THE COURT:  I think you have that represented in your briefing, Mr. Bakke.

MR. BAKKE:  I do.

THE COURT:  My recollection is that.  And I will allow you an opportunity for post-hearing briefing to sort of summarize and, you know, if we can do it in a short -- like, especially ten pages or less.

MR. BAKKE:  Okay.

THE COURT:  So I'll give you that opportunity if you have that information, and I believe you do in the briefing as well as in the exhibits themselves now.  We could do it that way because we are, you know, running short of time.

MR. BAKKE:  Sure.  Yeah.  And I wanted to be mindful of how the Court wanted to --

THE COURT:  I appreciate that.

MR. BAKKE:  So I guess with that, I can stop my questioning of Mr. Slemko.  I do have some argument to present in relation to our motion but --

THE COURT:  Sure.

MR. BAKKE:  You know, I don't know whether Mr. Shaffer is going to have any questions for this witness.

THE COURT:  I don't either.  I'm about to ask him,

though.

Mr. Shaffer, any questions of this witness?

MS. WOOD:  Actually, Ms. Wood has questions for this witness, if I may, Your Honor.  And just to get a sense of timing for lunch, is that something the Court wants to consider right now?

THE COURT:  Tell me how much time you anticipate you would need for your cross of this witness.

MS. WOOD:  I mean, gosh.  That's such a hard question.

THE COURT:  Well, let's try it.  Let's go forward with it first and see where we end up.  All right.

MS. WOOD:  Okay.  All right.  I appreciate that.

CROSS-EXAMINATION

BY MS. WOOD:

Q.    Okay.  So, Mr. Slemko, you were asked a number of questions about the sale of the two Mandan Dealerships in December 2024, and the subsequent transfer of proceeds from that sale.  Can you just start from the beginning of when Foundation began considering selling these two dealerships?

A.    Well, formally considered, the beginning of 2024.  We were already in forbearance.  We had sold or were in the process of selling a large asset called the truck -- Service Truck Depot and it was -- through that we were able to pay down a significant amount of debt, all things considered, but it

wasn't enough to satisfy our lenders.  We were still in default, and they were looking for us to do more.  So we embarked on a process to market our Henson dealerships and the Mandan Dealerships.

Q.    And why did the Henson dealerships and the Mandan Dealerships come up as the options to sell?

A.    We thought they were both assets that would look like they had upside to a potential buyer because they were, as we saw it, underperforming for us.  We thought somebody would see an opportunity to maybe pay a slight premium compared to where they were performing.

Q.    And when did you -- how did the Eagal entities/Eide entities, how did they become involved and approximately when?

A.    They came to the table fairly late, as I recall.  We had already had an LOI from another buyer, but that transaction was starting to get -- starting to become uncertain.  It didn't seem like they wanted the Subaru anymore.  The price they were going to transact at seemed to be coming down and -- so I think when that LOI expired, Eagal joined the picture and -- or Eide. Sorry.

Q.    And who of those two parties -- of Foundation -- FA ND entities, those were the parties to the asset purchase agreement with Eide; correct?

A.    Correct.

Q.    And which of those parties in that asset purchase

agreement were the ones who came up with a goodwill amount?

A.   They didn't.  The buyer did.  The buyer determined what they were willing to pay and we were -- we'd either accept or, you know, negotiate with them and we negotiated with them to that $22 million mark.  But it was right at the -- right inside the range that our independent M&A advisor had suggested we could get for the dealerships.  I think it was at the low end of the 22 to 28 was what they had indicated.  And given we had already had a party get cold feet, we decided to move forward at that lower range.

Q.   And that prior offer, was that less than the offer from Eide?

A.   It was right around the same amount in the beginning, I believe.  Until they started renegotiating and wanting to exclusively buy the Chevrolet store.

Q.   And so let's talk --

        THE COURT:  Mr. Slemko, you kind of tail off in your responses.  And I'm going to ask you to just speak up a bit more.  You know, speak in the direction of the bulbous end and it will help me and others understand what you're saying.  Okay?

        Go ahead, Ms. Wood.

        MS. WOOD:  Thank you, Your Honor.

Q.   (MS. WOOD CONTINUING)   So, Mr. Slemko, let's talk about Foundation Automotive U.S. Corp.'s role in the corporate

structure.  You had mentioned the credit agreements with various lenders, specifically HPS; correct?

A.   Correct.

Q.   And is Foundation Automotive U.S. Corp. the only party to that agreement?

A.   No.  Foundation Automotive Corp., Foundation Automotive U.S. Corp. are the co-borrowers and all of the subsidiaries are guarantors.

Q.   And Foundation Automotive Corp. is the Canadian corporation that we've been discussing today?

A.   Correct.  It owns a hundred percent of Foundation Automotive U.S. Corp.

Q.   And also a party to this case?

A.   Correct.

Q.   And so FA N -- the FA ND entities were each guarantors under those agreements?

A.   Correct.

Q.   So the dealership subsidiaries guaranteed obligations that Foundation Automotive U.S. Corp. and Foundation Automotive Corp. owed to creditors?

A.   Correct.

Q.   And when were those agreements entered into?

A.   June 24, 2022.

Q.   So that creditor agreement existed before the judgment in this case?

A.    Yes.

Q.    And before Foundation even began considering the sale of the Mandan Dealerships?

A.    Correct.

Q.    And what role -- or let's -- let's actually start with the type of interest did the HPS as a creditor have in the dealerships, the two Mandan Dealerships?

A.    They had secured guarantees from them.

Q.    And can you explain what that means?

A.    It means that if we're liquidating assets, they would have first priority to the proceeds from them.

Q.    And did the HPS, as the creditor, have priority over general unsecured creditors?

A.    They did.

Q.    And did this creditor, HPS, have priority over judgment creditors like BAPTKO?

A.    I believe so.

Q.    In early 2024, when Foundation began considering the sale of the two Mandan Dealerships, what role did these creditor obligations play in that decision?

A.    Sorry.  Can you repeat that?

Q.    Yeah.  So starting the beginning of 2024 when that, the -- internally deciding to potentially sell the two Mandan Dealerships, what role did HPS have in coming to that decision?

A.    A very large role.  We were in default and needed to pay

them.

Q.   And explain, just a little bit to the Court, about the kind of financial pressure that Foundation was under at that time.

A.   We were unable to make our interest payments to them at the end of that quarter.  So we were under a lot of pressure to delever and bring in proceeds from asset sales to get them repaid.

Q.   And the forbearance that you've spoken about, that -- does HPS have discretion over when, you know, they kind of had their time up and they just could, you know, foreclose on the amount due?

A.   Yes.

Q.   And they're choosing not to do that --

A.   No.

Q.   -- to maintain the dealership operations that are viable right now?

A.   For now.

Q.   So that they can get paid back on the amount?

A.   Correct.

Q.   What is the total amount outstanding to date right now?

A.   It's around 150 million including unpaid interest.

Q.   Okay.  So that's not including the -- that's just the principal?

A.   No, that includes the unpaid interests.

Q.   Okay.  And the forbearance agreement, that requires proceeds from the -- any sales of any of the dealerships to be used to satisfy outstanding obligations?

A.   Yes, and through this waterfall of proceeds.

Q.   And the waterfall proceeds that you just pointed to, can you tell me what exhibit that is?

A.   23.

Q.   So BAPTKO's counsel, Mr. Bakke, had suggested that Foundation hasn't set aside the amount of the judgment to satisfy the judgment that's outstanding right now.  Can you explain what the reality is?  Could Foundation have done that?

A.   No.  We -- we are -- have to pay everything we get to HPS to keep them from calling all our loans and forcing us into liquidation.

Q.   You testified earlier that the proceeds were transferred to Foundation Automotive U.S. Corp. but that was part of a routine practice.  Why did you -- why was that a routine practice in every day?

A.   Largely it was to mitigate the risk of fraud.  If we consolidated the cash in one account, it would be less likely to be, you know, a victim of fraud.

Q.   Did Foundation Automotive U.S. Corp. exist at the time that Foundation Automotive Corp. purchased the two Mandan Dealerships from Kupper Chevrolet Inc. back in 2019?

A.   It existed when we purchased them, not when the original

APA was entered into.

Q.   Okay.  So by the time it was closed, in 2019, June 2019 --

A.   Correct.

Q.   -- Foundation U.S. Corp. existed?

A.   Yes.

Q.   And was that the practice of the business from that point in time, in 2019, to the sale to consolidate the funds?

A.   I believe we started that in 2020, not 2019.  We had grown a little bit more and then realized the need to start consolidating cash.

Q.   And what do you mean by "grown a bit more"?  Additional dealerships?

A.   Yes.  We had acquired a few more dealerships.

Q.   And so what happened to the proceeds from the twenty -- the December 2024 sale of the Mandan Dealerships once they reached Foundation Automotive U.S. Corp.?

A.   They were then used to pay down all the secured creditors.

Q.   And if you could, could you turn to exhibit -- I saw that it was in front of you, but Exhibit 23 -- and just to my very math-resistant brain and numbers, it just -- this is a complicated spread.  So can you kind of simplify it for me specifically with regard to where we end up, where the proceeds end up, and where -- where they're going.

A.   Okay.  So BMO -- BMO was the first in.  So they have priority on everything, including up to 20 percent of goodwill

on any transaction.  In this case, they didn't -- they didn't need to use that priority collateral because all of the loans that they had identified were paid through the collateral that was sold prior to the goodwill.

Then HPS has the next security and they -- they are allocated all of the goodwill except what is allocated to BMO, in this case nothing, and any FME or fixed assets.

Q.    Just for clarification are you kind of using that last column as your guidance?

A.    Yes.

Q.    Okay.  Thank you.

A.    Then that collateral is used -- so that is the money coming in, the top section.

The money going out is the bottom section where it says "Allocation of Net Proceeds."  That is where you see BMO's loans being paid first.  They're on the left, so they get paid first, then HPS, and they get paid out of the remaining collateral the amount that we agreed, and then we retained in the business to satisfy vendor payables and other items like that.  The -- I can't make out the number.  It's, like, 1.4 million.

Q.    And that went where?

A.    That went to pay vendors, like vendors of the business. And then the 1.2 million was paid to -- 1.25 million was paid to CARS as a fee for the transaction for doing the lease

amendment and assignment.  And 1.56 million was paid to, I mean, to -- it was another creditor.

Q.   Okay.  And you briefly mentioned the CARS fee.  Can you explain that a little more?

A.   So they charged a fee --

Q.   Let me stop you.  Who is CARS?

A.   CARS is the landlord.  They own the property.

Q.   And what -- just summarizing what your typical relationship looks like with CARS, what do they do?

A.   They own auto dealership real estate and they enter into transactions with auto dealers where they buy the real estate and then lease it back to them.

Q.   Lease it back.  And what -- what purpose would -- what purpose does that serve for the dealership?

A.   It would free up -- it would free up an amount of capital depending on how much was owed originally on the property.  If you sold it, you could free up the existing equity in the property.

Q.   And Mr. Bakke asked you a number of questions about that transfer back to Foundation for the December 2024 closing for the Mandan dealership sales but he expressed he did not want you to explain why.  And I'd like to give you that opportunity now.

A.   So CARS, although they own the real estate, it's under a triple net lease; so we're fully responsible for everything

that happens on the property.  And during the sale, they don't want the buyer to go back to them with any issues.  So they transfer it to us and then in -- or they sell it to us under this real estate purchase agreement, but then immediately, before sale, it's transferred to the ultimate buyer.  So on the closing statement, the buyer is transferring the funds for the purchase directly to CARS, but we are listed as the last existing owner prior to the -- prior to the sale on the title documents so that CARS eliminates their liability.

Q.    Would the Mandan dealership sale have gone through if Foundation chose not to do the process with CARS that you just explained?

A.    No.

        MR. BAKKE:  I object.  It's calling for speculation; no foundation.

        THE COURT:  Overruled.

        Go ahead and answer, if you can.

        THE WITNESS:  If we hadn't paid the fee, they would not have consented to the sale.

Q.    (MS. WOOD CONTINUING)   All right.  Let's talk about -- I'm actually --

        THE COURT:  Ms. Wood, why don't we take a break.

        I have one question before we take our break.  If they don't consent to the sale, then the sale can't take place?  Am I understanding that right?

THE WITNESS:  That's my understanding.

THE COURT:  And that's -- you believe is represented in the written documents giving them a security interest?

THE WITNESS:  Correct.

THE COURT:  But Mr. Bakke doesn't have access to that or hadn't had access, as far as you know?

THE WITNESS:  As far as I know.

THE COURT:  Okay.  All right.  Let's -- we'll break until 1:30, 1:30 this afternoon.  I've got a hearing, I believe, scheduled for 1:15, or that was the last I heard it was scheduled for.  Could go in 15 minutes.  It might take a little longer too.  I'm going to suggest that we come back at 1:30 in the event that I'm ready to go then so that we can pick it up from there, Ms. Wood.

Mr. Bakke, you had something?

MR. BAKKE:  Yes, Your Honor.  Just one question.  Can we leave our things in here over the noon hour?

THE COURT:  Fine by me.  I think we can lock this room.  Am I right, Rob?  Okay.  We'll lock it up, Mr. Bakke, until 1:30.  Will that work?

All right.  Any other questions, Mr. Bakke? Mr. Shaffer?  Ms. Wood?

MS. WOOD:  No, Your Honor.  Thank you.

THE COURT:  All right.  We'll be in recess until 1:30 p.m.  Thank you.

(Recess taken from 12:25 p.m. to 1:30 p.m.)

THE COURT:  All right.  We're back on the record in FA ND CHEV, LLC, and others v. Kupper and others, Civil 1:20-cv-138 Mr. Slemko is still on the stand and still under oath and, Ms. Wood, I believe you were questioning.

Before we get started, my apologies for my delay in getting back here.  We had something scheduled and many of our cases depend upon other facilities -- sometimes county, sometimes state facilitates -- to get our defendants to a speakerphone in time and it doesn't always work out that way.  So my apologies for the delay.

Ms. Wood.

MS. WOOD:  Thank you, Your Honor.

Q.   (MS. WOOD CONTINUING)  All right.  Mr. Slemko, I will make this as fast as possible so that you can get off the stand for the day, but I wanted to just -- you were asked earlier about the commingling of assets.  Do you recall that terminology?

A.   Yes.

Q.   Can you just explain -- it's more of a consolidation, would you say, of funds?

A.   Yes.

Q.   So can you explain the sweeping process that you were referring to earlier?

A.   Sure.  So the -- the needs of the -- the case needs of the individual dealerships or entities within the structure vary

from day to day.  Some entities need more cash from day to day; some accept more cash from day to day.  So the purpose of consolidating all the funds in one sweep account is to allow all of the entities to do business regularly without fear of overdraft.  So we would leave a minimum balance in the account every day enough to, you know, maybe cover a certain -- certain checks or certain payments going out and then the rest would be swept into a central account.  And it was all accounted for in individual balances within Foundation Automotive U.S. Corp.  So at any given time we knew how much aggregately we had put into a dealership or had taken out of a dealership.  It was all accounted for daily.

Q.   And those -- the funds came from all of the dealership entities on a daily basis?

A.   Correct.

Q.   So this was in the ordinary course of business?

A.   It was.

Q.   And -- so the FA ND CHEV bank account and the FA ND SUB bank account, there weren't commingling of those funds in a separate account; correct?  It was just the sweep up to a parent corporation?

A.   Correct.

Q.   Which that corporation Foundation Automotive U.S. Corp.?

A.   Correct.

Q.   Okay.  Can you explain to the Court a little bit about

HPS's involvement, the creditor, in Foundation today?

A.   They have replaced the board of Foundation Automotive U.S. Corp. with one independent director and three HPS employees. And they are really involved in every business decision that gets made now.

Q.   So they have taken a more hands-on approach to make sure that they get paid on their -- the amount that is outstanding and due to them?

A.   Yes.

Q.   And could you briefly explain if Foundation -- or sorry, if the FA ND entities had tried to keep the proceeds or transfer them somewhere other than the Foundation Automotive U.S. Corp. to satisfy the secured creditor obligations, could you explain what would have happened?

A.   They -- we would -- we'd be in default.  We would -- they would be in another legal proceeding.

Q.   Could the FA ND entities have simply ignored these creditors and given the money to BAPTKO instead?

A.   No.

Q.   So in essence the FA ND entities weren't choosing to favor one creditor over another, they were following the legal priority of creditor interests?

A.   Correct.

          MS. WOOD:  That's a signal that I'm almost done.

          Okay.  So I actually am done.  So no further

questions for this witness right now.

THE COURT:  Mr. Bakke, I'll give you a few questions.

MR. BAKKE:  Yes.  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. BAKKE:

Q.   Following up on these last questions by Ms. Wood about whether or not as part of the sale to the Eide entities you could have paid BAPTKO instead, did you ask anyone from HPS or from BMO what the repercussions would be if you did that?  In other words, did you ask permission to assure this judgment?

A.   What is -- what is the question you're asking?  Sorry.

THE COURT:  Did you factor in the fact that you have a judgment in favor of BAPTKO, did that enter into your discussions at all with the creditors?

THE WITNESS:  Yes.  But it was also -- we were appealing the judgment so it was our thought that this would take priority.

Q.   (MR. BAKKE CONTINUING)  Well, but my question is did you specifically ask either BMO Bank or HPS, "Can we pay this judgment and you still won't pursue a default lawsuit against us?"  Did you ask that specific question?

A.   Not that specific question.

Q.   And an option that you could have done is simply not sold the dealerships to the Eide entities when you did and then BAPTKO could have then executed on that judgment and then BMO

Bank and/or Harris could have pursued whatever legal remedies they thought were appropriate?

A.    Not under the terms of our forbearance.  We were required to sell the dealerships.

Q.    Okay.  So did the forbearance agreement, that we've never received, specifically identify the two Mandan Dealerships as ones that had to be sold?

A.    It did.

Q.    Okay.  And when did that first occur?

A.    The first one was entered in July of 2024.

Q.    Okay.  And it specifically said in there July 2024 that the Mandan Dealerships had to be sold?

A.    Among other sale requirements, yes.

Q.    Was there a timeframe --

A.    Yes.

Q.    -- they indicated that this had to be done within?

A.    There was.

Q.    Okay.  And what was that timeframe?

A.    I believe it was the end of September 2024 which we had to get extended.

Q.    Okay.  And so in the jury trial there was a claim brought by the FA ND entities and a request from the jury to pay damages including for many years into the future when Foundation specifically knew it was going to no longer own these dealerships at the time it made that claim to the jury;

is that correct?

A.    Can you rephrase that, please?

Q.    Well, there was a claim for damages being paid into the future as a result of this supposed failure by Mr. Kupper to maintain the 12-month rolling average of vehicles prior to the sale.  You recall that; correct?

A.    I'm not sure what you mean by "into the future."

Q.    I'm asking whether you recall the claim on the rolling averages.  Yes or no.

A.    The claim on the rolling averages?

Q.    That Mr. Kupper had failed to maintain the required rolling average for the 12 months prior to the sale.

A.    Yeah.  That I remember, yes.

Q.    Okay.  And Foundation was claiming that affected them all the way through the time of trial and thereafter and requested from the jury damages for time periods they knew they were no longer going to own those dealerships; correct?

A.    Well, when the -- when the case began, we had no intent to sell the dealerships.  So I'm not sure how to properly answer that.  Because the claims started well before --

Q.    You told me prior --

THE COURT:  Again, we can only have one person speaking at a time.

MR. BAKKE:  Sorry, Your Honor.

THE COURT:  Go ahead.

Q.    (MR. BAKKE CONTINUING)  You were supposed to sell it by September 2024.  The trial was in October, November of 2024; correct?

A.    Correct.  But --

Q.    So let me ask you this.  You talked about the ten higher performing dealerships that Foundation still owns; correct?

A.    I didn't say that there were ten higher performing dealerships.  I said we still have ten dealerships.

Q.    Well, what you testified to is you got rid of the underperforming, is the word, dealerships; correct?

A.    There are still some underperforming dealerships that we own.

Q.    Okay.  And the ten dealerships, how many of those does Foundation categorize as good performing dealerships?

A.    Six.

Q.    Okay.  And has there been any attempts to sell any of those better performing dealerships?

A.    There has been an attempt to sell one of them.

Q.    Okay.

A.    But it is the least performing of the six.

Q.    Okay.  And how much was that proposed price?

A.    We never got to a asset purchase agreement on it.

Q.    So you never had a sale price established?

A.    We had several letters of interest, but none that were acceptable.

Q.   Well, what I'm asking is did Foundation have an asking price for that dealership.

A.   We did.

Q.   How much?

A.   20 million.

Q.   Was that just a goodwill?

A.   Yes.

Q.   Okay.  So if I take the 20 million for the -- just the goodwill and I multiply it times ten dealerships, that's $200 million just for the goodwill; correct?

A.   No.  Because they're not all equal.

Q.   I'm just asking if my math is correct.

A.   20 times 10 is 200.

Q.   Okay.  And that's just goodwill; correct?

A.   No.  Because you're taking one number and multiplying it across ten entities that aren't equal; so it's not the goodwill.

Q.   Well, my question is in addition to goodwill there are the physical assets of the dealership, the tangible assets?

A.   Correct.

Q.   Okay.  So on the case of the -- the Mandan Dealerships, that total number, we did the math, was about 47 million; correct?

A.   No.  Because we did not own the real estate.

Q.   Okay.  So let's take out even the real estate and take out

that 11-million-some.  That still leaves 36 million when you include all the vehicles, the equipment, the goodwill, et cetera; correct?

A.    No.  The real estate, as you pointed out earlier, was 17 million.  So it leaves the 25 million we did receive.

Q.    Okay.  So let's take 25 million and if I multiply that times ten dealerships, 250 million, you said the total debt of the Foundation -- that Foundation, all the entities, owe is 150 million; correct?  Isn't that what you testified to?

A.    That's correct.

Q.    Okay.  So that leaves a million -- or, I'm sorry, a hundred million dollars in liquidity even if these other ones were underperforming dealerships, which all of them are not; correct?

A.    Well, we're selling two dealerships tomorrow that we're only going to get $3 million for; so the math, as you're explaining it, doesn't work because not all the dealerships are equal.

Q.    Well, if you had more debt than you did assets, you'd be in bankruptcy, wouldn't you?

A.    We are insolvent.

Q.    And you've never filed for bankruptcy, never approached a private law firm about bankruptcy; is that correct?

A.    No.  We have discussed with a private law firm the concept of bankruptcy.

Q.    Does Mr. Kutschinski have any ownerships in CARS?

A.    No.

Q.    Who owns Amynta that's listed as someone you paid over a million dollars to on Exhibit 23?

A.    Amynta is owned by a private equity firm, and I don't remember exactly which one it is.

Q.    Okay.  And did the ND entities have a note or a loan or an obligation with Amynta?

A.    They did.

Q.    And what was that for?

A.    It was for the sale of -- we sold our F&I business to them and -- in exchange for recurrent cash flow over time and if we ever sold a dealership and the buyer didn't take assignment of that business, then we would have to pay them back the money that they gave us.

Q.    So this million for Amynta -- 1,563,019 was all specific to the Mandan Dealerships?

A.    Correct.

Q.    Does the -- do the Foundation entities have any other judgments against them anywhere other than BAPTKO Kupper's judgment?

A.    No.

Q.    So is it your testimony that posting a bond or providing other security for this $4.67 million will force Foundation into bankruptcy?

A.    That I don't know.

Q.    You're not testifying that would occur, are you?

A.    I'm sorry.

Q.    You're not testifying bankruptcy would occur should the Court require that a bond be posted for Foundation to continue with its appeal?

A.    We have no means to pay it.

Q.    But you're not saying it would put you into bankruptcy?

A.    It would be another -- another catalyst, I guess, towards bankruptcy.

Q.    You know what the OEMs are; right?

A.    Yeah.

Q.    Okay.  The manufacturers, so GM's an OEM --

THE COURT:  I'll stress again get your microphone a little closer, if you can, each of you.  Speak in the direction of -- and speak up if you can and it will help us get a more accurate recording.  Occasionally I get information from my persons that some of what we're saying is not being picked up as it --

MR. BAKKE:  Okay.  I apologize.

THE COURT:  And, you know, it will be more frustrating, I guess, for not just the court reporter but us if we see less of what we remember having taken place.  Go ahead.

MR. BAKKE:  Thank you, Your Honor.

Q.    (MR. BAKKE CONTINUING)   So these manufacturers called OEM

Subarus and OEM; correct?

A.    Correct.

Q.    Do you know what "out of trust" means with the manufacturer?

A.    I know that, the term out of trust.  I don't know specific to each manufacturer.

Q.    Okay.  And out of trust means that they will not provide new manufactured vehicles to dealerships that are out of trust; you're aware of that?

A.    Well, the -- when I hear the term "out of trust," it's generally used with regard to the floor plan lender and not being able to pay them.  And we have never been out of trust with our floor plan lender.

Q.    Okay.  And have you ever been out of trust, any of the Foundation dealerships, such that they refused to provide new vehicles to any Foundation dealership?

A.    No.

Q.    And if a dealership is out of trust, it's pretty typical for the manufacturer to actually have one or more of their employees at the dealership itself to make sure you're probably -- properly managing the sales and acquisition of new vehicles.  Has Foundation ever had that experience where the manufacturer has physically sent out employees to monitor the sales and help facilitate proper sales?

A.    No.

Q.   In your discussions with the Eide entities -- and I mean you or anybody else in Foundation -- prior to or at the closing on December 11, 2024, did you tell them about all this debt you're telling the Court about today by the Foundation entities?

A.   Not the amount of the debt but they would have been made aware of all the filings that needed to be released.  And in order for those filings to be released, we had to pay the creditors.

Q.   Okay.  So did you have discussions with them about the BAPTKO judgment?

A.   No.

Q.   Okay.  To your understanding, were they aware of the BAPTKO judgment?

A.   I don't know.

Q.   Well, do you recall submitting a declaration to this Court in relation to post-judgment discovery?

A.   Yes.

Q.   Okay.  And in that declaration, you indicated --

          MR. BAKKE:  And we'll get you the exhibit number for that, Your Honor.  That's Exhibit 32.

Q.   (MR. BAKKE CONTINUING)  You indicated that you spoke to the Eide representatives about this judgment and they were not that concerned.  Do you recall saying that?

A.   What was the exhibit?

Q.    It's 32.

A.    (Examining.)

Q.    I'm looking at paragraph 16 of your declaration, Exhibit 32.  You said since the transaction was structured as an asset deal where the Foundation parties retained all liabilities "Eide was not particularly concerned about the litigation"?

A.    Correct.  It doesn't say anything about the judgment.

Q.    Well, the litigation had already proceeded through a trial.  You didn't tell them that there was a judgment on file at the courthouse in Morton County and in federal court here in Bismarck?

A.    I don't recall telling them that.

Q.    Did anyone from the Eide entities or their banks tell you that they were aware of this judgment?

A.    No.

Q.    Okay.  Were there bank representatives present from Bravera Bank and Starion Bank at the closing on December 11, 2024?

A.    I wasn't at the closing but that does sound right.

Q.    Okay.  You offered some testimony about the sales price and prior sales and part of the Court's docket is Document 298-4, which was the deposition testimony of Mr. Kutschinski at the jury trial.  And he testified that Mr. Jesse Peterson on behalf of the Eide entities presented an

offer of 25 to 26 million for the goodwill.  Do you recall that testimony by Mr. Kutschinski?

A.    I recall the testimony.  I don't recall the specific dollar figures he used, but I do recall it being higher than what we ultimately sold for.

Q.    Okay.  Well, it was actually either 3 to 4 million dollars higher than the 22 million in goodwill sold for; correct?

A.    Correct.  Indicating the dealerships had subsequently underperformed.

Q.    And he testified at this deposition on October 4, 2023, that he didn't want to sell the Mandan, North Dakota, dealerships because he "liked the cash flow."  Do you recall that?

A.    I do.

Q.    And he countered with a offer for the goodwill value to Mr. Peterson and offered for the Mandan Dealerships to be sold for $35 million; correct?

A.    That sounds right.

Q.    Okay.  And yet, as I understand it, you testified in response to Ms. Wood's questions that Haig, the appraiser, said the value of the goodwill was 22 to 28 million and you accepted the first offer by Mr. Peterson of 22 million; correct?

A.    I don't believe it was the first offer, but, yes, we accepted 22 million.

Q.    Even though Mr. Kutschinski knew -- for these same

dealerships prior to that he had offered 25 to 26 million and Mr. Kutschinski countered at 35 million; correct?

A.   Correct.   Because the time between when the initial offer was made in '25 and when we ultimately sold it, the dealership performance had declined.

Q.   This -- did I hear you say this waterfall document is Exhibit 23?

A.   That's what we call it, yes; waterfall.

Q.   Okay.   Well, the waterfall document is not a note or a loan or doesn't -- isn't on any either BMO or HPS letterhead. During my earlier questions of you you said there are waterfall documents, credit agreement and waivers, there was a consent agreement.   None of those documents have been produced to us, have they?

A.   I don't believe so.

Q.   And you never produced any document even today indicating that either BMO Bank or HPS had required a sale of the Mandan Dealerships by September 2024 or any other time period; true?

A.   I don't believe so.

        MR. BAKKE:   Your Honor, I don't have any other questions for Mr. Slemko.

        However, I know the Court said you were going to revisit this issue later, but we don't believe there's any reason why this testimony should be deemed confidential including the numbers.   This is important information for my

client to be able to use, albeit belatedly, in these other lawsuits because he concedes that Foundation provided none of this information in response to our written discovery requests, instead we only got objections.  And when they did provide some information pursuant to Court order, he's conceded none of the meaningful information about where the money went was ever provided to us.  And we only got that by subpoenaing it from BMO Bank and they will not agree to protective orders in these other state court actions to allow us to use that information in those lawsuits to try to collect, which is very unusual that they won't agree to protective orders and are requiring us to file motions which still have not been decided.  I'm not faulting those courts in any way but this should not --

THE COURT:  I will give you an opportunity, Mr. Bakke, when we're finished but no other questions for this witness?

MR. BAKKE:  No.  No, Your Honor.

THE COURT:  The witness is excused.

Any other testimony, Mr. Bakke?

MR. BAKKE:  No, Your Honor.

THE COURT:  Mr. Shaffer, testimony?

MR. SHAFFER:  Yes, Your Honor.  We would call Mr. Kupper to the stand.

Your Honor, while Mr. Kupper is on the way to the stand just to be -- just for perhaps my edification.  Are we --

we're still presenting evidence on the motion to compel?

THE COURT:  You're presenting evidence on all of the pending motions.

MR. SHAFFER:  All motions.  Okay.

THE COURT:  I'm going to consider this a combined hearing on all of the pending motions, both sides.

MR. SHAFFER:  Okay.

THE COURT:  So if you have anything in addition to Mr. Kupper as a witness -- we've already got all the exhibits, they are all received; so we've got all of that in the record for today.  We've got the testimony of Mr. Slemko, and now we're going to have testimony from Mr. Kupper.

MR. SHAFFER:  Yes, Your Honor.  Thank you.

ROBERT KUPPER,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SHAFFER:

Q.   Good afternoon, Mr. Kupper.  You are the president of BAPTKO; is that true?

A.   Correct.

Q.   Okay.  Isn't it true that on November 7, 20 --

THE COURT:  Hang on once, Mr. Shaffer.  Have you stated your full name, Mr. Kupper?

THE WITNESS:  Robert Kupper.

THE COURT: Will you spell your last name?

THE WITNESS: K-u-p-p-e-r.

MR. SHAFFER: That's my fault, Your Honor. That's generally how I do it at the beginning but I apologize.

Q. (MR. SHAFFER CONTINUING) Mr. Kupper, on November 7 of 2024, there was a judgment that was entered in this lawsuit in favor of BAPTKO; correct?

A. Correct.

Q. And at the time the judgment was entered, BAPTKO was aware that the FA ND entities were in the process of selling the dealerships; isn't that true?

A. Yes.

Q. Yeah. Because the day after the judgment was entered you know your attorney sent me an email -- or the day before, actually, judgment was entered, you know that Mr. Bakke sent me an email to that effect?

A. I believe we -- I found out about the sale the day after the trial. But the timeline on that --

THE COURT: It's on but maybe --

THE WITNESS: Oh, it wasn't on, sir.

I think we found out about the judgment or about the sale -- I think right after the trial we saw that there was a business name signed for for Eide Chevrolet and Eide Subaru.

Q. (MR. SHAFFER CONTINUING) And you -- well, do you know who the owner of the Eide entities are?

A.    Jesse Peterson is one of the -- one of the owners.

Q.    And Jesse Peterson is a neighbor of yours; correct?

A.    No, I live in Mandan; he lives in Bismarck.

Q.    Oh, my apologies.  Have you recently moved?

A.    No.  Been there 20-plus years -- I've been in the neighborhood 35 years where I lived.

Q.    Okay.  I have that wrong then.  I apologize.  But you've known Mr. Peterson for a long time?

A.    I've been acquainted with him, yes.

Q.    Okay.  Because you guys -- you both operated in the same business circles, essentially, for a couple decades?

A.    Correct.  He worked at Eide for 10, 15 years prior to ownership.

Q.    Isn't it true that you knew, not long after the judgment entered in this case, that the sale was set to occur in early December of 2024?

A.    I'm not sure I knew when the closing was but I did hear about the sale.

Q.    And that it would occur in that general timeframe?

A.    Well, usually it takes -- usually the -- usually from the time of the sale to the time of the closing normally is a little longer than this one was.  This one closed a little faster.  Obviously it closed a lot faster than when I sold the store to Foundation.

Q.    And you still knew some individuals that worked at those

stores at the time the judgment was entered; right?

A.    Correct.

Q.    Like you knew Shawn Weekes?

A.    Yes.

Q.    What did you do after you learned about the sale, other than going through an attorney, to investigate the circumstances of it?

A.    I prob- -- I might have called Shawn Weekes and asked him about the sale.

Q.    Did you learn anything from Shawn?

A.    Not very much.

Q.    Did he give you the general timeframe of when it would occur?

A.    No.

Q.    Isn't it true, Mr. Kupper, that BAPTKO has never requested that this Court issue a writ of execution on the judgment?

A.    I don't know what that is.

Q.    Okay.  So you would defer to your attorneys on that?

A.    Correct.

Q.    We know that you did file or record the original judgment in Morton County; is that true?

A.    As far as my -- where it was filed, I would leave that up to the attorney.  I would assume it's Morton County because that's where the sale took place.

Q.    And your attorneys took steps to get a certified copy of

the judgment so that recording could happen; isn't it true?

A.    I'm not sure of that either.

Q.    Well, you do know that an amended judgment was entered in April of 2025?

A.    Was the amount added to it?  Attorneys' fees?  Is that the amended judgment?

Q.    Yes, Mr. Kupper.

A.    Yes.

Q.    So that amended judgment replaced the original judgment; is that true?

A.    Now you're getting into the legal stuff.  I guess I'm not real sure of that.  I don't quite understand all of it.

Q.    But the amended judgment did add you as a party to the judgment for attorneys' fees; is that true?

         MR. BAKKE:  I'm going to object as a misstatement.

         THE WITNESS:  Do you mean an added --

         THE COURT:  Hang on once.

         Is there an objection, Mr. Bakke?

         MR. BAKKE:  Yeah.  I think the original judgment also applied to Robert Kupper and to BAPTKO.  Although, there was some briefing on post-judgment issues where they asked the Court to reconsider that and Judge Traynor indicated for the reasons he explained denying their motion for new trial, et cetera.

         THE COURT:  I'm going to assume, Mr. Shaffer, much of

this is a matter of record and is in the actual documents that appear --

MR. SHAFFER:  Sure.

THE COURT:  -- as part of the record.  So if there are factual issues that we need to flesh out or address, I'd be more comfortable addressing those especially with --

MR. SHAFFER:  Certainly.

THE COURT:  Go ahead, Mr. Shaffer.

MR. SHAFFER:  Absolutely, Your Honor.  I'll move on.

Q.   (MR. SHAFFER CONTINUING)  Do you know if your attorney obtained a certified copy of the amended judgment just one way or the other?

A.    I don't know that for sure.  I don't know.

Q.    Did you take any steps to try to intervene in the sale process of the two dealerships?

A.    The -- ask that again.

Q.    Did you take any steps to intervene in the sale of the Mandan Dealerships to the Eide entities?

A.    Did I try to stop the sale?

Q.    No.  Did you take any steps to intervene, to assert your rights, as to any of the assets that might be subject to that sale to -- for purposes of enforcing the judgment?

A.    Did I try to -- did I try to get my money?  Did I try to collect -- I guess I don't understand what you're --

THE COURT:  Did you intervene at all in the process,

people you knew or anyone?  Did you try to contact someone?  Did you try to stop it?

THE WITNESS:  No, I didn't contact Peterson or Foundation or -- no.

Q.    (MR. SHAFFER CONTINUING)    You didn't reach out to Mr. Peterson, say, "Hey, I hear you're buying the Mandan Dealerships.  I've got a judgment against them and I feel that I've got rights to some of those, some of the assets."  Nothing like that happened?

A.    I don't remember that happening, no.

Q.    Okay.  And then you subsequently heard, I'm assuming sometime in December, that the sale had closed; correct?

A.    Correct.

Q.    And it wasn't until early February, I believe it was February 7, that you first served written post-judgment discovery on the FA ND entities and Foundation Automotive; true?

A.    My -- that would have been up to my attorneys.  I'm not sure of the dates.  I'm not sure -- I guess I'm not sure what you're getting at.  I'm not -- I don't know.  I don't know timeframes.  I don't know when -- when legal filings were filed and stuff like that.

Q.    Okay.  And that's fine.  I was just curious.  And as the Court just asked, you didn't run to Court and ask for an injunction to stop the sale; right?

A.    Did I try to stop the sale?

Q.    Yeah.

A.    I don't believe so.  I just assumed that the sale wouldn't happen if there was a judgment on the store.

Q.    And isn't it true that -- well, you know --

MR. SHAFFER:  Hold on one second, Your Honor.

Q.    (MR. SHAFFER CONTINUING)   Now, Mr. Kupper, it's your position, if I understand it, both on behalf of yourself individually and on behalf of BAPTKO, that the FA ND entities and Foundation Automotive are trying to avoid paying their judgment that's owed or that's been entered in favor of you and BAPTKO; is that true?

A.    You said that's my position?

Q.    Is that -- I understand that to be your position.  Is that in fact your position?

A.    Yes, quite evidently.

Q.    Okay.  And you, through your attorneys, have brought out testimony here today that a judgment entered -- Judge Traynor entered a judgment in BAPTKO's favor on the earnout payment claim very first thing, very first morning of trial; correct?

A.    Correct.

Q.    And it's your testimony that the FA ND entities and Foundation were attempting -- have attempted since then, essentially, to avoid paying you that amount?

A.    Yes, obviously, because I haven't gotten paid.

Q.   Okay.  Isn't it true, though, that after that judgment entered on the first day of trial, that they made an offer of settlement to you?

A.   He had made several offers prior to that and then actually when -- sitting right there when the judgment was made, you handed me a piece of paper with numbers far less than what was owed on the paper.

Q.   And I understand that may be true but there was an offer of $2.5 million to be paid to you?

A.   Before the sale -- before the court?

Q.   No.  On the morning of court -- the morning of the first day of trial, after Judge Traynor made that entry of summary judgment on the -- on the earnout payment, isn't it true that that offer was made to you?

A.   I don't remember what the number was.  I remember actually you handed me over a piece of paper.  I was sitting right there in my chair and you handed me over a piece of paper.  And I actually thought it was for Randy and I handed the paper over to Randy.  And then I think at break we looked at it.  I don't remember what the number was.  But I wasn't interested in any settlement at that time because there was no guarantee that I would ever see a dime from Mr. Kutschinski because clearly his word hadn't been good at any time.

So when you handed over that piece of paper, there was no way -- there was no way to guarantee that no matter what

number would have been on that piece of paper.  There was no way to guarantee that I would have got any money.

Q.   Okay.  Now, you have filed -- you, along with BAPTKO, have filed two additional lawsuits; is that true?

A.   Yes.

Q.   One in state court here in North Dakota, in Morton County?

A.   Yes.

Q.   And then one in state court in Texas; is that true?

A.   Yes.

Q.   Now, isn't it also true that as a part of the post-judgment discovery process that the FA ND entities and Foundation Automotive provided you with a copy of all of the documents associated with the closing of the Mandan Dealerships, the closing of that transaction to the Eide entities -- or to the Eide entities?

A.   I guess I'm not sure if that's all the documents.  I do remember getting some closing documents on the sale of the Mandan store.

Q.   Isn't it true also that you utilized some of the information in those closing documents to formulate the allegations in your complaint that you filed here in state court in North Dakota?

A.   Now you're getting into the legal stuff of it and I would have to -- that, obviously, is through my attorney.  I don't know what was filed.  I don't know what information was used.

That's -- sorry.  I don't know all that.

Q.    That's quite all right.  I just want to make sure that I have an understanding.

So it's your testimony on behalf of -- or sitting here as the president of BAPTKO and also you individually that you are unsure as to the source materials for the allegations contained in the complaint filed on your behalf individually and also BAPTKO in state court here in North Dakota?

A.    Say that again.

Q.    I'll try and make it a little simpler.

As far as where the factual allegations came from the complaint filed on your behalf individually and on BAPTKO's behalf here in state court in North Dakota, you were not aware of the source material, like where the factual allegations came from; is that true?

A.    I don't know what was used in the state court and the Texas court and -- for the filing.  I don't know.

Q.    Also the same is the case for the Texas court; is that also true?

A.    Correct.

Q.    Okay.  So that would be better -- those questions would be better left for your attorney?

A.    I would assume so, yes.

MR. SHAFFER:  Okay.  Nothing further for Mr. Kupper, Your Honor.

THE COURT:  Mr. Bakke, any questions for Mr. Kupper?

CROSS-EXAMINATION

BY MR. BAKKE:

Q.    The only question I would have is I've looked at the jury verdict.  And that's -- do you recall that that was on November 5, 2024, when the jury came back that afternoon?

A.    Yes, Election Day.  I remember that.

Q.    Okay.  And the judgment didn't actually get filed by the Court until later on November 7; correct?

A.    Correct.

Q.    Okay.  And -- which would be two days after the jury verdict.  And I'm not faulting the Court in any way but there is a time lag from when the judgment occurs in a courtroom and when it gets memorialized in the form of a judgment.

But the letter Mr. Shaffer's referring to is Exhibit 1 in the court documents.  That's on November 6, 2024, when we advised him that we had heard that the Foundation entities might be in the process of selling the Mandan Dealerships, which would be a day after the jury verdict occurred.  And -- and had you heard rumors in the community to that effect shortly after the jury trial ended?

A.    Yes.

Q.    Okay.

A.    Yes.

MR. BAKKE:  That's all the questions I have, Your Honor.

THE COURT:  All right.  Anything else, Mr. Shaffer, for this witness?

MR. SHAFFER:  Maybe one question.

THE COURT:  One question.

REDIRECT EXAMINATION

BY MR. SHAFFER:

Q.   Okay.  You didn't do anything to act on those rumors of the sale, did you?

A.   I guess I don't know what you mean by "do anything to act on them."

Q.   To follow up, get more information, to try to assert your rights with respect to the assets that were about to be sold.

A.   Yes, I tried to get as much information as I could.  I wanted to know what was going on because I heard -- I heard -- I heard the store that owes me a lot of money was selling, and I wanted to know what was going on.

Q.   Yet you did nothing with that information to enforce your rights as to those assets; is that true?

A.   I talked to my attorney about it.

MR. SHAFFER:  Okay.  Nothing further, Your Honor.

THE COURT:  All right.  The witness is excused.

Any other testimony, Mr. Shaffer?

MR. SHAFFER:  Yes, Your Honor.  I would call Kensye

Wood to the stand.

KENSYE WOOD,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SHAFFER:

Q.   Good afternoon, Ms. Wood.

A.   Mr. Shaffer.

Q.   Would you please state your full name for the record, spelling your last for the record?

A.   Yes, of course.  My first name is Kensye N. Wood and the spelling of my last name is W-o-o-d, and I'll give you the first, K-e-n-s-y-e.

Q.   Thank you.  You represent both the FA ND entities and Foundation Automotive; correct?

A.   Yes.

Q.   And you were involved in providing them advice with respect to the post-judgment discovery that was served on those entities by Mr. Kupper and BAPTKO?

A.   Yes.

Q.   Okay.  I want to just kind of help -- or provide the Court with a timeline of how everything went down and just the amount of information that is previous.  Okay?

A.   Yes.

Q.   When were those -- when were those post-judgment written

discovery requests served on FA -- the FA ND entities and Foundation Automotive?

A.    February 7 of 2025.

Q.    Okay.  When did the FA ND entities and Foundation Automotive provide responses and objections?

A.    We had to seek leave for additional time beyond the allowed time under the rules, but I can't remember exactly.  I believe it was the beginning of April -- maybe April 10.

Q.    Okay.  Were there any documents that were produced with the responses and objections?

A.    No documents were produced at that time.

Q.    Okay.  And why was that?

A.    The discovery request as originally -- well, as they stand even today -- looked to seek information from the Foundation entities going back to 2019.  And I was here when Mr. Slemko testified and as I understand, a lot of that information is not useful for what the current assets are.  So essentially it -- or with the floor plan.  Like the -- all of the cars that come in from the OEMs they would have, you know, some type of lien, I guess, technically.  And so to go through the dealerships going back to 2019 based on the face of the discovery request would have been a substantial amount of time and resources to be able to do that.  And so that is -- we objected, but then we're definitely willing to provide information within reason.

Q.    Were there any conferrals before the issue came before the

Court for an informal discovery discussion?

A.    Yes, there were.  There were a number of emails that were exchanged back and forth between counsel and then also Mr. Bakke set a informal -- he reached out to get that process initiated, and that's the same sentiment I just said was what we conveyed as well to Mr. Bakke.

Q.    Now eventually we came before the Court and before Judge Hochhalter and we were -- and the Court ordered the Foundation Parties, FA ND entities, and Foundation Automotive, to produce all the documents associated with the transaction, i.e., the sale of the Mandan Dealerships.  Do you recall that?

A.    Yes.

Q.    Is that something the FA ND entities and Foundation Automotive complied with that particular order?

A.    Yes.  And that order, it was in addition to reinstating the protective order as well.

Q.    And that was a request that you as counsel made or through the attorneys?

A.    Yeah.  We had -- based off of the letter that was -- or the email -- initial email from Mr. Bakke, November 6, so the day before the judgment, and then subsequent emails and letters after that indicated, like, there was -- there were hints that -- potential fraudulent transfer allegations.  It was being thrown around a lot.  So we had hesitations.  So that's why -- that's what we had mentioned during the -- the status

conference with Your Honor and mentioned that we were worried that the information that we provide in response to this discovery -- these discovery requests would be used to initiate a separate lawsuit and we were right.

Q.   Were there -- now the Court also ordered the parties to meet and confer again on the particular disputes over discovery.  Did that occur?

A.   Yeah.  So it was -- so the -- we had to meet and confer one more time before BAPTKO and Kupper could file their motion and that -- counsel for Mr. Kupper and BAPTKO, it was not Mr. Bakke, reached out.  I can't -- it might have been junior Mr. Bakke but it was to set a meet and conferral.  That was on the Friday before at, like, maybe 5:30, 5:21, something like that, before that deadline to meet and confer.  And then we -- myself and you, Mr. Shaffer, and Mr. Bakke -- all met on a Sunday to comply with that order to meet and confer one more time.

Q.   Okay.  And during that meet and confer, were there any commitments to produce additional documents?

A.   Yes.  So -- and before that I had already produced the closing binder.  And the closing binder, as I understand it, is everything that would have been associated with that sale of those two Mandan Dealerships.  I had initially redacted a number of -- a number of things in that closing binder based off of our fear of potentially these being -- used to initiate

other litigation.  But I -- after that was brought to my attention that there was an issue, I immediately removed those redactions and I produced those.

Then, during the meet and confer I had expressed very, very clearly we were more than willing to provide information.  It was just can you work with us.  Like, what do you really, really want to know and to get because what you have served would take so much time and effort and resources to be able to respond to it adequately.  But we're willing to do that but, like, let's meet in the middle on what would be a reasonable amount of time.

My takeaways from that was it didn't matter what we responded with and what would be produced, there was going to be a motion to compel coming and a motion for sanctions.  Period.

Q.   And that was subsequently filed; correct?

A.   That was, yes, I believe the end of that week.  So we conferred on a Sunday.  I followed up on Monday explaining that the -- all the documents that I'm still in the process of collecting, and I did produce those during that week.  But, yeah, that was filed by the end of the week.

Q.   What additional items did you produce?

A.   I produced the tax documents for 2023 and -- at that time those were the most up-to-date tax filings for the Foundation entities.  The 2024 were not available yet.  And that was --

like, it was a chunk of document -- or a chunk of pages.  Like, it wasn't a small amount.

I also produced and it -- the -- some internal audit -- like they're unaudited but they were documents from Foundation Automotive U.S. Corp. just kind of outlining more of the financial state in December 2024 those were dated, and then also the BMO records for FA ND CHEV and FA ND SUB, and that was for the entire month of December 2024 and those were completely unredacted.  So everything that occurred in December were contained in those two -- in those two account documents.

Q.   When you say "the BMO records," what are you referring to?

A.   The -- when I'm talking about the BMO records, they're FA ND CHEV and FA ND Sub's respective bank account records through BMO, which would have -- for the entire month of December 2024.  So those were produced.

Q.   And after producing those records, did you ever say or to your knowledge did any attorney on behalf of FA ND CHEV, FA ND SUB or Foundation Automotive ever say, "This is it.  This is all you're getting.  We're not going to produce any more records"?

A.   No, and in fact the -- we were very clear that -- just tell us what you want.  Like, if there's a specific document you're looking for, tell us what you want in terms of discovery and we'll give it to you within, you know, reasonable limits.  And the motion to compel for sanctions was, in my book,

inevitable.  But then once that was filed and those two other lawsuits were filed, all our work and our attention had to turn to that because it was a substantial, substantial lift to respond to both of those lawsuits.

Q.    Would it be fair to say that you kept the door open to counsel for Mr. Kupper or counsel for BAPTKO to follow up if there's additional information that they might need to make those -- make requests?

A.    Absolutely.

Q.    Within the boundaries of what had been previously requested?

A.    Absolutely.  The door was open.

Q.    Did you ever say -- ever get a follow-up communication from counsel to that effect?

A.    Not specifically.  We were told that the Foundation parties needed to post a bond.  That was really the focus, not that there was any more discovery that was necessary.

Q.    And was a lawsuit -- you mentioned a lawsuit was subsequently filed?

A.    Yes.

Q.    And do you know when?

A.    Yeah.  So May 20 we got an email from Mr. Bakke's office that if the Foundation Parties did not post a bond to stay the appeal, essentially, they would file the North Dakota state court action on behalf of Kupper and -- Mr. Kupper and BAPTKO

Inc. by May 23.  And, in fact, on May 23 we were provided with a copy of that complaint and a summons that -- we weren't provided with the copies that were filed but they did file on May 23.

Q.    You're familiar with the closing binder for the transaction between the FA ND entities and the Eide parties?

A.    I am.

Q.    Okay.  And you also had the opportunity to review a copy of the complaint that was filed in North Dakota state court in Morton County?

A.    Yes, because I prepared the motion to dismiss in that case.

Q.    Okay.  Based on your review of the complaint and your perception, did it appear to be that there was information within that complaint that had been sourced from the closing factor?

A.    1,000 percent.

Q.    Explain that.

A.    So the allegations of the complaint in the state court action in North Dakota track the timing of the sale of the Mandan Dealerships, the funds, which that would also not necessarily come from the binder but from the BMO records that I produced subsequently.  And I -- I would say -- well, the buyer, the buyer entities, PKMC Mandan, which is another party defendant in that North Dakota state court action and that

information would not be known and those transfers and the inner workings of the -- even the real estate would not have been known but for the production of those documents that we produced hesitantly, albeit, but after the Court ordered that we produce them, we did.

Q.    Okay.  And there was subsequently a lawsuit filed in Texas?

A.    Yes.

Q.    Okay.  Do you know when that was?

A.    Yes.  That -- I want to say that was June 24, 2025.  Or somewhere around there.  And that one specifically -- those allegations came from the BMO records and -- well, definitely still the closing binder as well.

Q.    What were the claims in that Texas lawsuit?

A.    Fraudulent transfer under the Texas code.

Q.    Okay.  And the laws -- the claims ensued in the North Dakota state court case?

A.    The North Dakota version of the fraudulent transfer or -- yeah, the Fraudulent Transfer Act.  It's just a variation of the uniform fraudulent transfer claim.

Q.    And you've been present for this entire hearing today?

A.    Yes.

Q.    That's the -- essentially the same issues and claims that we've gone over here today?

A.    Verbatim.

MR. SHAFFER:  I nothing further at this time, Your Honor.

THE COURT:  All right.  Why don't we take a break until 3:00 p.m.  we're in recess.

(Recess taken from 2:45 p.m. to 3:00 p.m.)

THE COURT:  Please be seated.  All right.  We're back on the record in FA ND CHEV, LLC, and others v. Kupper and others, Civil 1:20-cv-138.

Ms. Wood is on the stand and still under oath.

Mr. Bakke.

MR. BAKKE:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BAKKE:

Q.   Ms. Wood, I'd like to follow up on some of the answers you just gave to Mr. Shaffer.

First of all, he talked about a writ of execution. You heard him ask Mr. Kupper that question?

A.   Did I hear him ask Mr. Kupper, not me?

Q.   Yeah.  Why didn't you file a writ of execution immediately upon the judgment being entered upon November 7, 2024.  Do you recall that?

A.   I was here for that testimony, yes.

Q.   Sure.  And you understand there's an automatic stay on judgments in federal courts for 30 days?

A.   I do understand that.

Q.   Okay.  And do you also understand -- and I'm going to show you -- ask you to refer in the binder to Exhibit 1?

A.   I'm assuming BAPTKO Kupper Exhibit 1.

Q.   Yes.  I think there only is Exhibit 1 today.

A.   I thought we were using "B" as in BAPTKO.

Q.   Okay.  That's fine.

A.   I'm just clarifying.

     THE COURT:  I'll again remind everyone to speak up, if you can.  Speak in the direction of the bulbous end of your microphone and only one person at a time.

     Sorry to interrupt, Mr. Bakke.

Q.   (MR. BAKKE CONTINUING)   Are you there?

A.   I am.

Q.   And that's an email I wrote to Mr. Shaffer on November 6, 2024, pointing out that under the First Amendment of the APA that if there was a sale that occurred of the Mandan Dealerships, that under the purchase price language in the APA, that the buyer, meaning the Foundation entities, would have to pay the full amount of the earnout prior to or at the time of the sale of the dealerships; correct?

A.   Do I see that email from you?

Q.   Yes.  And that's the topic it discusses, one of them?

A.   Yes, it appears that way.

Q.   And then it also indicates that we were requesting that BAPTKO will be paid the full 3 million plus the interest

awarded in the judgment and that if they failed to do so, this would be another breach of the APA by the Foundation entities; correct?

A.   I see that you said that there on the second page.

Q.   Okay.  And I'm going to hand you what we're marking as a rebuttal exhibit.

MR. BAKKE:  Your Honor, that we will mark as Exhibit 37 and provide a copy both to the witness and to Mr. Shaffer.

THE COURT:  And I have what's been marked for identification purposes in the upper right-hand corner of the first of two pages, Number 37, it appears.  Is that right Mr. Bakke?

MR. BAKKE:  Yes, Your Honor.

THE COURT:  All right.  Mr. Shaffer, you have that as well?

MR. SHAFFER:  Yes, Your Honor.

THE COURT:  Any objection to it being received?

MR. SHAFFER:  No objection.

THE COURT:  Exhibit 37 is received, Mr. Bakke.

MR. BAKKE:  Thank you, Your Honor.

Q.   (MR. BAKKE CONTINUING)   And you see on there on December 4, prior to the closing of the Mandan Dealerships, that Mr. Shaffer was denying that transferring the dealerships to another owner would be considered a fraudulent transfer and

also threatened Rule 11 sanctions against me and my firm if we pursued such a claim at that time?

A.    Yes.

Q.    You offered some testimony about a lien on cars.  And I looked back at our written discovery requests, and I don't see any discovery requests asking for liens on specific cars that you said would have been a lot of work to find and respond to.

A.    I didn't say specifically that that -- I didn't quote that discovery request but that is the scope of what was requested.

With regard to the personal property, all records, that's any records, dating back to June 2019 of personal property, assets of the dealerships, those involved, the new vehicles that were allocated to the dealerships since the closing with Mr. Kupper and the Foundation Automotive Corp.; so that's a substantial amount of cars coming in and out through both of those dealerships.  So that -- yeah.  That's -- but I didn't say liens.  I was talking about the transfers of -- I want to say I really don't even remember.  But it wasn't -- I wasn't quoting a discovery request.

Q.    Well, let's look at the discovery requests.  Take a look at Exhibit 4, BAPTKO's exhibits.

A.    (Examining.)  I'm there.

Q.    Okay.  Look at -- look at Interrogatory 7.  And I'll represent to you and the Court that there were three identical sets of discovery requests to each of the judgment debtors in

this case.  You're aware of that; correct?

A.    I am aware of that, yes.

Q.    And they essentially mirrored each other's; correct?

A.    Yep.

Q.    Okay.  So looking at Exhibit 7, I want you to focus on subparts (d), (e), and (f).  We specifically asked you to identify and describe where the proceeds of the sale were deposited or kept after the sale, meaning the sale of the Mandan Dealerships by the Foundation entities; correct?

A.    Yes.

Q.    We asked you to identify and describe any subsequent transfers of the proceeds and the current location of the proceeds; correct?

A.    Yeah.

        THE COURT:  Is this Exhibit 4, Mr. Bakke, or Exhibit 7?

        MR. BAKKE:  It could be any of Exhibits 4, 5, and 6.

        THE COURT:  The one you're referring to now is?

        MR. BAKKE:  Is 4.

        THE COURT:  4.  Okay.  Thank you.

        THE WITNESS:  That's on page 8; right?

Q.    (MR. BAKKE CONTINUING)  Yeah.  Yeah, it's on page 8.  Interrogatory Number 7, subparts (d), (e), and (f).

        THE COURT:  Okay.  I'm looking at Exhibit 4, page 8.

        MR. BAKKE:  Okay.  Thank you, Your Honor.

Q.    (MR. BAKKE CONTINUING)  And (d), (e) -- and we'll cover (f) -- identify and describe how FA ND CHEV, LLC, has used/spent the proceeds since the sale; correct?

A.    Yes.

Q.    And that information was never provided to us even up to this date.  You agree?

A.    We have produced the documents and provided the information through the documents but the response to the interrogatory, no.

Q.    Well, that's not true either.  In fact, if we look at the interrogatories, they aren't even signed as is required under Rule 33 of the Federal Rules of Civil Procedure by your client; isn't that correct?

A.    Well, we didn't provide any substantive responses.  We objected to all of them.

Q.    Right.  You gave no responses and no supplemental responses either; correct?

A.    Just disclosure of documents, about 500 pages.

Q.    Okay.  And what is the document that was supposedly produced by Foundation that answered subparts (d), (e), and (f) in Interrogatory 7 to tell us where the proceeds from the sale were transferred to and any subsequent transfers?  What document is that?

A.    Specifically the -- it's the waterfall document that was also produced with the FAC stamp at the bottom also indicating

a post-judgment production.

Q.   Well, but that doesn't identify on there what FA ND CHEV or FA ND SUB did because we heard the testimony this morning where we learned for the first time that -- where it says on that exhibit, which is Exhibit 23, on the top "Foundation Automotive," that is Foundation Automotive U.S.  Did you hear Mr. Slemko's testimony in that regard?

A.   Yes, but that answers the questions regarding --

Q.   No.  No, it does not.

A.   Okay.

Q.   Because these are not directed nor could we send interrogatories or requests for production in aid of execution to Foundation Automotive U.S. because they're not a party. They're not a judgment debtor, are they?

A.   You've served discovery responses in the Texas case to that very effect.

Q.   And that -- those have been objected to as well --

A.   No.

Q.   -- and to clarify the record, I have not been involved in that case and am not counsel of record --

A.   Right, but you just said --

             THE COURT:  Hang on.  Slow down.  One at a time.

             THE WITNESS:  You just said we objected to those discovery responses and we have not at all.  We are -- they're not even due yet.  They're due a week from today.

MR. BAKKE:  Okay.

THE WITNESS:  So you're going to get this -- you're getting all of this information.  The point is we've asked --

Q.  (MR. BAKKE CONTINUING)  I don't have a question pending to you.

A.  You haven't let me finish.

THE COURT:  Unless there's a question, Ms. Wood --

THE WITNESS:  Okay.

THE COURT:  -- wait for the question.  All right?

THE WITNESS:  All right.  Sorry, Your Honor.

Q.  (MR. BAKKE CONTINUING)  I'm asking about this case.  The federal court action.  The only discovery request served in this case were on the judgment debtors, the FA ND CHEV, the FA ND SUB, and Foundation Automotive Corp., the Alberta corporation.  You understand that; correct?

A.  Yes.

Q.  And you -- we have not served any discovery requests nor have we subpoenaed any records from Foundation Automotive U.S. Corp. in the federal court action; true?

A.  True.

Q.  Okay.  So my question is -- because we know Exhibit 23 does not relate to where FA ND CHEV or FA ND SUB transferred the money or how they used the money, that document, according to Mr. Slemko, relates to Foundation Automotive U.S. which we first learned this morning.  The document itself doesn't say

Foundation Automotive U.S.; correct?  Exhibit 23?

A.    It says Foundation Automotive.

Q.    But it doesn't provide a definition of who that's for.

A.    Okay.

Q.    Correct?

A.    Yeah.

Q.    We never got supplemental answers saying on Exhibit 23 the -- what you're calling the waterfall document, that the Foundation Automotive identified means Foundation Automotive U.S.; correct?

A.    Can you restate that?  Sorry.

Q.    Yeah, it doesn't -- you never gave us any answers that told us that.  The first time that was indicated to us was today through Mr. Slemko's testimony; correct?

A.    If I can explain?

Q.    I don't want you to explain.

A.    Okay.

Q.    Is that a -- is that a true statement that I just made?

A.    Sure.

Q.    And so if we look at what you did produce, because you talked about some BMO Bank records -- and I want you to turn to those now, that is Exhibits 24 and 25.

A.    (Examining.)

Q.    Are you there?

A.    Yeah.

Q.   And what we have, for example, Exhibit 24, is a document that shows us the -- some limited bank account information for FA ND CHEV, LLC; correct?

A.   Yes.

Q.   Okay.

A.   This is the FA ND CHEV one.

Q.   Okay.  And so what this shows is deposits in to and transfers out of the FA ND CHEV, LLC, accounts; correct?

A.   Yes.

Q.   So if we go to the page FAC000396 of Exhibit 24 we see there's something on December 11 described as "PC TRANSFER DEBIT BAL TRANSFER" for 13,416,829.49; correct?

A.   Yes.

Q.   Above that a few lines, December 11, "PC TRANSFER CREDIT, IC TFR CARSDEPOSIT, 13,516,671.76"; correct?

A.   Yeah.

Q.   Okay.  So on the second one, the transfer debit, it doesn't give us any information on where that money was transferred to on December 11, 2024; correct?

A.   It doesn't appear so.

Q.   Okay.  That doesn't give us any name of the company or business or person where that money was transferred to; correct?

A.   Nope.

Q.   Doesn't even give us an account number for the company or

business or person that it was transferred to; correct?

A.   I will say it tracks the other ones that were also debit balance transfers.

Q.   Well, no, not exactly.  The numbers are different.

But that doesn't give us any information on how the money was used, does it?

A.   I mean, it's -- it does, though.

Q.   Well, how does it describe how the money was used other than a transfer?

A.   This is a full -- full -- month of debits and credits and withdrawals and deposits; so --

Q.   I'm not asking you about the full month.  I'm talking about the bank deposit that Mr. Slemko has testified was for the closing on the Mandan Dealerships paid by the Eide entities on December 11, 2024.  There's no information in there providing us where the money was transferred to; correct?

A.   I -- I can't say that for certain because I do see that there's a number of transfers that it does tell you where it's going.

Q.   Let's turn to Exhibit 25, to the third page, in FAC00404.

A.   (Examining.)

Q.   On December 11, about a quarter down the page we have a transfer amount of 11,539,727.59; correct?

A.   Yes, I see that there.

Q.   And then right above it, same date, "FED wire transfer

credit," it's got some numbers -- perhaps part of the routing number -- 11,638,508.63; correct?

A.    I see that.

Q.    Once again, in relation to FA ND SUB, LLC, no information on where that money was transferred; correct?

A.    I would answer the same way.  With regard to the ones you're pointing out, no, it does not have one.

Q.    And so following the production of those we followed up -- and I'm going to turn now to Exhibit 11.  And Exhibit 11 is an email from me on April 11, 2025, to you, copying in Mr. Shaffer; correct?

A.    Yes.

Q.    And following up on the provision of Exhibits 24 and 25, the BMO Bank records that we just discussed; correct?

A.    I actually don't think that's the case, no.  That's not correct.

Q.    Okay.  Well, I say in here, "The information you provided appears to be related to the sale of the Mandan Dealerships previously owned by FA ND CHEV and FA ND SUB, and there's virtually no information provided as to where the proceeds from the sale of the Mandan Dealerships went, other than one wire transfer document identifying that the proceeds were deposited in a BMO Harris bank account for some Foundation entity."  Do you see that there?

A.    The subject line does not include -- I produced these

later.  These -- these -- Exhibit 24 and 25, I was producing the closing binder in this email chain.

Q.   Well, the closing binder was the same time you provided the BMO records?

A.   No, it wasn't.

Q.   Okay.  When did you produce those?

A.   I would have to look at a email to refresh my memory but it was after because the Bates label of 24 starts on FAC000393.

Q.   Okay.

A.   And you can see here that I've produced to 211, FAC000211.

Q.   Then let's --

THE COURT:  Which exhibit, Mr. Bakke, are you referring to now (audio glitch).  Which page of the exhibit?

MR. BAKKE:  The first page of that exhibit, Your Honor, the first paragraph.

THE COURT:  And, Ms. Wood, you're referring to the subject line of that first page of Exhibit 11?

THE WITNESS:  Yes, Your Honor.

Q.   (MR. BAKKE CONTINUING)  Okay.  Then -- then let's turn to Exhibit 12.  April 15, 2025, another email by me to you and Mr. Shaffer; correct?

A.   Yes, I see that.

Q.   And once again, in the second paragraph on the first page, I explain that the documents we've received from Foundation do not indicate what the Foundation entities did with the proceeds

of the sale -- they do not describe where the proceeds are held, or the type of account they're held in, or even which Foundation currently holds the proceeds of the North Dakota dealership sales.  The only information we have in that regard is Max's statement that he believes the proceeds "flowed up" from FA ND CHEV and FA ND SUB to a different corporate entity.

Have I read that correctly?

A.    It appears so.

Q.    Okay.  Then let's turn to Exhibit 13, first page.  That's an email from me to Mr. Shaffer.  You're copied in on April 16.

A.    Yes.  Sorry.  Yeah.

Q.    Okay.  And once again I'm saying we find no documents or information, and I referred to the Bates labeled numbers which are different than on Exhibit 11.  So that's based on the subsequent production; correct?

A.    It looks like it was based off of up to 389.

Q.    Okay.

A.    Which also would be 24 or 25.

Q.    Okay.  Indicating, once again, we don't have information on where the money went after it was received by the FA ND entities; correct?

A.    I read that there.  Sure.  Yeah.

Q.    Okay.  Okay.  Then let's turn to Exhibit 14, which is another email from me to you dated April 24, Max Shaffer is copied in.  And that refers to the documents that we're looking

at, Exhibit 24 and 25; correct?  So that it includes the BMO Bank records?

A.    That's right.

Q.    And I say in the first paragraph to you, "There's no information in the documents provided indicating where the payment proceeds for the Mandan dealership sales went to"?

A.    You read that correctly.

Q.    Okay.  And the second to last paragraph I specifically indicate we're requesting that the Foundation Parties -- and I identify the FA ND entities and Foundation Automotive Corp. -- immediately advise where the referenced funds in the amount of the 13,416,829.49 and 11,539,727.59 were transferred to and then Foundation produce all related documentation.

        And that's the very pages I just went over with you in page -- in Exhibits 24 and 25, isn't it?

A.    Yeah.

Q.    Okay.  And those were -- you never provided any information on where that money was transferred and still have not produced that information on where the money was transferred to, even up until this day still not produced; correct?

A.    At that point there was already a motion to compel filed on the record so at that point there was -- the -- we have no more opportunity to comply.

Q.    Well -- well, you had several months prior to when the

motion to compel was filed, which was, incidentally, after I sent you this email on April 25; correct?

A.    No.

Q.    Okay.  So you -- you couldn't have produced it after that and said, "Well, gee, we're going to give you the documents showing where the money was transferred to"?

A.    This was filed -- the motion to compel -- you can see Doc 552, you reference it in this email -- had already been filed for, what, two weeks almost.  I think it was filed on -- well, I guess it was filed the end of the week on February -- or on April 13, so right after that conferral with Grant Bakke.

Q.    Okay.  And you still had an opportunity for a response to that motion and could have said to the judge, Judge, we're now -- we agree, we can give him this information.  And you didn't to that and you still haven't given that information today; correct?

A.    You wouldn't provide what you needed -- what you wanted from us further.

Q.    I just read it to you from Exhibit 14.

A.    Okay.

Q.    Correct?

A.    Not necessarily.

        THE COURT:  Let me ask a question.

        Ms. Wood, is there additional documentation of these -- of the sale of these two businesses that has not been

disclosed?

THE WITNESS:  No.  We have produced everything with regard to the sale of the two Mandan Dealerships that Foundation maintains.

THE COURT:  As of what date was that produced?

THE WITNESS:  So I think the last production was -- and, honestly, April 18.  But it was not -- the -- yeah.  So the April 18, that was the Exhibit 24 and 25, I believe.  And those were the BMO records that I had my client go ahead and find and obtain for me to produce.  But those weren't necessarily associated with the sale of the Mandan dealership.  So the first production was 211 pages of the whole closing packet that they maintain in their records.

THE COURT:  Does that include the -- whatever security agreements there are in place with regard to creditors?

THE WITNESS:  Not security agreements.  No, Your Honor.  The closing -- no.  That wouldn't have been even maintained in the closing binder.  Because it -- it was just related to the Eide parties and the subsequent lease agreement.

THE COURT:  Was there any kind of settlement statement, any accounting that described which creditor should receive what?

THE WITNESS:  The -- the -- we also produced -- I -- shortly after that the -- with the waterfall document that does

outline that.  But in terms of the actual agreement, no.

THE COURT:  Is there such an agreement?

THE WITNESS:  No.  Maybe.  I'm not sure.  But by that point, I mean, we were already -- we -- we feel like we've complied with Your Honor's order to give all those documents. And with regard to the subsequent discovery, I think that we had hesitations to give further because it was going to be used in subsequent lawsuits.

Q.   (MR. BAKKE CONTINUING)  Well, in relation to providing all the closing documents, that's not correct either because the closing documents on the sale would have included documents from -- from BMO Bank and from HPS showing the amounts that they were paid and how that was credited by them towards the debt of whom, which Foundation entity.  And that was actually paid by Foundation Automotive U.S., according to Mr. Slemko; correct?

A.   I actually don't know what part you want me to answer there.

Q.   Well, did you hear Mr. Slemko testify that the amounts paid to HPS were paid by Foundation Automotive U.S.?

A.   I did hear that.

Q.   Okay.  And you heard him testify that the amount due BMO Bank was paid by Foundation Automotive U.S.; correct?

A.   I'm sorry.  Can you repeat that?

Q.   The documents relating to the amounts owed to BMO Bank --

A.    The floor plan, yeah.

Q.    -- from the sales of the Mandan Dealerships was paid by Foundation Automotive U.S.?

A.    I don't necessarily remember -- yeah.  Probably.

Q.    Okay.  And so there would be documents that exist that were never produced on those notes and loans, things such as the seven-year term loan, the notes or agreements with the lenders, HPS and BMO, the forbearance documents, the credit agreement and waivers Mr. Slemko talked about and the consent he talked about this morning and none of those have been produced; correct?

A.    I don't feel comfortable agreeing to that whole laundry list.

Q.    Well, Mr. Slemko testified this morning they were not provided.  Do you have reason to disagree with him?

A.    What are "they"?  I --

Q.    The documents I just described.

A.    I don't think those would be part of the closing binder.

Q.    Okay.  And then those were documents that we specifically asked for in Exhibits 4, 5, and 6.  For instance, I'm looking at Request Number 6:  Copies of all mortgages, promissory notes, liens, and any other instruments securing debt owed by FA ND CHEV or related to any property owned by FA ND CHEV from June 21, 2019, to present.  And identical requests to FA ND SUB were also served too; correct?

A.    Sorry.  I don't know what page you're on.

Q.    I'm on Request Number 6 and Request Number 7.  I'm talking about debt owed about the FA ND entities and none of --

A.    Requests for production?

Q.    Correct.  And none of those were provided.  Still haven't been today; correct?

A.    I just wanted to read it because I wasn't there when you were.

THE COURT:  What exhibit and what page of that exhibit, Mr. Bakke?

MR. BAKKE:  It is Exhibit 4 and it is Request Number 6 and 7 which is on page 9.

Q.    (MR. BAKKE CONTINUING)  That's not -- that information has not been provided; correct?

A.    From June 21, 2019, to present?

Q.    Right.

A.    We've offered.  If you would -- if you would agree to limit -- like, limit the scope to be able to actually collect on the judgment, that was declined.

Q.    Well, let's explore that issue.  Take a look at Exhibit Number 10.

THE COURT:  Is this the one, Mr. Bakke, where you said "pick any timeframe" --

MR. BAKKE:  It is.

THE COURT:  -- or at least some of it?

MR. BAKKE:  It is.

Q.  (MR. BAKKE CONTINUING)   Exhibit 10, March 25, 2025, before this motion to compel is filed.  In order to try to avoid the dispute, at least initially, we agreed, in writing, to Mr. Shaffer and Mr. -- you, specifically me, on March 25, 2025, third paragraph down, "We note that the Foundation Parties' objections relate primarily to the time periods involved in the individual requests.  In an effort to resolve this discovery dispute in good faith, we request that you provide all responsive information and documents for each interrogatory and request for production, limited to whatever timeframe the Foundation Parties feel is reasonable and allowable under the Rules of Civil Procedure (whether that is limited to just the present time, or some reasonable lookback period )."

Have I read that correctly?

A.  Yes.

Q.  Okay.  And you never did that; correct?

A.  We had a phone call afterwards and -- see at the bottom there, it says, "Let us know your availability on March 31 and April 1, 2025, for a meet and confer phone call."  And on that phone call it was expressed to us that no matter how the -- if we limit our scope to whatever we think is reasonable, a motion to compel and a motion for sanctions are inevitable unless we had our client post a bond.  That was, like, the main hook.

Q.   Well, this says -- and you don't have anything -- you don't have any recording on that call, do you?  That you can provide to the Court?

A.   I have my memory, and I am swearing that I'm telling the truth.

Q.   And then there's an email -- an email where you tried to memorialize that and sent that to David Phillips and Grant Bakke from our firm -- we can pull that out, if necessary -- they disagreed with your rendition of what occurred.

But in writing you were told to limit it to whatever time period and you didn't give that information for any time period, did you?

A.   No, because a motion to compel and a motion for sanctions was inevitable as -- as we understood it.

Q.   Well, motions to compel can be resolved between the parties; correct?  Once one is filed; isn't that true?

A.   No.

Q.   And then we ask for -- and I'm not going to go through all these discovery requests, but I can tell you, Ms. Wood, in these discovery requests we provided annual financial statements, balance states, income statements, tax returns, documents evidencing asset transfers of personal property, real property, and all documents relating to FA ND's use, spending, investing or otherwise accounting for the proceeds since the sale and so on.  And we're hearing from Mr. Slemko for the

first time today there's many such documents that exist that have not been produced.

And so you talked about this issue of this concern about fraudulent transfer.  What -- what law is it that you're relying on that says that a party who has a judgment against another party cannot pursue enforcement or collection on that judgment in state court?

A.    My understanding of the fraudulent transfer claims, both in North Dakota and Texas, are not judgment enforcement -- judgment enforcement or collection proceedings.  They are alleging actual fraud.  And so it's -- that's not what we're saying.  We're not saying that Mr. Kupper can't collect on the judgment.  We're saying also that he can't use the discovery which we've provided to date.  Why would we give more when there is a clear disregard for the protective order?  That was what -- that was our fear.

And we -- like, it's now happening.  That there's been a ton of work and fees gone into each one of those cases to defend against it, against non-judgment debtors as well. And it's been substantial.

So, yeah, I would say I feel very hesitant sitting up here because there is a chance it will be used because the protective order, it doesn't seem to matter.

Q.    Okay.  Well, let's answer my question first and then we'll move on to the issue of what you think the motives are by

Mr. Kupper and/or his counsel.

So you're not telling this Court you think there's a legal basis to say that someone in this case, Kupper or BAPTKO, who have a judgment, can't try to execute on the assets of the judgment debtors when they have failed to post a bond?  You don't disagree with that, do you?

A.    No.  Do not.

Q.    Okay.  So on this issue of fraudulent transfer, you do understand that if there is a fraudulent transfer, that then that is a viable, legal claim that can be made against Foundation?

A.    I'd say that that is not judgment enforcement collection proceedings whatsoever.

Q.    That wasn't my question.

Can an action be pursued, to your understanding, for a fraudulent transfer that occurs by someone who has a judgment against them and transfers the funds to a third-party, in this case Foundation Automotive U.S.?

A.    Is that a claim that exists?  Is that what you're asking?

Q.    Yeah.  Is that a viable legal claim to your understanding?

A.    I would not call that claim viable.

Q.    Okay.  So there's never a circumstance you can envision where if a party who has a judgment against them transfers money to a third party knowingly in an attempt to try to avoid collection on that judgment, you could never see a universe

where that's a viable legal claim; is that correct?

A.    Not in this universe in this courtroom and in this case.

Q.    And how many of those lawsuits have you previously been involved with in North Dakota before, under the Uniform Fraudulent Transfer -- Voidable Transfer Act?

A.    Personally?

Q.    Sure.

A.    Zero.

Q.    Okay.  And how about in Texas?

A.    Zero.

Q.    Okay.  And how many fraudulent transfer cases in any jurisdiction have you been involved with where there was a claim that someone who had a judgment against them made a fraudulent transfer to avoid collection on the judgment?

A.    I would say I'm not trying to be an expert in fraudulent transfer claims here.  Like, I have Westlaw.  I've researched it.  That's the extent of it.

Q.    Okay.  Let's turn to this topic of your belief that some documents were used to -- let's start with the action in Morton County and you said documents were used in that action that were produced by Foundation in this federal court action?

A.    Yep.

Q.    Okay.  What -- what document was referred to or used in the complaint or amended complaint in the Morton County action?

A.    The information contained in the closing documents and the

BMO account documents.  The actual information was used to turn around and file a lawsuit.

Q.   Okay.  I'm asking about the documents.  Was there a document that was produced by Foundation in this case that was used in the Morton County action?

A.   Yes.  All the documents produced post-judgment and received from BMO.

Q.   Okay.  So -- so let's look at F2.  That's your exhibit. Okay.  And let's just very quickly go over the documents that are referenced in the amended complaint.  And you'll see here -- this is your exhibit -- there are no documents that were attached with this amended complaint; is that correct?

A.   I'm not saying they were attached.

Q.   Okay.  Because a minute ago you said they were attached.

A.   No, I said they were used.

Q.   Okay.  So there were no documents attached, produced --

THE COURT:  Just for clarity, the documents that the witness was referring to were used for informational purposes, I think was her testimony, in drafting the complaint at state court.  Is that what you were saying, Ms. Wood?

THE WITNESS:  Yes, Your Honor.

Q.   (MR. BAKKE CONTINUING)  Okay.  Let's go through the documents referenced there, the information.

So in this, in terms of the failure to pay, it talks about the earnout provisions in the APA; correct?

A.    On page 2?

Q.    On page 2 and 3.

A.    That is the header that I'm reading there, yes.

Q.    Okay.  And that asset purchase agreement is publicly available on the court docket in federal court here and has been for many years; correct?

A.    Yes.

Q.    Okay.  So that's -- that's not a document that was produced in post-judgment discovery, is it?

A.    No.

Q.    Okay.  And then let's turn to page 4 of the federal lawsuit to recover unpaid earnouts of money.  Those talk about the judgments, the original judgment and the amended judgment, both of which are publicly filed; correct?

A.    Yes.

Q.    Those weren't produced by Foundation in post-judgment discovery, were they?

A.    No, they were not.

Q.    Okay.  And then the transfers made with actual intent to hinder, delay or defraud BAPTKO on -- starting on paragraph 21, page 5 continuing on to page 6, in terms of the sales documents, those documents that are referred to, the real estate transaction documents, those are publicly available in Morton County through the NDRIN system, are they not?

A.    The reason you know to look for those is because of the

closing binder that was produced because that -- as Mr. Slemko testified earlier, that whole transfer of property was -- involved a lease agreement, the -- to, you know, free up capital.  I mean, it wasn't just, like, direct.  It wasn't clear.  The only way you know that is if you look at the closing binder.

Q.   Well, no.  It would be a matter of just simply looking it up on NDRIN showing who had the mortgages.  It was Bravera Bank and Starion Bank for the real estate and showing that the documents -- because there were warranty deeds and related documents filed, showing the property transferred from the CARS entities to the Eide entities; correct?  Specifically PKMC. Those are publicly available documents, aren't they?

A.   The link to Foundation was the -- cause like you just said, when you search that it doesn't come up FA ND CHEV, FA ND SUB owned that property.  It comes up with this CARS entity that owned it and then transferred it to the Eide entities.  So the only way you know that's connected to Foundation is through the closing binder.

Q.   Well, except for during the case in federal court there was discussion in front of the jury in open court and in deposition testimony that was not sealed where there was discussion that Foundation had sold and was in the process of selling the real estate and owned the real estate prior to CARS; correct?  That's all publicly available information.  You

don't need to look at --

A.   I don't think so.

Q.   -- anything that was produced by Foundation in post-judgment discovery, do you?

A.   I'm going to heavily disagree with that as an accurate portrayal of what was said in open court in front of the jury.

THE COURT:  So why don't we move on to something else.  Because I -- you know, for my purposes it doesn't really matter to me where the information came that has been used in this complaint.  Those witnesses said that everything was disclosed.  I understand, Mr. Bakke, if your client does not necessarily agree.

Q.   (MR. BAKKE CONTINUING)  Okay.  And just -- just quickly, in the Texas action, in relation to Foundation Automotive U.S.'s involvement, we received in the federal court action -- and also when you mistakenly filed or removed the action in Texas -- information indicating how the FA ND entities were owned and by whom; correct?  Because it's a federal court requirement on the corporate disclosure to identify that information which then becomes publicly available information; correct?

A.   Right.  We weren't hiding that information.

Q.   And in terms of the BMO records that we have marked Exhibit 28, that customer information where we sent two subpoenas to BMO Bank to find out where the money got

transferred to from Foundation -- excuse me -- from FA ND CHEV, LLC, and FA ND SUB, LLC, you received a copy of that subpoena; correct?

A.    I'm not seeing Exhibit 28 in here.  Hold on.  Oh, there was a binder clip there.  Sorry.  Now I'm there.  Sorry.  Go ahead.

Q.    You received that subpoena we sent to BMO Bank; correct?

A.    The Exhibit 28 is not the subpoena; right?

Q.    No.  My question was the subpoena that allowed us to get this information you received.

A.    You noticed the subpoena, yeah.

Q.    And you got a notice and the actual subpoena and you never objected to it; correct?

A.    No.  Right.

Q.    And Mr. Slemko has testified these are records of Foundation that he has -- he checks every day and has for many years, yet these documents showing where the money was transferred to were never provided to us at any time.  We only got them through serving third-party subpoenas; correct?

A.    Yes, for good reason.

Q.    Okay.  And these documents, you agree, do disclose where the money got transferred to; correct?

A.    Exhibit 28?

Q.    Exhibit 28.

A.    Yes.  Yes.

Q.    Okay.  And Foundation has never designated these documents as being confidential; correct?

A.    We didn't produce them.

Q.    Okay.  But under the amended protective order that you're claiming Mr. Kupper and our law firm and BAPTKO violated, which is Document 275, there's a procedure for designation of -- and protection of confidential information, subpart (d)(10).  And it says, "In the event a party or nonparty produces confidential information, a party may designate it in the following manner."  And this is a production, Exhibit 28, from BMO Bank from a nonparty; correct?

A.    We never received this, though.

Q.    Okay.  This is a production from a nonparty; correct?

A.    Yes, that we never received.  So how could we have designated it?

Q.    Well, I offered in an email to produce it to you and you never responded; correct?

A.    Months later.  Months later.

Q.    I'm not asking for a date of when it happened.  You acknowledged we offer, and you never took us up on that offer?

A.    After the Harris County case had already been filed, so it wouldn't have mattered.

Q.    Okay.  And these were records that were available to your client, according to Mr. Slemko, the entire time; correct?

A.    Yes.

Q.    Okay.  And do you know whether BMO Bank provided copies of the documents they produced in response to the subpoena directly to your client or to your firm?

A.    We did not receive those documents, no.

Q.    Okay.  And never -- still haven't been designated as confidential as required under the amended protective order by your client; correct?

A.    Right.  What would be the point?  They've already been used.

        MR. BAKKE:  Okay.  Your Honor, I don't have any other questions for Ms. Wood.

        THE COURT:  One question?

        MR. SHAFFER:  I maybe have two.  Just a couple follow-ups, Your Honor.

                    REDIRECT EXAMINATION

BY MR. SHAFFER:

Q.    With respect to Exhibit 28, Ms. Wood, that we just looked at for BAPTKO, is a copy of the Court's protective order included with that subpoena?

A.    No.

Q.    What was the compliance date for the subpoena, according to Exhibit 27?

A.    Gosh.  I want to say it was, like -- yeah.  So it was May 1, 2025.

Q.    And that's more than five months ago?

A.    Uh-huh.  Yes.

Q.    Since that time have you seen a single writ of garnishment served on BMO?

A.    No.

Q.    Have you seen a single notice of post-judgment deposition served on anyone in the case?

A.    No.

Q.    Have you seen a single application for writ of execution?

A.    No.

Q.    With respect to Exhibit 28, what is -- does the word "confidential" appear anywhere on the first page of the document?

A.    No.  Oh.  Wait.  Yes, it does.  Sorry.  28.  Yeah.  Right under "subpoena processor BMO Bank NA," under the whole table there it says confidential below it.

Q.    Okay.  With respect to the information that was requested in the post-judgment interrogatories, is it true that some of that information that had been requested had already been produced during the course of the lawsuit?

A.    Yes, a large number of them.

Q.    For instance, tax returns?

A.    Yes, in addition to all of the CDK documents that involved all of the personal property, i.e., the vehicles had already been produced as well.

Q.    As well as -- are you familiar with Crowe?

A.    Yes, the Crowe audits, the financial documents.

Q.    First of all, what is Crowe?

A.    I think they're an auditor.

Q.    So they're an accounting firm?

A.    Accounting firm, yeah.

Q.    And they -- there have been balance sheets?

A.    Tons from them.  Tons from Crowe, from the beginning of when they first acquired -- and I say "they," Foundation Automotive Corp. -- acquired these two Mandan Dealerships.

Q.    Would it be fair to say that in that respect the post-judgment discovery was -- covered information that had, in fact, already been produced in the case?

A.    Yes.

Q.    Wasn't that something that you discussed with Grant Bakke?

A.    Yes, on April 13th that is something we discussed and we were told in response to that that he would need to get with Mr. Bakke here today to discuss what additional documents they would need in addition to the documents we've produced prejudgment discovery.

        MR. SHAFFER:  Your Honor, I apologize.  That was more than two questions but I have nothing further.

        THE COURT:  Witness is excused.

        Any other testimony, Mr. Shaffer?

        MR. SHAFFER:  I believe that is it for witnesses for us, Your Honor.  Thank you.

THE COURT:  All right.  Let's look at some of these just so I understand the issues and some of these we might be able to resolve today.

Pending motions, as we discussed at the beginning of today's hearing, motion for stay pending appeal.  That's a stay of discovery?  Am I understanding that?

Mr. Bakke, someone is -- Foundation Parties are requesting a stay of discovery issues or what is this stay that --

MR. BAKKE:  Well, I guess I best let Mr. Shaffer respond to that question.

THE COURT:  Mr. Shaffer.

MR. SHAFFER:  Your Honor, I believe the scope of that request is the stay of execution, and if I just may make a brief record on that.

Our concern here, and one of the concerns that I raised at the beginning of the hearing, was that this -- the information that was going to come out in this hearing, if used and made public, could eventually just bring about the --

THE COURT:  Oh.  Okay.  Let me stop you there.  "The information that's going to come out."  There is, presently, an amended protective order that's in place; right?  We all agree on that.  And that allows for disclosure to numerous persons in your offices -- experts, others, the Court, you name it.

Are we -- have you thought about the prospect of

having a protective order in these state court cases?

MR. SHAFFER:  Yes, Your Honor.  That is something that is currently being discussed in --

THE COURT:  Cause isn't that -- aren't we really talking about just expanding the group that can be -- that this information can be disclosed to?  We're not talking about -- Mr. Bakke is not planning on publishing it somewhere in a newspaper or something, these documents.  It's to be used in the course of what he believes is prosecuting the case on behalf of his client, Mr. Kupper, and executing on a judgment.

MR. SHAFFER:  I completely agree with you, Your Honor.  But if it's included in a complaint or a court filing, you know, that's made public -- that's public knowledge.  Our concern is the only way they found the information or discovered the information is in this suit.  Now they're bringing it outside this suit to use in a different lawsuit.

THE COURT:  So you're kind of suggesting -- my criminal mind or criminal prosecutor mind thinks of fruit of the poisonous tree, that somehow he got this information in violation of this protective order?

MR. SHAFFER:  Vis-à-vis the new lawsuit.  I'm not suggesting that he obtained the information in this suit inappropriately.  What I'm saying is that it's inappropriate to bring it outside the lawsuit to pursue what is an independent state law tort.

THE COURT:  Well, and I think Mr. Bakke's position is that part of recovering the judgment on behalf of his client is determining whether there have been fraudulent transfers of money that would otherwise be available to satisfy that judgment.  Am I right about that, Mr. Bakke?

MR. BAKKE:  You're absolutely spot on.

THE COURT:  And that, to me, is mentioned in this protective order that we have in place.  Let me find that.

I'm looking at page 5 of the amended protective order, subpart (e), paragraph 16:  Confidential information shall not be used for any purpose except for the prosecution or defense of these consolidated cases.

And I think Mr. Bakke's point is that he's prosecuting this case.  Having received a judgment, he's trying to have his client realize on that judgment.  And part of that process is finding out whether money was fraudulently transferred at some point or another.  So to me that fits within the parameters of the existing protective order.  And do you disagree with that?

MR. SHAFFER:  Slightly, Your Honor.

THE COURT:  Okay.

MR. SHAFFER:  If I may?  The -- I think primarily what I'm -- I'm not so worried about information about bank transfers.  What I'm worried about is information that's truly nonpublic.  That if it's gone and put into a complaint in state

court that they're 150 to 200 million dollars in debt, that they're under forbearance agreements with their financial folks, that's the kind of information that can bring the company down tomorrow, especially with the OEMs.

THE COURT:  Hang on once.  The complaints have already been filed in these state actions, am I right about that, Mr. Bakke?

MR. BAKKE:  Yes.

THE COURT:  And were documents attached as exhibits somehow to those complaints or some such thing?

MR. BAKKE:  No.

THE COURT:  So none of the confidential documents have been used in public filings in the state court proceedings?

MR. BAKKE:  Correct.  We'd like to.

THE COURT:  You'd like to use them in court filings?

MR. BAKKE:  Yes.  Well, so -- so here's the situation, Your Honor, recognizing the protective order still in place in this case.  And bear in mind when that -- when we had that discussion on the conference call with the Court prior to the motion to compel being filed, we didn't know about the existence of any of these documents showing these fraudulent transfers; so we said it's fine to keep the amended protective order in place.  We don't believe that's the case since we've seen all the deliberate withholding of documents and learned

through a third party, BMO Bank, about these fraudulent transfers.

But our position is we have to present these documents to at least the judges in those cases and ultimately the jury in those state court cases.  And the Court asked the question --

THE COURT:  The judges and juries as part of what? Motions before the Court there or if part of a jury trial?

MR. BAKKE:  Well, not only that in the Morton County state court action -- two of the parties, Bravera Bank and Starion Bank -- have filed a motion to dismiss for an indefinite statement as to our legal claims.  The reason they're kind of vague is because we can't file these documents showing all the proof we have of fraudulent transfers and that the bank should have known.  'Cause some of these documents came in this case, you know, some of the closing documents were Bravera Bank and Starion Bank --

THE COURT:  If those filings were made in this Court given this amended protective order, would you be able to do that in this Court, include those documents?

MR. BAKKE:  We could but we're not sure that this Court would be --

THE COURT:  So the amended protective order would not preclude your use in that manner in this case?

MR. BAKKE:  It would not.

THE COURT: And, Mr. Shaffer, do you agree with that?

MR. SHAFFER: To make public filings of the confidential banking records of the company, I think I would disagree with that.

THE COURT: Even if they were redacted in some fashion?

MR. SHAFFER: If they were redacted to address our confidentiality concerns, perhaps.

You know, one of the problems, Your Honor, is that we've had communications with Mr. Bakke in the state court case. He put pressure -- he was, like, why won't you agree to the protective order, the banks have agreed to the protective order; and then they turn around the banks, in fact, had not, they opposed it. So, you know, we're having trouble getting on the same page understanding, like, what -- what the framework would be here.

THE COURT: Well, you wouldn't need the banks' permission in this Court, you've got these documents. Why -- how is it different? Because to me it seems like the only thing that we're doing by allowing use of these documents in the state court matters is slightly expanding the listing of persons who already have access. And in -- frankly, the judges have access in this Court. We're only talking now about applying the same substance that is presently in effect in this amended protective order in a state court proceeding, two state

162

court proceedings.  What's wrong with that?

MR. SHAFFER:  I guess what I would -- I would be concerned about was just making sure that they're uniform. That they're congruent.  That they don't conflict with each other, but that's something me and Mr. Bakke could work on.

I understand what Your Honor's saying.  It's just been -- it's not that conceptually I'm against it.  I'm more concerned about other information then the specific transfers that are highlighted in Exhibit 28, for instance.

THE COURT:  Well, what I'm getting at, though, is that the same documentation could be used in some fashion in this Court in this case.  Why shouldn't this Court expand that because the Court has the power to do that, order otherwise, and allow the same substance to apply in these two state court proceedings?

MR. SHAFFER:  And I think that -- conceptually I understand what Your Honor is driving at.  And I guess why we feel a little sandbagged it's that -- that there is some evidence to suggest that the information was taken from this post-judgment process and used and the letter of the protective order doesn't allow it.  I guess, you know, and then we have other parties --

THE COURT:  Well, I think the letter of the amended protective order allows it in several respects.  You disagree with that?

MR. SHAFFER:  I think that it speaks of prosecuting the claims and defenses in this case.  It speaks of prosecuting within this courtroom and we're -- in this Court with respect to these parties and now we've expanded it to include parties that are not subject to --

THE COURT:  Let's look at paragraph 16 at page 5: Nothing in this protective order shall preclude the parties from requiring a separate protective order in any other litigation arising from the same or similar operative facts.

The reference to a separate protective order and other -- any other litigation, it seems to me, suggests that there's an opportunity here for either the Court or the parties to agree that this information -- there's a way to use it that protects all the interests just as you have here.

MR. SHAFFER:  I'm absolutely for that.  If that's the case, if that's what we're going to do is truly make sure that the interests of all the parties is preserved here, then, you know, we can work with Mr. Bakke on that.  So long as -- you know, if we have the option open to say, hey, we have some concerns here about, you know, the framework of the protective order, schematics between the three cases, whatever it may be. I just want to make sure that we're not putting into the public, you know, significant, sensitive business information that could, you know, accelerate the downfall of the company.

THE COURT:  Any more than you are now with this

existing amended protective order?  You don't want to expand the --

MR. SHAFFER:  I don't want to -- I don't want to bring down the protections.  I think we can expand it to the number of people that are covered by it as long as the state court protective order and the federal court protective order essentially mirror each other.  But, you know, the problem is --

THE COURT:  Hang on once.

Mr. Bakke, what's your thought on that?

MR. BAKKE:  Well, a few different points, Your Honor.  I think the Court is correct.  This is a prosecution of issues in this case, two judgments -- an amended judgment, an original judgment.  The problem that we have now that we believe there's very strong evidence of fraudulent transfers from the judgment debtors' account to third parties, which is all, you know, new information on how this money was used today, is the parties who got that money, Foundation Automotive U.S., doesn't do business in North Dakota.  They're not on file with the Secretary of State.  We can't sue them in North Dakota.  We can only enforce our judgments in Texas where they reside; so we have to sue them in state court there and that's our only option.

As to the Morton County action, we've got parties there.  We wouldn't have diversity of citizenship, no federal

question.  So we've got Bravera Bank, we've got Starion, we've got these Eagal entities.  We've got PKM --

THE COURT:  But in those state court actions, those state court cases, you'd have the ability, as would Mr. Shaffer, to approach the Court for a protective order with regard to all of the same discovery that you have in place now?

MR. BAKKE:  And we, in fact, have done that in the Morton County case.  We tried to work it out with Mr. Shaffer and with the attorney for the banks.  They refused.  We were forced to file a protective order.  The protective order, all the briefings done.  Judge Borgen has heard that.  I think he's kind of -- my speculation is he's kind of waiting to see what this Court does to see if the Court issues an order saying this amended protective order in this case can apply there and --

THE COURT:  Well, frankly, I think it can.  It would be up to that judge to impose it.  I don't have any control, frankly, over that but --

MR. BAKKE:  But I think it would be helpful if this Court said that, that it had some sort of order saying it can apply in the state court action.

And so, you know, to Mr. Shaffer's point, we've tried to resolve it with him.  I don't think us trying to work together, unfortunately --

THE COURT:  Well, it sounds like there may be an opening to work together on it after today's hearing or at this

point in the hearing.

Am I right about that, Mr. Shaffer?

MR. SHAFFER:  You are right about that, Your Honor. I think one of our -- our primary objection in state court case was that it was a premature request for a protective order.  If we can amend the protective order here to suggest that, you know, no documents can be used in another case unless that -- in that case a protective order that's substantially similar to the one entered in this case is entered in that case, then I think we're getting there.

THE COURT:  What if the Court were to simply expand the persons listed at page 5, paragraph 18, and ending at halfway through page 6.  There are all kinds of persons to whom information may be disclosed, including, for example, the parties, legal counsel, expert witnesses, representative agents, officers, directors, employees, the Court and its personnel, court reporters, witnesses, employees of copying, imaging or computer services.  People we don't even know anything about whether they're keeping this stuff secure.  Any person to whom disclosure is expressly authorized by the parties or a nonparty and such other persons by further order of the court.  If this Court orders that such "other persons" includes all of those other counterparts in the course of a state court proceeding in -- was it Arizona?

MR. BAKKE:  Texas.

THE COURT: Texas or North Dakota -- and North Dakota.

Do you have any objection to that, Mr. Shaffer?

MR. SHAFFER: My concern, Your Honor, is that there's not a backstop. That that's a permitted use but once it's in those persons' hands, they're not required to sign on to this Court's and be bound by this Court's protective order. So we don't have anything on that end to prevent further disclosure once it's in those persons' hands.

THE COURT: Don't you have a disclosure that goes out to any person that's part of this protective order that they sign off on as part of these terms too?

MR. SHAFFER: Absolutely.

THE COURT: So they would -- all of that would be incorporated into the same -- I mean, this order would then just be expanded so that the information can be shared consistent with the rest of this amended protective order with those additional persons that I've just described.

MR. SHAFFER: So long as a disclosure can't be made unless they've signed onto it, yeah. I'm with -- I think that works, Your Honor.

THE COURT: Mr. Bakke.

MR. BAKKE: Well, Your Honor. Just let me go back to the 35,000-foot level.

Our concern is -- I mean, really what we're seeking

here today from this Court, especially after hearing Mr. Slemko's testimony on all the documents that were withheld, we think there's a clear -- multiple discovery violations where they withheld important documents from us which is -- have had real severe consequences to my client in the respect that now the money is gone.  We have these judgments against these three judgment debtors which are uncollectible.  Mr. Slemko's affidavit said they left only nominal amounts in these accounts.  They've now been impermissibly transferred to one or more third -- well, at least two third parties that we don't have --

THE COURT:  Of course the evidence, though, is that it wasn't necessarily impermissibly transferred.  I mean, there's evidence today, testimony, that the persons who received the money had priority interests above that of a judgment.  I mean, that's the -- that's the defense, I think, to the fraudulent transfer.

MR. BAKKE:  Yeah.  I understand that claim.  But he's also conceded these were not monies owed by the Foundation entities and as an example, this $18 million amount appears to be done just to drain the accounts of the FA ND --

THE COURT:  But he also testified that the sale wouldn't have been approved by the major creditors unless these other debts were paid as well.

MR. BAKKE:  Which, when pressed, he said he had never

explored this with the lending entities and that was just his speculation, nothing more.

So here we are, they're down to ten dealerships. All the money is gone, and they want to litigate our ability to collect in darkness. I mean, I think this is clearly a case where sanctions are appropriate on our motion to compel. Now we've lost -- since the judgment was entered almost a year -- on our ability to collect. We were told in writing, so was this Court on at least two briefs, that they were going to file a bond.

All of these issues can essentially be resolved by this Court simply requiring them to file a bond for the full amount of the judgment within so many days of the Court's order, and we don't have to deal with any of this because --

THE COURT: Am I requiring them to produce blood from a turnip then? Because the testimony was they can't afford it.

MR. BAKKE: Well, but they've done nothing to explore the possibility of a bond. He said they never talked to anybody. Quote/unquote they did "research." If you do the math and they sold this one for, you know, 35 million when you include everything -- cause just the goodwill was 22 million. You take ten dealerships, even if some are not the best performers, he says six fall into the category of better performers. So -- and if that's the case, so be it.

That's not the fault of my client in any way who has

a judgment that they are trying to pursue execution of a judgment on. And they're appealing with -- and the party who's taking the lumps, so to speak, suffering the consequences of all that is my client because they've appealed to the Eighth Circuit Court of Appeals. We're the appellee. We prevailed on all issues between motions and the jury trial --

THE COURT: Does the law require them to obtain a bond?

MR. BAKKE: No. But under Rule 37 of the Federal Rules, the Court can require them to pay the bond and/or post security. I think they should at least demonstrate --

THE COURT: And is that this Court that would require that? Or is it the Circuit Court that has jurisdiction over the case?

MR. BAKKE: No, I believe it can be this Court that can do that. And if the Court decided they should post a bond, if they wanted to fly that up the flagpole to the Eighth Circuit, but I don't think the Eighth Circuit would have original jurisdiction on that issue.

But my point here, Your Honor, is they -- there has to be consequences to being able to appeal, and the consequences shouldn't be that the appellee who prevailed on every issue at trial and before trial should have a judgment they can't collect on and that they're required to litigate --

THE COURT: I'm actually trying to find a way to

expedite the process of your client pursuing its rights to recover on its judgment. That's what I'm interested in today.

And one of the ways to do that, it seems to me, is to get rid of this impediment that appears to be in place, or at least some people are assuming it's in place, that stops you from using documents gathered as part of the discovery case, as part of the discovery process in this case in state court proceedings.

And we can get rid of that impediment, I think, pretty quickly. Today. It sounds like, to me, this amended protective order is something that the substance of it can be applied so that there is no longer any restriction, as far as your client is concerned, in using the documents gathered as part of the discovery process here in those state court proceedings. It seems to me that that would at least solve part of the overall problem. Do you agree?

MR. BAKKE: Yeah. I don't disagree it would resolve part of it, but the problem is --

THE COURT: You don't want to resolve part of it?

MR. BAKKE: No, we don't want to resolve just part of it. And part of the issues it presents there is several. One is we got to go through full jury trials on fraudulent transfers; so that's, what, another two-year process to try to collect on the judgment. And so that's problematical.

The amended protective order has these "attorneys'

eyes only" provisions in there which have proven very problematical in the federal court case, as this judge is aware. We've had numerous motions on "attorneys' eyes only." We're having to file these motions to file under seal, which typically get rejected in any event and so litigation --

THE COURT: Well, you would rather that I just order that this -- this protective order is extinguished?

MR. BAKKE: Yes. That -- well, my -- our first druthers would be for this Court to determine that based on what the Court has seen in terms of the evidence so far, that they should be required to post a bond within so many days. Because this litigation, both here in this court and in the state court actions, is going to drag on forever. And that's -- you know, that shouldn't be.

Under Rule 37, this Court has a lot of discretion and a lot of options available to it, which includes requiring them to at least explore and demonstrate to the Court they can't get a bond. Because if they get a bond, all these problems are put in abeyance; right? Then we just wait for the Eighth Circuit Court of Appeals to decide the case. And if they agree with how Judge Traynor rendered his decisions and handled the case and they agree with the jury verdict, then we're done; the money will be there and everyone can move on.

And that's -- you know, as this Court is no doubt aware -- I mean, I've been doing this for 43 years. I've had

judgments both for and against my clients before.  I have never seen a situation where an appellant has not filed a bond, whether it be in a federal court action or whether it be in a state court action.  It's just a matter of routine.  And they've represented to the Court twice they were going to do that in briefing to the Court.  I mean, on that basis alone the Court can find that that's a representation to the Court that they've got to carry through on.

So I think the real remedy here, so we don't have to darken your door again on issues in this case, is to simply say they get 15 days, 30 days to file a bond, and if they say they can't demonstrate through different insurance or bonding companies that they wouldn't provide a bond to them, including any associated documentation and communications.  That would resolve and allow us to sit in abeyance these lawsuits that they say are expensive and are draining funds of theirs.  We agree.  Just post a bond and we can dismiss those lawsuits without prejudice and see what the Eighth Circuit says.

THE COURT:  Mr. Shaffer.

MR. SHAFFER:  Your Honor, I've not found a single case in which that's been a remedy that a district court has -- has issued.  That, I think, would be remarkable.  I would love to go and look further --

THE COURT:  As issued or doesn't have the power to issue?

MR. SHAFFER:  I think those are two questions; right?  I mean, I think that the bond is the option of the judgment debtor could pursue.

THE COURT:  Let me stop you.  What about the prospect of your client obtaining a bond understanding that in the long run it could end up saving a substantial amount of money, Ms. Wood testified about all the work that's going in to defending these state court cases.  Doesn't it make sense economically for your client to consider it?

MR. SHAFFER:  We -- my apologies, Your Honor.  I didn't mean to step on you there.  But that was something that we put into our -- an original motion to stay execution pending the outcome post-judgment briefing.  We, I think, represented to the Court that we were willing or able to put up a quarter-million-dollar bond as security to stay execution, and then the Court ended up denying that motion as moot because Judge Traynor ended up ruling on all those motions.

It's something that the -- that Foundation has looked into but to -- I think the premiums on the bond of a four point six or seven million dollar bond, I think, would be particularly onerous on the company, that's my understanding.

We're happy to have those discussions afterwards and report back to the Court.  I think the Court indicated that you might allow each party ten pages to put a bow on these proceedings.  That's something I'm happy to look into and to

report.  I think that the facts that came out in trial, Your Honor -- I mean, in this hearing, Your Honor, if I may, just for a few minutes, repeat them, is that they knew about the sale the day before judgment was entered.  There was a 30-day moratorium on it.  Mr. Kupper testified from the -- from the stand that he knew it was happening through people he talked with at the dealership.  That 30-day moratorium would have stopped on December 7.  They had time to get a writ of execution and to go and execute on it.  And then after the sale happened, they waited for nearly -- for more than two months to pursue any post-judgment discovery.  By that point in time, the money is truly gone.  It is to those creditors.

THE COURT:  Was there any lis pendens filed on any of the real property?

MR. SHAFFER:  There was a -- the judgment itself was filed -- I think it was recorded in Morton County.  But none of the -- I don't think any judgment debtor in name actually owned property; so it didn't attach to anything.  Moreover, it was the first judgment.  So when the Court entered an amended judgment in April of 2025, that particular lien would be extinguished because it's like that judgment never even existed.

And what happened here is we have sets of written discovery and then that's it.  Your Honor knows very well there were opportunities to go and take post-judgment depositions.

Rule 69 says you can take post-judgment deposition of anybody. Full stop.  And that would have given them the expansive power to serve deposition subpoenas, which you know you can serve anywhere in the country.  They've just done nothing with the information.

The other thing that came out in this hearing is that they had this information from BMO in May, five months ago. They've done nothing with it.  Not a writ of execution, not a writ of garnishment, any sort of garnishment in aid of attachment.  Nothing.

So to now come before the Court, you know, five months later and say, Your Honor, you should impose -- you should require them to post a bond in a full judgment amount as a sanction for being caught up in motion to compel briefing for the last five months seems to me to be an extraordinary request and we've got -- in state court proceedings we've got a transcript, Your Honor, that's going to -- in these binders, came into evidence today from a motion to dismiss hearing we had in Morton County in which Mr. Bakke said, you know what, this -- this lawsuit essentially would be extinguished if they just posted a bond which seems to -- remarkable to me; either the transfer is fraudulent or it's not.  A bond makes neither --

THE COURT:  Mr. Bakke just shared with me as well that he'd be willing -- his client would be willing to dismiss

them without prejudice if there were a bond posted, which is one of the reasons, I guess, to raise the issue for your client.

MR. SHAFFER:  We're happy to look into it.  I don't know how long ago it was explored.  I mean, now we're in October.  Those discussions were 10 or 11 months ago and the financial picture --

THE COURT:  Well, Mr. Bakke says it was mentioned in briefing.  I don't remember it independently but I have no reason to doubt him either.

MR. SHAFFER:  It was.

THE COURT:  But let's assume it was mentioned in your briefing that your client would obtain a bond.  What happened?

MR. SHAFFER:  We intended to obtain a bond and we offered the 250,000, I believe, was in the briefing.  It was very early on, I think it was early this year, January or February.  Since then I think we had testimony here today that the financial circumstances of this company have changed dramatically.  They got way out over their skis on a credit facility and have had to completely downsize this company and reorganize.

And that reorganization and that -- that information on the total debt they had for HPS is extremely confidential. It is not publicly noted anywhere, but we offer it in this particular setting to respond to these motions.  And I will ask

that certain aspects, certain topics will be covered by a protective order but I can deal with that by written submission, Your Honor.  But my point being is that the financial circumstances of the company have changed significantly over the last eight to ten months, and I'm just not so sure that they can afford the premiums on that kind of bond.

THE COURT:  But you don't know for sure at this point.

MR. SHAFFER:  We will look into it and I absolutely will report on back, Your Honor.

THE COURT:  All right.  Well, I don't know that we're going to resolve anything today.  But Mr. Bakke --

MR. BAKKE:  Yeah.  Could I just briefly respond, Your Honor?

THE COURT:  Sure.

MR. BAKKE:  So they made two assurances to the Court which are admissions on behalf of their client.  One is Docket 535 filed on March 21, 2025.  It's in relation to their motion to stay execution of judgment, and I'm looking at page 2.  And I'm quoting, "The Foundation Parties are prepared to post a supersedeas bond to secure the judgment."  That's what they represented to the Court and admitted to the Court on behalf of their client.

Then in Docket 542, filed shortly thereafter, on

April 4 of 2025, in their reply brief on the motion to stay execution of judgment, on page 4 they say, "To be clear, the Foundation Parties stand ready to abide by the Court's guidance on whether security is necessary; and if so, the amount the Court will require to be posted."

So they've specifically represented to this Court on two occasions that they're -- they will abide by any Court order on posting a bond.  And that's part of the reason we're requesting it is because they've committed to this Court that they would do this.

Now, Mr. Shaffer says, "Well, Kupper and Foundation should do this, they should do that."  What he's leaving out of the equation is a writ of execution on what?  A writ of garnishment on what?  The money's gone.  They transferred it on December 11, 2024.  We don't have judgments against the parties who received that money.  It's within Foundation U.S. and now they've transferred on, apparently, to some other third party, either BMO Bank or HPS.  And so none of these things make it --

THE COURT:  From today's testimony, though, the funds from the sale went to secured creditors, I mean, they went in a roundabout way.  It may have gone to a nonparty initially, but supposedly they were paid to secured creditors who had a priority interest.

MR. BAKKE:  Well, except for we don't have any documentation to show that.  And the critical step here is

between the FA ND entities and Foundation Automotive U.S.  I have not heard any testimony or seen any evidence that these FA ND entities owed a dime to the third party they transferred it to, Foundation Automotive U.S.  That debt, if there was a debt, was owed by Foundation Automotive U.S.; so you can't use a third party to transfer the money to.

Now they say Foundation via FA ND entities were owed part of this money.  We have no idea.  Mr. Slemko hasn't said how much that is or whether --

THE COURT:  Well, there's going to be documentation of these different security interests that if they haven't been disclosed, they can be.

MR. BAKKE:  Which we don't have.

THE COURT:  Right.  I get that.

But, Mr. Shaffer, you'd agree that there's -- there is documentation to substantiate the claims that these various creditors had to the proceeds from the sale of these two dealerships?

MR. SHAFFER:  Yes, Your Honor.  And --

THE COURT:  And -- and has that been disclosed?

MR. SHAFFER:  The actual credit agreements for the facilities have not been disclosed and out -- my understanding --

THE COURT:  Because it seems to me that that's part of what is required to be disclosed.

MR. SHAFFER:  I don't disagree, Your Honor.

THE COURT:  Okay.

MR. SHAFFER:  Okay.  I do want to make a point, though, that stating that there's been no evidence or testimony provided that any of these entities owed that money to those creditors is just false.

THE COURT:  I understand that.  I'm anticipating that each of you has a counterargument to whatever I'm hearing.

MR. SHAFFER:  Well, I just wanted to --

THE COURT:  Okay.  That's the way it is with lawyers --

MR. SHAFFER:  I just --

THE COURT:  I've come to realize.

MR. SHAFFER:  May I just make the point quickly, Your Honor.  That the testimony came out that both the FA ND entities, the Foundation Automotive, were either parties to the credit facility or guarantors of the total debt.  And if what we need to do is to, you know, produce copies of those credit facilities, first, if I could just have the opportunity to review them and determine what confidentiality obligations there are, then maybe we can address it with the Court.  But conceptually, again, I don't think that's a problem providing them with that --

THE COURT:  Within the next seven days.

MR. SHAFFER:  Okay.  Yeah.  Absolutely, Your Honor.

THE COURT:  And then as far as the briefing that I suggested that I will allow, I am going to allow post-hearing briefing, and I'm going to rely on it to the extent that I'm not going to limit you to ten pages anymore.  Let's make it 20.  And you can refer to the exhibits as well, and please be as concise as you can.

And as far as timing, I'd like to have the first cell come in contemporaneously.  Let's -- each side will have 15 days to file.  And then each side will have ten days to reply, or respond, excuse me, to the --

MR. SHAFFER:  Ten days, Your Honor?

THE COURT:  Yeah, is that enough?

MR. SHAFFER:  Absolutely.  I was just -- I didn't hear correctly.

THE COURT:  Mr. Bakke, that's enough time?

MR. BAKKE:  I think so.

THE COURT:  Okay.  If you reasonably need more, because I know things can come up in your practices as well as your family life, who knows.  If you end up needing more time, we can talk about that.  Get in touch with chambers, we'll talk about it.  Chances are I'll be agreeable to it, but I'm trying to expedite the process a little bit too.  It's been a long time.

MR. BAKKE:  Yeah.  My only hesitancy, Your Honor -- the only reason I think so -- normally I wouldn't say that, but

I have a knee replacement surgery a week from tomorrow, so -- but I'm going to do everything I can to --

THE COURT:  If you need more time, let me know. Mr. Shaffer is agreeable, I can tell already; so it's not going to be a problem.

MR. SHAFFER:  You could see it on my lips.  Any time --

MR. BAKKE:  And just so the Court is aware, the Court asked about, you know, the Court's ability -- the specific subdivision in Federal Rules of Civil Procedure I was referring to is 37(b)(2)(A) dealing with sanctions which includes a nonexclusive list including dismissal --

THE COURT:  What were the subsections, Mr. Bakke?

MR. BAKKE:  37(b)(2)(A).

So there's a lot of remedies available to the Court including, we believe, requiring them to post the bond.

But our biggest concern here is meanwhile we've got this judgment and these assets, you know, it seems like every day he just talked about other deals --

THE COURT:  You know, it bothers me a little bit too. I mean, if you had been involved in the sale more, putting pressure on those creditors who wanted to see this sale go through, they may have been willing to make concessions, even if they had a prior interest, if they knew that you might screw up their deal, their sale, or delay it or something.  So I --

and you lost that opportunity, I think, for some reason or another.

MR. BAKKE:  Well, there was --

THE COURT:  Not necessarily blaming your client for this, Mr. Shaffer, but you missed -- I mean, I don't know whose fault, if anyone's fault that is, but it was an opportunity that passed, it seems to me.

MR. BAKKE:  Well, except for we know that in hindsight there's a 30-day automatic stay.  We had no information on when that closing was going to be and they're threatening us with Rule 11 sanction, we're concerned about tortious inference claims potentially, you know, if we try to interfere with the contract.

We're asking for information we're pointing out under the contract you're obligated to pay when they transfer the ownership of the dealership, told them to do that to comply with the -- so that's a whole another legal claim we have against them.

THE COURT:  Right.

MR. BAKKE:  That they violated the APA with us, you know, that they entered into way back in 2019.

THE COURT:  You don't necessarily need more claims, though, you just need a way to collect on what you have.

MR. BAKKE:  Exactly and that's the bond.

THE COURT:  All right.  Mr. Shaffer, some closing

remark.

MR. SHAFFER:  Just closing remarks is that I think there's a body of case law that suggests when you -- when you sue on a breach of contract, and that was specifically sued on for this particular provision of the APA, and the benefit of that was reduced to a judgment, that obligations underlying are extinguished.  So there's that.

And then in addition, you know, it comes right on the -- the sale was coming right on the heels of the 30-day, you know, automatic stay of execution.  There's no -- no ability to get out discovery requests, no -- and there's no obligation on the part of our clients to provide that discovery.  I mean, it's a very tricky time.  I understand it but there's --

THE COURT:  Without some of this information, though, you can understand how that all looks really suspicious.

MR. SHAFFER:  I absolutely understand.  But, I mean, if there are -- and we're representing to the Court as officers to the Court those credit facilities exist and that those obligations exist.

THE COURT:  I understand.

MR. SHAFFER:  And if that is, in fact, the case --

THE COURT:  Look into that bond requirement, Mr. Shaffer, whether it can be obtained.

MR. SHAFFER:  I think --

(Cross-talk.)

THE COURT:  In the near --

MR. SHAFFER:  I will absolutely.

THE COURT:  All right?

MR. SHAFFER:  But --

THE COURT:  I'm tired now.

Anything else before we conclude, adjourn for the day?

Thank you, all, for your participation.  We're adjourned.

(Proceedings concluded at 4:40 p.m.)

<u>CERTIFICATE</u>

STATE OF NORTH DAKOTA    )
                         )    ss.
COUNTY OF BURLEIGH       )

I, Ronda L. Colby, do hereby certify that the foregoing and attached typewritten pages contain an accurate transcription, to the best of my ability, of said digital recording made at the time and place herein indicated.

Dated at Bismarck, North Dakota, on 13th day of October, 2025.


                              /s/ *Ronda L. Colby*
                              _____
                              Ronda L. Colby