IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| FA ND CHEV, LLC and FA ND SUB, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>Robert Kupper; Bismarck Motor Company; and BMC Marine LLC d/b/a Moritz Sport & Marine,<br><br>Defendants.<br><br>———————————————<br><br>BAPTKO, Inc.,<br><br>Plaintiff and<br>Counterclaim Defendant,<br><br>v.<br><br>Foundation Automotive Corp, an Alberta Corporation, FA ND CHEV, LLC and FA ND SUB, LLC,<br><br>Defendants and<br>Counterclaimants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil No. 1:20-CV-00138-DMT-CRH<br><br><br><br><br><br>**BAPTKO, INC. AND ROBERT KUPPER'S POST-HEARING BRIEF** |

***     ***     ***

## I.   <u>Introduction</u>

BAPTKO, Inc. ("BAPTKO") and Robert Kupper ("Kupper") submit this brief in accordance with the Court's post-hearing briefing schedule. (*Order*, Doc. 625 at p. 1.)

The October 7, 2025, evidentiary hearing exposed a staggering pattern of bad faith and deceit by defendants Foundation Automotive Corp, FA ND CHEV, LLC and FA ND SUB, LLC (collectively "Judgment Debtors"). Their misconduct was not accidental. It was strategic, willful,

- 1 -

and contemptuous of this Court's authority. The Judgment Debtors admitted at the hearing that they intentionally withheld documents in post-judgment discovery with the specific intent to thwart BAPTKO and Kupper's collection efforts. They then doubled down on that misconduct by lying to the Court—falsely claiming in briefing and in a declaration that they had no solvency issues and misrepresenting the whereabouts of the dealership sale proceeds. This conduct transcends ordinary discovery violations. It constitutes a coordinated scheme to conceal assets, defraud BAPTKO and Kupper, and mislead this Court.

## II.    The Judgment Debtors Have Lied to the Court and Intentionally Violated a Court Order

The extent of the Judgment Debtors' bad faith is most evident when their pre-hearing conduct and representations to the Court are juxtaposed with the admissions made during the hearing and the documents subsequently produced:

### A.    Prior to the Hearing - Risk of Insolvency of the Judgment Debtors:

Prior to the October 7, 2025 hearing, the Judgment Debtors did not produce any documents or information at all in response to post-judgment discovery about their current assets, debts, and financial situation. (Docs. 540-9; 540-10 and 540-11.) They did, however, make representations to the Court about these issues. In their *Reply in Support of Foundation Automotive Corp., FA ND CHEV, LLC, and FA ND SUB, LLC's Motion to Stay Execution of Judgment*, filed with the Court on April 4, 2025, the Judgment Debtors told the Court:

> The purpose of a supersedeas bond is to protect and secure an appellee from loss resulting from the stay of execution. *In re Genetically Modified Rice Litigation*, 4:06MD1811 CDP, 2010 WL 2926214 (E.D. Mo. July 20, 2010). **And despite BAPTKO's allegations, neither the current nor the past business interests and activities of the Foundation Parties are accompanied by circumstances suggesting insolvency. While it is certainly true that several dealerships in the broader Foundation automotive group have been sold over the last year, such business-related decisions are evidence neither of impropriety nor financial crisis.** Indeed, even a cursory review of the Foundation Automotive website

(foundationauto.com) reveals that today the **Foundation automotive group owns and operates multiple dealerships across Colorado, Texas, and Tennessee. In short, the Foundation automotive group will continue forward with its business operations, by way of its considerable asset portfolio.**

Ultimately, the Court has inherent and discretionary authority in setting and/or requiring supersedeas bonds. Here, however, because the stay of execution will not render BAPTKO's judgment uncollectible from the Foundation Parties, such a bond is not necessary in this case. *See Miami Intern. Realty Co. v. Paynter*, 807 F.2d 871, 873 (10th Cir. 1986). **This conclusion is only reinforced by the fact that a reasonable likelihood does not exist that the Foundation Parties will be unable or unwilling to satisfy the judgment and all subsequent orders in full upon the ultimate disposition of the case.** *See Fed. Prescription Serv., Inc. v. Am. Pharma. Ass'n*, 636 F.2d 755, 760 (D.C. Cir. 1980). If, however, the Court determines that security is appropriate, **the Foundation Parties are ready and willing to post an appropriate bond to stay execution of the judgment.** On this point, the Court should disregard BAPTKO's attempt to cast blame on the Foundation Parties for not stating an exact amount of the bond, and, further, for not identifying all of their potential obligations to BAPTKO or Kupper. The omission of a specific proposed bond amount was due only to the current posture of post-trial briefing, and the relative uncertainty surrounding their potential obligations. To be clear: the Foundation Parties stand ready to abide by the Court's guidance on whether security is necessary, and, if so, the amount the Court will require to be posted.

(Doc. 542 (bold added).)

The above statements in the Judgment Debtors' brief to the Court were reinforced by the

Declaration of Derek Slemko, dated May 1, 2025, wherein he explained to the Court that the reason

the Mandan Dealerships were sold had nothing to do with financial problems, stating:

5. Beginning in early 2025, Foundation implemented a strategic initiative designed to focus the business on core dealerships in key markets. Ultimately, the goal was to consolidate operations in geographic regions where we could achieve greater scale and operational efficiency. Because we did not consider North Dakota a "key" market, the potential sale of the Mandan Dealerships was one component of this initiative.

\*        \*        \*

20. Ultimately, the decision to sell the Mandan Dealerships was made as part of a strategic shift in our business approach – one which we initiated months before the Court entered judgment in this case.

- 3 -

(Doc. 562-1 at ¶¶ 5, 20.)

Thus, prior to the October 7, 2025 hearing, BAPTKO and Kupper did not have any substantive discovery responses by which to evaluate the Judgment Debtors' financial situation, but the Judgment Debtors' representations to the Court clearly indicated that they were not in a financial crisis, could fully pay the judgment if their appeal is unsuccessful, and they were willing and able to post any bond required by the Court. They further told the Court the reason the Mandan Dealerships were sold was that North Dakota was not a "key market", and the sale of the Mandan Dealerships was simply part of larger "strategic initiative designed to focus the business on core dealerships in key markets."

### B.    At the Hearing and After the Hearing - Risk of Insolvency of the Judgment Debtors:

The Judgment Debtors had a starkly different story to tell about their financial situation at the October 7, 2025 hearing. Derek Slemko ("Slemko") on behalf of the Judgment Debtors testified at length about the Judgment Debtors ████████████. (Doc. 628 at p. 41, l. 12 – p. 43, l. 25; p. 91, ll. 19-25.)

Further, Slemko explained at the hearing that the Judgment Debtors sold the Mandan Dealership because they were required to do so pursuant to a ████████████████ with their lender (which was never produced to BAPTKO prior to the hearing) due to the Judgment Debtors' default, not as part of any strategic initiative designed to focus the business on core dealerships in key markets, as they had previously told the Court. Specifically, Slemko testified:

> Q. And an option that you could have done is simply not sold the dealerships to the Eide entities when you did and then BAPTKO could have then executed on that judgment and then BMO Bank and/or Harris could have pursued whatever legal remedies they thought were appropriate?
>
> A. Not under the terms of ████████████. We were required to sell the dealerships.

- 4 -

Q. Okay. So did the ███████████████ that we've never received, specifically identify the two Mandan Dealerships as ones that had to be sold?

A. It did.

Q. Okay. And when did that first occur?

A. The first one was entered in July of 2024.

Q. Okay. And it specifically said in there July 2024 that the Mandan Dealerships had to be sold?

A. Among other sale requirements, yes.

Q. Was there a timeframe –

A. Yes.

Q. -- they indicated that this had to be done within?

A. There was.

Q. Okay. And what was that timeframe?

A. I believe it was the end of September 2024 which we had to get extended.

(Doc. 628 at p. 86, l. 23 – p. 87, l. 18.)

The Judgment Debtors' ████████████ were a constant theme of the Judgment Debtors at the hearing[1], and it stands in sharp contrast to what they told the Court in the months prior to the hearing. It should be noted, this difference in stories told prior to and at the hearing is not the result of changed circumstances. The July 2024, ████████████████ and even the extension on the creditor-required deadline to sell the Mandan Dealerships all predate the false statements in briefing and Slemko's declaration submitted to the Court. In fact, the Judgment Debtors produced some additional documents after the hearing for the first time disclosing various documents

---

[1] The Court even commented, "Am I requiring them to produce blood from a turnip then? Because the testimony was they can't afford it." (Doc. 628 at p. 169, ll. 15-16.)

indicating defaults and other financial problems long prior to the misrepresentations to the Court, attached to the Affidavit of David R. Phillips ("Phillips Aff.") as *Exhibit A*.

The Judgment Debtors, through Slemko and their legal counsel, flat out lied to the Court either before or during the hearing, because the discrepancies between the two stories cannot be reconciled. Yet, shockingly at the hearing, the Judgment Debtors argued BAPTKO and Kupper have been dilatory in failing to more aggressively attempt to garnish or otherwise seize assets. (Doc. 628 at p. 103, 1. 5 – p. 107, 1. 4.) This is a truly bizarre argument that tries to blame BAPTKO and Kupper for the Judgment Debtors' own wrongdoing. Query how BAPTKO and Kupper could have taken any further action with respect to the Judgment Debtors' assets when the Judgment Debtors failed to substantively answer any post-judgment discovery about current asserts, and when they were actively making misrepresentations to the Court that they were willing and able to either post a bond or fully satisfy the judgment? BAPTKO and Kupper justifiably relied on the Judgment Debtors' representations, including representations to the Court.

Additionally, the Judgment Debtors' flagrant disregard of this Court's orders is evident by comparing their document production and related representations to the Court prior to the October 7, 2025, hearing with their admissions at the hearing and subsequent production of documents after the hearing, as discussed below.

### C.    Prior to the Hearing - Production of Documents Relating to the Sale of the Mandan Dealerships:

On April 8, 2025, this Court ordered the Judgment Debtors to "disclose **all** records pertaining to the sale of the Mandan dealerships to BAPTKO, Inc. and Robert Kupper ("Kupper parties") by the end of the business day on April 10, 2025." (Doc. 547 at p. 1) (emphasis added). In subsequent briefing to this Court, the Judgment Debtors made a big deal of the hand-selected documents that they chose to produce in response to the Court's order, arguing:

The Foundation Parties have produced over 400 pages of documents in response to BAPTKO's discovery requests. This substantial production hardly resembles a refusal "to provide any documents or information," as BAPTKO has misleadingly alleged. (Doc. 556 at 2.) The production includes: (a) 211 pages of documents related to the sale of the Mandan Dealerships; (b) unredacted versions of real estate purchase agreements when requested; (c) tax returns that are currently available for the Foundation Parties; and (d) additional financial records of the Foundation Parties. (Doc. 562 at p. 11.) What the Judgment Debtors failed to tell the Court and BAPTKO prior to the October 7, 2025, hearing was that the documents produced pursuant to the Court order were incomplete, with the Judgment Debtor having intentionally omitted certain select documents specifically because they did not want BAPTKO and Kupper to use the information and documents to try to collect on their judgment.

**D.    At the Hearing and After the Hearing - Production of Documents Relating to the Sale of the Mandan Dealerships:**

Numerous relevant documents and information were identified at the hearing, which Derek Slemko ("Slemko") on behalf of the Judgment Debtors, and their legal counsel Kensye Wood ("Wood"), admitted were intentionally never produced in response to post-judgment discovery:

- Slemko confirmed no notes, mortgage, or loan documents were ever produced to BAPTKO in response to specific post-judgment discovery requests made by BAPTKO (Doc. 628 at p. 27, ll. 6-21 and p. 31, ll. 12-15).

- Even though Slemko testified the Judgment Debtors had daily access to their BMO Bank records online, in addition to monthly BMO Bank statements showing where money deposited into FA ND CHEV, LLC and FA ND SUB, LLC accounts from the sale of Mandan dealerships was transferred to (Doc. 628 at p. 36, ll. 1-23), the Judgment Debtors never produced that information in response to BAPTKO's post-judgment discovery requests.

- Slemko admitted that the Judgment Debtors and Foundation Automotive U.S. Corp ███████████████████████████████████████████ (Doc. 628 at p. 41, ll. 8-21; p. 49, l. 25 and p. 50, ll. 1-5).

- 7 -

- Slemko admitted that the Judgment Debtors never produced any documents to BAPTKO in response to BAPTKO's post-judgment discovery requests indicating either BMO Bank or HPS had required a sale of the Mandan dealerships by September, 2024, or any other time period. (Doc. 628 at p. 98, ll. 9-19).

- Wood admitted the Judgment Debtors never provided any discovery answers identifying where the money went for the Mandan dealership purchases after FA ND CHEV, LLC and FA ND SUB, LLC received the payments on December 11, 2024. (Doc. 628 at p. 129, ll. 11-25; p. 130, ll. 1-19). She admitted the BMO Bank records for FA ND CHEV, LLC and FA ND SUB, LLC produced by judgment debtors (BAPTKO Hearing Exhibits 24 and 25 [Doc. 600, pp. 4-18]) did not disclose where the money from the sale of the Mandan dealerships went after FA ND CHEV, LLC and FA ND SUB, LLC received it. (Doc. 628 at p. 131, ll. 1-24; p. 132, ll. 20-25; p. 133, ll. 1-7).

- Wood admitted the Judgment Debtors and her law firm never provided any discovery answers where money received from sale of Mandan dealerships went to, ever. (Doc. 628 at p. 136, ll. 17-24).

Slemko's testimony confirmed the existence of significant relevant documents and information which were simply never produced at all, and which the Judgment Debtors and their counsel deliberately withheld to prevent collection of the BAPTKO judgment.[2] In fact, **after** the hearing, on October 17, 2025, the Judgment Debtors disclosed 1,287 pages of documents (Phillips Aff., *Exhibit A),* including documents relating to the Judgment Debtors' financing and relating to the sale of the Mandan Dealerships (which were previously ordered to be produced no later than the end of the business day on April 10, 2025 [Doc. 547 at p. 1]).

**Even more significant than Judgment Debtors' failure to produce the requested documents and information is their own admitted reason for that failure. During testimony, Slemko and Wood admitted the reason the Judgment Debtors withheld documents and information in post-judgment discovery was to prevent BAPTKO and Kupper from using it**

---

[2] And the answers that were given were not even signed by the Judgment Debtors. (Doc. 628 at p. 127, ll. 10-15).

**in collection actions:**

- Slemko admitted that documents ordered by the Court to be produced were not produced because Foundation believed BAPTKO would initiate other lawsuits. (Doc. 628 at p. 36, ll. 18-25 and p. 37, ll. 1-5).

- Under questioning by counsel and the Court, Slemko confirmed the withholding of documents and information was deliberately done by Foundation officers, in-house counsel, and with knowledge and approval of Foundation CEO Kevin Kutschinski. (Doc. 628 at p. 37, ll. 14-25 and p. 38, ll. 1-17 and p. 39, ll. 13-17).

- Slemko admitted the Judgment Debtors did not provide responsive bank records to BAPTKO because they "were of the mindset that we needed to let the appeal run its course before really deciding . . ." (Doc. 628 at p. 39, ll. 18-25 and p. 40, l. 1).

- The "Foundation Automotive Expected Mandan Proceeds Allocation" document (BAPTKO Hearing Exhibit 23 [Doc. 600 at p. 3]) was not produced to BAPTKO until the Court ordered it to be produced. (Doc. 628 at p. 24, l. 17 – p. 25, l. 10). Slemko testified it was not produced "because it's -- like, it's a business document that's not yet -- that BAPTKO's not a party to." (Doc. 628 at p. 25, ll. 1-2).

- The documents and information identifying where the money FA ND CHEV, LLC and FA ND SUB, LLC received from the sale of the Mandan dealerships went to (transferred to a third party (Foundation Automotive U.S. was knowingly withheld by judgment debtors' attorneys ("I think that we had hesitations to give further (information) because it was going to be used in subsequent lawsuits.") (Doc. 628 at 138, ll. 21-25; and at 139, ll. 1-8) This was a deliberate violation by judgment debtors' attorneys and judgment debtors of the Court's prior order dated April 8, 2025, requiring production of this information to BAPTKO. (Doc. 547) Wood admitted this information was requested by BAPTKO in its post-judgment discovery requests. (BAPTKO Hearing Exhibits 4, 5, and 6 – Request Nos. 6 & 7 [Doc. 540-6, 540-7, and 540-8]) (Doc. 628 at p. 140, ll. 19-25; and p. 141, ll. 1-16).

Slemko and Wood's testimony made clear documents and information were not withheld based on legitimate objections to specific post-judgment discovery requests. Rather, the Judgment Debtors made the deliberate decision (while being advised by in-house legal counsel and outside legal counsel) to withhold documents and information because they did not want BAPTKO and Kupper to use it to attempt to collect on the judgment. It is hard to imagine a clearer case of willful, bad faith conduct in discovery. As a result of the Judgment Debtors' flagrant discovery violations, BAPKTO and Kupper have incurred substantial expense pursuing these motions, and proceeding

in state court actions to attempt to recover fraudulently transferred assets without the benefit of all

the necessary documents and information never produced in post-judgment discovery.

### III.    Other Important Facts Learned at the Hearing

#### A.    The Judgment Debtors Admitted They Fraudulently Transferred Almost All of Their Cash and Other Assets to Third Parties

In addition to admitting the Judgment Debtors' flagrant discovery violations and violation

of this Court's order, Slemko admitted the Judgment Debtors have intentionally depleted their

assets, and intentionally transferred them to third parties:

- Slemko admitted the Judgment Debtors intentionally transferred funds from the Mandan Dealership sales on December 11, 2024 of over ███████████████ to a non-judgment debtor third-party Foundation Automotive U.S. Corp. (Doc. 628 at p. 40, ll. 18-25; p. 41, ll. 1-3; p. 45, ll. 21-24; p. 46, ll. 9-14).

- The FA ND CHEV, LLC 2023 tax return K-1 indicates FA ND CHEV, LLC paid a cash distribution to Foundation Automotive U.S. Corp of ██████less than a year prior to the entry of judgment against the judgment debtors. (Doc. 628 at p. 51, ll. 24-25; p. 52, ll. 1-6, and ll. 15-18; p. 53, ll. 3-6; and p. 54, ll. 5-8). (BAPTKO Hearing Exhibit 18 at FAC000239 [Doc. 555-5] at p. 28)

- The FA ND entities also liquidated the real estate it owned for the Mandan Dealership real estate in 2023 by selling all the real estate to a third-party called CARS. (Doc. 628 at p. 54, ll. 10-17)

- Slemko acknowledges the Judgment Debtors received at the closing of the Mandan Dealerships over ██████ and immediately transferred the ██████ to Foundation Automotive U.S. Corp., who in turn transferred ██████ to HPS and to other third parties. (BAPTKO Hearing Exhibit 23 [Doc. 600] and Doc. 628 at p. 54, ll. 18-24; p. 56, ll. 16-25; and p. 57, ll. 1-5).

- BAPTKO Hearing Exhibit 15 [Doc. 555-3] reflects that the FA ND entities reacquired the Mandan dealerships real estate just 8 days after the BAPTKO judgment, through a ████ ███████████████████████████████████████████████. The FA ND entities assigned the Mandan dealerships to PKMC on December 11, 2024, in exchange for payment of ██████ for the real estate. (BAPTKO Hearing Exhibit 16 [Doc. 559] at FAC000125).

- Slemko admitted that after BAPTKO's judgment, FA ND CHEV, LLC and FA ND SUB, LLC transferred the Mandan dealerships real estate and "controlled that real estate" (Doc. 628 at p. 64, ll. 1-5).

- Slemko admitted no Foundation dealership has been "out of trust" with any vehicle manufacturer, nor has any vehicle manufacturer ever stationed an employee at any Foundation dealership, as is typical if a dealership is "out of trust". (Doc. 628 at p. 94, ll. 3-25).

- Slemko admitted that an outside appraiser, Haig, valued the Mandan dealerships as being worth ███████████ in a sale, but accepted███████ from the Eide entities, which suggests the Judgment Debtors sold the dealerships for below market value. (Doc. 628 at p. 97, ll. 19-24).

- Slemko asserted there were UCC filings relating to loans and notes by FA ND CHEV, LLC and FA ND SUB, LLC, but did not know if any such filings were filed or of record in Morton County. (Doc. 628 at p. 66, ll. 20-25; and p. 67, ll. 1-5).

- Slemko admitted that the Judgment Debtors paid ██████████out of the closing payments by the Eide entities for the Mandan dealerships for real estate loans by other Foundation dealerships, i.e. third parties. (Doc. 628 at p. 67, ll. 9-16; and p. 68, ll. 14-17).

- Foundation never asked its creditors, BMO Banko and HPS, whether it could pay the judgment in this case without causing BMO Bank and/or HPS to pursue a default lawsuit against Foundation. (Doc. 628 at p. 86, ll. 18-22) Instead, it intentionally ignored the BAPTKO judgment and paid third parties instead.

Despite the Judgment Debtors' bad faith actions that have forced BAPTKO and Kupper to litigate in darkness to date, BAPTKO and Kupper have brought viable and compelling collection actions in state court. Wood, contrary to applicable law, testified no legal action to collect on a judgment would be viable, even if a fraudulent transfer by a judgment debtor to a third party occurred. (Doc. 628 at p. 145, ll. 15-25; and p. 146, ll. 1-2). However, she has virtually no experience with fraudulent transfer lawsuits. (Doc. 628 at p. 146, ll. 3-17). She asserted documents produced in the federal court action were "used in the state court actions" (Doc. 628 at p. 147, ll. 17-21), but upon questioning admitted almost all the fact allegations in the state court actions is

- 11 -

available through publicly available documents. (Doc. 628 at p. 148, ll. 3-25; p. 149, ll. 1-25; and p. 150, ll. 1-6).

It should be noted that Slemko testified he has seen UCC filings relating to the notes and loans at issue. (Doc. 628 at pp. 66, l. 20 – p. 67, l. 5.) However, a lien search on the North Dakota Secretary of State's website conducted by the office of BAPTKO and Kupper's counsel did not reveal any relevant UCC filing statements. Without a UCC filing in North Dakota, the HPS loans do not have lien priority over BAPKTO and Kupper's judgment in Morton County, North Dakota where the Mandan Dealerships are located.

Further, the chain of events described by Slemko at the hearing establishes a fraudulent transfer. (Doc. 628 at p. 86, l. 12 – p. 87, l. 20.) Slemko admits that during this litigation, several months before trial, the Judgment Debtors and their related companies entered into a ██████████ ███████ which converted a debt owed by other related companies into a secured interest binding the assets of the Judgment Debtors. *Id.* This conversion into a secured interest binding the Judgment Debtors took place during a lawsuit, shortly before a trial the Judgment Debtors would ultimately lose on all counts. The Judgment Debtors knew they owed earnout money to BAPTKO, and they took action essentially on the eve of trial to pledge all their assets to a previously unsecured creditor of related companies, with the intent of making all their assets uncollectable by BAPTKO.

## B.    The Judgment Debtors Continue to Dissipate Assets

Slemko admitted at the hearing the Judgment Debtors continue to intentionally dissipate assets. Foundation is down to 10 dealerships, from 23 dealerships, when BAPTKO's judgment was filed. Foundation was selling two more dealerships on October 8, 2025. (Doc. 628 at p. 91, ll. 15-18).

### C.    The Court Has Correctly Interpreted the Amended Protective Order

The Judgment Debtors argued in briefing and at the hearing that BAPTKO and Kupper have violated the Amended Protective Order (Doc. 275), or otherwise acted improperly by bringing state court collection actions while relying on (but not filing) documents marked "confidential." As the Court noted at the hearing, Paragraph 16(e) of the Amended Protective Order states, "Confidential information shall not be used for any purpose except for prosecution or defense of these consolidated cases." As this Court explained:

> And I think Mr. Bakke's point is that he's prosecuting this case. Having received a judgment, he's trying to have his client realize on that judgment. And part of that process is finding out whether money was fraudulently transferred at some point or another. So to me that fits within the parameters of the existing protective order.

(Doc. 628 at p. 158, ll. 9-18.) All arguments by the Judgment Debtors that the protective order has been violated are utterly without merit.

## IV.    Argument

### A.    The Court Should Order the Judgment Debtors to Post a Full Supersedeas Bond or Other Sufficient Security

The Court should order the Judgment Debtors to file a full supersedeas bond or other sufficient security for three reasons: 1) because the Judgment Debtors told this Court they would do so; 2) as a sanction for blatant  post-trial discovery violations, and 3) because the Judgment Debtors have affirmatively asked this Court for a stay of execution of judgment, a request that requires the filing of a supersedeas bond or other security.

#### 1.    The Court Should Order the Judgment Debtors to Post a Full Supersedeas Bond Or Other Sufficient Security Because They Told This Court They Would Do So

The Judgment Debtors previously represented to this Court that they are prepared and willing to post a supersedeas bond to secure the judgment after the Court ruled on post-judgment

- 13 -

motions, but have never posted the bond. *See* Doc. 534 at p. 1 (stating, "The Foundation Parties propose posting a single bond after the Court resolves all pending motions."); Doc. 535 at p. 2 (stating, "The Foundation Parties are prepared to post a supersedeas bond to secure the Judgment...."); Doc. 535 at p. 3 (stating, "the Foundation Parties remain willing to post an appropriate bond as necessary for a potential appeal to secure the final judgment once determined."). The Court may treat statements contained in a party's brief as binding on that party because "[j]udicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible." *In re Big Drive Cattle, L.L.C.*, No. 4:15CV3039, 2016 WL 1270987, at *4 (D. Neb. Mar. 30, 2016) (quoting *In re Crawford*, 274 B.R. 798, 804-05 (B.A.P. 8th Cir. 2002); *also citing Knudsen v. United States*, 254 F.3d 747, 752 (8th Cir. 2001); *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988) ["[S]tatements of fact contained in a brief may be considered admissions of the party in the discretion of the district court."]). The Court should order the Judgment Debtors to do that which they themselves told the Court they would do – post a supersedeas bond.

At the October 7, 2025, hearing, Slemko did not disagree that the Judgment Debtors have the financial ability to file a bond for $4.67 million for their appeal, but rather asserts it would be a "hardship." (Doc. 628 at p. 64, ll. 19-23). He claimed they "researched" securing a bond, but could not identify who at Foundation did that research, and did not claim a bonding company was ever contacted. (Doc. 628 at p. 65, ll. 14-25; and p. 66, ll. 7-19). The Judgment Debtors have no other judgments against them other than the BAPTKO judgment. (Doc. 628 at p. 92, ll. 19-22) and Slemko admitted posting a bond for the BAPTKO judgment would not force the Judgment Debtors into ████████ (Doc. 628 at p. 92, ll. 23-25; and p. 93, ll. 1-10).

### 2.    The Court Should Order the Judgment Debtors to Post a Full Supersedeas Bond Or Other Sufficient Security as a Sanction

As a separate and independent reason for the Court to order the Judgment Debtors to post a supersedeas bond, the Court should do so as a discovery sanction.

### i.    Federal Rule of Civil Procedure 37(b)(2)(A)

On April 8, 2025, the Court ordered the Judgment Debtors to "disclose all records pertaining to the sale of the Mandan dealerships to BAPTKO, Inc. and Robert Kupper ("Kupper parties") by the end of the business day on April 10, 2025." (Doc. 547 at p. 1.) At the hearing, almost six months after the Court ordered deadline, Slemko admitted the Judgment Debtors did not comply with this Court's order.  Importantly, Slemko and Wood admitted the reason the Judgment Debtors refused to comply with the Court order was because the Judgment Debtors believed BAPTKO would initiate other lawsuits (which is necessary for collection of the assets in the jurisdictions the Judgment Debtors transferred the assets to and from).

The Court should sanction Judgment Debtors for their intentional violation of a discovery order pursuant to Federal Rule of Civil Procedure 37(b)(2)(A), a rule which "provides courts with broad discretion to impose sanctions and includes a **non-exclusive list** of sanctions courts can impose when a party "fails to obey" an order requiring it to provide discovery. *Elkharwily v. Mayo Holding Co.*, No. CV 12-3062 (DSD/JJK), 2014 WL 12597508, at *1 (D. Minn. Dec. 17, 2014) (emphasis added) (citing Fed. R. Civ. P. 37(b)(2)(A)(i)–(vii)); *see also Heidersheid v. Russell*, No. 18-CV-1733 (NEB/SER), 2019 WL 6075123, at *2 (D. Minn. Oct. 15, 2019).

As this Court has previously explained:

> In order to impose sanctions under Rule 37, there must be an order compelling discovery, a willful violation of that order, and prejudice to the other party." *Chrysler Corp. v. Carey L.L.C.*, 186 F.3d 1016, 1019 (8th Cir. 1999). If the facts show both willful misconduct and bad faith, "the district court need not investigate the propriety of a less extreme sanction." *Everyday Learning Corp. v. Larson*, 242 F.3d 815, 818 (8th Cir. 2001). In all other cases, the sanction must be "just" and "specifically related to the claim at issue in the discovery order." *Hairston v. Alert*

- 15 -

*Safety Light Prods., Inc.*, 307 F.3d 717, 719 (8th Cir. 2002).

*Murray v. Altendorf Transp., Inc.*, No. 2:10-CV-103, 2014 WL 12628461, at *3 (D.N.D. Mar. 12, 2014). The Judgment Debtors' blatant admitted intentional disregard of the Court's Order (Doc. 547) and systematic abuse of the post-judgment discovery process amounts to a willful violation of the Court's Order. As discussed, the Court ordered the Judgment Debtors to produce documents (Doc. 547), which the Judgment Debtors willfully failed to do in bad faith. As a result, BAPKTO and Kupper have had to incur substantial expense pursuing these motions, and have had to proceed in state court collection actions without the benefit of all the necessary documents and information. Further, hearing testimony established that the Judgment Debtors continue to bleed assets. The Judgment Debtors' intentional delays in providing actionable information to BAPTKO and Kupper significantly limits their ability to collect on the judgment and forces them to try to recover assets after the assets have already been fraudulently transferred to third parties.

Requiring the Judgment Debtors to post a full supersedeas bond or other sufficient security is appropriate as Judgment Debtors have acted in bad faith in post-judgment discovery specifically to prevent BAPTKO and Kupper from collecting on the judgment. A full supersedeas bond or other sufficient security pending the outcome of the appeal in the Eighth Circuit would eliminate the need for further post-judgment discovery and the multiple state court collection actions.

### ii.    Inherent Power Sanctions

As discussed, the Court has the power under Rule 37(b)(2)(A) to order the Judgment Debtors to post a full supersedeas bond or other sufficient security as a discovery sanction. To the extent the Court may find that Rule 37(b)(2)(A) and other rules and statutes do not give specific authority to issue such a sanction, finding those rules and statutes are not "up to the task" the Court should instead issue such a sanction pursuant to its inherent power. *See Chambers v. NASCO, Inc.*,

501 U.S. 32, 50 (1991). In addition to the Judgment Debtors' violation of this Court's discovery order by failing to disclose all records pertaining to the sale of the Mandan dealerships by the end of the business day on April 10, 2025 (*see* Doc. 547 at p. 1), the Judgment Debtors also failed to provide any substantive responses to all other discovery requests in the over 8 months time since post-trial discovery was served.

"In *Chambers v. NASCO, Inc.*, the Supreme Court held that federal courts possess the inherent authority—independent of their own rules or statutes passed by Congress—'to fashion an appropriate sanction for conduct which abuses the judicial process.'" *Danks v. Slawson Expl. Co., Inc.*, No. 1:18-CV-186, 2022 WL 22907065, at *6 (D.N.D. May 12, 2022) (citing 501 U.S. 32, 44–45 (1991)). "[I]n exercising its inherent powers, the court has substantial discretion in deciding not only whether to impose sanctions but also what that the sanctions should be. *Danks*, 2022 WL 22907065, at *7 (citing *Chambers*, 501 U.S. at 50; *Burrull v. First Nat. Bank of Minneapolis*, 831 F.2d 788, 790 (8th Cir. 1987)).

While this Court should exercise this inherent authority with "restraint" and "great caution" (*id.*), its exercise is called for due to the Judgment Debtors' willful bad faith conduct. Although a simple award to BAPKTO and Kupper of attorneys' fees and costs in relation to these motions is available to the Court as a sanction (*see* Fed. R. Civ. P. Rules 37(a)(5); 37(b)(2)(A); 28 U.S.C. § 1927[3]), and should be imposed, such a sanction alone is not sufficient. As discussed, Slemko and Wood admitted at the hearing the reason the Judgment Debtors refused to answer discovery was to prevent BAPKTO and Kupper from pursuing collection actions. This is part of a larger pattern

---

[3] Stating, "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

of improper conduct including fraudulent transfers of assets without disclosing related documents or information, representing an intention to post a supersedes bond but failing to do so. The Judgment Debtors are forcing BAPTKO and Kupper to incur substantial expenses just to find out if they even have remaining assets, and then track them down and reverse the transactions.

The case *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.* is instructive, wherein the court exercised its inherent power to sanction a party to punish its bad faith conduct under similar facts. No. 5:16-CV-06370-EJD, 2020 WL 1139638, at *1 (N.D. Cal. Mar. 9, 2020). In that case, after a six-week trial, the jury entered a verdict in the plaintiff's favor on all counts. *Id.* Contradicting statements made to the court in a post-trial hearing and statements made in a declaration submitted to the court that any transfers of cash and other assets would be in the ordinary course of business, the defendant and a co-conspirator then transferred over $4 million outside of the United States and outside of the ordinary course of business. *Id.* at *2-3. Further, while the defendant did produce some documents in response to post-judgment discovery, it failed to include in its responses copies of the documents that evidenced this particular transfer. *Id.* The Court noted, "[s]ignificantly and most troubling, Ningbo Sunny's failure to produce both the Qiu Email and the Remittance in discovery is evidence of consciousness of guilt—that Ningbo Sunny understood that the documents would show it's conduct contradicted the Ni Declaration." *Id.* at *3. The court, in relevant part, sanctioned the defendant as follows:

> 1. **The defendant was ordered to pay $4,184,057 to the plaintiff (the amount of the improper transfer)**;
>
> 2. The defendant was enjoined from transferring assets outside the United States until such time as either (a) the plaintiff collects the judgment money owed by the defendant, or (b) **the defendant posts a bond sufficient to satisfy the Court's judgment**;
>
> 3. The defendant was ordered to provide plaintiff a declaration, which is signed and made under penalty of perjury, describing the actions it has taken to ensure that it

complied with its post-judgment discovery obligations;

4. The defendant was allowed to serve expedited discovery, with responses due one week after service, to determine what, if any, other improper transfers the defendant caused or accepted, or whether anyone else aided or abetted these transfers;

5. The defendant was required to identify all planned and actual sales of product made by the defendant into the United States, whether directly or through an intermediary;

6. The plaintiff was allowed to register the Court's Judgment in federal districts outside of California under 28 U.S.C. § 1963;

7. The defendant was required to pay reasonable attorney's fees and costs incurred by the plaintiff in connection with this motion.

*Id.* at *4 (emphasis added).

Similarly, the Judgment Debtors improperly transferred assets after judgment was entered in this case, misrepresented key facts to this Court, and selectively intentionally omitted documents from their post-judgment discovery responses to hide the improper transfers. A targeted and specific sanction including but not limited to the requirement to post a full bond is thus appropriate.

### 3.    The Court Should Order the Judgment Debtors to Post a Full Supersedeas Bond Or Other Sufficient Security Pursuant to Their Own Request for a Stay of Execution

As another separate and independent reason for the Court to order the Judgment Debtors to post a supersedeas bond, they themselves have essentially asked for it. One of the motions pending before the Court is the Foundation Parties' Motion to Stay Pending Appeal (Doc. 604), wherein the Judgment Debtors asked this Court to stay all collection actions pending the outcome in the appeal to the Eighth Circuit. BAPTKO and Kupper have previously briefed that the Judgment Debtors' request falls squarely within Federal Rule of Civil Procedure 62(b), which requires the posting of a full supersedeas of other security, unless certain factors are met, which are not met and which the Judgment Debtors have not even attempted to argue. (Doc. 608 at pp.

12-17. ) The Judgment Debtors' own motion to this Court requires the posting of a full supersedeas bond or other security.

## V.    <u>Conclusion</u>

BAPTKO and Kupper respectfully requests that the Court:

(1) Grant BAPTKO's Motion to Compel Discovery and For Sanctions (Doc. 552) by:

> a) entering an order compelling the Judgment Debtors to immediately fully respond to BAPTKO's discovery requests in aid of execution with substantive responses, without objections and properly executed;
>
> b) awarding BAPTKO its reasonable expenses, including attorneys' fees, in bringing the motion, which have been incurred solely as the result of the Judgment Debtors failure to cooperate in discovery; and
>
> c) imposing such further sanctions as the Court deems just to ensure compliance and preserve the integrity of the judicial process, which may include but not be limited to monetary penalties, ordering the Judgment Debtors to post a full bond or other sufficient security pending appeal, and/or prohibiting the Judgment Debtors, Foundation Automotive US Corp., and their principals from further depleting of assets.

(2) Grant BAPTKO's Motion to Use Documents and Information Obtained in Post-Judgment Discovery (Doc. 590) in collection actions, including State Court actions;

(3) Deny the Foundation Parties' Motion to Enforce Protective Order (Doc. 602); and

(4) Deny the Foundation Parties' Motion to Stay and Motion for Attorneys Fees (Doc. 604)

Dated this 23rd day of October, 2025.

BAKKE GRINOLDS WIEDERHOLT

By: */s/ Randall J. Bakke*
       Randall J. Bakke (#03989)
       Shawn A. Grinolds (#05407)
       David R. Phillips (#06116)
       Grant T. Bakke (#9106)
       300 West Century Avenue
       P.O. Box 4247
       Bismarck, ND 58502-4247
       (701) 751-8188

rbakke@bgwattorneys.com
sgrinolds@bgwattorneys.com
dphillips@bgwattorneys.com
gbakke@bgwattorneys.com

*Attorneys for Defendant Robert Kupper and Plaintiff-Counterclaim Defendant BAPTKO, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **BAPTKO, INC. AND ROBERT KUPPER'S POST-HEARING BRIEF** was on the 23rd day of October, 2025, was filed electronically with the Clerk of Court through ECF.

Maxwell Shaffer
Kensye Wood
Leland Shaffer LLP
8694 E. 28th Ave.
Denver, Colorado 80238
maxwell.shaffer@lelandshaffer.com
kensye.wood@lelandshaffer.com

By: */s/ Randall J. Bakke*
RANDALL J. BAKKE