**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

| | |
|---|---|
| FA ND CHEV, LLC and FA ND SUB, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> Robert Kupper; Bismarck Motor Company; and BMC Marine LLC d/b/a Moritz Sport & Marine, <br><br> Defendants. <br> ·········································· <br> BAPTKO, Inc., <br><br> Plaintiff and Counter-Defendant, <br><br> v. <br><br> Foundation Automotive Corp., an Alberta Corporation; FA ND CHEV, LLC; and FA ND SUB, LLC, <br><br> Defendants and Counterclaimants. | Civil No. 1:20-CV-00138-DMT-CRH <br><br><br> **THE FOUNDATION PARTIES' POST-HEARING BRIEF SUPPORTING MOTION TO ENFORCE PROTECTIVE ORDER AND FOR STAY, AND OPPOSING BAPTKO'S MOTION TO COMPEL AND FOR SANCTIONS** |

Foundation Automotive Corp. ("Foundation"), FA ND CHEV, LLC ("FA CHEV"), and FA ND SUB, LLC ("FA SUB," and together with FA CHEV, the "FA ND Entities") (collectively, the "Foundation Parties"), hereby respectfully submit this Post-Hearing Brief following the October 7, 2025 evidentiary hearing before Magistrate Judge Hochhalter. The evidence and arguments presented at the hearing reinforce the Foundation Parties' position that BAPTKO, Inc. ("BAPTKO") and Robert Kupper ("Kupper") violated this Court's Amended Protective Order by filing two separate state court fraudulent transfer actions—one in North Dakota and one in Texas—relying on information obtained through federal post-judgment discovery.

The Foundation Parties respectfully request that the Court (1) enforce the Protective Order by enjoining BAPTKO and Kupper from further use of protected discovery outside this proceeding; (2) stay the state court actions pending appeal; (3) deny BAPTKO's motion for

sanctions; and (4) award the Foundation Parties their reasonable attorneys' fees and costs incurred in connection with this motion.

The evidentiary hearing confirmed several critical facts. First, BAPTKO used confidential materials obtained through Rule 69 discovery in this federal case to pursue independent claims against third parties in state court—without first obtaining the Court's authorization to do so, as expressly required by the Protective Order. Second, the Foundation Parties' post-judgment cash transfers, including those related to the December 2024 sale of the Mandan dealerships, were made to satisfy obligations to senior secured lenders whose rights predated the judgment and remain legally superior to those of BAPTKO, an unsecured creditor. Third, and finally, BAPTKO's litigation strategy—coordinated federal discovery, followed by parallel state court actions, followed by demands for a supersedeas bond as leverage—threatens to destabilize ongoing restructuring efforts and risks impairing all parties' potential recovery, including BAPTKO's own.

As detailed below, the Foundation Parties have at all times acted in good faith during the post-judgment discovery process. They have produced voluminous documents, complied with the Court's orders, and explored in earnest the viability of obtaining a supersedeas bond—which, given the complexities of their financial circumstances and obligations to secured creditors, is not possible. Nonetheless, BAPTKO has improperly insisted on using discovery and parallel litigation to compel the Foundation Parties to post a bond—even going so far as to condition the dismissal of the related lawsuits on the posting of the bond. Ultimately, the Court should maintain the Protective Order, deny BAPTKO and Kupper's request for sanctions, and, further, stay post-judgment discovery pending appeal.

## <u>ARGUMENT</u>

**I.      THE COURT SHOULD ENFORCE THE PROTECTIVE ORDER.**

**A.      BAPTKO and Kupper used federally-protected discovery to initiate state court litigation in violation of the Protective Order.**

Testimony at the October 7 hearing confirmed that BAPTKO and Kupper obtained detailed financial information about the Foundation Parties and related entities through federal post-judgment discovery, only to use that information to initiate two separate state court fraudulent transfer lawsuits. Indeed, Randy Bakke, BAPTKO's counsel, acknowledged that the discovery obtained in this federal action formed the basis for the state court claims. When the Court asked him whether the core issue involved restrictions on document use, Mr. Bakke conceded that if the document restrictions were lifted, that "would solve part of the overall problem." (Transcript of Oct. 7, 2025 Omnibus Hearing ("<u>Hr'g Tr</u>.") at 171:9-24.) Yet, Mr. Bakke also expressed frustration with the time involved in "full jury trials on fraudulent transfers" (*id*.), revealing the improper litigation motivation behind the filings.

BAPTKO, Kupper, and their counsel's conduct clearly violates the plain terms of the Protective Order. It provides that discovery materials "shall not be used for any purpose except for the prosecution or defense of these Consolidated Cases unless authorized by further order of this Court." (Doc. 275, ¶ 16.) BAPTKO, however, did not seek or obtain such authorization from the Court before filing the state court lawsuits in May and June 2025. Instead, BAPTKO served discovery requests in February 2025—focusing on the Mandan dealership transactions—and used the resulting materials to file suits in North Dakota (naming EAGAL3 LLC, EAGAL4 LLC, and PMKC Mandan LLP) and Texas (naming Foundation Automotive US Corp. and Foundation Auto Holdings, LLC). (*See* Doc. Nos. 592-1, 592-8.)

BAPTKO's subsequent motion seeking *post hac* permission to use these materials (Doc.

590), however, does not cure the violations. As the Foundation Parties explained in their Reply, BAPTKO's request "puts the cart before the horse and demonstrates contempt for the Court's Protective Order." BAPTKO's disregard for this obligation reflects a deliberate strategy, not a good-faith mistake.

On this point, it is important to note that this is not the first time that BAPTKO and Kupper have disregarded a protective order in this litigation. Indeed, in 2022, the Court found cause to enforce an earlier-entered protective order when Kupper improperly disclosed confidential documents to BAPTKO for use in separate litigation. (*See* Doc. 80.) As such, the at-issue conduct reveals a disturbing pattern: the use of protected materials to gain procedural and substantive advantages outside the bounds of this Court's authority.

**B.     The state court complaints rely on discovery material protected by this Court's Order.**

The record—as well as the complaints themselves—confirm that BAPTKO's state court lawsuits are grounded in information obtained exclusively through federal post-judgment discovery. For instance, the North Dakota complaint alleges detailed facts about the December 2024 dealership sales and the entities involved—facts that were not publicly disclosed and could only have been obtained through the targeted discovery served in February 2025. Similarly, the Texas petition relies on confidential transaction records and financial data disclosed in the federal case.

Moreover, BAPTKO's motion to compel Mr. Kutschinski to testify (Doc. 610) admits that the October 7 hearing was expected to address evidence central to both the North Dakota and Texas state court lawsuits. (*Id*. at 3.) That admission underscores the central problem: BAPTKO is leveraging this Court's post-judgment discovery process to pursue claims in other forums— claims that should rise or fall independently, based on facts discoverable through appropriate

channels under the law of those jurisdictions. BAPTKO and Kupper's conduct is precisely the type that the Protective Order is designed to prevent.

### C.    The Court should enjoin further misuse of the discovery information.

Needless to say, the Court holds broad discretion to enforce protective orders and impose remedies under Federal Rule of Civil Procedure 37(b)(2). When a party violates a discovery or protective order, a district court may grant the additional relief necessary to address the violation, and—unless the conduct was "substantially justified" or it would be unjust—must award reasonable attorneys' fees. Fed. R. Civ. P. 37(b)(2)(C).

"Courts should construe protective orders in a reasonable and commonsense fashion, so that their prohibitions are connected to their purpose." *Hunter Eng'g Co. v. Hennessy Indus., Inc.*, No. 4:08 CV 465 DDN, 2010 WL 1186454, at *2 (E.D. Mo. Mar. 29, 2010). The order entered in this case is considered a "blanket" protective order, which:

> Place[s] upon the parties themselves, or others from whom discovery is sought, the initial burden of determining what information is entitled to protection. Normally, a blanket protective order requires that counsel for a producing party review the information to be disclosed and designate the information it believes, in good faith, is confidential or otherwise entitled to protection. The designated information is thereafter entitled to the protections afforded by the blanket protective order unless the designation is objected to by an opposing party. Judicial review of a party's designation as confidential occurs only when there is such an objection which the parties cannot resolve by agreement.

*Gillard v. Boulder Valley School Dist. Re.-2*, 196 F.R.D. 382, 386 (D. Colo. 2000). "Blanket protective orders routinely are approved by courts in civil cases, frequently[,]" as was the case here, "on the stipulated request of the parties." *Id*. Moreover, blanket protective orders "serve the interests of a just, speedy, and less expensive determination of complex disputes by alleviating the need for and delay occasioned by extensive and repeated judicial intervention." *Id*. In fact, "many courts" have such orders "essential to the functioning of civil discovery." *Baker v. Amazon Logistics, Inc.*, Civil Action No. 23-3991, 2025 WL 4147, *2 (E.D. La. Jan. 6, 2025) (fn omitted).

Similarly, federal courts widely recognize the critical importance of enforcing protective orders and maintaining the integrity of the discovery process. As another district court in the Eighth Circuit explained:

> When an opponent ignores its obligations in handling information it receives under a protective order, the producing party's confidence that its sensitive information will be safeguarded erodes. The Court's confidence that its orders will be followed erodes as well. That erosion of confidence changes the landscape of the discovery process for the producing party and the Court's expectations that litigation can be effectively managed, and there lies the harm.

*U.S. ex rel. Johnson v. Golden Gate Nat. Sr. Care, L.L.C.*, Civ. 08-1194, 2013 WL 1182905, at *3 (D. Minn. Mar. 21, 2013). BAPTKO and Kupper's "better to ask forgiveness than permission" approach to the Protective Order constitutes intentional conduct that threatens to undermine the integrity of judicial proceedings. *See, e.g., True Scan LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, Case No. 19-13518, 2021 WL 915514, *2 (E.D. Mich. March 9, 2021) (holding that party's willful disregard of court orders thwarted the proceeding and subverted the integrity of the judicial process); *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 73 (2nd Cir. 1988) (noting the "importance" of "a party's compliance with discovery orders[,]" and that "[s]uch compliance is necessary to the integrity of our judicial process.").

BAPTKO's conduct here evidences a calculated effort to circumvent the limitations imposed by the Protective Order through the expedient of filing parallel state court litigation. BAPTKO's actions were neither substantially justified nor inadvertent. It used confidential documents—subject to a Protective Order—to initiate lawsuits against nonparties in other jurisdictions, without first seeking permission. Then, after the fact, it sought authorization—all the while continuing to litigate the state court matters. The Foundation Parties have incurred substantial attorneys' fees in moving to enforce the Protective Order and in defending against BAPTKO's sanctions motion. Under Rule 37, the Court should award them attorneys' fees and

issue an order prohibiting further use of federally-protected materials outside this proceeding.

At the October 7 evidentiary hearing, the Foundation Parties raised appropriate concerns about protecting sensitive financial and operational data disclosed in discovery. As explained by counsel for the Foundation Parties, the documents at issue include non-public information regarding company structure, financial circumstances, lender obligations, and asset allocations—information that, if disclosed broadly, could result in harm to the Foundation Parties and to third parties. (Hr'g Tr. at 9:20-25; 10:1-25.) The Court's Amended Protective Order (Doc. 275) remains in full effect and governs the treatment of all confidential information produced in the litigation, including but not limited to financial documents, bank records, credit facility terms, and related transactional materials produced by the Foundation Parties. The testimony that both Ms. Wood and Mr. Slemko provided at the hearing confirmed that significant amounts of discovery materials—comprising closing binders, BMO bank records, tax returns, unaudited financial statements, and other documents—were produced with the Foundation Parties' full compliance subject to confidentiality predicates designed to protect proprietary and commercially sensitive information, including the details of ███████████████████ and ███████████████.

Unfortunately, BAPTKO now seeks to expand use of these materials beyond these judicial proceedings into two ongoing state court actions in North Dakota and Texas (the latter involving non-parties Foundation Automotive U.S. Corp. and Foundation Auto Holdings). The Foundation Parties do not oppose reasonable use of discovery materials obtained here to enforce judgments and pursue valid claims related to the post-judgment collection efforts, provided such use is conditioned upon any and all receiving parties following the protections that this Court has put in place to maintain the confidentiality of the information and protect the Foundation Parties' interests. The evidence showed good faith efforts to produce discovery to BAPTKO while

balancing legitimate apprehensions about potential misuse, including the risk of public dissemination of financial data that could imperil business operations, manufacturer relationships, collateral financers, and, ultimately, *BAPTKO and Kupper's own ability to collect on their judgment*.

Importantly, in closing the hearing the Court acknowledged that such concerns were appropriate and noted that redactions could be used to safeguard financial details while maintaining public access. (Hr'g Tr. at 10:9-25.) These safeguards are particularly important given that Foundation's business operations involve complex multi-entity structures, ███████ ████████████████████████████████████████—all of which were discussed on the record.

Of note, on October 17, 2025, the Foundation Parties produced an additional tranche of documents (Bates Nos. FAC000408–FAC001684), over 1,200 pages of records supporting the entitlement of senior secured lenders to dealership sale proceeds. These documents further confirm the interwoven nature of Foundation's financial structure and its lender obligations, and, further, underscores the importance of reinforcing the Protective Order to shield sensitive financial arrangements from misuse in litigation or the public domain.

## II.  THE COURT SHOULD STAY THE STATE COURT PROCEEDINGS PENDING APPEAL WITHOUT REQUIRING A SUPERSEDEAS BOND.

### A.  A bond is not financially feasible under current circumstances.

At the October 7 hearing, the Court inquired whether the Foundation Parties had pursued a supersedeas bond. Counsel for the Foundation Parties explained that the circumstances had changed since the earlier discussions about posting a modest bond in April 2025. At that time, and specifically, on April 4, 2025, the Foundation Parties had proposed posting a $500,000 bond to stay execution during the pendency of post-trial motions (*see* Doc. 542)—a short-term measure

for a modest amount while the District Court considered the Foundation Parties' Motion for Judgment Notwithstanding the Verdict, and, Alternatively, Motion for a New Trial (Docs. 511-512). Shortly thereafter, however, the District Court denied the Foundation Parties' post-trial motions and their motion to stay as moot (Doc. 544) and, on April 7, 2025, entered an Amended Judgment (Doc. 545) that increased the total judgment amount by nearly $2 million to include attorneys' fees and costs awarded to BAPTKO and Kupper (Doc. 543). What had been contemplated as a $500,000 bond to secure a stay for mere weeks or months suddenly became a question of posting a supersedeas bond for a judgment of approximately $5 million (plus interest and costs for delay) for a more prolonged appellate process.



Mr. Shaffer further explained at the hearing that the Foundation Parties' ███████ ███████████████████████████████████████ The Foundation Parties' "got way out over their skis ██████████████████████████████████████ ███████" (Hr'g Tr. at 177:15-21.) Mr. Shaffer expressed uncertainty about whether Foundation ██████████████████████████████████████████████ ███████████████████████████████. (*Id*. at 178:4-5; 177:25-26.)

The Court appropriately recognized ███████████████████████████ ███████ at one point asking, would "I [be] requiring them to produce blood from a turnip then? Because the testimony was they can't afford it." (Hr'g Tr. at 169:15-16.) This acknowledgment reflects the reality that the circumstances had fundamentally changed between the April 2025 representations about posting a modest short-term bond and the October 2025 hearing addressing a robust, potentially multi-year bond for the full appellate process.

Following the hearing, the Foundation Parties diligently explored whether they could obtain a supersedeas bond with their lenders and advisors. Senior creditors did not authorize a

bond. This is due to the lack of ██████████████████████████ and, as such, the premium on such a bond would be ████████████████████████████ ████████████ In short, the Foundation Parties' ████████████—confirmed by Mr. Slemko's testimony and the October 17 production—renders the bond not feasible. (Hr'g Tr. at 24:1-25; 25:1-5; 30:1-31:15.)

Nonetheless, BAPTKO's counsel has taken the position that if the Foundation Parties post a bond, the two state court lawsuits would go away. This remarkable assertion reveals BAPTKO's true intent: not to litigate the validity of the alleged transfers, but to leverage procedural remedies to extract financial concessions. In short, the Foundation Parties' ability to post a bond today has no bearing whatsoever on the nature of alleged transfers that occurred nearly ten months ago.

**B.    The Court lacks authority to unilaterally impose a supersedeas bond on the Foundation Parties.**

Following the close of testimony at the hearing, Mr. Bakke urged the Court to issue an order *compelling* the Foundation Parties to post a bond to stay execution on appeal. (Hr'g Tr. at 172:8-19; 183:8-16.) Specifically, Mr. Bakke claimed that Fed. R. Civ. P. 37(b)(2)(A)—which applies when there is a "fail[ure] to obey an order to provide or permit discovery"—provides the basis for the Court to enter such an order. (*Id*. at 183:8-16.) To state the obvious, by its plain language the Rule applies only under circumstances where a litigant has "fail[ed] to obey" a court's discovery order. Those circumstances simply do not exist here.

Perhaps more important, obtaining a supersedeas bond by rule "is permissive rather than mandatory[.]" *Niemi v. Lasshofer*, 770 F.3d 1331, 1343 (10th Cir. 2014). "If an appeal is taken, the appellant *may* obtain a stay by supersedeas bond." F.R.C.P. 62(d) (emphasis added); *see also U.S. for Use of Terry Inv. Co. v. United Funding and Investors, Inc.*, 800 F. Supp. 879, 881 (E.D. Cal. 1992) ("When a party files for appeal, it may move for a stay of judgment under F.R.C.P.

62(d)."). "If the appellant does not file for a stay, the appellee may enforce the judgment at any time, even during the pendency of the appeal." *U.S. for Use of Terry*, 800 F. Supp. at 881. Rule 62(d), therefore, "is … intended to protect an appellant from execution of an adverse judgment during an appeal," *and* "to provide assurance to the appellee *if thus prevented from collecting on the judgment*." *Niemi*, 770 F.3d at 1343 (emphasis added).

Cutting further against Mr. Bakke's request, "Rule 62(d) nowhere expressly provides that the district court may, of its own accord or on motion from appellee, order appellant to post a supersedeas bond." *U.S. for Use of Terry*, 800 F. Supp. at 881. "In fact, the language of Rule 62 provides that discretionary power regarding stays is left to the court of appeals, which may 'make any order appropriate to preserve the status quo or the effectiveness of the judgment subsequently to be entered.'" *Id*. (*quoting* F.R.C.P. 62(g)). Indeed, "only Rule 62(g), which leaves discretion to the appellate court, speaks more generally of any action by the court which may 'preserve the status quo.'" *Id*. (footnote omitted). "Thus, the Federal Rules of Civil Procedure seem to anticipate that discretionary matters like the one currently before this court be left in the hands of the court of appeals." *Id*.

"Ultimately, given the limitations imposed by" the Federal Rules of Civil and Appellate Procedure, the Court "does not have the power to grant a supersedeas bond, except pursuant to an *appellant's* motion to stay." *Id*. at 882 (emphasis added). This conclusion has the support of "[t]he uniform federal authority[.]" *See Fessler v. Porcelana Corona de México, S.A. de C.V.*, Civil Action No. 4:19-cv-00248, Civil Action No. 4:17-CV-00001, 2020 WL 3498872, *3 (E.D. Tex. June 29, 2020); *see also, e.g., Blatman v. Siebel*, 2021 WL 2458213, *2 (D. Del. May 21, 2021) (concluding that district courts lack authority to impose a supersedeas bond in the absence of a stay granted under Rule 62); *In re Navistar Diesel Engine Prods. Liab. Lit.*, No. 11 C 2496, MDL

11

No. 2223, 2013 WL 4052673, *3 (N.D. Ill. Aug. 12, 2013) ("By its terms," Rule 62(d) "applies only when the appellant asks the court to impose a stay."); *Af-Cap, Inc. v. Republic of Congo*, Case No. A-01-CA-321-SS, 2005 WL 8155158, *1 (W.D. Tex. Oct. 17, 2005) ("[T]he plain language" of Rule 62(d) "does not authorize the Court to independently require a defendant to post a supersedeas bond."); *In Re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Lit.*, No. MDL NO. 1203, CIV.A. 99-20593, 2000 WL 1665134, *3 (E.D. Pa. Nov. 6, 2000) (concluding that a district court "has no authority to impose a supersedeas bond in the absence of an appellant's motion for a formal stay of execution."). BAPTKO and Kupper "do not provide a way around this overwhelming authority." *Fessler*, 2020 WL 3498872 at *3. Accordingly, the Court should reject their request for an order requiring the Foundation Parties to post a supersedeas bond.

### C.    Rule 62 permits a stay without a bond where circumstances warrant it.

As noted above, Federal Rule of Civil Procedure 62(b) permits a party to obtain a stay pending appeal upon "providing a bond or other security,[]" but does not make a bond mandatory. "The purpose of a supersedeas bond is to secure the appellee from loss resulting from the stay of execution." *Executive Air Taxi Corp. v. City of Bismarck*, 2007 WL 559819, at *1 (D.N.D. Feb. 14, 2007) (*quoting Fed. Prescription Serv., Inc. v. American Pharm.*, 636 F.2d 755, 761 (D.C. Cir. 1980)).

Generally, a district court will set the supersedeas bond at an amount equal to the judgment being appealed. *Id*. However, courts have recognized that the bond requirement may be waived or modified in appropriate cases. *Id.*; *see Brakebill v. Jaeger*, No. 1:16-CV-008, 2020 WL 13699062, at *1 (D.N.D. June 29, 2020) (listing factors and waiving bond where justified by the record); *see also Skrovig v. BNSF Ry. Co.*, 2012 WL 2505749, at *3 (D.S.D. June 28, 2012) (*citing Poplar Grove Planting and Refining Co., Inc. v. Bache Halsey Stuart, Inc.*, 600 F.2d

12

1189, 1191 (5th Cir. 1979)).

A number of factors may be considered in deciding whether to waive the bond requirement: (1) the complexity of the collection process; (2) the amount of time required to obtain a judgment on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the appellant's ability to pay the bond is so plain the cost of the bond would be a waste of money; and (5) whether the appellant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the appellant in an insecure position. *Id.*; *Dillon v. City of Chicago*, 866 F.2d 902, 904-05 (7th Cir. 1988).

Multiple factors here support staying the case without a bond. <u>First</u>, the Foundation Parties are engaged in structured efforts to address outstanding obligations through controlled asset sales and restructuring. <u>Second</u>, enforcement proceedings in the interim would risk ███████████ ███████ <u>Third</u>, the Foundation Parties' ██████████████████████████████ ████████████████████████████████—make it unlikely that assets could be freely applied to satisfy a bond obligation without adverse consequences. <u>Fourth</u>, and finally, requiring a bond now could trigger a cascade of ██████ actions that would damage—not protect— BAPTKO's ability to recover.

Here, the costs of a bond could imperil the Foundation Parties' ability to meet their other legal obligations, and secured creditors hold priority claims on the Foundation Parties' assets. A waiver of the bond requirement is therefore justified.

**D.    BAPTKO's approach risks leaving all parties worse off.**

BAPTKO has asserted—both in briefing and at the October 7 hearing—that if the Foundation Parties post a supersedeas bond, the two state court lawsuits may be resolved or withdrawn. (*See* Hr'g Tr. at 172-73.) That position is both illogical and revealing. The claims raised in the state court lawsuits either have merit or they do not; the ability to post a bond in a

13

separate federal case has no bearing on whether the underlying transactions were fraudulent.

By linking dismissal of the state court actions to the posting of a bond, BAPTKO confirms that those lawsuits are being used not as legitimate enforcement mechanisms, but, rather, as strategic pressure. Worse, this strategy threatens to force the Foundation Parties into a position ██████████████████████████████████████████████████████████ ████████—which would impair or eliminate all stakeholders' ability to recover.

As Mr. Slemko indicated during the hearing, Foundation's ████████████ has materially changed amid efforts to ████████ enter ████████████████████ ████████████ and ████████ dealership assets, including the sale of 13 dealerships since judgment was entered, leaving a smaller footprint of 10 dealerships. The sale of the Mandan dealerships, although a significant monetization event, distributed proceeds first in order of priority to secured creditors, as confirmed at the hearing. Mr. Slemko testified that Foundation's cash management system is highly consolidated. All proceeds from dealerships—including the sale of the Mandan Dealerships—were swept into Foundation Automotive U.S. Corp., which holds cash for the entire structure, on a daily basis. (Hr'g Tr. at 22:13-25; 23:1-7.) These funds were allocated in accordance with existing contractual ████████████ obligations to institutional lenders. (Hr'g Tr. at 21:17-23.)

As confirmed in the Foundation Parties' production, certain proceeds were earmarked for repayment of ████████—reflecting obligations that predate the judgment. Contrary to BAPTKO's assertions, the Foundation Parties did not act to evade payment of the judgment but to comply with ████████████████████████████████████████ ████████████████

BAPTKO's collection efforts, if unchecked, risk disrupting relationships with senior

lenders. Given the structure of Foundation's financing, any aggressive enforcement action—such as compelled payments or forced asset seizures—could have broader operational consequences. In that event, BAPTKO would not only face diminished recovery, but could inadvertently trigger a chain of events harmful to all stakeholders, including third-party creditors. A temporary stay of post-judgment enforcement is therefore reasonable and warranted. It will preserve the status quo, avoid prejudice to third-party creditors, and allow the appellate process to proceed without collateral harm. It is precisely this risk—of destabilizing secured arrangements to the detriment of all creditors—that Rule 62(b) is designed to help courts avoid.

### III.   THE STATE COURT ACTIONS SHOULD BE STAYED WITHOUT REGARD TO A BOND.

#### A.   The state court actions are tainted by misuse of protected discovery.

As demonstrated in Section I above, the state court lawsuits are based on information obtained through this Court's post-judgment discovery process. That information is subject to the Amended Protective Order, which expressly forbids its use outside these consolidated cases without Court approval. (Doc. 275, ¶ 16.)

Because BAPTKO filed the lawsuits before seeking leave, and did so using confidential information, the Court should exercise its authority to stay the state actions pending appeal—not to delay collection efforts generally, but to protect the integrity of its own orders and prevent the misuse of the discovery process.

The need for a stay does not depend on whether the Foundation Parties have posted a bond. It stems from the Court's inherent authority to enforce its orders, prevent circumvention of its procedures, and ensure that discovery is not weaponized for collateral litigation.

#### B.   The Foundation Parties must defend the state lawsuits, at substantial cost.

BAPTKO and Kupper's litigation conduct has forced the Foundation Parties into defending

two separate state court cases in two jurisdictions, involving numerous parties and claims. Even though these lawsuits arise from the same core allegations underlying the federal judgment, they target different entities and rely on information that was supposed to remain confined to this case.

The Foundation Parties cannot ignore those lawsuits. Default judgments would carry serious consequences for the named entities and could impair efforts to resolve creditor claims in an orderly fashion. At the same time, defending these actions imposes significant legal and financial burdens—burdens exacerbated by the fact that the lawsuits were initiated in direct violation of this Court's Protective Order.

Under these circumstances, the Court should stay the state actions regardless of bond status and enjoin further prosecution of those cases using information protected under the federal discovery regime.

## IV.    BAPTKO'S MOTION FOR SANCTIONS SHOULD BE DENIED.

### A.    BAPTKO has not shown a discovery violation or legal basis for sanctions.

BAPTKO's motion for sanctions—premised on alleged discovery violations—lacks merit. Since entry of judgment, the Foundation Parties have complied with post-judgment discovery obligations, producing tax records, financial statements, and transactional materials. The Foundation Parties produced these responsive materials following meet-and-confer efforts and this Court's orders. The record demonstrates that objections to broad and retroactive discovery requests, including demands for documents dating back to 2019, were based on proportionality, undue burden, and the irrelevance of certain historical financial data to the present collection efforts. No willful or bad faith withholding was shown. BAPTKO, however, has taken that discovery, used it to file two parallel state court lawsuits in North Dakota and Texas, and now demands that a supersedeas bond be posted to secure dismissal of those actions.

After the Court's April 8, 2025 order compelling broader production, the Foundation

16

Parties promptly produced the closing binder associated with the sale of the Mandan dealerships in December 2024 and other materials, like the BMO bank records. This is not evidence of bad faith. It is a good-faith objection and subsequent compliance following a court order.

Moreover, BAPTKO's delay in pursuing post-judgment remedies, including waiting until months after the sale closing, not filing writs of execution or garnishments, and choosing to litigate side proceedings rather than immediately seek to satisfy the judgment from any available assets, undermines any request for sanctions. The Foundation Parties have cooperated in good faith with discovery and have continually expressed openness to working with BAPTKO on appropriate limits and protections concerning discovery. No delay was intentional, no misconduct transpired, and no prejudice to BAPTKO occurred. BAPTKO has failed to establish any willful noncompliance or bad faith required for Rule 37 sanctions.

Mr. Slemko's testimony explained the disposition of the Mandan sale proceeds and the nature of Foundation's lender relationships, including the priority rights of its senior secured creditors. The documents produced—including those referenced during the hearing and those produced afterward—contain detailed support for those positions. That BAPTKO was able to initiate detailed state court litigation confirms not the inadequacy of Foundation's responses, but their sufficiency.

Moreover, BAPTKO has not identified any Court order that Foundation violated, nor any conduct warranting sanctions under Rule 37. If anything, BAPTKO's own conduct—filing state court cases in violation of a protective order—raises questions about whether it has complied with its own obligations in this litigation.

What is clear is that BAPTKO's discovery strategy has evolved into a pressure campaign. It has used discovery to launch new lawsuits and now seeks sanctions against the Foundation

Parties to compel a supersedeas bond, which goes far beyond the scope of Rule 37. This is not the purpose of sanctions. The Court should reject it.

**B.    BAPTKO and Kupper have made no meaningful attempt to collect the judgment through lawful means.**

BAPTKO's demand for sanctions rings hollow in light of its own inaction in executing on the judgment and its premature accusations of impropriety. While BAPTKO repeatedly claims it is pursuing legitimate enforcement of its judgment, the record tells a different story of strategic delay and misguided priorities. The timeline of events demonstrates that BAPTKO had ample opportunity to pursue conventional enforcement mechanisms but chose not to do so.

BAPTKO's counsel knew about the potential sale of the Mandan dealerships as early as November 6, 2024—one day before judgment was entered—when counsel sent an email demanding that the Foundation Parties "pay BAPTKO in full the $3 million plus interest" using proceeds from the anticipated sale. (**Exhibit 1**, Nov. 6, 2024 Email from R. Bakke.) The judgment was entered on November 7, 2024. (Doc. 545.)

By December 4, before the sale even occurred, BAPTKO's counsel sent a formal letter threatening to pursue a fraudulent transfer claim. (**Exhibit 2**, Dec. 4, 2024 Letter from R. Bakke.) Counsel for the Foundation Parties appropriately responded that such allegations were "as incorrect as [they were] reckless" and warned that any fraudulent transfer action would violate Federal Rule of Civil Procedure 11. (**Exhibit 3**, Dec. 4, 2024 Email from M. Shaffer.)

The 30-day automatic stay on execution expired on December 7, 2024, yet BAPTKO made no effort to enforce the judgment through conventional court-supervised mechanisms such as writs of garnishment or other seizure remedies available under Federal Rules of Civil Procedure 64 and 69.  The sale of the Mandan dealerships occurred on December 11, 2024. (Doc. 555-2, at 3.) Thus, BAPTKO had several days after the stay expired to take enforcement action but failed to do so.

18

Rule 64 provides that "every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment," yet BAPTKO pursued none of these readily available remedies. *See* Fed. R. Civ. P. 64(a).

Since the judgment, BAPTKO has made little to no effort to collect through conventional, court-supervised enforcement mechanisms available under Rules 64 and 69 or state analogues. It has not sought writs of execution, garnishment, turnover orders, or property seizure remedies. Nor has it attempted to identify specific, non-exempt assets of the Foundation Parties that could be reached through lawful means. Instead, BAPTKO has used discovery as a weapon to create parallel lawsuits and to demand concessions outside the scope of ordinary judgment enforcement. After obtaining targeted financial information in federal discovery—subject to a protective order—it diverted that information into two state court lawsuits against affiliates and third parties. Counsel for BAPTKO admitted at the October 7 hearing that these suits are expected to take "another two-year process" to resolve (Hr'g Tr. at 171:24), further confirming that they are not designed to satisfy the federal judgment but to create pressure through prolonged litigation.

This conduct undercuts BAPTKO's position that its goal is recovery. It has not pursued the judgment against the actual judgment debtors through ordinary channels available under Rules 64 and 69. Instead, it seeks to sidestep procedural protections and gain leverage through costly and coercive litigation. In doing so, BAPTKO has multiplied proceedings, increased the cost of defense, and placed the Foundation Parties—and their lenders—in a position of risk without making progress toward lawful collection. Counsel's suggestion that the state lawsuits would "go away" if the Foundation Parties posted a supersedeas bond (Hr'g Tr. at 172-73) reveals the coercive nature of this strategy. That statement suggests that the lawsuits are not designed to litigate real claims, but to pressure the Foundation Parties into taking financial actions that may

19

not be legally required—and which the Foundation Parties cannot undertake without ███████████ ████████████████████████ The ability to post a bond has no bearing on the underlying merits of alleged fraudulent transfers.

This pattern of behavior reveals a misuse of the litigation process. The Court should view BAPTKO's request for sanctions, and its arguments regarding a supersedeas bond, through the lens of its broader strategy: not a good-faith effort to collect, but an effort to extract leverage through litigation pressure, even at the expense of orderly recovery or the rights of other creditors. The Court should reject BAPTKO's attempt to transform its improper tactics into a basis for punitive relief and deny the motion in full.

## CONCLUSION

BAPTKO and Kupper's litigation approach has escalated beyond standard judgment enforcement. Their demands for compelled discovery, collateral lawsuits, and now a financially impossible bond place the Foundation Parties in an untenable position. If continued unchecked, this approach could upend relationships with secured lenders, disrupt operations, and result in significant loss for all parties involved, including BAPTKO.

The Foundation Parties have complied with their obligations, acted in good faith, and attempted to resolve matters constructively. They now ask this Court to preserve procedural balance and prevent unnecessary harm. Accordingly, the Foundation Parties respectfully request that the Court: (1) enforce the Protective Order (Doc. 275, as extended by Doc. 547); (2) grant a stay of judgment enforcement proceedings pending appellate resolution; and (3) deny BAPTKO's motion to compel and for sanctions in its entirety.

Dated this 23rd day of October, 2025.

Respectfully submitted,

*/s/ Kensye N. Wood*
Maxwell N. Shaffer
Kensye N. Wood
LELAND SHAFFER LLP
8694 E. 28th Avenue
Denver, Colorado 80238
(720) 556-1872
Maxwell.Shaffer@lelandshaffer.com
Kensye.Wood@lelandshaffer.com

*Attorneys for Foundation Automotive Corp.,*
*FA ND CHEV, LLC, and FA ND SUB, LLC*

21