IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

Civil No. 1:20-CV-00138-DMT-CRH

| | | |
|---|---|---|
| FA ND CHEV, LLC and FA ND SUB, LLC, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| Robert Kupper; Bismarck Motor Company; and BMC Marine LLC d/b/a Moritz Sport & Marine, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |
| _____ | ) ) ) ) | **BAPTKO, INC. AND ROBERT KUPPER'S BRIEF IN OPPOSITION TO THE FOUNDATION PARTIES' RESPONSE TO ORDER TO SHOW CAUSE** |
| BAPTKO, Inc., | ) ) | |
| Plaintiff and Counterclaim Defendant, | ) ) ) | |
| v. | ) ) ) | |
| Foundation Automotive Corp, an Alberta Corporation, FA ND CHEV, LLC and FA ND SUB, LLC, | ) ) ) ) | |
| Defendants and Counterclaimants. | ) ) ) | |

\*\*\*          \*\*\*          \*\*\*

## I.   INTRODUCTION

BAPTKO, Inc. and Robert Kupper (collectively "BAPTKO"), submit this brief pursuant

to the Court's *Order Directing Disclosure and to Show Cause* ("Order to Show Cause") (Doc.

648) and in response to Foundation Automotive Corp, FA ND CHEV, LLC, and FA ND SUB,

1

LLC's ("Foundation Parties") *Response to Order to Show Cause* ("Foundation Response") (Doc. 649).

At its core, this matter is not complicated: the Court issued a clear, unequivocal, and mandatory order requiring the Foundation Parties to post a bond in the amount of $5,139,981.90, and the Foundation Parties have openly refused to comply. Rather than demonstrating good-faith efforts to obey the Court's directive or providing competent evidence of an inability to do so, the Foundation Parties have chosen defiance coupled with unsupported assertions, outdated testimony, and repetitive arguments on issues previously decided by the Court and some limited new arguments that ignore both the governing legal standards and the Court's prior rulings.

The record establishes three undisputed facts that frame the issues before the Court. First, the Court entered a lawful and specific order requiring the Foundation Parties to deposit funds with the Clerk of Court. Second, the Foundation Parties had actual knowledge of that order. Third, the Foundation Parties admit they have not complied and, more importantly, do not intend to comply. These facts alone satisfy the threshold showing necessary for contempt. The burden therefore shifts to the Foundation Parties to demonstrate a present inability to comply. They have failed to meet that burden.

Instead of presenting evidence, the Foundation Parties rely almost exclusively on outdated testimony from October 2025 and conclusory statements of counsel, neither of which constitutes competent proof of present inability. They provide no affidavits, no financial statements, no communications with lenders, no documentation of efforts to secure a bond, and no evidence of any attempt to comply with the Court's order after it was issued. This complete absence of evidence is striking given the Court specifically ordered the Foundation Parties to show cause why they should not be held in contempt. Faced with that directive, one would expect detailed,

substantiated explanations of efforts undertaken, obstacles encountered, and efforts to overcome obstacles. The Foundation Parties have provided no such explanations.

Equally significant, the Foundation Parties' claimed inability to comply is contradicted by the record and, to the extent any financial constraint exists, appears to be self-induced. The evidence demonstrates the Foundation Parties received tens of millions of dollars in proceeds from the December 2024 sale of the Mandan Dealerships. Rather than preserving those funds to satisfy the judgment or comply with anticipated court-ordered obligations, they chose to distribute substantial sums to other creditors, including unsecured creditors and related entities. A party cannot avoid compliance with a court order by voluntarily dissipating assets and then claiming inability to pay. The law is clear that such self-created circumstances do not excuse contempt.

This conduct did not occur in isolation. It is part of a broader and well-documented pattern of noncompliance throughout this litigation. The Foundation Parties have repeatedly failed to comply with discovery orders, withheld critical financial information, and provided incomplete and evasive disclosures despite multiple directives from the Court. The present refusal to post a bond is simply the latest and most direct manifestation of that pattern. It reflects not confusion, hardship, or inadvertence, but a deliberate decision to disregard the authority of the Court.

Ultimately, this case presents a straightforward but serious question: whether parties may openly refuse to comply with a clear court order, offer no competent evidence of inability, and avoid consequences. The answer must be no. The integrity of the judicial process depends on the enforceability of court orders. Where, as here, the evidence establishes an ability to comply (or at minimum the Foundation Parties failed to prove otherwise) and a willful refusal to do so, contempt sanctions are necessary to compel compliance, compensate BAPTKO, and vindicate the authority of the Court.

## II.    BACKGROUND

### A.    The Foundation Parties Continue to Refuse to Comply with a Clear, Unequivocal, and Explicitly Mandatory Court Order Directing the Payment of a Bond

On October 7, 2025, Magistrate Judge Clare R. Hochhalter held an omnibus evidentiary hearing on various pending motions, including BAPTKO's *Motion to Compel Discovery, For Sanctions, and For Expedited Decision* (Doc. No. 552) and *Motion to Use Documents and Information Obtained in Post-Judgment Discovery* (Doc. No. 590), as well as the Foundation Parties' *Motion to Enforce Protective Order* (Doc. No. 602) and *Motion for Attorney's Fees and to Stay Pending Appeal.* (Doc. No. 604).

Following the omnibus evidentiary hearing, Magistrate Judge Hochhalter issued a detailed *Report and Recommendations* (Doc. 642), recommending in relevant part:

> Based on the Foundation Partes' current financial position, and as dictated by relevant caselaw, the undersigned recommends that the court **require** a supersedeas bond for the full amount of judgment, plus 10% for post-judgment interest, costs, and damages.

*Report and Recommendations*, Doc. 642 at p. 38 (emphasis added). On February 23, 2026, District Judge Daniel M. Traynor issued an *Order Adopting Report and Recommendation* (Doc. 645), adopting Magistrate Judge Hochhalter's *Report and Recommendations* in its entirety, and ordering in relevant part:

The Court orders as follows:

- The Defendants **shall** deposit $5,139,981.90 with the Clerk of Court in accordance with Local General Rule 1.10(A)(2) and (B)(2) for deposit in the Court Registry Investment System ("CRIS"). The check **shall** be made payable to the United States District Court and **must** be forwarded to the Fargo Clerk's Office at:

    o United States District Court
      Clerk of Court
      655 1st Avenue North, Suite 130

4

Fargo, North Dakota 58102-4932.

*Order Adopting Report and Recommendation*, Doc. 645 at ¶¶ 3-4 (emphasis added).

The Court's order directing the Foundation Parties to deposit $5,139,981.90 with the Clerk of Court was clear, unequivocal, and explicitly mandatory. *See id.* The docket text in relation to the *Order Adopting Report and Recommendation* (Doc. 645), served on all counsel by email through the Court's CM/ECF system, stated:

> ORDER by Judge Daniel M. Traynor adopting [642] Report and Recommendations; granting [552] Motion to Compel; finding as moot [552] Motion to Expedite; denying [552] Motion for Sanctions; granting [590] Motion to Use Documents; denying [602] Motion to Enforce Amended Protective Order; denying [604] Motion for Attorney Fees; granting in part and denying in part [604] Motion to Stay. **The Court orders discovery within seven days of this Order, and a bond in the amount of $5,139,981.90.**

(Emphasis added).

This notice also makes clear the Foundation Parties were ordered to post a bond in the amount of $5,139,981.90, and indicates it should be done within seven days along with the service of ordered discovery. If the Foundation Parties and their counsel were still confused about the mandatory nature of this order or about the deadline for compliance, they should have asked the Court for clarification, which they never did. In fact, BAPTKO's counsel is the one who asked the Court for clarification of next steps by letter dated March 5, 2026, which informed the Court of the Foundation Parties' failure to post a bond, and stated, "We are unaware of any specific procedure to follow with the Court on Foundation's failure to pay the bond to the Court, and thus are respectfully requesting a status conference with the Court regarding the bond issue." In light of the Foundation Parties' complete inaction with respect to the bond, including failure to ever seek clarification from the Court, their claim of confusion rings hollow.

Additionally, any doubt the Foundation Parties may have allegedly harbored about the mandatory nature of the Court's order or the fact that compliance must be prompt, were explicitly eliminated by Magistrate Judge Hochhalter's comments at the March 16, 2026, status conference and the March 17, 2026, Order to Show Cause (Doc. 648). In the face of an explicit Court order to post a bond, and now an order to show cause, the Foundation Parties have made two facts crystal clear in their Response: 1) they have not yet complied with the Court order (Doc. 649 at p. 6); and 2) they have no intention of complying in the future (Doc. 649 at pp. 6-9).

As discussed in the Argument section below, the Foundation Parties' intentional violation of the Court's order constitutes civil and/or criminal contempt of court, and should be punished, either to coerce the Foundation Parties into compliance with the Court's order or to compensate BAPTKO for losses sustained, or both. *Chicago Truck Drivers v. Brotherhood Labor Leasing*, 207 F.3d 500, 505 (8th Cir. 2000) (citing *United States v. United Mine Workers*, 330 U.S. 258, 303-04 (1947)); *see also Wright v. Nichols*, 80 F.3d 1248, 1251 (8th Cir. 1996).

**B.      The Foundation Parties' Claim of Inability to Pay the Required Bond Falls Flat and is Contradicted by the Evidence**

The complete failure of the Foundation Parties to evidentially establish their alleged inability to pay the required bond, and their failure to meet the legal standard for this excuse, is discussed in more detail in the Argument section below. However, by way of background, the Court should be aware of both the evidence the Foundation Parties have presented to allegedly establish an inability to pay (or lack thereof), and the significant evidence establishing the opposite.

**i.      <u>The Foundation Parties Rely on Outdated and Uncertain Evidence, and on Unsupported Statements in Briefs</u>**

The Foundation Response (Doc. 649) was filed unaccompanied by any supporting affidavits or any other evidence at all, and without any details regarding any specific steps taken

to attempt to comply with the Court order. The only actual evidence the Foundation Parties point to regarding their alleged inability to post a bond is prior testimony from Foundation CFO Derek Slemko ("Slemko") from the October 7, 2025, omnibus evidentiary hearing before Magistrate Judge Hochhalter. A close review of Slemko's testimony reveals the Foundation Parties did not engage in any serious exploration of their ability to post a bond prior to or after Slemko's testimony on October 7, 2025. On examination by BAPTKO's counsel, Slemko could not back up the claim that the Foundation Parties would be unable to secure a bond for the BAPTKO judgment, merely stating, "a bond of that amount would be a hardship…." Hr'g Tr. (Doc. 628) at 64:19-23. Slemko testified the only thing the Foundation Parties did to see if they could secure a bond for the BAPTKO judgment was "a little bit of research done on the bond process back when it was something that was being explored." Hr'g Tr. (Doc. 628) at 65:14-19. Slemko admitted he did not do the research himself and could not identify who at Foundation, if anyone, did the research or what they did. Hr'g Tr. (Doc. 628) at 65:20-25; 66:1-14. He was not aware of anybody from Foundation calling a bonding company or insurance company to explore whether the Foundation Parties qualified for a bond, answering, "I don't know if it got to that point. I don't recall that." Hr'g Tr. (Doc. 628) at 66:15-19. Slemko also admitted the Foundation Parties never asked their only secured creditors, BMO Bank and HPS, whether those secured creditors would pursue a default against them if the Foundation Parties paid the BAPTKO judgment. Hr'g Tr. (Doc. 628) at 86:18-22.

Based on the Slemko testimony, it is clear the Foundation Parties did not earnestly explore, or explore at all, their ability to post a bond prior to the October 7, 2025, hearing. Near the conclusion of the October 7, 2025, hearing, Magistrate Judge Hochhalter questioned counsel for the Foundation Parties about the ability to post a bond, and counsel stated, "I'm just not so sure

that they can afford the premiums on that kind of bond." Hr'g Tr. (Doc. 628) at 177:12-25; 178:1-7. The Court then stated, "But you don't know for sure at this point," and counsel responded, "We will look into it and I absolutely will report on back, Your Honor." Hr'g Tr. (Doc. 628) at 178:8-11.

In post-hearing briefing filed on October 23, 2025, the Foundation Parties explained the efforts they allegedly undertook after the hearing as follows:

> Following the hearing, the Foundation Parties diligently explored whether they could obtain a supersedeas bond with their lenders and advisors. Senior creditors did not authorize a bond. This is due to the lack of available collateral or unencumbered assets, and, as such, the premium on such a bond would be economically unmanageable under the company's current financial condition.

Doc. 633 at pp. 9-10. It should be noted, this extremely cursory explanation of efforts allegedly undertaken after the October 7, 2025, hearing is entirely unsupported by affidavits or any other evidence. These alleged facts are merely stated by counsel in a post-hearing brief without citation and carry no evidentiary weight. *ANTOINE LAMONT EUBANKS PLAINTIFF v. UNITED STATES OF AMERICA; TRENTON BEHNKE DEFENDANTS*, No. 4:24-CV-00151-LPR, 2026 WL 909646, at *2, n. 26 (E.D. Ark. Mar. 31, 2026) (citing *Beck v. Fed. Land Bank of Houston*, 148 F.2d 204, 205 (8th Cir. 1945) ("What appellant's concept of evidence or competent evidence may be we do not know, but it is clear that the mere assertion in his brief and argument, without more, ... is not sufficient ...."); *Duha v. Agrium, Inc.*, 448 F.3d 867, 879 (6th Cir. 2006) ("Arguments in parties' briefs are not evidence."); *United States v. Dixon*, 137 F.4th 592, 604 (7th Cir. 2025) ("The unsupported assertions of attorneys are not evidence, so they cannot support a district court's factual findings."); *In re Strubbe*, 347 F.2d 217, 218 (3d Cir. 1965) ("We also point out that the briefs of the parties are replete with assertions of facts, but statements in briefs of counsel are not part of the record and cannot serve as bases for adjudication."); *Lee v. Chicago*

*Youth Centers*, 69 F. Supp. 3d 885, 888 (N.D. Ill. 2014) ("[I]t is basic that unsupported statements of lawyers in briefs are not evidence, do not count, and are given no weight.")).

On February 23, 2026, the Court expressly ordered the Foundation Parties to post a bond (Doc. 645 at ¶¶ 3-4), and on March 17, 2026, ordered them to "show cause why the Foundation Parties, their officers, directors, and representatives should not be held in contempt for failing to abide by the February 23, 2026, Order…. (Doc. 648 at p. 2)." After that, one would expect the Foundation Parties to file an extensive explanation of efforts to comply with the Court order, supported by affidavits and/or other evidence. It would be expected the explanation and evidence would lay out for the Court in detail which representatives of the Foundation Parties attempted to secure sufficient funds, when they took action, what actions they took, including identifying available cash and assets that may be liquidated, specific communications to potential lenders including requests for financing and the lenders' responses, specific communications to secured creditors and the secured creditors' responses, efforts to overcome any hurdles encountered, details about how much the Foundation Parties could deposit in partial fulfillment of the Court order even if they cannot deposit the entire required amount, etc.

However, the Foundation Response (Doc. 649) to the Court's Order to Show Cause (Doc. 648) contains no such details. It merely states in cursory fashion:

> Following the October 7, 2025 hearing, the Foundation Parties diligently explored whether a supersedeas bond could be obtained through their lenders and advisors. Senior secured creditors declined to authorize the bond precisely because the Foundation Parties lack available unencumbered collateral, rendering the bond premium economically unmanageable under current financial conditions. (Doc. 633 at 10.)

Foundation Response (Doc. 649) at p. 7. There are multiple important facts to point out about this explanation. First, it contains a profound lack of meaningful details. As discussed in the Argument section below, the Foundation Parties provided nowhere near sufficient information to avoid a

finding of contempt based on the alleged inability to comply. Further, this explanation in the Foundation Response mirrors and cites to Doc. 633, which is the Foundation Parties' post-hearing brief filed on October 23, 2025 (which in turn only contains the same cursory attorney statements unsupported by evidence). In fact, all citations to evidence in the Foundation Response (Doc. 649) purporting to explain the inability to comply with the Court order are either from the October 7, 2025, testimony of Slemko (Hr'g Tr., Doc. 628) or to the Foundation Parties' counsel's unsupported statements in the October 23, 2025, post-hearing brief (Doc. 633). Thus, all citations given by the Foundation Parties are to alleged facts from prior to ever being ordered by the Court to post a bond. What actions have the Foundation Parties taken since being ordered by the Court to deposit $5,139,981.90 with the Clerk of Court? Based on the Foundation Response (Doc. 649) and the cited evidence within; absolutely nothing. The Foundation Parties have not informed the Court of any single thing they have done to comply with the Court order after the order was issued. They continue to cite only cursory statements in briefs by Foundation's counsel and testimony from a time when the Foundation Parties' posting of a bond was still optional.

By citing only Slemko's uncertain and outdated testimony, and unsupported statements of counsel in response to the Order to Show Cause, the Foundation Parties are cleverly attempting to avoid going on the record about their alleged inability to pay and potentially getting caught (again) making false statements to the Court. BAPKTO has established that the Foundation Parties and their representatives and counsel have previously made inconsistent statements to the Court which directly contradict Foundation's newly devised claims of poverty. For example, prior to the October 7, 2025 hearing, the Foundation Parties filed a *Reply in Support of Foundation Automotive Corp., FA ND CHEV, LLC, and FA ND SUB, LLC's Motion to Stay Execution of Judgment* on April 4, 2025, wherein they told the Court:

10

The purpose of a supersedeas bond is to protect and secure an appellee from loss resulting from the stay of execution. *In re Genetically Modified Rice Litigation*, 4:06MD1811 CDP, 2010 WL 2926214 (E.D. Mo. July 20, 2010). **And despite BAPTKO's allegations, neither the current nor the past business interests and activities of the Foundation Parties are accompanied by circumstances suggesting insolvency. While it is certainly true that several dealerships in the broader Foundation automotive group have been sold over the last year, such business-related decisions are evidence neither of impropriety nor financial crisis.** Indeed, even a cursory review of the Foundation Automotive website (foundationauto.com) reveals that today the **Foundation automotive group owns and operates multiple dealerships across Colorado, Texas, and Tennessee. In short, the Foundation automotive group will continue forward with its business operations, by way of its considerable asset portfolio.**

Ultimately, the Court has inherent and discretionary authority in setting and/or requiring supersedeas bonds. Here, however, because the stay of execution will not render BAPTKO's judgment uncollectible from the Foundation Parties, such a bond is not necessary in this case. *See Miami Intern. Realty Co. v. Paynter*, 807 F.2d 871, 873 (10th Cir. 1986). **This conclusion is only reinforced by the fact that a reasonable likelihood does not exist that the Foundation Parties will be unable or unwilling to satisfy the judgment and all subsequent orders in full upon the ultimate disposition of the case.** *See Fed. Prescription Serv., Inc. v. Am. Pharma. Ass'n*, 636 F.2d 755, 760 (D.C. Cir. 1980). If, however, the Court determines that security is appropriate, **the Foundation Parties are ready and willing to post an appropriate bond to stay execution of the judgment.** On this point, the Court should disregard BAPTKO's attempt to cast blame on the Foundation Parties for not stating an exact amount of the bond, and, further, for not identifying all of their potential obligations to BAPTKO or Kupper. The omission of a specific proposed bond amount was due only to the current posture of post-trial briefing, and the relative uncertainty surrounding their potential obligations. To be clear: the Foundation Parties stand ready to abide by the Court's guidance on whether security is necessary, and, if so, the amount the Court will require to be posted.

Doc. 542 at pp. 3-4 (emphasis added).

The above statements in the Foundation Parties' prior briefing to the Court were reinforced by the Declaration of Derek Slemko[1], dated May 1, 2025, wherein he explained to the Court that the reason the Mandan Dealerships were sold had nothing to do with financial problems, stating:

---

[1] The Declaration of Derek Slemko contains a 28 U.S.C. § 1746 Certification, certifying under penalty of perjury that the statements therein are true and correct. Doc. 562-1 at p. 4.

5. Beginning in early 2025, Foundation implemented a strategic initiative designed to focus the business on core dealerships in key markets. Ultimately, the goal was to consolidate operations in geographic regions where we could achieve greater scale and operational efficiency. Because we did not consider North Dakota a "key" market, the potential sale of the Mandan Dealerships was one component of this initiative.

\*      \*      \*

20.  Ultimately, the decision to sell the Mandan Dealerships was made as part of a strategic shift in our business approach – one which we initiated months before the Court entered judgment in this case.

Doc. 562-1 at ¶¶ 5, 20.

Thus, Slemko told the Court in his affidavit the reason the Mandan Dealerships were sold was that North Dakota was not a "key market", and the sale of the Mandan Dealerships was simply part of larger "strategic initiative designed to focus the business on core dealerships in key markets."

At the time, BAPTKO did not have any substantive discovery responses by which to evaluate the Foundation Parties' financial situation, but the Foundation Parties' representations to the Court clearly indicated they were not in a financial crisis, could fully pay the judgment if their appeal is unsuccessful, and they were willing and able to post any bond required by the Court.

However, the Foundation Parties had a starkly different story to tell about their financial situation and about the circumstances of the selling of the Mandan Dealerships at the October 7, 2025, hearing. Slemko on behalf of the Foundation Parties testified[2] at length about the Foundation Parties' alleged financial woes. Hr'g Tr. (Doc. 628) at 41:12-25; 42:1-25; 43:1-25; 91:19-25.

Further, Slemko explained at the hearing that the Foundation Parties sold the Mandan Dealership because they were required to do so pursuant to a forbearance agreement with their

---

[2] Slemko's testimony at the October 7, 2025, hearing was given under oath after being duly sworn. Hr'g Tr. (Doc. 628) at 11:18-20.

lender (which was never produced to BAPTKO prior to the hearing) due to the Foundation Parties' default, not as part of any strategic initiative designed to focus the business on core dealerships in key markets, as Slemko had previously told the Court in a sworn affidavit. Specifically, Slemko testified at the hearing:

Q. And an option that you could have done is simply not sold the dealerships to the Eide entities when you did and then BAPTKO could have then executed on that judgment and then BMO Bank and/or Harris could have pursued whatever legal remedies they thought were appropriate?

A. Not under the terms of our forbearance. We were required to sell the dealerships.

Q. Okay. So did the forbearance agreement, that we've never received, specifically identify the two Mandan Dealerships as ones that had to be sold?

A. It did.

Q. Okay. And when did that first occur?

A. The first one was entered in July of 2024.

Q. Okay. And it specifically said in there July 2024 that the Mandan Dealerships had to be sold?

A. Among other sale requirements, yes.

Q. Was there a timeframe –

A. Yes.

Q. -- they indicated that this had to be done within?

A. There was.

Q. Okay. And what was that timeframe?

A. I believe it was the end of September 2024 which we had to get extended.

Hr'g Tr. (Doc. 628) at 86:23-25; 87:1-18.

13

The Foundation Parties' financial woes were a constant theme of the Foundation Parties at the hearing, and it stands in sharp contrast to what they told the Court in the months prior to the hearing. Importantly, this difference in stories told prior to and at the hearing is <u>not</u> the result of changed circumstances, as the Foundation Parties claim. The July 2024, forbearance agreement and even the extension on the creditor-required deadline to sell the Mandan Dealerships all predate the statements in briefing and Slemko's declaration submitted to the Court.

The Foundation Parties, through Slemko and their legal counsel, flat out lied to the Court either before or during the October 7, 2025, hearing, because the discrepancies between the two stories cannot be reconciled. Yet the Foundation Parties now ask the Court to simply trust Slemko's hearing testimony and the cursory post-hearing statements of counsel, as dispositive of the issue of the Foundation Parties alleged inability to pay the required bond. The Foundation Parties' past actions have given the Court good reasons not to trust them, and they have not even provided the most basic updated facts of their alleged efforts to comply with the Court's order by affidavit or otherwise.

> ii. **<u>There is Substantial Evidence that the Foundation Parties Have the Ability to Comply with the Court Order in Whole or in Part</u>**

The Foundation Parties have not complied with the Court's order to deposit $5,139,981.90 with the Clerk of Court, and have not even attempted to partially comply by depositing whatever amount they can pay. They try to give the impression that all three of the Foundation Parties are practically insolvent and only capable of servicing other debt held by secured creditors, with absolutely no ability to pay anything else at all. The available evidence establishes this is simply not true.

> a. **The Foundation Parties Continue to Aggressively Litigate in Three Simultaneous Lawsuits**

This federal action has been heavily litigated both before and after judgment was entered against the Foundation Parties. The judgment in this case, entered on November 7, 2024, after the jury verdict, is Doc. 490 in this District Court docket. The docket is now over 650 documents, and is replete with numerous post-judgment motions that have been exhaustively briefed and argued by the Foundation Parties. As BAPTKO has previously pointed out to the Court, the Foundation Parties appear at all matters with two to three expensive out-of-state attorneys, which was noted in Magistrate Judge Hochhalter's *Report and Recommendations* (Doc. 642 at pp. 36-37). Additionally, the Foundation Parties have appealed the judgment in this case to the Eighth Circuit Court of Appeals (Case No. 25-1741), which has been fully briefed, and the Eighth Circuit recently held the oral argument on March 19, 2026, where both attorney Shaffer and Wood appeared.

The Foundation Parties are also simultaneously aggressively litigating the two state court collection actions relating to collection of the federal judgment (*BAPTKO, Inc. v. Foundation Automotive US Corp., et. al.*, Cause No. 2025-44872, 151st Judicial District, Harris County, Texas and *Robert Kupper, et al. v. FA ND CHEV, LLC, et al.*, Case No. 30-2025-CV-00652, Morton County, North Dakota). By way of example as to how the Foundation Parties have spared no expense to aggressively litigate these matters, in the Texas state court action without having conducted any written discovery at all or deposed anyone else, the Foundation Parties issued a subpoena to attempt to depose Randall J. Bakke ("Bakke"), BAPTKO's current litigation counsel about his representation of his client. This bizarre litigation strategy seeking to depose opposing counsel was pure harassment and would obviously violate the attorney-client communication privilege, attorney work product privilege, and other privileges. BATPKO timely filed a motion to quash and for protective order in the Texas state court relating to the subpoena of its attorney Bakke, and a hearing was scheduled on the motion in Texas. Under Texas law, Bakke was not

15

required to appear at the deposition until the Texas court ruled on the motion. Tex. R. Civ. P. 176.6(e). However, after the hearing was scheduled but before it was held, the Foundation Parties had the Burleigh County Clerk of Court issue a local North Dakota subpoena and served it on Bakke, and sought to force Bakke to appear at a deposition prior to the Texas hearing on the pending motion there. This forced Bakke to start yet another action in North Dakota state court to challenge the local subpoena served on him. Predictably, both the North Dakota state court and Texas state court quashed the Bakke subpoenas, and the Texas court prohibited any discovery involving Bakke going forward. The North Dakota and Texas court orders are attached to the Affidavit of David R. Phillips, filed herewith, as ***Exhibits 1*** and ***2***, respectively. Notably, at the hearing held in Texas on the motion to quash and for protective order, two out-of-state attorneys appeared in-person on behalf of the Foundation Parties: Kensye N. Wood and Maxwell Shaffer, the same attorneys representing the Foundation Parties in this federal action. *See* Hearing Transcript, attached to the Affidavit of David R. Phillips, filed herewith, as ***Exhibit 3***. That Texas hearing was held recently on March 4, 2026, which was after the Foundation Parties were ordered by this Court to post a bond. *See* February 23, 2026, District Judge Daniel M. Traynor issued an *Order Adopting Report and Recommendation* (Doc. 645). In the Texas Court action there are 181 docket entries. ***Exhibit 4*** to the Affidavit of David R. Phillips. In addition, Foundation routinely has three attorneys involved on its behalf in the Morton County action, attorneys Shaffer, Wood, and Jack Zuger, a St. Paul, MN attorney. In the Morton County action, there are 174 docket entries. ***Exhibit 5***. There have also been numerous motions, hearings, briefings, and depositions in these state court cases. In the Morton County action, the Foundation Parties responded to written discovery with a 153-page response, primarily composed of objections with minimal substantive response.

16

The Foundation Parties have seemingly endless resources to aggressively litigate multiple actions in North Dakota and Texas, using Colorado-based and St. Paul-based counsel, and to pursue bizarre litigation tactics including a futile attempt to depose their opposing counsel Bakke, which have driven up the cost of litigation and forced motions to quash in two different state courts. Ironically, the state court collection actions would not even be necessary at all if the Foundation Parties simply deposited the Court-ordered bond in this federal case.

While BAPTKO does not have access to the Foundation Parties' attorney billing statements, based on BAPTKO's own attorneys' fees incurred in these matters since the jury verdict, it is confident the Foundation Parties would have incurred at least $600,000 in attorneys' fees just since judgment was entered in this federal case. This type of spending on litigation is not indicative of an insolvent company that is simply unable to comply with a Court order to post a bond, as the Foundation Parties claim.

>    **b.      The Foundation Parties Previously Told the Court on Multiple Occasions That They Intended to Post a Bond and That They Had the Financial Resources to Do So**

The Foundation Parties are talking out of both sides of their mouth on their ability to post a bond. In March and April 2025, the Foundation Parties represented to the Court they were financially sound and ready to post a bond. *See* Docs. 535 and 542. This was during a time when the Foundation Parties are now saying they could not afford to pay a bond due to obligations to secured creditors. Specifically, the Foundation Parties have told the Court:

- "The Foundation Parties are prepared to post a supersedeas bond to secure the Judgment; however, it would be inefficient and unduly burdensome for them to secure an initial bond now for a portion of the current Judgment amount and then later obtain an additional bond once the Court determines the total amount due after resolving the Fees/Costs Motion." Doc. 535 at p. 2.

- "Staying execution of the Judgment pending resolution of the Post-Trial Motions and the Fees/Costs Motion will not prejudice BAPTKO, as the Foundation Parties

17

remain willing to post an appropriate bond as necessary for a potential appeal to secure the final judgment once determined." Doc. 535 at p. 3.

- "If, however, the Court determines that security is appropriate, the Foundation Parties are ready and willing to post an appropriate bond to stay execution of the judgment." Doc. 542 at p. 4.

- "To be clear: the Foundation Parties stand ready to abide by the Court's guidance on whether security is necessary, and, if so, the amount the Court will require to be posted." Doc. 542 at p. 4.

- "The Foundation Parties expressly acknowledge that, if the Court determines a discretionary stay is inappropriate, a bond will be required to obtain the requested relief—in an amount the Court identifies." Doc. 542 at p. 4.

The record demonstrates that, at the very time they now claim financial incapacity, the Foundation Parties affirmatively represented to the Court they were financially capable and willing to comply with any bond requirement imposed. Having secured the benefit of those representations, the Foundation Parties cannot now reverse course and claim inability without any competent evidence to support that assertion, which they have wholly failed to provide. This contradiction further underscores that their present refusal to comply is not the product of impossibility, but of choice.

    c.   **The Foundation Parties Have the Ability to Sell Some Or All of Their Ten Remaining Dealerships to Obtain Cash to Pay the Bond**

The Foundation Parties have the ability to sell some or all of their ten remaining dealerships to obtain cash to pay the bond. Slemko testified on October 7, 2025, that Foundation still owns ten dealerships, which are making money. Hr'g Tr. (Doc. 628) at 43:6-8. No appraisal of those ten dealerships has been performed. *Id.* at 43:13-15. The sale price to the Eide Entities for the Mandan Dealerships real estate was $17,893,000. *Id.* at 63:1-4. In total, more than $43 million was paid to FA ND CHEV and FA ND SUB by Eide Entities on December 11, 2024 for Mandan Dealerships, including real estate. *Id.* at 63:9-13. Foundation paid BMO Bank $2,384,000 for other real estate

18

mortgages unrelated to the Mandan Dealerships with money paid to FA ND CHEV and FA ND SUB on December 11, 2024. *Id.* at 68:14-17. Slemko admitted that if Foundation sold its remaining better performing car dealerships for the same goodwill paid for the Mandan Dealerships, $25 million, this would be $250 million, with debt of only $150 million, resulting in $100 million liquidity. *Id.* at 91:4-18. Slemko admitted Foundation has no other judgments against it other than BAPKTO judgment. *Id.* at 92:19-22. Further, Slemko admitted no Foundation dealership has been "out of trust" with any vehicle manufacturer, meaning unable to pay their floor plan (new vehicle inventory) lender. *Id.* at 94:3-25.

### iii. If the Foundation Parties Do Not in Fact Have the Ability to Comply with the Court Order, It is Due to their Own Misconduct

As discussed above, there is substantial evidence that the Foundation Parties have the ability to comply with the Court order to post a bond. However, assuming arguendo the Foundation Parties are not in fact in a financial position to comply, their inability is due to their own misconduct, which should not relieve them of a finding of contempt. The Foundation Parties' even accepted a low-ball offer on the Mandan Dealerships. Slemko admitted at the October 7, 2025, hearing, Haig Partners, Foundation's broker for the Mandan Dealerships sale, calculated the goodwill value for the Mandan Dealerships as being between $22 million and $28 million. Hr'g Tr. (Doc. 628) at 97:19-24. Yet, Foundation accepted the $22 million offered by EAGAL (Jesse Pederson) when Peterson had previously offered $25-$26 million just a few years prior. *Id.* at 96:21-25; 97:1-8. The Foundation Parties' subsequent fraudulent attempts to divest themselves of assets to avoid paying BAPTKO's judgment, using a tangled web of interrelated companies, has been previously briefed to this Court. *See e.g.* Doc. 593 at pp. 4-10; Doc. 608 at pp. 2-4, 7; Doc. 630 at pp. 10-12. The Court's attention is also directed to the following new facts BAPTKO has learned, not previously briefed.

19

The Foundation Parties argue all available proceeds from its business activities must be applied to obligations to secured lenders of the Foundation Parties to prevent the lenders from calling their loans and forcing Foundation Automotive U.S. Corp. into liquidation. Doc. 649 at p. 7. What the Foundation Parties fail to mention is that they immediately used the proceeds from the sale of the Mandan Dealerships to pay both secured creditors *and* unsecured creditors of their choosing. Slemko even provided false testimony about this at the October 7, 2025, hearing, stating, "all the assets are subject to liens from secured creditors…." Hr'g Tr. (Doc. 628) at 59:23-24. The table below is taken directly from the *Second Supplement to FA ND SUB, LLC's Responses and Objections to BAPTKO, Inc.'s Interrogatories and Requests for Production of Documents in Aid of Execution*, dated March 31, 2026. ***Exhibit 7*** to the Affidavit of David R. Phillips. The only change to the table produced by FA ND SUB, LLC is that BAPTKO identifies whether the payees were secured or unsecured (in bold) at the time of the payments in December 2024:

| PAYOR | PAYEE | AMOUNT | DATE | TYPE | RECORD |
|---|---|---|---|---|---|
| FA Holdings | FA CHEV (CARS lease amendment agreement) | $1,250,000.00 | 12/11/24 | PC Credit – Cars Deposit | FAC001929 FAC000396 FAC001779 |
| EAGAL3 | FA CHEV | $13,516,671.76 | 12/11/24 | WIRE | FAC000396 |
| EAGAL4 | FA SUB | $11,638.508.63 | 12/11/24 | WIRE | FAC000404 |
| EAGAL4 (escrow) | FA SUB | $800,000.00 | 12/11/24 | WIRE | FAC000404 |
| FA SUB | FAUS | $11,539,727.59 | 12/11/24 | PC Balance Transf. Debit | FAC001790 |
| FA CHEV | FAUS | $13,416,829.49 | 12/11/24 | PC Balance Transf. Debit | FAC000396 FAC001790 |
| FA CHEV | First American Title Insurance | $207,231.90 | 12/11/24 | WIRE | FAC001949 |

20

| | | | | | |
|---|---|---|---|---|---|
| | (dealership payables) **[UNSECURED]** | | | | |
| FA CHEV | First American Title Insurance (dealership payables) **[UNSECURED]** | $1,224,067.41 | 12/11/24 | WIRE | FAC001950 |
| FAUS | HPS Investment Partners **[SECURED]** | $12,500,000 | 12/11/24 | WIRE | FAC001951 FAC001790 |
| FAUS | HPS Investment Partners **[SECURED]** | $5,500,000 | 12/12/24 | WIRE | FAC001952 FAC001791 |
| FAUS | BMO Harris Bank – Real Estate Mortgages **[SECURED]** | $2,384,222 | 12/12/24 | PC Bank Transfer – Debit | FAC001791 |
| FAUS | Global Dealer Resources, LLC (per contract) **[UNSECURED]** | $1,563,918 | 12/18/24 | PC Bank Transfer – Debit | FAC001794 |
| FA Holdings | HAIG Partners **[UNSECURED]** | $600,000 | 12/11/24 | WIRE | FAC001948 FAC001779 |

As shown above, the Foundation Parties paid unsecured creditors First American Title Insurance, Global Dealer Resources, LLC, and HAIG Partners a total of $3,595,217.31 immediately following the sale of the Mandan Dealerships.

The Foundation Parties have not explained why the millions of dollars they paid to unsecured creditors from the proceeds of the sale of the Mandan Dealerships were not paid to BAPTKO pursuant to the Foundation Parties' contractual obligations to BAPTKO under the First Amendment to the APA, which provides in relevant part:

> (f) Notwithstanding the provisions of item (d) and (e) above, in the event the Owner no longer remain as majority owners and no longer retain the ability to control the Buyer or any of its Affiliates, or no longer own or control, directly or indirectly, an entity which may then own or control the Buyer or any of its Affiliates, or no longer

own or control, directly or indirectly, an entity which then operates either one or both of the Dealerships, **the Buyer shall be required to pay the Seller the entire remaining balance of the Maximum Earn Out Amount, subject to subordination of the amount owed by the Buyer to its Lender attributed to the Buyer's purchase of the Dealerships.**

Doc. 44-2 (emphasis added). Over a month before the Foundation Parties paid the above-described unsecured creditors, this Court had entered Judgment in BAPTKO's favor in relation to the earnout money due BAPTKO. Doc. 490.

Further, Slemko, the CFO of Foundation, testified very recently at a deposition on March 31, 2026, in the Texas state court action, that Foundation owns 49% of Global Dealer Resources, LLC. Transcript of the Deposition of Derek Slemko, attached to the Affidavit of David R. Phillips, as *Exhibit 6*, at 102:22-23. More specifically, and as a good example of the tangled web of Foundation entities, Slemko testified, "Foundation Automotive US Corp. [a subsidiary of Foundation Automotive Corp] owns 100 percent of Foundation Auto Finance Holdings, LLC. Foundation Auto Finance Holdings, LLC owns 100 percent of Global Dealer Resource Holdings LLC, which owns 49 percent of Global Dealer Resources, LLC." *Id.* 155:1-6. As shown in the chart above, Global Dealer Resources, LLC, an unsecured creditor, was paid $1,563,918 from the proceeds of the sale of the Mandan Dealerships. Thus, a Foundation Party actually owns one of the unsecured creditors who was paid $1,563,918 of the proceeds of the sale of the Mandan Dealerships.

In sum, the Foundation Parties voluntarily chose to pay over $3.5 million from the sale of the Mandan Dealerships to unsecured creditors, including an unsecured creditor in which they held a significant ownership interest (essentially the Foundation Parties choosing to pay themselves), rather than setting aside those amounts to pay the judgment against them or to post bond on appeal.

     **C.**     **The Foundation Parties' Refusal to Comply with the Court Order is a Continuation of a Pattern**

22

The Foundation Parties' refusal to post the Court-ordered bond is not the first instance of them refusing to comply with a Court order; it is merely a continuation of a longstanding pattern of violation of orders, including discovery orders. *See Report and Recommendations* (Doc. 642) at pp. 11-17; *see also Order Adopting Report and Recommendation* (Doc. 645) at ¶ 3; *Order Directing Disclosure and to Show Cause* (Doc. 648). Even after the Court's most recent order once again directing the Foundation Parties to comply with their post-judgment discovery obligations (Doc. 648), the responses are still inadequate. As directed by the Court, each of the Foundation Parties did provide signed supplemental discovery responses on March 31, 2026, attached as *Exhibits 7, 8*, and *9* to the Affidavit of David R. Phillips, filed herewith. However, the responses continue to promise throughout that additional documents will be provided on "a rolling basis." It seems the Foundation Parties will simply never comply with their post-judgment discovery obligations no matter how many times the Court orders them to do so, and also have no intention of complying with their Court-ordered obligation to post a bond.

III.   **ARGUMENT**

A.   **The Foundation Response Primarily Focuses on Irrelevant Issues that have Already Been Decided by the Court**

The Foundation Response (Doc. 649) contains a litany of arguments that have already been rejected by the Court, are irrelevant to the Court's order to show cause, and which require little to no response by BAPTKO. By way of example, the Foundation Parties continue to argue that the Court lacked the power to order the Foundation Parties to post a bond because the Foundation Parties' request for a stay was not made under Federal Rule of Civil Procedure 62. Foundation Response, Doc. 649 at pp. 9-10. This is the exact same argument the Foundation Parties already made in their post-hearing briefing following the October 7, 2025, omnibus evidentiary hearing.

The Foundation Parties even cite the same case law now that they previously cited in their post-hearing brief. *See* Foundation Response, Doc. 649 at pp. 9-10 (*U.S. for Use of Terry Inv. Co. v. United Funding & Investors, Inc.*, 800 F. Supp. 879, 881-82 (E.D. Cal. 1992); *Af-Cap, Inc. v. Republic of Congo*, No. A-01-CA-321-SS, 2005 WL 8155158, at *1 (W.D. Tex. Oct. 17, 2005); Foundation Parties' Post-Hearing Brief, Doc. 633 at pp. 10-12 (citing the same caselaw).

The Court's Order to Show Cause (Doc. 648) is not an invitation to reargue whether the Court can or should order the Foundation Parties to post a bond. The Court has already considered and rejected the Foundation Parties' arguments in that regard. This is not a motion for reconsideration. The Court has in fact ordered the Foundation Parties to post a bond, and the Foundation Parties have refused to comply. The Foundation Parties are free to disagree with the Court's orders, but they are not free to violate them.

The Foundation Response is full of such attempts to reargue issues that have already been decided by the Court against the Foundation Parties. As another example, the Foundation Parties continue to argue that BAPTKO engaged in misconduct by filing two state court collection actions premised on information and documents obtained in post-judgment discovery from this federal case. Foundation Response, Doc. 649 at pp. 2-3. The Court has already explicitly rejected these arguments. *Report and Recommendations* (Doc. 642) at pp. 20-32; *Order Adopting Report and Recommendation* (Doc. 645) at ¶ 3.

The Court expressly ordered "the Foundation Parties to show cause why the Foundation Parties, their officers, directors, and representatives should not be held in contempt for failing to abide by the February 23, 2026, Order requiring it to post bond in the amount of $5,139,981.90…." Order to Show Cause (Doc. 648) at p. 2. Faced with a potential finding of contempt of court, the Foundation Parties have chosen to use much of the ink in their short 13-page Foundation Response

(Doc. 649) to reargue irrelevant issues the Court has already addressed in prior orders, rather than explaining to the Court and providing evidence as to why they have failed to comply with a Court order. The Foundation Parties have clearly failed to comply with the Court's order to post a bond, have expressly indicated they do not intend to comply, and have wholly failed to show cause why they should not be held in contempt for their failure to comply.

**B.**      <u>**The Alleged Lack of a Court-Ordered Deadline to Comply Does Not Excuse the Foundation Parties' Failure to Post a Bond**</u>

The Foundation Parties argue in their Response that a finding of contempt is not appropriate because the Court allegedly never set a deadline for them to deposit $5,139,981.90 with the Clerk of Court. Doc. 649 at pp. 5-6. The Foundation Parties claim they "have not flouted a specific command of this Court; they have simply not yet completed an act for which no deadline was established." *Id.* at p. 6.

This argument entirely ignores that the docket text in relation to the *Order Adopting Report and Recommendation* (Doc. 645), served on all counsel by email through the Court's CM/ECF system, which specified that the bond should be paid within seven days, along with the service of ordered discovery. Even if the Foundation Parties were still confused about when they should comply with the Court order, they should have asked the Court for clarification rather than simply ignoring the order.

Further, the Foundation Parties' argument that they can safely ignore any Court order that does not have an explicit deadline is absurd and is unsupported by any case law or other legal authority. The Foundation Parties' argument would render the Court's order meaningless. The Court explicitly ordered the Foundation Parties to take specific action. It is absurd to suggest that action can be delayed indefinitely until the Court expressly provides a deadline for completing the ordered action.

25

In any event, the Foundation Parties' professed belief that they are not required to promptly post the bond should have been eliminated based on Magistrate Judge Hochhalter's comments at the March 16, 2026, status conference and based on the March 17, 2026, Order to Show Cause (Doc. 648). The Foundation Parties' continued assertion that they are not actually required to do what the Court has clearly ordered them to do, even in the face of an order to show cause, is absurd and directly challenges the authority of the Court.

Additionally, the Foundation Parties' claim "they have simply not yet completed an act for which no deadline was established" (Doc. 649 at p. 6) rings hollow in light of their admission that they have no intention of complying in the future (Doc. 649 at pp. 6-9). This is not a situation in which the Foundation Parties intend to post a bond, and are simply waiting on the Court to tell them when to do so. They do not intend to post a bond at all, and they have made that fact clear. Their arguments based on the deadline are irrelevant and are intended to distract from the basic fact that the Foundation Parties are refusing to comply now and into the future. They will never voluntarily post a bond in the absence of a finding of contempt and imposition of remedies discussed below.

**C.      The Court Should Hold the Foundation Parties, their Officers, Directors, and Representatives in Civil and/or Criminal Contempt for Failing to Abide by the Court Order Requiring them to Post Bond in the Amount of $5,139,981.90**

**i.      Civil Contempt**

Under the contempt power of the court, a court may punish violation of a lawful court order. *See* 18 U.S.C. § 401(3); Fed. R. Civ. P. 70(e) (court may hold party disobeying judgment for a specific act in contempt); *see also Taylor v. Finch*, 423 F.2d 1277, 1279 (8th Cir. 1970). "Courts have power to adjudge persons who willfully disobey their orders to be in contempt and such power extends to both civil and criminal contempt." *United States v. United Mine Workers*,

330 U.S. 258, 302-03 (1947); *see also ecoNugenics, Inc. v. Bioenergy Life Sci., Inc.*, 381 F. Supp. 3d 1082, 1089 (D. Minn. 2019) ("18 U.S.C. § 401 establishes two classes of contempt—civil and criminal.").

Before a party can be held in contempt for violating a court order, he must have actual knowledge of the order and the order must be "sufficiently specific to be enforceable." *Finney v. Arkansas Bd. of Correction*, 505 F.2d 194, 213 (8th Cir. 1974). The party moving for contempt sanctions bears the burden of proving facts warranting a civil contempt order, such as violation of a court order, by clear and convincing evidence. *Independent Fed'n of Flight Attendants v. Cooper*, 134 F.3d 917, 9820 (8th Cir. 1998). "However, the moving party does not need to show that the violation of the court's order was willful" because "[t]he absence of willfulness does not relieve [a party violating a court order or decree] from civil contempt." *Faegre & Benson, LLP v. Purdy*, 367 F.Supp.2d 1238, 1243 (D. Minn. 2005) (citations omitted); *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949); *see also N.L.R.B. v. Ralph Printing & Lithographing Co.*, 433 F.2d 1058, 1061 (8th Cir. 1970) ("The absence of willfulness does not relieve an individual from civil contempt since it is a sanction to enforce compliance with an order of the court and is not dependent on the state of mind of the respondent.").

Applying these principles to the present case, a finding of civil contempt is not only warranted, but compelled by the record. There is no dispute that the Court issued a clear, specific, and unequivocal order requiring the Foundation Parties to deposit $5,139,981.90 with the Clerk of Court. There is likewise no dispute that the Foundation Parties had actual knowledge of that order. Finally, the Foundation Parties have expressly admitted both that they have not complied and that they do not intend to comply. This alone satisfies BAPTKO's burden to establish a violation of a court order by clear and convincing evidence.

27

####   a.    Self-Induced Inability to Comply is No Defense to Contempt

If violation of a court order is shown, the burden shifts to the contemnor to show an inability to comply with the court order. *Chicago Truck Drivers v. Brotherhood Labor Leasing*, 207 F.3d 500, 505 (8th Cir. 2000) (citing *United States v. Rylander*, 460 U.S. 752, 757 (1983)). It is not the movant's burden to show whether the contemnor has the ability to pay amounts owed pursuant to a court order but failed to do so. *Chicago Truck Drivers*, 207 F.3d at 505. Courts have specifically held contempt is an appropriate sanction for a party's failure to secure a supersedeas bond where the party presented little evidence that she even attempted to secure a bond and purposely depleted her assets post-judgment. *S.E.C. v. Yun*, 208 F. Supp. 2d 1279, 1288-89 (M.D. Fla. 2002) (cleaned up) ("Contempt is an appropriate sanction for Yun's failure to secure any supersedeas bond. . . . The Court finds that imprisonment is a proper sanction for Yun's contempt of this Court's order.").

"[A] mere assertion of 'present inability' is insufficient to avoid a civil contempt finding. Rather, alleged contemnors defending on the ground of inability must establish: (1) that they were unable to comply, explaining why categorically and in detail; (2) that their inability to comply was not self-induced; and (3) that they made in good faith all reasonable efforts to comply." *Chicago Truck Drivers*, 207 F.3d at 506 (quotations and citations omitted); *see also S.E.C. v. Yun*, 208 F. Supp. 2d 1279, 1286 (M.D. Fla. 2002) (cleaned up) ("To avoid contempt for failure to pay a judgment or secure a full supersedeas bond, the alleged contemnor must prove that (1) it was impossible to pay all, or any part, of the judgment; (2) this impossibility was not "self-induced"; and (3) in good faith all reasonable efforts to secure payment were made."). If a contemnor fails to explain "categorically and in detail" why he was unable to comply with a court order, a finding of inability to comply is precluded. *Bricklayers and Allied Craftworkers Service Corporation v. Archithority United L.L.C.*, No. 19-cv-2588 (MJD/ECW), 2020 WL 7249860, at *10 (D. Minn.

28

Nov. 3, 2020). To succeed on an inability to comply defense, the alleged contemnor must do more than simply claim that compliance is impossible. Instead, the alleged contemnor must make an evidentiary showing that he has made all reasonable efforts to comply with the court order he is seeking to avoid. *See United States v. Hayes*, 722 F.2d 723, 725 (11th Cir. 1984).

Moreover, even if the contemnor proves all elements required to show the inability to comply, such inability is only a complete defense if the contemnor cannot pay *any* portion of the judgment. *S.E.C. v. Monterosso*, No. 07-61693-CIV-LENARD/GOODMAN, 2015 WL 13239830, at *6 (S.D. Fla. July 29, 2015) ("'[i]nability to comply is only a complete defense if [the contemnor] cannot pay any of the judgment; otherwise, he must pay what he can.'") (quoting *S.E.C. v. Bilzerian*, 112 F. Supp. 2d 12, 17 (D.D.C. 2000); *see also Loftus v. Southeastern Penn. Trans. Auth.*, 8 F. Supp. 2d 264, 468 (E.D. Pa. 1998) ("unless a party is completely unable to comply with the Court's Order's [sic] due to poverty, he must comply to the extent that his finances allow him").

A showing that inability to comply with a court order was not self-induced requires the contemnor to provide specific details and supporting documentation. *See Bricklayers and Allied Craftworkers Service Corporation v. Archithority United L.L.C.*, No. 19-cv-2588 (MJD/ECW), 2020 WL 7249860, at *11 (D. Minn. Nov. 3, 2020) ("Defendants' generic reliance on the pandemic, health issues, and accounting errors is insufficient to establish that their inability to comply was not self-induced."); *United States v. Latney's Funeral Home, Inc.*, 41 F. Supp. 3d 24, 33 (D.D.C. 2014) ("Although LFHI's financial hardship may be real, Defendants provide no specific factual details or documentation to support their assertions. Such threadbare and conclusory statements of financial distress, without supporting records or documentation, are insufficient to allow the Court to evaluate fully Defendants' potential justification."); *S.E.C. v.*

*Kenton Capital, Ltd.*, 983 F. Supp. 13, 16 (D.D.C. 1997) (finding that a party's "bald and conclusory statements in his affidavit," without supporting documentation, were not sufficient evidence of his inability to comply with the court's disgorgement order); *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995) (noting that conclusory statements of poverty are inadequate to carry one's burden of establishing an inability to comply); *In re Spanish River Plaza Realty Co.*, 155 B.R. 249, 255 (Bankr. S.D. Fla. 1993) (finding that "bare financial statements" prepared by interested parties and unsupported by documentation such as bank statements and financial records failed to establish an inability to comply); *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988) (noting that evasive and incomplete testimony will not satisfy the alleged contemnor's burden of production).

When a contemnor dissipates funds as a result of anticipated or actual judgment being entered against it, the inability to comply is self-induced. *See e.g., Henderson v. Biltbest Products, Inc.*, No. 4:10CV01503 AGF, 2010 WL 5392802, at *4 (E.D. Mo. Dec. 22, 2010) ("the Court finds Biltbest's choice to use its funds to settle the involuntary bankruptcy proceeding, satisfy its bank creditor, and pay other operating expenses, rather than pay the union dues and establish the health care escrow account, to be 'self-induced' and therefore not within the inability to comply defense to contempt."); *S.E.C. v. Bilzerian*, 112 F. Supp. 2d 12, 28 (D.D.C. 2000) ("With full knowledge of the existence of the Court's disgorgement judgment, [the contemnor] voluntarily chose to transfer his assets . . . If he cannot convince the [recipients] to return his assets to him, it is a problem of his own making."); *Central States, SE & SW Areas Pension Fund v. Wintz Props., Inc.*, 155 F.3d 868, 826 (7th Cir. 1998)) (affirming contempt sanction against company's president in the amount the company had paid other creditors rather than the pension fund since the court issued its order compelling the company to make withdrawal liability payments to the fund); *S.E.C. v.*

30

*Kenton Capital, Ltd.*, 983 F. Supp. 13, 16 (D.D.C. 1997) (holding defendant in contempt where he "had more than sufficient funds or assets to make the required payment, but . . . dispersed or spent the funds and assets with no credible explanation as to what other obligations he has which would take precedence over the obligations to the court."); *Piambino v. Bestline Products, Inc.*, 645 F. Supp. 1210, 1215 (S.D. Fla. 1986) (finding that attorneys who had dissipated disputed funds rather than set them aside pending resolution of the dispute had created their own inability to comply and therefore had not established an inability defense); *United States v. Lay*, 779 F.2d 319, 320 (6th Cir. 1985) (upholding district court's contempt finding where defendant consciously induced his purported inability to comply by divesting himself of assets through property conveyances to family members).

Partial compliance with a court order does not necessarily establish a contemnor made the requisite "good faith all reasonable efforts to comply" element of an inability to comply defense to contempt. *Bricklayers and Allied Craftworkers Service Corporation v. Archithority United L.L.C.*, No. 19-cv-2588 (MJD/ECW), 2020 WL 7249860, at *11 (D. Minn. Nov. 3, 2020). Delay in providing documents ordered to be produced or incomplete productions undermine the conclusion that the good faith all reasonable efforts to comply element was met. *Id.* Other circuits have determined the bar to meet this element is extremely high. *See Combs v. Ryan's Coal Co.*, 785 F.2d 970, 984 (11th Cir.) (cleaned up) ("We construe this requirement strictly. Even if the efforts he did make were 'substantial,' 'diligent' or 'in good faith,' . . . the fact that he did not make 'all reasonable efforts' establishes that [respondent] did not sufficiently rebut the . . . prima facie showing of contempt.")

31

The Foundation Parties violation of a court order being clear, the burden therefore shifts to the Foundation Parties to demonstrate a present inability to comply. They have failed to meet that burden in every respect.

First, the Foundation Parties have not provided any competent evidence (no affidavits, no financial statements, no lender communications, and no documentation of any kind) explaining, "categorically and in detail," why compliance is impossible. Instead, they rely entirely on outdated testimony from October 2025 and unsupported statements of counsel, neither of which constitutes evidence of present inability. The Court should consider as a possible remedy that CEO Kevin Kutschinski and Foundation CFO Derek Slemko be held in civil or criminal contempt in this matter, with attendant civil and criminal sanctions. It is important to note again that Foundation CFO Slemko's testimony regarding the financial position of Foundation directly contradicts itself, during relevant time periods, since Foundation was in forbearance starting in July 2024. Which time was Slemko testifying truthfully, if at all?

Second, even if some financial constraint exists, the record demonstrates that any such inability is self-induced. The Foundation Parties received tens of millions of dollars from the December 2024 sale of the Mandan Dealerships and chose to distribute those proceeds to other creditors, including unsecured creditors, rather than preserve funds to satisfy the judgment or comply with the Court's order. A party cannot avoid contempt by voluntarily dissipating assets in the face of a known judgment and then claiming inability to comply.

Third, the Foundation Parties have made no good-faith effort, let alone "all reasonable efforts," to comply with the Court's order. They have not identified any attempt to secure financing, obtain a bond, liquidate assets, negotiate with lenders, or even partially comply with the Court's directive. The complete absence of any post-order efforts is fatal to any inability defense.

32

Moreover, even if the Foundation Parties could not satisfy the full amount of the bond, they were required to comply to the extent of their ability. They have made no showing that they are unable to deposit any portion of the ordered funds. Their total noncompliance, coupled with their stated refusal to comply in the future, underscores the necessity of civil contempt sanctions.

In short, the Foundation Parties have violated a clear court order, failed to carry their burden of demonstrating inability to comply, and engaged in conduct that reflects deliberate disregard for the Court's authority. Civil contempt sanctions are therefore necessary to coerce compliance, compensate BAPTKO for ongoing harm, and preserve the integrity of the judicial process.

### b.    The Court has Wide Discretion to Determine the Appropriate Sanction for Civil Contempt

Courts have broad discretion in crafting a sanction to coerce compliance with a court order in the context of civil contempt. *Bricklayers and Allied Craftworkers Service Corporation v. Archithority United L.L.C.*, No. 19-cv-2588 (MJD/ECW), 2020 WL 7249860, at *12 (D. Minn. Nov. 3, 2020) (citations omitted). Factors which should be considering in fashioning a coercive civil sanctions include: (1) the character and magnitude of the harm threatened by continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about the result desired; (3) the amount of the contemnor's financial resources and the consequent seriousness of the burden to that particular party; and (4) the willfulness of the contemnor in disregarding the court's order. *Chaganti & Assocs., P.C. v. Nowotny*, 470 F.3d 1215, 1224 (8th Cir. 2006) (quotation omitted); *Paisley Park Enters., Inc. v. Boxill*, No. 17-CV-1212 (WMW/TNL), 2019 WL 2710703, at *4 (D. Minn. June 28, 2019). "A finding of 'willful disobedience' of a court order 'does not mean that the district court must find that the litigant acted in bad faith' [and] 'requires only that the litigant acted intentionally as opposed to accidentally or involuntarily.'" *Powerlift Door*

33

*Consultants, Inc. v. Lynn Shepard et al.*, No. 21-CV-1316 (WMW/ECW), 2021 WL 4261251, at *9 (D. Minn. Sept. 20, 2021) (quoting *Hunt v. City of Minneapolis*, 203 F.3d 524, 527 (8th Cir. 2000)).

In the present case, the harm is both monetary and prejudicial to the timely resolution of the case. *See Bricklayers and Allied Craftworkers Service Corporation v. Archithority United L.L.C.*, No. 19-cv-2588 (MJD/ECW), 2020 WL 7249860, at *13 (D. Minn. Nov. 3, 2020) (concluding harm was both monetary and prejudicial to timely resolution of the case where judgment creditor incurred significant expense in litigating case after judgment and was no closer to collecting eight months after judgment); *Edeh v. Carruthers*, No. CIV. 10-2860 RJK/JSM, 2011 WL 4808194, at *3 (D. Minn. Sept. 20, 2011), *R.&R. adopted sub nom. Edeh v. D. Scott Carruthers Attorneys at Law*, 2011 WL 4808191 (D. Minn. Oct. 11, 2011) (holding contempt was the only way to ensure judgment creditor obtained post-judgment discovery due to judgment debtor's refusal to participate). Any relative harm to the contemnor is not considered under the first factor for fashioning a coercive civil sanction. *See Bricklayers and Allied Craftworkers Service Corporation v. Archithority United L.L.C.*, No. 19-cv-2588 (MJD/ECW), 2020 WL 7249860, at *14 n.13 (D. Minn. Nov. 3, 2020) (determining harm to judgment debtor was not a factor and harm was only supported by conclusory assertions anyway).

As to the second factor, probable effectiveness of any suggested sanction, courts within the Eighth Circuit have concluded that effectiveness is shown where contempt is one of few or the only coercive mechanism available to coerce compliance with a court order. *See Bricklayers and Allied Craftworkers Service Corporation v. Archithority United L.L.C.*, No. 19-cv-2588 (MJD/ECW), 2020 WL 7249860, at **14-15 (D. Minn. Nov. 3, 2020); *Paisley Park Enters., Inc. v. Boxill*, No. 17-CV-1212 (WMW/TNL), 2019 WL 2710703, at *4 (D. Minn. June 28, 2019)

34

("civil contempt is one of the few (if not the only) remaining tools left that might bring about compliance with the Court's Order. As a result, the Court concludes that this factor also weighs in favor of contempt.").

As to the third sanction factor, the contemnor's financial resources and the consequent seriousness of the burden to the contemnor, courts within the Eight Circuit have determined a contemnor's claimed lack of financial resources is unpersuasive when it is not accompanied by evidence. *See Bricklayers and Allied Craftworkers Service Corporation v. Archithority United L.L.C.*, No. 19-cv-2588 (MJD/ECW), 2020 WL 7249860, at *14 n.13 (D. Minn. Nov. 3, 2020) ("The Court finds Defendants' ability-to-pay arguments unpersuasive. Even accepting Defendants' statements that Archithority is "small" with "limited" resources and is not currently generating income, that is not enough to convince the Court that a monetary sanction is inappropriate. Defendants provided no evidence of Archithority's finances (e.g., does Archithority have cash or other assets) and made no representations as to Kotowski's personal financial resources.").

The fourth sanction factor, the willfulness of the contemnor in disregarding the court's order, does not require any showing of mens rea. Courts within the Eighth Circuit have determined this factor weighs against a contemnor simply because the contemnor persistently violated its obligations under a court order. *See Bricklayers and Allied Craftworkers Service Corporation v. Archithority United L.L.C.*, No. 19-cv-2588 (MJD/ECW), 2020 WL 7249860, at *16 (D. Minn. Nov. 3, 2020) ("The Court need not determine whether Defendants are attempting to evade their obligations under the collective bargaining agreement to address this factor. It is enough that Defendants have been aware of the February 20 Order and their obligations pursuant to that order for months now, have not complied with the February 20 Order (despite repeated promises that

35

they would do so), and only took preliminary steps toward compliance after the Court set the September 3 hearing on the Motion for Contempt.").

"In a proceeding before a magistrate judge, disobedience of a lawful order 'shall constitute a contempt of the district court for the district wherein the magistrate is sitting.'" *Chicago Truck Drivers v. Brotherhood Labor Leasing*, 207 F.3d 500, 504 (8th Cir. 2000) (quoting 28 U.S.C. § 636(e)). "Although magistrate judges do not themselves have contempt power, they may certify any contemptuous acts or conduct to a district judge, who may then adjudge that person or party in contempt 'by reason of the facts so certified.'" *Chicago Truck Drivers*, 207 F.3d at 504-05 (quoting 28 U.S.C. § 636(e)).

### ii.    Criminal Contempt

The facts of this case likewise support a finding of criminal contempt. "Traditionally, contempt sanctions are civil if they are coercive and remedial, and criminal if they are punitive." *Jake's, Ltd., Inc. v. City of Coates*, 356 F.3d 896 (8th Cir. 2004). "Criminal contempt 'is designed to serve the limited purpose of vindicating the authority of the court.'" *Backpage.com, LLC v. Schmitt*, No. 4:17-CV-1951 PLC, 2019 WL 2285909, at *7 (E.D. Mo. May 29, 2019) (quoting *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 800 (1987)). "The same actions by a party can amount to both civil and criminal contempt"; "[i]t is the nature and purpose of the punishment that is determinative." *Hubbard v. Fleet Mortgage Co.*, 810 F.2d 778, 781 (8th Cir. 1987) (citations omitted). The commonly stated distinction is that if the penalty is to compensate the complaining party or to coerce the defendant into complying with the court's orders, the contempt is civil, while if the penalty is punitive, intended to vindicate the authority of the court, then the contempt is criminal. *Id.* at 781-82. "[C]riminal contempt is appropriate when 'the end is punishment of past behavior.'" *Josephs v. Marzan*, No. 21-749 (JRT/DTS), 2024 WL 3904646, at

36

*3 (D. Minn. Aug. 22, 2024) (quoting *N.L.R.B v. A-Plus Roofing*, 39 F.3d 1410, 1418 (9th Cir. 1994)). "As with civil contempt, both incarceration and monetary sanctions are available [for criminal contempt]." *Josephs*, 2024 WL 3904646, at *3.

"In initiating and punishing criminal contempt, the Court should consider 'the extent of the willful and deliberate defiance of the court's order, the seriousness of the consequences of the contumacious behavior, the necessity of effectively terminating the defendant's defiance as required by the public interest, and the importance of deterring such acts in the future.'" *Josephs v. Marzan*, No. 21-749 (JRT/DTS), 2024 WL 3904646, at *3 (D. Minn. Aug. 22, 2024) (quoting *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 838 (1994)). "In the context of criminal contempt, willfulness 'means a deliberate or intended violation, as distinguished from an accidental, inadvertent, or negligent violation of any order.'" *Wright v. Nichols*, 80 F.3d 1248, 1251 (8th Cir. 1996) (quoting *Hubbard v. Fleet Mortgage Co.*, 810 F.2d 778, 781 (8th Cir. 1987)). "Willfulness may be inferred from the evidence." *Hubbard*, 810 F.2d at 781. "A finding of 'willful disobedience' of a court order 'does not mean that the district court must find that the litigant acted in bad faith' [and] 'requires only that the litigant acted intentionally as opposed to accidentally or involuntarily.'" *Powerlift Door Consultants, Inc. v. Lynn Shepard et al.*, No. 21-CV-1316 (WMW/ECW), 2021 WL 4261251, at *9 (D. Minn. Sept. 20, 2021) (quoting *Hunt v. City of Minneapolis*, 203 F.3d 524, 527 (8th Cir. 2000)). Attorneys are held to a higher standard; as to an attorney, "willfulness in the context of criminal contempt may be inferred from an attorney's 'reckless disregard for his professional duty.'" *United States v. Anderson and Smith*, No. 4:23-cm-00008-RK, 2026 WL 736291, at *9 (W.D. Mo. Mar. 16, 2026) (quoting *United States v. Cutler*, 58 F.3d 825, 837 (2d Cir. 1995)).

"[A]n alleged contemnor's 'good-faith compliance' with the order is a defense to a charge of criminal contempt." *United States v. Anderson and Smith*, No. 4:23-cm-00008-RK, 2026 WL 736291, at *18 (W.D. Mo. Mar. 16, 2026) (quoting *In re Kendall*, 712 F.3d 814, 831 (3d Cir. 2013)). "'To provide a defense to criminal contempt . . . [a] mistaken construction must be one which was adopted in good faith and which, given the background and purpose of the order, is plausible.'" *Anderson and Smith*, 2026 WL 736291, at *18 (quoting *Waste Conversion, Inc. v. Rollins Env't Servs.*, 893 F.2d 605, 609 (3d Cir. 1990)). "Ultimately, 'the court should consider the entire background behind the order,' such as 'the conduct that the order was meant to enjoin or secure, the interests that it was trying to protect, the manner in which it was trying to protect them, and any past violations and warnings,' in deciding 'whether the defendant knew or should have known that his conduct was wrongful.'" *Anderson and Smith*, 2026 WL 736291, at *18 (quoting *United States v. Greyhound Corp.*, 508 F.2d 529, 532 (7th Cir. 1974)).

Criminal contempt has been held to be an appropriate sanction for a party's failure to secure a supersedeas bond where the party presented little evidence that she even attempted to secure a bond and purposely depleted her assets post-judgment. *See S.E.C. v. Yun*, 208 F. Supp. 2d 1279, 1288-89 (M.D. Fla. 2002) (cleaned up) ("Contempt is an appropriate sanction for Yun's failure to secure any supersedeas bond. . . . The Court finds that imprisonment is a proper sanction for Yun's contempt of this Court's order.").

The Foundation Parties' violation of the Court's order was not accidental, inadvertent, or the result of misunderstanding; it was deliberate and intentional. The record establishes that the Foundation Parties were fully aware of the Court's February 23, 2026, Order requiring the deposit of $5,139,981.90. Despite that knowledge, they made a conscious decision not to comply. Indeed,

they have affirmatively stated to the Court that they have not complied and do not intend to comply. This is the very definition of willful disobedience.

Willfulness may be inferred from such conduct. The Foundation Parties did not seek clarification of the Court's order, did not request an extension, did not move for relief, and did not present any contemporaneous evidence of inability to comply. Instead, they chose outright defiance. Their response to the Order to Show Cause further confirms this intent, as it largely avoids addressing their noncompliance and instead attempts to relitigate issues already decided.

Additionally, this conduct did not occur in isolation. It is part of a broader pattern of noncompliance with court orders throughout this litigation, including repeated failures to comply with discovery obligations and orders requiring full disclosure of financial information. This pattern reinforces the conclusion that the present violation is knowing and intentional, rather than inadvertent.

Criminal contempt is designed to vindicate the authority of the Court, and few circumstances more directly implicate that authority than a party's open refusal to comply with a clear and mandatory order. If such conduct is not addressed through appropriate sanctions, it risks signaling that court orders may be disregarded without consequence.

Accordingly, the Foundation Parties and their attorneys' deliberate and ongoing refusal to comply with the Court's order, which continues to this day, constitutes willful disobedience sufficient to support a finding of criminal contempt. Incarceration or monetary sanctions are appropriate sanctions for their criminal contempt.

### D.     The Court Has Multiple Remedies Available

To address the Foundation Parties' civil and/or criminal contempt, the Court has multiple remedies available, which the Court may impose individually, or together in a suite of remedies.

39

i.      **Receiversip Over the Foundation Parties and their Non-Party Subsidiaries, Parents, and Related Companies**

The Court possesses broad equitable authority pursuant to Federal Rule of Civil Procedure 66 to appoint a receiver to protect a judgment creditor's interests and to prevent further frustration of its orders, and BAPTKO specially requests the Court do so in this case. This authority is particularly appropriate where, as here, a judgment debtor has demonstrated a pattern of noncompliance, asset dissipation, and obstruction of collection efforts. "[T]he appointment of a receiver in a diversity case is a procedural matter governed by federal law and federal equitable principles." *Morgan Stanley Smith Barney LLC v. Johnson*, 952 F.3d 978, 980 (8th Cir. 2020) (citing *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993)). Although state law may inform the analysis, it does not limit the federal Court's equitable powers. *Id.*

A receivership is an "extraordinary equitable remedy," but one that is warranted in "extreme situations." *Id*. While there is no formula that determines when a receiver should be appointed, the Eighth Circuit Court of Appeals has considered several factors in determining whether appointment of a receiver is appropriate:

- The existence of a valid claim by the party seeking appointment;

- The probability that fraudulent conduct has occurred or will occur to frustrate that claim;

- Imminent danger that property will be concealed, lost, or diminished in value;

- The inadequacy of legal remedies;

- Lack of a less drastic equitable remedy; and

- Likelihood that appointing the receiver will do more good than harm.

*Id.* at 980–81 (citing *Aviation Supply*, 999 F.2d at 316-17).

"[F]raud is not required to support a district court's discretionary decision to appoint a receiver." *Morgan Stanley*, 952 F.3d at 981 (citing *Aviation Supply*, 999 F.2d at 317). Rather, the Eighth Circuit Court of Appeals has explained, "a receiver may be appropriate to protect a judgment creditor's interest in a debtor's property when the debtor has shown an intention to frustrate attempts to collect the judgment." *Morgan Stanley*, 952 F.3d at 981 (citing *Aviation Supply*, 999 F.2d at 317; 12 C. Wright & A. Miller, *Federal Practice and Procedure* § 2983, at 15-16 (3d ed. 2014)).

The Eighth Circuit's decision in *Morgan Stanley Smith Barney LLC v. Johnson* is directly analogous and highly instructive. There, the court affirmed the appointment of a receiver where the judgment debtor failed to satisfy a substantial judgment despite evidence of significant assets, resisted post-judgment discovery, structured financial affairs through LLCs in a manner that obscured assets, and frustrated the judgment creditor's repeated attempts to collect through ordinary means. 952 F.3d at 981–83. The Eighth Circuit Court of Appeals explained:

> mindful that appointment of a receiver is an "extraordinary equitable remedy," [the district court] determined that a receiver was warranted to "investigate and determine what assets Johnson possesses, whether in the LLCs or otherwise," and to "determine whether the arrangements are a subterfuge for avoiding Johnson's debt." On this record, we conclude the court did not abuse its discretion in appointing a receiver under Federal Rule 66 to exercise extraordinary investigative powers to determine whether Morgan Stanley's substantial judgment can be paid within a reasonable time.

*Id.* at 983.

Even more egregious circumstances are present in the current case, which satisfy the factors considered in the Eighth Circuit in determining whether appointment of a receiver is appropriate. First, there is no dispute that BAPTKO holds a valid and substantial judgment.

Second, the Foundation Parties have not only failed to satisfy that judgment (forcing BAPTKO to initiate two state court collection actions grounded in claims of fraudulent transfers)

41

but have openly declared that they do not intend to comply with the Court's order requiring them to post a bond. The record demonstrates a clear pattern of obstruction and noncompliance. As detailed above, the Foundation Parties have repeatedly failed to comply with discovery orders, have provided incomplete and evasive financial disclosures, have refused to meaningfully engage in post-judgment discovery, and have offered no competent evidence of any efforts to comply with the Court's order to post a bond.

Third, there is substantial evidence that assets have been transferred, dissipated, or concealed. The Foundation Parties received tens of millions of dollars from the sale of the Mandan Dealerships, yet chose to distribute those proceeds to other creditors, including unsecured creditors, rather than preserve assets to satisfy BAPTKO's judgment. This is precisely the type of conduct that supports receivership. *See Morgan Stanley*, 952 F.3d 978.

Fourth, traditional legal remedies have proven wholly inadequate. BAPTKO has already been forced to pursue extensive post-judgment discovery and two state court collection proceedings, yet remains no closer to collecting its judgment. As in *Morgan Stanley*, standard remedies have yielded little to no recovery. 952 F.3d at 983.

Fifth, there is no less drastic equitable remedy that will be effective. The Foundation Parties have demonstrated that they will not comply with Court orders voluntarily. Contempt sanctions and appointment of a receiver are necessary to identify and secure assets.

Finally, a receivership will do substantially more good than harm. A receiver appointed by the Court over each Foundation Party (Foundation Automotive Corp, FA ND CHEV, LLC and FA ND SUB, LLC) and their non-party subsidiaries, parents, and related companies (including but not limited to Foundation Auto Holdings, LLC and Foundation Automotive US Corp.) can conduct a full accounting of the Foundation Parties' assets, liabilities, and transactions; investigate the

42

disposition of the Mandan Dealership sale proceeds; evaluate intercompany and secured and unsecured transfers, relationships, and financial arrangements to determine whether they are being used to avoid payment; and ensure that any available assets are preserved and applied toward compliance with Court orders and satisfaction of the judgment.

> In the Foundation Response, the Foundation Parties suggest that:
>
> Any aggressive judicial intervention that disrupts the Foundation Parties' operating relationships with those lenders—including the appointment of a receiver or the filing of an involuntary bankruptcy petition—risks causing those lenders to terminate forbearance, call their loans, and initiate foreclosure or liquidation proceedings. In that event, BAPTKO—as an unsecured judgment creditor ranking below all senior secured debt—would stand to recover nothing.

Doc. 649 at pp. 10-11. This is mere speculation. Notably, the record developed by the Foundation Parties is silent as to whether its secured creditors have even been informed of the Court' order to post a bond, or the Court's order to show cause. As discussed above, the only "evidence" of any discussions the Foundation Parties had with their lenders about the bond is a cursory explanation by counsel in post-hearing briefing from prior to the Court's order to post a bond, when the Foundation Parties' posting of a bond would have been merely voluntary. The Foundation Parties cannot be trusted to work with lenders in good faith to comply with the Court order, and to report back to the Court with meaningful information. A neutral third-party receiver can and should be trusted to do just that.

It should be noted, there is no restriction on this Court's power to appoint a receiver over related Foundation entities, even ones that are not named parties to this case, such as Foundation Auto Holdings, LLC and Foundation Automotive US Corp., to which assets have been transferred. This is precisely what is endorsed by the Eighth Circuit in *Morgan Stanley*, where the receiver was similarly empowered over numerous LLCs set up by the defendant. 952 F.3d at 983; *see also*

43

*Chicago Truck Drivers v. Brotherhood Labor Leasing*, 207 F.3d 500, 507 (8th Cir. 2000); *United States v. Robinson*, 83 F.4th 868, 881 (11th Cir. 2023).

It should also be noted, one of the Foundation Parties, Foundation Automotive Corp, is a foreign (Canadian) corporation. Other related non-party Foundation entities are also foreign corporations, being incorporated in states other than North Dakota.[3] The fact that Defendant Foundation Automotive Corp and other related non-party Foundation entities are foreign corporations is no hinderance to the Court's authority to appoint a receiver in this case. Federal courts have jurisdiction to appoint a receiver as part of their equity powers, even over foreign corporations. *In re Whittaker Clark & Daniels Inc*, 152 F.4th 432, 444–45 (3d Cir. 2025); *FTE Networks, Inc. v. Szkaradek*, No. CV 22-785-WCB, 2023 WL 8650002, at \*4 (D. Del. Dec. 14, 2023) (citing *Jacobs v. Tenney*, 316 F. Supp. 151, 170 (D. Del. 1970) ("A federal court has the power to inquire into the internal affairs of a foreign corporation and the power to appoint a receiver of a foreign corporation—even when the assets of the corporation lie outside the district of the appointing court."); 12 Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus § 2985 (3d ed. 2023) ("[E]very federal court having equity jurisdiction is said to have inherent power to appoint receivers in proper cases.")

Although this federal Court's equitable authority to appoint a receiver is not restricted by state law (*Morgan Stanley*, 952 F.3d at 980), it is notable that North Dakota state law also favors appointment of a receiver in this case. Under North Dakota Century Code section 32-10-01:

> A receiver may be appointed by the court in which an action is pending, or by a judge thereof:
>
> \*       \*       \*

---

[3] Named defendants FA ND CHEV, LLC and FA ND SUB, LLC, however, are domestic North Dakota business entities.

44

3.      After judgment, to carry the judgment into effect.

4.      After judgment, to dispose of the property according to the judgment or to preserve it during the pendency of an appeal, or in proceedings in aid of execution, when an execution has been returned unsatisfied, or when the judgment debtor refuses to apply the debtor's property in satisfaction of the judgment.

5.      In the cases provided in this code, when a corporation or limited liability company has been dissolved, or is insolvent or in imminent danger of insolvency, or has forfeited its corporate rights, and in like cases within this state, of foreign corporations and of foreign limited liability companies.

6.      In all other cases in which receivers heretofore have been appointed by the usages of courts of equity.

N.D.C.C. § 32-10-01.

This case presents precisely the "extreme situation" warranting receivership. The Foundation Parties have ignored a clear Court order, obstructed discovery, dissipated assets, and demonstrated an intent to frustrate collection. Under *Morgan Stanley* and well-established equitable principles, the appointment of a receiver is not only appropriate, it is necessary to preserve the Court's authority and to protect BAPTKO's ability to enforce its judgment.

BAPTKO requests to be involved in the process of selecting a receiver if the Court deems it helpful to receive input from the parties.

### ii.      Writs of Execution in Relation to the Assets of the Foundation Parties and their Non-Party Subsidiaries, Parents, and Related Companies

Rule 69 provides in relevant part that "[a] money judgment is enforced by a writ of execution, unless the court directs otherwise." Fed. R. Civ. P. 69(a)(1). When a party fails to satisfy a court-imposed money judgment, the appropriate remedy is generally a writ of execution. *See Data Axle, Inc. v. CFM Data Network, LLC*, No. 23-cv-3255 (LMP/DLM), 2025 WL 1733378, at *4 (D. Minn. June 23, 2025) (citations omitted). A judgment debtor can avoid execution upon a

judgment by posting a supersedeas bond pending appeal. *U.S. v. Weir*, 235 F. Supp. 306, 308 (E.D. Ark. 1963).

BAPTKO has recently moved the Court for a writ of execution to attempt to collect small cash amounts held in bank accounts of FA ND CHEV, LLC and FA ND SUB, LLC (about $10,000 each). FA ND CHEV, LLC and FA ND SUB, LLC, after being compelled by the Court, only recently produced bank statements evidencing the existence of these funds, which may be executed upon via a writ of execution. Docs. 650, 651. However, these small amounts that BAPTKO is currently pursuing from the named Foundation Parties are only a tiny fraction of the multi-million dollar judgment in this case, and a tiny fraction of the millions of dollars the Foundation Parties have fraudulently transferred to their related Foundation companies, including Foundation Auto Holdings, LLC and Foundation Automotive US Corp.

BAPTKO requests the Court allow it to pursue writs of execution in relation to the assets of not only the named Foundation Parties in this case, but also their non-party subsidiaries, parents, and related companies (including but not limited to Foundation Auto Holdings, LLC and Foundation Automotive US Corp.).

"It is well-settled that a court's contempt power extends to non-parties who have notice of the court's order and the responsibility to comply with it. The Supreme Court has long recognized that a person, 'not a party to the suit, [may be] guilty of contempt for violation of an order of that court, made in such suit, and imposing a fine for such contempt.'" *Chicago Truck Drivers v. Brotherhood Labor Leasing*, 207 F.3d 500, 507 (8th Cir. 2000) (quoting *Bessette v. W.B. Conkey Co.*, 194 U.S. 324, 325 (1904)). "[A] non-party 'may be punished if he either abet[s] the defendant or [is] legally identified with him.'" *Chicago Truck Drivers*, 207 F.3d at 507 (quoting *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 833 (2d Cir. 1930)). A nonparty is legally identified with a party where

there is a close identification of interest between the two such that the nonparty exercises significant control over its interests and actions. *United States v. Robinson*, 83 F.4th 868, 881 (11th Cir. 2023). The essence of this rule is 'that ""defendants may not nullify a decree by carrying out prohibited acts through aiders and abetters, although they were not parties to the original proceeding."' *Chicago Truck Drivers*, 207 F.3d at 507 (quoting *Independent Fed'n of Flight Attendants v. Cooper*, 134 F.3d 917, 920 (8th Cir. 1998)).

### iii.    Award of Attorneys' Fees, Costs, and/or a Monetary Fine

"Civil contempt may be employed either to coerce the defendant into compliance with a court order or to compensate the complainant for losses sustained, or both." *Chicago Truck Drivers v. Brotherhood Labor Leasing*, 207 F.3d 500, 505 (8th Cir. 2000) (citing *United States v. United Mine Workers*, 330 U.S. 258, 303-04 (1947)). "Either incarceration or a fine may accomplish the purpose of coercion, while, '[w]here compensation is intended, a fine is imposed, payable to complainant.'" *Chicago Truck Drivers*, 207 F.3d at 504-05 (quoting *United Mine Workers*, 330 U.S. at 304). Attorneys' fees and other costs incurred in prosecuting the contempt motion may also be awarded to the moving party. *See Kehm v. Procter & Gamble Mfg. Co.*, 724 F.2d 630, 630–31 (8th Cir. 1984) (per curium) (affirming award of $10,000 in attorney's fees for litigating contempt motion). "If a financial contempt sanction is intended to coerce compliance with an order, the sanction should be payable to the court, rather than to the opposing party. A compensatory sanction, on the other hand, may be paid to the complainant when the amount is based on evidence of the losses it sustained." *World Wrestling Entm't, Inc. v. AWA Wrestling Entm't, Inc.*, No. 07-CV-2058-ADM-KMM, 2019 WL 2393062, at *1 (D. Minn. Apr. 12, 2019) (quotation and citation omitted). "Any sanction for civil contempt must not be punitive." *Id.*

47

The Court should award BAPTKO its attorney's fees and costs sustained as a result of the Foundation Parties' contempt, and/or issue a monetary fine. In the event the Court awards attorneys' fees and costs to BAPTKO as a result of the Foundation Parties' contempt, BAPTKO will submit detailed information to the Court in this regard.

### iv.    Incarceration

A corporate officer may be jailed as a sanction for the corporation's civil contempt. *See Painters Dist. Council No. 2 v. Paragon Painting of Missouri, LLC*, No. 08-cv-1501, 2011 WL 3891870, at *1 (E.D. Mo. Sept. 1, 2011). "Incarceration is an appropriate coercive sanction for civil contempt so long as the contemnor can avoid the sentence imposed on him, or purge himself of it, by complying with the terms of the original order." *In re Count Liberty, LLC*, 370 B.R. 259, 274 (Bankr. C.D. Cal. 2007) (quotation omitted). "When the petitioners carry the keys of their prison in their own pockets,' the action 'is essentially a civil remedy designed for the benefit of other parties and has quite properly been exercised for centuries to secure compliance with judicial decrees.'" *Id.* (quoting *Shillitani v. United States*, 384 U.S. 364, 368 (1966)). Incarceration for contempt is especially appropriate where a contemnor has displayed a history of noncompliance with court orders. *See in re Eletson Holdings Inc.*, No. 23-10322 (JPM), 2026 WL 699539, at *4 (Bankr. S.D.N.Y. Mar. 12, 2026).

Incarceration of Foundation CEO Kevin Kutschinski and Foundation CFO Derek Slemko, both of whom are responsible for the contemptuous conduct of the Foundation Parties, may be appropriate in this case. Additionally, Slemko testified at the October 7, 2025, hearing before Magistrate Judge Clare R. Hochhalter and contradicted his earlier affidavit testimony.

### v.    Dismissal of Appeal

48

The Foundation Parties have appealed the judgment in this case to the Eighth Circuit Court of Appeals (Case No. 25-1741), which has been fully briefed, and the Eighth Circuit recently held the oral argument on March 19, 2026. This District Court has requested the parties brief it on the potential remedy of dismissal of the appeal. Doc. 648 at p. 2. However, counsel for BAPTKO has researched dismissal of the appeal as a remedy and could not find any analogous cases where a federal district court applied such a remedy. Given the advanced stage of the appeal (just awaiting an opinion from the Eighth Circuit) and the lack of legal precedent, such a remedy risks even more appeals in this case with the potential for reversal, and thus BAPTKO is not requesting this remedy.

### vi.    Involuntary Bankruptcy

BAPTKO does not seek to institute involuntary bankruptcy proceedings against the Foundation Parties as a sanction for their failure to abide by the Court's February 23, 2026, Order. "[T]he threshold inquiry for creditors wishing to file an involuntary petition" is whether the debtor is paying its debts as they become due. *In re Cannon Express Corp.*, 280 B.R. 450, 454 (Bankr. W. D. Ark. 2002). In this case, Slemko testified on October 7, 2025, that Foundation still owns ten dealerships, which are making money. Hr'g Tr. (Doc. 628) at 43:6-8. BAPTKO has not found any case in which a court has instituted involuntary bankruptcy proceedings as a contempt sanction or as a sanction for a party failing to post bond after being ordered to do so. And the remedies of receivership and writs of execution, discussed above, are preferable to bankruptcy.

### IV.    CONCLUSION

For the foregoing reasons, the Foundation Parties' continued and deliberate refusal to comply with the Court's clear and unequivocal order to post a bond warrants immediate and meaningful action. The record establishes not only a violation of the Court's order, but a sustained pattern of obstruction, asset dissipation, and disregard for judicial authority. The Foundation

49

Parties have failed to meet their burden to demonstrate any legitimate inability to comply, and their unsupported assertions and outdated evidence fall far short of what the law requires.

Accordingly, BAPTKO respectfully requests that the Court find the Foundation Parties, along with those responsible for directing their conduct, in civil and/or criminal contempt, impose appropriate coercive and compensatory sanctions, and grant such additional relief as is necessary, including appointment of a receiver over the Foundation Parties and their non-party subsidiaries, parents, and related companies to conduct a full accounting of their assets, liabilities, and transactions; investigate the disposition of the Mandan Dealership sale proceeds; evaluate intercompany transfers, relationships, and financial arrangements to determine whether they are being used to avoid payment; and ensure that any available assets are preserved and applied toward compliance with Court orders and satisfaction of the judgment. The Court should also allow BAPTKO to pursue writs of execution in relation to the assets of not only the named Foundation Parties in this case, but also their related non-party subsidiaries, parents, and related companies (including but not limited to Foundation Auto Holdings, LLC and Foundation Automotive US Corp.). The Court should also consider additional remedies as discussed above, including but not limited to an award of attorneys' fees, costs, and/or a monetary fine, and imprisonment of Foundation CEO Kevin Kutschinski and Foundation CFO Derek Slemko.

Dated this 9th day of April, 2026.

BAKKE GRINOLDS WIEDERHOLT

By: /s/ Randall J. Bakke
Randall J. Bakke (#03989)
Shawn A. Grinolds (#05407)
David R. Phillips (#06116)
300 West Century Avenue
P.O. Box 4247
Bismarck, ND 58502-4247
(701) 751-8188

rbakke@bgwattorneys.com
sgrinolds@bgwattorneys.com
dphillips@bgwattorneys.com

*Attorneys for Defendant Robert Kupper and Plaintiff-Counterclaim Defendant BAPTKO, Inc*

## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2026, a true and correct copy of the foregoing **BAPTKO, INC. AND ROBERT KUPPER'S BRIEF IN OPPOSITION TO THE FOUNDATION PARTIES' RESPONSE TO ORDER TO SHOW CAUSE** was filed electronically with the Clerk of Court through ECF.

Maxwell Shaffer
Kensye Wood
Leland Shaffer LLP
8694 E. 28th Ave.
Denver, Colorado 80238
maxwell.shaffer@lelandshaffer.com
kensye.wood@lelandshaffer.com

By: */s/ Randall J. Bakke*
    RANDALL J. BAKKE