CAUSE NO. 202544872

| | | |
|---|---|---|
| BAPTKO, INC., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | |
| | § | HARRIS COUNTY, TEXAS |
| FOUNDATION AUTOMOTIVE | § | |
| US CORP., and | § | |
| FOUNDATION AUTO | § | |
| HOLDINGS, LLC, | § | |
| | § | |
| Defendants. | § | 151ST JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
DEREK SLEMKO
MARCH 31, 2026
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

REMOTE ORAL AND VIDEOTAPED DEPOSITION of DEREK SLEMKO, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on March 31, 2026, from 9:35 a.m. to 2:59 p.m., before Mendy A. Schneider, CSR, RPR, in and for the State of Texas, recorded by machine shorthand, remotely at the offices of MENDY SCHNEIDER, LLC, The Woodlands, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto; that the deposition signature has been waived.

**Exhibit 6**

Page 1

REMOTE APPEARANCES

FOR THE PLAINTIFF:
     JUSTIN G. BATES
     WICK PHILLIPS GOULD & MARTIN, LLP
     3131 McKinney Ave., Suite 500
     Dallas, Texas 75204
     214.692.6200
     Justin.bates@wickphillips.com

FOR THE DEFENDANTS:
     KENSYE WOOD
     MAX SHAFFER
     LELAND SHAFFER LLP
     8694 E. 28th Avenue
     Denver, Colorado 80238
     kensye.wood@lelandshaffer.com

ALSO PRESENT:
     DENNIS LIVINGSTON, The Videographer
     ROBERT KUPPER
     JOHN HUDSON

Veritext Legal Solutions
346-293-7000

```
                       EXAMINATION INDEX
WITNESS:  DEREK SLEMKO
    EXAMINATION                                        PAGE
          BY MR.  BATES                                   6
          BY MS.  WOOD                                  124
    FURTHER EXAMINATION
          BY MR.  BATES                                 153

    SIGNATURE WAIVED

    REPORTER'S CERTIFICATION                            159

                       EXHIBIT INDEX

                                                       PAGE
    SLEMKO EXHIBIT NO.  1                                 7
          Notice of the Deposition for the
    Corporate Representative of Foundation
    Automotive US Corp.

    SLEMKO EXHIBIT NO.  2                                11
          Objections to the Notice of Deposition
    SLEMKO EXHIBIT NO.  3                                16
          BMO Bank Statement

    SLEMKO EXHIBIT NO.  4                                27
          BMO Bank Statement Excerpt
    SLEMKO EXHIBIT NO.  5                                30
          BAPTKO's Complaint in the Federal Lawsuit
    against FA ND Chev, FA ND Sub and Foundation
    Automotive Corp.

    SLEMKO EXHIBIT NO.  6                                32
          Judgment
    SLEMKO EXHIBIT NO.  7                                69
          Guarantee and Collateral Agreement

    SLEMKO EXHIBIT NO.  8                                83
          Asset Purchase Agreement
    SLEMKO EXHIBIT NO.  9                                86
          Release of Security Interest and Consent
```

Page 3

EXHIBIT INDEX (CONTINUED)                    PAGE

SLEMKO EXHIBIT NO. 10                            94
        Release of Security Interests

SLEMKO EXHIBIT NO. 11                            98
        Expected Mandan Proceeds Allocation

SLEMKO EXHIBIT NO. 12                           106
        First Amendment to Asset Purchase
Agreement

SLEMKO EXHIBIT NO. 13                           108
        Asset Purchase Agreement

SLEMKO EXHIBIT NO. 14                           126
        Waiver Consent Forbearance and Amendment

SLEMKO EXHIBIT NO. 15                           140
        Transfer Activity Report

SLEMKO EXHIBIT NO. 16                           142
        Wire Transfers December 2024

    (REPORTER'S NOTE: All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily denote an exact quote from the document.)

Veritext Legal Solutions
346-293-7000

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:35 on March 31, 2026. This is Media Unit 1 of the video-recorded deposition of Derek Slemko taken by counsel for plaintiff in the matter of BAPTKO, Inc. versus Foundation Automotive US Corp., et al., filed in the District Court, 151st Judicial District, Harris County, Texas. Case No. 202544872.

My name is Dennis Livingston. I'm representing Veritext Legal Solutions, and I'm the videographer.

The court reporter is Mendy Schneider from the firm Veritext Legal Solutions.

Counsel and all present will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. BATES: Justin Bates, counsel for plaintiff BAPTKO, Inc.

And with me are Mr. John Hudson, who's just an observing younger associate from our office as well as Mr. Bob Kupper who is the principal for BAPTKO, Inc.

MS. WOOD: This is Kensye Wood. And with me today I have Maxwell Schaffer, and we are here on behalf of defendants Foundation Automotive US Corp.

Page 5

and Foundation Auto Holdings, LLC, and on behalf of the witness Derek Slemko.

THE VIDEOGRAPHER:  Will our court reporter please swear in the witness, and then counsel may proceed.

THE REPORTER:  The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.

They further acknowledge that, in lieu of an oath administered in person, I will administer the oath remotely.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

DEREK SLEMKO, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. BATES:

Q.   Mr. Slemko, could you state your full name for the record, please.

A.   Derek Lee Slemko.

Q.   And today, sir, where are you located physically?

A.   In my home office.

Page 6

Q.   Is that in Houston or a nearby suburb? Where -- where is that specifically?

A.   It is in Spring/Klein, Texas.

Q.   Are you the only one that's present in the room right now?

A.   Yes.

Q.   Do you have any notes or anything on your desk that you're seated at?

A.   No.

Q.   Is there anything up on your computer screen other than this Zoom program?

A.   No, I closed everything.

(Discussion off the record.)

MR. BATES:  Mr. Slemko, we might have to mess with the Zoom function a little bit today, but I've got on my screen pretty blown up what I'm marking as Deposition Exhibit 1, sir.

(Marked Slemko Exhibit No. 1.)

Q.   (BY MR. BATES)  Are you able to see the screen okay?  Is it too big?  Is it too small?

A.   No, it's fine.

Q.   I'll zoom out a little bit for my own edification.

Is that okay zoom-wise for you, sir?

A.   I'll need to get closer now.

Page 7

Q. Okay. No, no. I think we can compromise. How about that?

Okay. This is strictly a housekeeping item for me, Mr. Slemko, but this is the notice of the deposition for the corporate representative of Foundation Automotive US Corp.

Do you understand that that is the capacity that I am deposing you in today, sir?

A. Yes.

Q. Have you ever served as a corporate representative in a deposition before?

A. I have.

Q. And for which entity have you done that?

A. I don't recall all of them off the top of my head, but I would say for Foundation Automotive Corp., FA ND Sub, LLC, and FA ND Chev, LLC.

I don't recall if I've ever done a deposition for either of these entities on this notice before. I don't recall.

Q. I appreciate that.

And -- and safe to say that you've been deposed on several occasions prior to this deposition?

A. I have.

Q. Approximately how many times?

A. On -- on all the matters or related to this

Page 8

matter?

Q. In -- in totality.

A. I would say around half a dozen times.

Q. In each of those instances, were you offering testimony in a matter that involved the business of Foundation Automotive Corp. or one of its subsidiaries?

A. Yes.

Q. Okay. Back to the corporate representative angle, do you understand that the testimony that you provide today is going to be binding on Foundation Automotive US Corp.?

A. I do.

Q. What is your present title with Foundation Automotive US Corp.?

A. Chief financial officer.

Q. And how long have you been the chief financial officer?

A. Since this entity was formed in 2018, I believe.

Q. When you say "this entity," are you referring to Foundation Automotive US Corp.?

A. I am.

Q. And I'll try to cut down on some of the word salad here.

Page 9

Can I use the abbreviation FAUS to refer to Foundation Automotive US Corp.?

A.    Yes.

Q.    Appreciate that.

Prior to becoming CF0 for FAUS, did you have any other titles or employment positions with Foundation or one of its related companies?

A.    Yes.

Q.    What were those titles?

A.    I was the chief financial officer of the parent company of FAUS.

Q.    And that would be Foundation Automotive Corporation, the Canadian entity?

A.    Sir, I have to correct you.  It's Foundation Automotive Corp.

Q.    I appreciate that.

And that was a Canadian entity, correct?

A.    Correct.

Q.    How long did you work for Foundation Automotive Corp.?

A.    Prior to forming FAUS?

Q.    Correct.

A.    Approximately one year.

Q.    And prior to that role, had you ever worked for any Foundation-related entity before you joined

Page 10

Foundation Automotive Corp.?

A.   I did not.

Q.   Are you a certified public accountant, Mr. Slemko?

A.   No.

Q.   Are you purporting to offer any sort of expert testimony in this lawsuit?

A.   No.  But let me elaborate.  I am a chartered accountant through CPA Alberta.

Q.   Can you -- can you explain.

A.   A certified public accountant is a U.S. term.

Q.   And so --

A.   Canadian version.

Q.   Understood.

Are you from Canada originally, Mr. Slemko?

A.   I am.

Q.   Okay.  And when did you move to the United States?

A.   October 2019.

Q.   This is another housekeeping matter, but this will be Exhibit 2 to the deposition.

Can you see my screen okay, Mr. Slemko?

(Marked Slemko Exhibit No. 2.)

A.   I can.

Page 11

Q.    (BY MR. BATES)   And you should be looking at some objections to the notice of deposition.

Have you seen this document before, Mr. Slemko?

A.    I have.

Q.    Okay.  There are, back to Exhibit 1, a list of 27 topics, I believe.  Are you prepared to testify as to the topics that were listed on Exhibit 1?

A.    I believe so.

Q.    Are there any topics that you are not prepared to talk about today?

A.    I don't think so.

Q.    What did you do, Mr. Slemko, to prepare for today's deposition?

A.    I reviewed that list of topics and some relevant documents that relate to those topics.

Q.    Do you remember any specific documents that you looked at?

A.    The one you just showed me, the objections.

And then a handful of other documents that I had helped prepare or sign for.

Q.    Which of those do you remember reviewing?

A.    I don't remember the specific names. There -- affidavit -- there was an affidavit.  There was a -- some -- some of those responses -- response

Page 12

documents.

That's most of it.

Q. Did you meet with your attorneys?

A. Sorry.

Q. Oh, sorry.

A. I reviewed my prior testimony that was taken in Bismarck.

Q. When you say "taken in Bismarck," what -- we'll talk a little bit about that later, but I assume you're referring to the federal lawsuit between BAPTKO, Foundation Automotive Corp., then FA ND Sub and FA ND Chev; is that right?

A. I don't -- yes, it was federal, correct. Yeah.

Q. And that testimony was from yourself under oath in the courtroom up there in Bismarck, right?

A. Yes.

Q. Okay. Other than what you've just shared with me, I understand you can't recall the universe of things that you looked at, do you remember anything else specific that you looked at to prepare for today's deposition?

A. No.

Q. Did you speak with your attorneys before today's deposition - and let me strike that question.

Page 13

Let me ask it this way:  Did you meet with your attorneys to prepare for today's deposition?

A.   I did.

Q.   Approximately how long did you meet with them?

A.   It was either 60 or 90 minutes.

Q.   Was anyone other than your attorneys present at this meeting?

A.   No.

Q.   Have you spoken with anyone, Mr. Slemko, other than your attorneys about today's deposition?

A.   I have not.

Q.   Is HPS Investment Partners, LLC aware that you are being deposed today?

A.   I believe they are.

Q.   So you've spoken with someone at that entity to that effect?

A.   I just told them that I had a scheduling conflict due to this -- due to a deposition.

Q.   Who did you share that with?

A.   I don't remember specifically.  It was one of the -- one of the members of the board.

Q.   HPS has a member of the board -- is it of FAUS, is that the correct distinction here?

A.   They have four members of the board.

Page 14

Q.    What are the names of those individuals?

A.    James Bunnell, Brett Pertuz, Vincent Lu, Jeffrey Fitts.

Q.    How many total board members does FAUS have?

A.    Four.

Q.    And all four of those are HPS personnel, correct?

A.    Correct.

Q.    Do any HPS employees work out of the Houston office for FAUS?

A.    No.

Q.    Do you see -- on a daily basis as part of your work for FAUS, you interact with HPS employees?

A.    On a daily basis, no.

Q.    Okay.  Do you work remotely full time, Mr. Slemko?

A.    As of tomorrow, yes.

Q.    And what is significant as of tomorrow?  Why is that happening?

A.    Our lease at our office is expiring today.

Q.    After that point in time, you will be fully remote.  Is that accurate?

A.    Correct.

Q.    Okay.  And if I had your testimony earlier correct, there was not a full-time HPS employee that

Page 15

worked at the physical office of FAUS, right?

A.   Correct.

Q.   Would HPS employees visit that office from time to time?

A.   No.

Q.   Okay.  I'm going to put up on the screen, Mr. Slemko, what will be Deposition Exhibit 3.

(Marked Slemko Exhibit No. 3.)

Q.   (BY MR. BATES)  Are you able to see this okay, Mr. Slemko?

A.   I am.

Q.   This, sir, I will represent to you is a copy of a bank statement that was produced from BMO as part of a subpoena in this case.

BMO is who FAUS banks with; is that right?

A.   Correct.

Q.   And as chief financial officer, do you have access to FAUS's banking information with BMO?

A.   I do.

Q.   This, sir, is a bank statement for FA ND Sub, LLC.  You can see it highlighted there, sort of the top third of the screen.

Are you able to see that?

A.   I am.

Page 16

Q.   FA ND Sub, LLC was an entity or is an entity that BAPTKO is suing in Bismarck, North Dakota, federal court.

You're familiar with that lawsuit, right?

A.   I am.

Q.   And this specific bank statement, sir, is a December 2024 bank statement, as you can see from the statement period referenced near the top right corner.

Are you able to see that as well?

A.   I am.

Q.   I'm bad at accounting, Mr. Slemko, but I understand there's a difference between a credit and a debit, and I've highlighted some entries down here.

Is it your understanding that a credit means money coming into the bank account?

A.   On a bank statement, yes.

Q.   And is it your understanding that a debit means money leaving that bank account on a bank statement?

A.   Correct.

Q.   I'm -- I've got a couple of highlighted entries on Exhibit 3 I want to discuss with you, Mr. Slemko.

And the first is a December 11 fed wire

Page 17

transfer credit in the amount of -- call it $11.6 million.

Can you see that?

A.   I see that.

Q.   December 11, 2024, is the date that FA ND Sub, LLC sold its assets to a North Dakota buyer; is that right?

A.   That's right.

Q.   Is it your understanding, Mr. Slemko, that this credit of about $11.6 million represents the sales proceeds that FA ND Sub, LLC received for selling its assets to that North Dakota buyer?

A.   It's the net proceeds from the transaction.

Q.   And help me understand the distinction that you're drawing.  I say "proceeds," you say "net proceeds."

Why is that important to you?

A.   Well, the total purchase price was much higher than that number, but several amounts, like floor plan payoff, are deducted off the top and not included in the net proceeds.

Q.   I appreciate that.

And so after those deductions, it's your testimony that this $11.6 [verbatim] is the net proceeds to FA ND Sub, LLC, correct?

Page 18

A.   Correct.

Q.   And then later down there is the highlighted debit entry showing north of $11.5 million leaving that bank account.  Is that an accurate general summary?

A.   Yes.

Q.   That amount is obviously very close to the amount that came in in the credit.

Why, sir, is there about -- there's about a 97- or 99,000-dollar delta between the credit and then the debit?

A.   It would be the daily activity, other than that transaction, would be influencing the amount transferred out.

Q.   What do you mean by "daily activity"?

A.   Well, every day, because we are on a consolidated cash system where amounts are transferred in and out of the child accounts, the -- the child accounts would -- would have money coming in to replace money going out.

As you can see on the third line from the top, there's a credit balance transfer.  That's -- as you described earlier, a credit means money coming in.  That is money coming in from the parent on December 10 to replace funds that were used by this

Page 19

entity that day.

On December 11, money came in to the child account and then was -- was swept to the consolidating account that evening. That is why you see the debit on December 11.

And if you go down a few more lines to December 13, oh, there's another credit which is money going back into the account to replace funds that had been removed from the account during that day.

It -- it is money going in and out of the account through the sweep system that we used.

Q. And couple of clarifying questions on that testimony.

Child account is what you're referring to as the -- what I'm calling the subsidiary, but here that would be the FA ND Sub account, right?

A. Yeah. It's a -- it's a sweep system term for accounts that are below the consolidating account.

Q. Parent account would be, in this case, either Foundation Automotive Holdings, LLC or Foundation -- or FAUS, which one?

A. It -- it is and always was FAUS.

Q. And one other point on -- on that testimony.

When I look at this bank statement here, is it showing me chronologically from top to bottom

Page 20

the timing of debits and credits coming in on a daily basis?

A.   Yes and no.  It's a very close approximation, but some transactions are dated for an effective date that may not actually be the transaction date.

For instance, the 800,000 on December 11 did not appear in our account until the next day.

Q.   Let me make sure that we're clear on the 11.6 million and then the 11.5 million, chronologically speaking though.

A.   Okay.

Q.   Do you have any reason to dispute that the 11.6 million came in to FA ND Sub's account before being transferred out of FA ND Sub's account in the form of that $11.5 million debit transfer?

MS. WOOD:  Object to the form of the question.

You can answer, though.

A.   I am going to have to get you to repeat that. It was -- do I have any reason to...

Q.   (BY MR. BATES)  Let me -- let me ask a question a different way.  It was probably a poor form.

So I'm looking at my first highlighted entry here of that $11.6 million because you just told me

Page 21

that, you know, it's not always true that these bank statements reflect things in a precise chronology, right?

A.   Correct.

Q.   But I want to make sure that you and I are on the same page when it comes to a few different debits and credits and their specific timing for today's purposes.

And the first transfer I want to make sure we're on the same page on is the $11.6 million credit followed shortly on this bank statement by the $11.5 million debit.

Is it your understanding that that $11.6 million credit hit the account for FA ND Sub before that $11.5 million debit occurred?

A.   Yes.

Q.   The $11.5 million debit, who was that transfer made to, Mr. Slemko, by FA ND Sub, LLC?

A.   To the parent account, Foundation Automotive US Corp.

Q.   And I think you testified earlier that that transfer really was just part of a sweep system.

Was that an automatic transfer under FAUS's accounting procedures?

A.   Not at that time.  In the spring of 2024,

Page 22

BMO, under the forbearance, turned off our automatic sweep and mandated that daily transfers would need to be done manually in order to maintain positive balances in every account that we had.

Q.   Why did BMO ask you to do that, as best as you have an understanding to?

A.   Because we were in default of their loan agreement, and under that forbearance agreement they agreed not to, I guess, well, take extreme measures and -- and in return we promised to or we committed to maintain positive account balances, a minimum level of liquidity.  And there was a third -- there was a third covenant at the time but it -- it really was just a -- a step up from maintaining positive account balances. They wanted to see cash grow over time, cash on deposit grow over time.

Q.   So if I'm understanding what you've said a few minutes ago, that $11.5 million debit was paid to FAUS out of this FA ND Sub account but it was not paid through an automatic sweep; is that right?

A.   That's right.

Q.   How -- well, let me -- let me strike that and ask it this way.

If it was not paid through an automatic sweep, was someone required to authorize that debit to

Page 23

process?

A.    Me.

Q.    And how would that process -- how would that process usually work for you as chief financial officer in terms of transferring money from a child account to a parent account in a nonautomatic sweep function?

A.    Well, when the non- -- when the automatic sweep got turned off and we were required to maintain positive account balances, I would have to take money out of the accounts that had the -- had positive cash and redistribute it to accounts that didn't have cash.

However, in this instance, we were required to take the net -- or a certain amount of the net proceeds from this transaction and pay a secured lender.  So that 11.5 million did not get redistributed, it got paid to a secured lender.

Q.    And I understand your position on the secured lender piece.  Let me ask it a little bit differently because that was probably another bad question.

Did you have to call BMO to authorize that debit to occur or was this something you did through an online banking platform?  Help me understand a little bit about the actual machinery that -- that you had to access to move that money from

Page 24

child to parent.

A.    It was through an online banking platform, through BMO's online banking.

Q.    It -- it looks like it's just a balance transfer as opposed to the credit entry which is actually a fed wire.

You understand the distinction between those two, obviously?

A.    Yes.

Q.    And -- and so just to help me understand, this wasn't a wire transfer like the credit entry was; this was simply transferring the balance from one account at BMO to another account at BMO?

A.    Correct.

Q.    There's a final entry here, Mr. Slemko, that I want to discuss with you that's highlighted.  It's a $31,500 entry and I understand from your testimony in the federal lawsuit that this entry concerns a management fee, I believe.  And here specifically in the entry it lists "MGMT PACK NOV24."

Do you see that?

A.    I see that.

Q.    We'll talk about the management fees a little bit later on, but were those typically paid to Foundation Automotive Holdings, LLC?

Page 25

A.   It's Foundation Auto Holdings, LLC.  And yes.

Q.   Appreciate that.

And is this $31,500 entry that we're looking at here on Deposition Exhibit 3 one of those management fees paid to Foundation Auto Holdings, LLC?

A.   It is.

Q.   And briefly before I close out of Deposition Exhibit 3, Mr. Slemko, do you understand that in terms of the Texas lawsuit that you're here to testify in today that these three transfers reflected here are part of the dispute between BAPTKO and FAUS in the Texas lawsuit?

MS. WOOD:  Object to the form of the question.

A.   I don't know that -- like I -- I -- I'm not sure what you want me to answer.  I'm -- I'm getting the impression they are.

Q.   (BY MR. BATES)  Do you have any knowledge that you have gleaned in your preparation for today's deposition about why BAPTKO is suing FAUS in this lawsuit?

MS. WOOD:  Object to the form of the question.

A.   I believe that -- I believe the term "fraudulent transfer" comes to mind.

Page 26

Q.   (BY MR. BATES)  And are you aware of any of the specific transfers that BAPTKO is complaining about in this lawsuit?

A.   I don't know if I know specifically, but, I mean, you've highlighted these so it's an indicator these are --

Q.   And I promise you I'm not trying to trip you up.  I just want to make sure that -- that you're aware that certain transfers are being complained about by BAPTKO here.  So let's talk about a few more.

A.   Well -- well, so -- so let's talk about all the credits that go in.  Is -- you want to go over those too?

Q.   No, I'm afraid -- I'm going to put up Deposition Exhibit 4 now.  We can talk about the credits in a minute.

(Marked Slemko Exhibit No. 4.)

Q.   (BY MR. BATES)  Are you able to see Deposition Exhibit 4 okay, Mr. Slemko?

A.   Yes.

Q.   And same general introductory piece, I'll represent to you this is a bank statement excerpt that BAPTKO received from BMO as part of a subpoena in the Texas lawsuit.

We see the same statement period

Page 27

referenced in the top right corner that we were looking at on Deposition Exhibit 3. But here at the top third or so of the page we see an account holder of FA ND Chev, LLC.

Do you see that?

A.   Yes.

Q.   And FA ND Chev, LLC, Mr. Slemko, is it accurate to say that was the company that owned the assets for Foundation's Mandan North Dakota Chevrolet dealership?

A.   Yes.

Q.   To back up on a question I had meant to ask you about FA ND Sub, LLC, is it accurate to say that FA ND Sub, LLC owned the assets for Foundation's Mandan North Dakota Subaru dealership?

A.   FA ND Sub, LLC owned the assets of the Subaru dealership, yes.

Q.   Couple highlights on Deposition Exhibit 4, Mr. Slemko, but the first one is a credit fed wire transfer in the amount of about $13.5 million.

Do you see that?

A.   I see that.

Q.   And does this represent money that FA ND Chev received on December 11, 2024?

A.   It does.

Page 28

Q.    Is it your understanding that that $13.5 million figure represents the net proceeds that FA ND Chev, LLC received from the sale of its assets to a North Dakota buyer dated that same day?

A.    It is.

Q.    Couple lines down, we see a debit transfer of $13.4 million and some change.

Do you see that?

A.    I do.

Q.    We talked a little bit about the chronology on Deposition Exhibit 3, so I want to make sure we're clear on this one as well.

Is it your understanding that the fed wire transfer credit highlighted on December 11 for $13.5 million hit FA ND Chev's account before that $13.4 million debit transfer occurred?

A.    Yes.

Q.    Mr. Slemko, is it also your understanding that that $13.4 million debit transfer was made from the child account for FA ND Chev up to the parent account for FAUS?

A.    It is.

Q.    We're also looking at about a $99,000 delta here from the credit to the debit.  You explained to me earlier on Deposition Exhibit 3 that -- I think the

Page 29

term you used was "daily" -- what was the -- the second piece of that?

A. Activity.

Q. Daily activity would -- would explain that delta.

Would the same be true in your mind here?

A. It would.

Q. And this $13.5 million transfer that's incoming as a credit, and I apologize if I already asked this, is it your understanding that that was a payment received from FA ND Chev, LLC for the sale of its assets to a North Dakota buyer?

A. It was received by FA ND Chev.

Q. Thank you.

For selling its assets to that North Dakota buyer?

A. Correct.

Q. I've put up on my screen Deposition Exhibit 5 for you, Mr. Slemko.

(Marked Slemko Exhibit No. 5.)

Q. (BY MR. BATES)  Can you see this okay?

A. I can.

Q. I'll represent to you this is a copy of BAPTKO's complaint in the federal lawsuit against

Page 30

FA ND Chev, FA ND Sub, and Foundation Automotive Corp.

Have you seen this document before?

A.   I have.

Q.   There's a filing date up here of 09/27/2021, being September 27, 2021.

To your knowledge, is that about the time BAPTKO sued these three Foundation parties in North Dakota federal court?

MS. WOOD:   I'm going to object to the form of the question as outside the scope of this lawsuit.

MR. BATES:   The witness can answer if he has knowledge.

A.   I don't recall the specific date.

Q.   (BY MR. BATES)  Was it sometime in approximately 2021?

A.   Again, I thought it was later than that but I -- I don't recall.

Q.   Let me -- let me ask it this way.  This might be easier.

Do you recall whether BAPTKO was suing these three defendant parties prior to the December wire transfers from 2024 that we just looked at in Exhibits 3 and 4?

A.   Yes.

Page 31

Q.    This will be Deposition Exhibit 6, Mr. Slemko.

Can you see this okay?

A.    I can.

None of the defendants in this case are listed here.

Q.    Well, I didn't have a pending question, but I appreciate the clarification, sir.

Have you seen this document before?

A.    No.

(Marked Slemko Exhibit No. 6.)

Q.    (BY MR. BATES)  I'll represent to you that this is the judgment entered by the North Dakota federal court against three of Foundation's parties listed here as defendants in the amount of approximately $3 million with some interest down here at the bottom.

If I -- if I had your testimony correct, sir, you've never seen this document before?

A.    I mean, I -- it's possible I've been sent this document.  I've never opened and seen it.

Q.    And down here there's a date of November 7, 2024, it's a little bit obscured, but it's also visible up here at the file date.

Do you see that date, sir?

Page 32

A.   I see that.

Q.   And is it correct to say that in our timeline chronology here, this judgment was entered by the federal court about a month before the wire transfers that we were just looking at in Exhibits 3 and 4?

A.   Yes.

Q.   You were the chief financial officer for FAUS as of November 2024; is that correct?

A.   I was.

Q.   Were you aware that judgment had been entered against one of FA -- well, two of FAUS's subsidiaries in November 2024?

A.   I was.

Q.   How were you made aware of that?

A.   I was at the trial.

Q.   Was the judgment disclosed to the North Dakota buyers of the assets of FA ND Sub, LLC and FA ND Chev, LLC prior to the December 10, 2024, closing?

A.   I believe --

MS. WOOD:   Objection; form.

Q.   (BY MR. BATES)   I'm sorry.   What was the answer?

A.   I believe it was.

Q.   Do you recall how it was disclosed to those

Page 33

buyers?

A.   I -- I don't.

Q.   That judgment is currently being appealed.

Do you have any understanding of whether that's true or not, Mr. Slemko?

A.   That is true.

Q.   Why has FA ND Sub, FA ND Chev, and Foundation Automotive Corp., why have they not paid that judgment?

MS. WOOD:  Object to the form of the question and outside the scope of this deposition of this corporate witness.

Q.   (BY MR. BATES)  You can answer, Mr. Slemko.

A.   The company has no funds to pay it.

Q.   Is it your testimony that if the company had those funds it would pay that judgment?

MS. WOOD:  Object to the form.

A.   No, I didn't say that.

Q.   (BY MR. BATES)  Let me ask that question again.

If -- if the company had those funds, would it pay that judgment?

A.   No.

Q.   Why is that?

A.   Because it's being appealed.

Page 34

Q.   If the company loses that appeal, will the company pay that judgment?

MS. WOOD:  Objection; form.

A.   I can't speak for the company on that, but the company still would not have any funds to pay it.

Q.   (BY MR. BATES)  So has the company explored bankruptcy?

A.   No.

MS. WOOD:  Object to the form.

Q.   (BY MR. BATES)  What communications has -- have you had as CFO of FAUS with any of FAUS's lenders about BAPTKO's judgment?

A.   Several.  There's -- they're interested in the appeal mainly, what the status of that is.

Q.   When you say "they," who specifically are you referring to?

A.   I'm referring to HPS, BMO, and CARS.

Q.   And you mentioned those entities being interested in the appeal.

Have you personally had any communications with any representative of those three entities about the appeal?

MS. WOOD:  Objection; form.

A.   Not without -- not without counsel present.

Page 35

Q.    (BY MR. BATES)   When those conversations took place, who was present?

A.    A representative from the lender and attorney.

Q.    Attorney for who?

A.    For Foundation Automotive US Corp. and its subsidiaries.

Q.    And what was discussed between these folks about the appeal?

A.    Timing.

Q.    Specifically timing concerning what?

A.    When the appeal would be heard.

Q.    And has anyone from HPS or BMO or CARS ever instructed you not to pay BAPTKO's judgment?

A.    Instructed not to pay?  Well, I guess by virtue of not having the ability to pay, I -- I don't -- I don't think it would ever come up.  We don't have the funds to pay, so what would they -- how would we pay it?

Q.    Have you ever asked any of those three entities for permission to pay BAPTKO's judgment?

A.    No.

Q.    You -- you referenced some conversations between HPS, BMO, CARS, and Foundation concerning the appeal.

Page 36

How recently have some of those conversations taken place?

A. Probably around a month ago as -- as the -- the oral argument date was approaching.

Q. Did -- well, strike that.

I'll ask it this way: In any of those conversations, was it discussed -- another bad question. I'm going -- I'm going to ask it differently.

In any of those conversations, do you recall discussion around what Foundation should do if the appeal is decided against it?

MS. WOOD: Objection; form.

A. No.

Q. (BY MR. BATES) Other than discussion concerning the timing of the appeal, do you recall any other conversations between HPS, BMO, or CARS and Foundation about BAPTKO's judgment in the federal lawsuit?

A. Again, sorry. Repeat that question.

MR. BATES: Mendy, do you mind reading that one back. I honestly forgot it.

(The requested portion was read.)

A. No.

MR. BATES: You guys want to take a

Page 37

quick five-minute break?  I'm about to a transition point and might as well do it now.

MS. WOOD:  Sounds good.

THE VIDEOGRAPHER:  Off the record at 10:24 a.m.

(Break from 10:24 a.m. to 10:31 a.m.)

THE VIDEOGRAPHER:  We're back on the record at 10:31 a.m.

Q.  (BY MR. BATES)  Mr. Slemko, before we took a quick break, we were just talking about some conversations that had been had between some Foundation folks and then CARS, BMO, and HPS concerning the appeal of the federal lawsuit.

Why is it your understanding that CARS was involved in any of those conversations?

A.  Because our -- excuse me.

Our lease agreements require us to disclose any material litigation matters.

Q.  And we'll talk about this later on today, but the same is also true of your credit and then guarantee agreement with HPS and BMO, right?  There are material adverse effect disclosure requirements in those agreements?

A.  Correct.

Q.  So you were apprising CARS of the status of a

Page 38

potential material adverse effect in these conversations?

A. Essentially, yes.

Q. Do you provide any reports to BMO or CARS or HPS concerning the status of the North Dakota federal lawsuit or the appeal?

A. No.

Q. How often do you speak with those three entities about the North Dakota federal lawsuit or the appeal?

A. Not very frequently. Couple times -- couple of times last year.

Q. And who were the specific individuals from HPS that you remember being involved in those conversations?

A. I don't recall specifically who attended.

Q. Would it have been one of the four persons that you identified earlier as the board members of FAUS?

A. I believe one or more, yes.

Q. What about from BMO? Who at the bank do you recall being involved in these conversations?

A. Their attorneys and one or two of the individuals who are in the -- they call it SAG -- I'm sorry, SAMU group, S-A-M-U, special asset management

Page 39

unit, I believe it stands for.

Q. I've seen Stephanie Clark's signature on a bunch of BMO's stuff we'll look at here in a little bit.

Is she one of the persons that was involved in these conversations?

A. It's possible.

Q. And how did these conversations occur? Were these done by e-mail?

A. No. By Zoom or Teams.

Q. Zoom meetings?

A. Yeah.

Q. Did you notify HPO -- I'm getting the three letters wrong.

Did you notify HPS, BMO, or CARS of the entry of the federal judgment against FA ND Chev, FA ND Sub, and Foundation Automotive Corp. after it was entered?

MS. WOOD: Objection; form.

A. I believe we did.

Q. (BY MR. BATES) Do you recall how that notification was made?

A. I -- I believe by phone.

Q. Is -- as far as you can understand, Mr. Slemko, is FA ND Chev an affiliate of FAUS?

Page 40

MS. WOOD:  Objection; form.

A.   It's a subsidiary, so yes.

Q.   (BY MR. BATES)  I think I've got the percentage right here, but is it accurate to say that FAUS owned 85 percent of FA ND Chev through its 100 percent ownership of Foundation Auto Holdings, LLC?

MS. WOOD:  Objection; form.

A.   That's correct.  But if you refer to that operating agreement, the remaining 15 percent also economically belongs to Foundation Auto Holdings.

Q.   (BY MR. BATES)  Drawing a distinction, I think, between economic and noneconomic ownership interest, correct?

A.   Correct.

Q.   Who is the 15 percent owner of FA ND Chev's noneconomic interest?

A.   That -- that was Kevin Kutschinski -- yes, Kevin Kutschinski.

Q.   Is it also correct to say that FA ND Sub is an affiliate of FAUS?

MS. WOOD:  Objection; form.

A.   It's also a subsidiary through Foundation Auto Holdings.

Page 41

Q.    (BY MR. BATES)   So it would be an affiliate, correct?

A.    Correct.

Q.    And just so our percentages are right here, I -- my understanding is that FAUS owned 100 percent of FA ND Sub through its 100 percent ownership interest in Foundation Auto Holdings, LLC; is that right?

MS. WOOD:   Objection; form.

A.    That's correct.

Q.    (BY MR. BATES)   Would you agree with me, Mr. Slemko, that FA ND Chev sold substantially all of its assets on December 11, 2024?

MS. WOOD:   Objection; form.

A.    That's correct.

Q.    (BY MR. BATES)   FA ND Chev is no longer an operating company.

Is that accurate to say?

MS. WOOD:   Objection; form.

A.    It's that -- that's correct.   There's some -- there are liabilities and reporting requirements that need to be fulfilled, but otherwise it's nonoperational.

Q.    (BY MR. BATES)   Why is the company still registered and I'm going to use the word "active"?

Page 42

Why wasn't it simply shut down following this asset sale?

A.   Well, I think you can probably guess as a litigator.

Q.   I'd love to hear your answer.

A.   Well, I -- I -- I don't think there's any way to wind it down or dissolve it while this lawsuit is out there.

Q.   That's your understanding of why the company wasn't shut down.  Fair?

A.   That's right.

Q.   Would you also agree with me that FA ND Sub, LLC sold substantially all of its assets on December 11, 2024?

MS. WOOD:  Objection; form.

A.   That's correct.

Q.   (BY MR. BATES)  And same operating question, but FA ND Sub, LLC was no longer an operating company following that December 2024 asset sale; is that right?

A.   That's right.

MS. WOOD:  Objection; form.

Q.   (BY MR. BATES)  I'm going to put Deposition Exhibit 3 back up.

These are the FA ND Sub bank statements that

Page 43

we were looking at earlier from December 2024, Mr. Slemko.

Would you agree with me that following the December 11 debit transfer of $11.5 million, that that money constituted substantially all of the assets of FA ND Sub, LLC at that time?

MS. WOOD:  Objection; form.

A.   Well, no.  That was encumbered by a lien on all of the assets of the company.

So those dollars were not really assets at all.  They were -- they were encumbered.

Q.   (BY MR. BATES)  And we'll talk about the encumbrances a little bit later.  I think I'm understanding what you're saying and I -- I know that that's Foundation's position in this lawsuit.

You're considering that $11.5 million to be encumbered money.

Is that a fair summary?

A.   All of the proceeds were to be used to pay creditors other than a small amount that was required by those same creditors to remain with the Foundation entities to maintain that minimum level of liquidity I spoke about earlier.

So none of the proceeds from this transaction could be used other than for specific

Page 44

creditor-determined purposes --

Q.   Wasn't quite --

(Speaking simultaneously.)

A.   -- secured creditors with UCC filings all over the place, which I think you've been provided with.

(Speaking simultaneously.)

A.   Sorry?

Q.   (BY MR. BATES)   That wasn't quite my question.

A.   Oh.

Q.   The $11.5 million debit transfer that we're looking at, that was money that was in FA ND Sub's account, correct?

A.   It was in the account, correct.

Q.   And your testimony just -- just a second ago is, even though that money was in this account, it was fully encumbered and had to be disbursed according to the instructions of various lenders.

That's what you're saying, and I -- I understand that completely.  We will talk about that today, I promise you.

That money, however, was money that FA ND Sub received for selling substantially all of its assets, right, encumbrance or not?

A.   All of the encumbered assets were sold,

Page 45

correct.

Q. And so back to my original question here: That $11.5 million represented substantially all of FA ND Sub, LLC's assets as of December 11, 2024, encumbrance or no encumbrance?

MS. WOOD: Objection; form.

A. I'm not sure I understand. The -- the assets themselves were encumbered, and so were the proceeds.

Q. (BY MR. BATES) Let me approach it a different way.

You're saying that money is encumbered. I -- I understand that.

That money is money that FA ND Sub received for selling its assets, which you are saying were also encumbered, right?

A. Correct.

Q. That money, encumbrance or no encumbrance, was paid to FA ND Sub for selling substantially all of its assets, right?

A. Its encumbered assets, correct.

Q. Its encumbered assets, according to you.

And -- so once those assets were sold, which represented substantially all of FA ND Sub's assets, those assets were converted into dollars; is that right?

Page 46

A.   That's right.

Q.   And you're saying those assets were encumbered and so were the dollars, I understand that.

But my question for you is once substantially all of the assets were converted into dollars, the dollars represented substantially all of the assets of FA ND Sub.

And I know you're going to tell me that they were encumbered dollars, but do you -- do you understand what I'm asking in that regard, Mr. Slemko?

MS. WOOD:   I'm going to object to the form of the question.

A.   I don't because you're -- you're skating by the fact that these assets were encumbered.

MR. BATES:   I'll object as nonresponsive.

Q.   (BY MR. BATES)   As of December 11, 2024, when the assets were converted into dollars, did the dollars represent substantially all of the assets of FA ND Sub, LLC?

MS. WOOD:   Objection; form.

A.   I -- I don't know how to answer this question for you in a way that doesn't qualify that they were encumbered.

Page 47

Q.    (BY MR. BATES)   Did they represent encumbered money in your position that was received from the sale of all of the assets?

A.    Yes.

Q.    And all I'm trying to get at, Mr. Slemko, here is the entity sold all of its assets for a sum of money.  That money hit the bank account and then left the bank account.  We talked about the timeline earlier.

When it left the bank account, it represented an asset of FA ND Sub, LLC, one that you say was encumbered.

Can we agree on that much?

MS. WOOD:  Objection; form.

A.    No.  Because it left FA ND Sub to go to a creditor.  So I would not consider that an asset.  It was a --

Q.    (BY MR. BATES)   I apologize.

Don't you think the recipient of this money would consider it an asset?

MS. WOOD:  Objection; form.

A.    I don't know how the recipient would classify that.

Q.    (BY MR. BATES)   Would you consider $11.5 million to be an asset?

Page 48

MS. WOOD: Objection; form.

A. Not if I immediately had to pay it to a creditor.

Q. (BY MR. BATES) Mr. Slemko, was FA ND Chev insolvent as of December 11, 2024?

MS. WOOD: Objection; form.

A. Strictly speaking assets minus liabilities on the balance sheet, yes.

Q. (BY MR. BATES) Was FA ND Chev insolvent before or after it sold substantially all of its assets to the North Dakota buyer entity?

MS. WOOD: Objection; form.

A. Before.

Q. (BY MR. BATES) And what leads you to reach that conclusion?

A. That entity, FA ND -- did you say Chev?

Q. Chev, correct.

A. LLC was a guarantor of 150 to 160 million dollars of debt at the time, and its affiliates, along with itself, did not have sufficient assets to repay that liability.

Q. Was FA ND Sub insolvent as of December 11, 2024?

MS. WOOD: Objection; form.

A. Yes. Same rationale: Their liabilities

Page 49

exceeded the value of -- of their assets.

Q. (BY MR. BATES) Is FA ND Chev, LLC currently insolvent as we sit here today?

MS. WOOD: Objection; form.

A. Yes.

Q. (BY MR. BATES) Is the same true for FA ND Sub, LLC?

A. Yes.

Q. I had mentioned earlier, Mr. Slemko, when we were talking about the $35,000 -- the $31,500 transfer from -- I believe it was Chev to Foundation Auto Holdings -- I might have that wrong -- was it Sub to Foundation Auto Holdings?

A. Correct.

Q. Okay. Thank you for -- for that distinction.

We had identified that as a management fee, right?

A. That's right.

Q. And I want to talk to you a little bit about the management fees now.

Were those fees something that was paid monthly from various Foundation dealership entities up to Foundation Auto Holdings, LLC?

MS. WOOD: Objection; form.

A. Yes, they were.

Page 50

Q. (BY MR. BATES) Was there a contract or agreement or some other written document that governed or provided for or allowed for the payment of these management fees?

A. There -- there is. It's either in the operating agreement itself or there was a separate management agreement. I feel like it was in the operating agreement, but I may be mistaken.

Q. And were these management fees paid for certain services that would be rendered from parent down to child in the family?

A. Yes.

Q. Such as providing centralized treasury management services?

A. That was provided by Foundation Automotive US Corp. Foundation Auto Holdings provided more operational-specific management support, marketing operations, that kind -- that kind of stuff. The treasury function and all the lender relationships, those were managed through a -- Foundation Automotive US Corp.

Q. Was Foundation Automotive US Corp. compensated for rendering those services from any of the child entities historically?

A. Only -- only through the benefit of the --

Page 51

the sweep account being efficient, but all of the -- all of the lender transaction costs, interest payments went through Foundation Automotive US Corp.

Q.   Once the management fees were paid to Foundation Auto Holdings, LLC, where did they go?

A.   They, again, were swept to the parent, to Foundation Automotive US Corp.

Q.   At that point, what happened to them?

A.   They -- they would be either disbursed back down to the dealerships that needed funds for that day or they would be held in Foundation Automotive US Corp. until they were needed for a specific purpose.

Q.   So is it accurate to say that FAUS was able to direct the management fees upon their receipt as it saw fit?

A.   Not exactly.   It was -- it was the hub, so if Foundation Auto Holdings had expenses that needed to be paid over those management fees, then Foundation Automotive US Corp. would send that money back down to Foundation Auto Holdings.

Q.   In its discretion?

A.   Well, it was an automatic sweep for most of the time.   It's only in recent history, and it would still not be discretionary.   It -- we're under a mandate from BMO to maintain positive cash balance in

Page 52

every account.

Q.    So subject to, in your testimony, lender discretion, once that money reached FAUS's account, FAUS could distribute it back down or otherwise if it had lender approval to do so?

A.    So you're inferring lender discretion from -- from what I said.  I -- I didn't say there was lender discretion.  I said we had a mandate from lenders to maintain positive cash balances.  So we needed to distribute the cash in a way that would maintain a positive cash balance in every account.

Q.    Were these management fees something that were invoiced by Foundation Auto Holdings, LLC to the dealership subsidiaries?

A.    They were.

Q.    Monthly?

A.    Monthly.

Q.    Were there any sort of line items contained on these invoices referencing what they were for and then what amounts?

A.    There should be.

Q.    Did -- let's just limit this right now to FA ND Chev, LLC and FA ND Sub, LLC.

Did those two entities pay management fees to Foundation Auto Holdings, LLC?

Page 53

A.    They did.

Q.    Was that a monthly payment traditionally?

A.    Yes.

Q.    Were those payments -- I'm trying to think of the right word here.

Did the amounts paid by those entities to Foundation Auto Holdings, LLC, were they static each month or did they vary?

A.    They were formulaic based on the number of units sold in that month.

Q.    Units being cars, trucks?

A.    Vehicles, correct.  Yeah.

Q.    And I think I understand what you're saying, but each month there was a specific formula that governed how much money got paid to Foundation Auto Holdings by a dealership subsidiary based on how many automobiles that dealership sold on a monthly basis?

A.    Is -- sorry.  Was that a question?

Q.    Yes, I'm sorry.  I -- I was just trying to, more for more my own edification than anything else, sort of summarize the way the formula worked.

You -- you had told me the formula was based on how many automobiles were sold each month, right?

A.    That's right.

Page 54

Q.    And then depending on what that data revealed, it went into a formula, that number of vehicles did, and got converted into dollars that were paid up to Foundation Auto Holdings, LLC.

Am I missing anything there?

A.    No.

Q.    How long were those management fees in place?

A.    From the beginning.

Q.    And I assume BMO, HPS, et cetera, were -- I'm thinking of the right word again here -- consented to the payment of these management fees from the dealership entities up to Foundation Auto Holdings, LLC?

A.    I don't recall specific consent, but this is normal industry practice.

Q.    Do you think they would have told you if they were not okay with these monthly payments being made up the chain?

A.    I don't know what they would -- I -- I can't speak for them.

Q.    But they've never told you to stop the monthly management fee payments, have they?

A.    No.

Q.    How were these management fees reflected on the financial statements for the dealership-level

Page 55

entities?

A.   As a reduction to gross profit.

Q.   They wouldn't be in the Due To or From Affiliates column of the financial statements?

A.   If they were outstanding at the end of the month and unpaid, they would be.

Q.   What benefit, Mr. Slemko, did FA ND Chev, LLC receive when it transferred -- I believe it's about 13.5 million to FAUS?

MS. WOOD:  Objection; form.

A.   Which 13.5 million are you referring to?

Q.   (BY MR. BATES)  Good question.  Let me pull back up Exhibit 4.

I'm referring specifically to this $13.4 million figure here.

Are you able to see that?

A.   Yes.  It primarily received the benefit of the reduction of the liability it's guaranteeing. That would be the first benefit that comes to mind.

Q.   Other than that, can you think of any other benefits FA ND Chev, LLC received for paying 13.4 million to FAUS?

MS. WOOD:  Objection; form.

A.   No.

As -- as we previously discussed, there

were benefits to all the dealerships of having a centralized cash management system, including the management of lender relationships, commercial banking relationships, access to capital when it was needed, as per you can see the December 10 credit working capital transfer on the fourth line from the top.

So overall, there were multiple benefits from using the centralized cash management system.

But on that specific 13.4 million, the primary benefit was the reduction of a very large liability.

Q.   (BY MR. BATES)  We're going to trial in about 2.5 months, Mr. Slemko.

And is it going to be your testimony at trial that the centralized treasury management services that FA ND Chev, LLC was receiving from FAUS were worth $13.4 million?

MS. WOOD:  Objection; form.

A.   I don't -- I don't think my previous answer came through clearly.

I said the primary benefit of this specific transfer was a reduction of a very large liability that was guaranteed by this entity in excess of $150 million.

Page 57

Q.   (BY MR. BATES)  I understand that.

Then you identified other benefits that were received by FA ND Chev, including the centralized treasury asset management access?

A.   And access to capital --

Q.   How much was that worth?

A.   -- such as that credit, PC transfer credit working capital, 505,000 going into the entity.

Q.   This entity is no longer operating, we talked a little about -- little bit about earlier, correct?

A.   It no longer has operating assets, correct.

Q.   Does it currently receive any benefit from any sort of centralized treasury asset management system?

MS. WOOD:  Objection; form.

A.   That --

MS. WOOD:  Go ahead.

A.   It does.  This entity has a -- has a very large chargeback liability for F&I chargebacks that are being funded from the centralized cash.

Q.   (BY MR. BATES)  What is an F&I chargeback?

A.   It's -- when you sell a -- when you sell finance and insurance products such as a loan or you help finance a loan or -- or you sell a vehicle service contract, or gap insurance.  Those types of

Page 58

products, they can be canceled by the customer down the road.  And depending on when they decide to cancel those products, you could be charged back a significant amount of the original cost of the product.

And currently this entity has really only enough cash in it right now to pay monthly bank fees.  And so the -- the liability of those chargebacks is being funded by the affiliate group through the centralized cash management system.

Q.   So to circle back to something from a moment ago, the primary benefit you identified for the transfer of this $13.4 million was debt reduction as a guarantor, correct?

A.   For that specific transfer, yes.

Q.   And then the other benefit was centralized treasury access, right?

A.   Correct.

Q.   Anything else that you can think of, sitting here today, that you would view as a benefit received in exchange for payment of that money?

A.   Of not having to deal with creditors.

Q.   What do you mean by that?

A.   Well, that was all done by the executives and not the dealership personnel directly, so I feel like

Page 59

that's a pretty big benefit, especially right now.

Q.   Why is right now of notable status to you?

A.   Because the company is in default on one of its credit facilities.

Q.   Weren't the management services, such as dealing with creditors, et cetera, weren't those already being compensated for through the monthly management fees paid by each dealership entity?

MS. WOOD:  Objection; form.

A.   Well, as I mentioned before, the management fees covered the operational side of the business, not the finance and treasury functions.  That was formed at that Foundation Auto US Corp. level.

Q.   (BY MR. BATES)  So your answer to that question is no.  Fair?

A.   So if your question was weren't they already being performed, correct, my answer is no.

Q.   Put back up Deposition Exhibit 3, Mr. Slemko, just so we can have the number correct.

What benefits did FA ND Sub, LLC receive from FAUS when it transferred $11.5 million on December 11, 2024?

MS. WOOD:  Objection; form.

A.   Well, the answer would be the same as for FA ND Chev.  Primarily that transfer was a reduction

Page 60

of liability it guaranteed, as well as, ancillary to that, the treasury management functions that were being done daily at the FAUS level.

Q.   (BY MR. BATES)  Same reasons that you offered with respect to the FA ND Chev entity --

A.   Correct.

Q.   -- we just discussed?

I want to talk to you, Mr. Slemko, a little bit about the debt restructuring, I'm going to call it, that Foundation and its affiliates went through in approximately 2022.

And I think you've testified to this to some degree in the federal lawsuit, but I'd like to walk through with you how the lender structure changed, originally being BMO and then subsequently becoming HPS?

And you did a good job of that in the federal lawsuit, but I want to make sure that I get the same testimony from you here.  So that's not a question.  That's just context.

Prior to 2022, BMO was Foundation's primary senior lender.  Is that accurate?

A.   Only as it relates to floor plan financing and real estate.

Q.   What other lenders are you aware of that

Page 61

Foundation had prior to June -- well, prior to 2022?

A.   Prior to 2022 or prior to June 2022?

Q.   Prior to 2022.  Thank you.

A.   Prior to 2022, so in 2021?

Q.   Sure.

A.   Was that your original question because I --

Q.   Yeah.  It was a -- it was a very bad question.  So let me ask it this way.

I -- I understand that HPS entered the picture in about 2022.

Is that accurate?

A.   June -- well, originally in -- on March 31/April 1 of 2022, correct.

Q.   And I think, from your testimony in the federal lawsuit, that came in the form of a $79.5 million bridge facility; is that right?

A.   That's correct.

Q.   And then I have your testimony from that case as in June of 2022 there was a permanent term facility that replaced the bridge loan and added $120 million in debt.

Does that sound accurate?

A.   That -- that's right.  At that point we had 208 million outstanding with them, yes.

Q.   "With them," at that point in time, we would

Page 62

be talking about HPS and BMO, correct?

A.   The 208 million was strictly HPS and term facility.  BMO then was only mortgage and floor plan.

Q.   And is it accurate to say that following the June 2022 permanent facility, a lot of the older other lenders other than HPS and BMO, they weren't in the picture anymore, right?

A.   That is correct.

Q.   I think you said we went from having seven different lenders to two different lenders.

A.   For some reason I'm only counting six, but yeah, it was either six or seven to then two, yeah.

Q.   Okay.  Before the June 2022 permanent facility, was FA ND Sub, LLC a guarantor on any debt of -- of FAUS?

A.   It was.  It was a -- it was either a borrower, co-borrower, or guarantor of debt we had taken from BMO Canada.  BMO Canada, maybe that was the seventh one there.

Q.   I -- I think I -- because you -- you anticipated my next question and I think the answer is going to be "I don't know," but correct me if I'm wrong, okay.

You're -- you're just not sure whether FA ND Sub was a guarantor, a borrower, or a

Page 63

co-borrower with respect to that prior arrangement. Fair?

A.   Yeah.  I believe it was a borrower, if I'm being honest.

Q.   And very high level, your understanding of how loan transactions work, do you make a distinction between a borrower and a guarantor?

A.   Only with regard to the signature line that they're on.

Q.   Do you account for the liabilities differently as chief financial officer when -- when your entity is a guarantor versus a direct borrower?

A.   In -- yes, they are different treatment.

Q.   How do you treat the liabilities of a direct borrower?

A.   They would appear as a liability on that borrower's balance sheet.

Q.   And how do you treat the liabilities of a guarantor by distinction?

A.   The credit facility and -- details and outstanding balance would appear in the footnotes to the financial statement as -- under guarantees.

Q.   Using your accounting background, do you have any knowledge or understanding as to why that distinction is drawn on financial statements between

Page 64

borrowers versus guarantors?

A.   I didn't know I was going to get a test today.

I would have to research it.

Q.   All you know is that they're treated differently on the finances.  Fair?

(Discussion off the record.)

A.   Correct.

Q.   (BY MR. BATES)  Same question, this time concerning FA ND Chev.

Do you know whether it was a guarantor of any of Foundations' debt before the June 2022 permanent facility?

A.   It was a borrower under that same facility with BMO.

Q.   You know that FA ND Chev was a -- was a direct borrower.

Do I have that right?

A.   That's my recollection.

Q.   And just to confirm, you did not know whether FA ND Sub was a direct borrower, right?

A.   I clarified that it's my recollection it was a borrower.

Q.   Okay.  So just to clean the record up on that point, your recollection is that before the June 2022

Page 65

permanent facility, both FA ND Chev and FA ND Sub were borrowers under prior arrangements?

A.   Yeah.  I mean, from seven years ago, yeah. That's my recollection.

Q.   Who did FA ND Sub borrow from before June of 2022?

A.   BMO.  Bank of Montreal.

Q.   Is the same true for FA ND Chev?

A.   That's correct.

Q.   Do you recall what amounts FA ND Sub borrowed from BMO before June of 2022?

A.   Subaru was a fairly small number by contrast. I want to say that it was maybe 2 to 3 million, and the Chevrolet was around 10.

Q.   Is it accurate to say that those two entities borrowed those funds from BMO to acquire a Subaru dealership and a Chevy dealership from Kupper Chevrolet way back in 2018?

A.   2019, and yes, those funds were used to fund the acquisition of those dealerships.

Q.   I think you said like -- well, let me ask you to -- to clean it up because I did a bad job there.

Do you remember what the total amount borrowed by both entities was?

A.   Combined I think it was in the 10- to

Page 66

12-million-dollar range.

Q. Looking at your testimony back from October 7 of last year in the federal case, you were asked a couple questions about how much that debt, that 10 to 12 million dollars had been paid down by FA ND Chev and FA ND Sub, and do you recall approximately how much debt was paid down by those entities?

A. I recall seeing it was around 2.5 million. It was a seven-year amortization and we were three years into it and I don't -- it's probably around a third to 40 percent of it so, yeah, 3 to 4 million combined.

Q. At the same time that those entities were making payments to BMO on the pre-2022 facility -- I'm going to call it the 2019 facility. If that sounds wrong to you, just let me know, okay. I'm referring to the money that they borrowed to buy the dealerships in the first instances. Fair?

Does that make sense, Mr. Slemko?

A. Yeah. That makes sense.

Q. Okay. And so when FA ND Chev and FA ND Sub are making payments on the 2019 BMO facility, are they also, at that time, guarantors of debt owed by FAUS or Foundation Automotive Corp. to BMO?

A. They were.

Page 67

Q. Do you remember approximately how much debt we're talking about?

A. What date? We're referring to June 2022?

Q. Pre-June 2022.

A. I -- I don't know what that means. Like that --

We had a lot of activity before June 2022, so which months specifically are you asking me about?

Q. Fair enough.

How much debt do you recall being outstanding to BMO prior to -- immediately prior to the 2022 debt reorganization with HPS?

A. With BMO specifically?

Somewhere around -- somewhere between 40 and 50 million. Term -- term debt, not including mortgages or floor plan.

Q. Those would be different lenders under different arrangements?

A. Well, BMO did a lot of the floor plan financing but I just didn't include that in the 40 to 50 million. If we include that, it's in the -- it's over a hundred million.

MR. BATES: I'm at a decent stopping point.

Page 68

Kensye, let's go off the record real quick.

THE VIDEOGRAPHER:  Off the record at 11:26 a.m.

(Break from 11:26 a.m. to 11:34 a.m.)

THE VIDEOGRAPHER:  We're back on the record at 11:34 a.m.

Q.   (BY MR. BATES)  Mr. Slemko, we were kind of hashing out the 2022 various debt restructuring efforts that Foundation and its subsidiaries went through.  I'm going to put up on the screen Deposition Exhibit 7.

(Marked Slemko Exhibit No. 7.)

Q.   (BY MR. BATES)  And this, sir, is a guarantee and collateral agreement dated June 24, 2022, between Foundation, HPS, and all of the entities listed as guarantors at the very end of this document.

You've seen this document before, correct?

A.   I have.

Q.   And it's correct to say, is it not, that FA ND Sub, LLC and FA ND Chev, LLC are guarantors under this agreement?

A.   That's right.

Q.   This document, sir, when we were talking earlier just general timelines, June of 2022 is

Page 69

sometime after BAPTKO sued FA ND Sub, FA ND Chev, and Foundation Automotive Corp. in North Dakota federal court.

Does that sound right to you?

A.   Like I said, I don't recall a specific date.

Q.   You have any reason to dispute that?

A.   Only that I don't recall the specific date.

Q.   Understood.  And fair enough.

And is it your understanding that through this guarantee agreement, FA ND Sub and FA ND Chev were guaranteeing the repayment obligations of Foundation Automotive US Corp. and Foundation Automotive Corp. to HPS Investment Partners, LLC?

A.   That's correct.

Q.   Is it your understanding that FA ND Chev, LLC and FA ND Sub, LLC were not borrowers or co-borrowers following the HPS restructuring?

A.   Correct.

Q.   They were just guarantors, right?

A.   On this facility.  That's right.

Q.   What other facilities existed with respect to those two entities following the HPS restructuring?

A.   The floor plan financing through BMO.

Q.   What benefit did FA ND Sub receive from guaranteeing tens of millions of dollars in debt owed

Page 70

by Foundation Automotive US Corp. and Foundation Automotive Corp.?

MS. WOOD: Objection; form.

A. From the -- from the beginning or with this facility?

Q. (BY MR. BATES) Through this facility.

A. The -- the benefit was access to a larger group including an expanded management team and expertise.

Q. How did that -- how did assuming that contingent liability benefit the North Dakota dealership entities?

A. I -- did you not just ask me that question?

Q. I asked it a little bit differently.

So -- so my apologies if it went in one ear and out the other on my side of things.

I think you had said the benefit that the North Dakota dealership entities received was management services and capital access, something to that degree?

A. Right. And with regard to the larger facility, we were expanding and therefore they had access to a larger group, a larger management team, more expertise.

Q. How did that specifically benefit the North

Page 71

Dakota dealership entities?

A.   I -- I can't speak for the dealership itself. I -- I don't --

Q.   Are you treating the benefit as inuring to the Foundation family as a whole?

A.   Yeah.   Well, the benefit is what the benefit is.   Now, whether they specifically benefit from it, that's up to each individual dealership.

Q.   FA ND Shub -- Sub -- excuse me -- and FA ND Chev were previously paying down a 10- to 12-million-dollar acquisition facility to BMO before this 2022 restructuring, right?

A.   That's right.

Q.   And they had made 30 to 40 percent of their payments on that facility before this restructuring, correct?

A.   Sounds right.

Q.   So did they have, before this facility, the 2022 facility, did FA ND Chev and FA ND Sub have any equity towards their purchase of the two Mandan dealerships?

MS. WOOD:   Objection; form.

A.   I don't understand the question.

Q.   (BY MR. BATES)   So you buy a house, Mr. Slemko, and you take out a mortgage on it.   And

Page 72

your mortgage is a hundred thousand dollars and you make principal payments each month. That principal is your equity in the home, right?

A. Okay.

Q. Is that fair? Is that your understanding of how that arrangement works?

A. That's fair.

Q. And I -- what I'm trying to get at here is didn't FA ND Sub and FA ND Chev have some principal equity built up in the form of the 30 to 40 percent of the payments that they had made towards the BMO acquisition facility?

A. Well, equity is -- is what -- it remains after debts are repaid, and that would only occur on a sale.

So if I paid down -- what was the number you used -- say 20,000 on my mortgage and that was, quote/unquote, equity, it's only equity realized if I sell the house for more than the hundred less 20- that I paid off.

So I would have to sell the house for 80,000 in order for it to be paid off.

Now, if I bought a -- a cottage and I put a mortgage on that but I guaranteed it with the -- with my house or I collateralized it with my house,

Page 73

then, you know, what is my equity then if I still owe money on the cottage.

Q.   I think that makes sense.

And -- and -- so go about this a different way.

Let's look at what's going to be Section 2.09 of this guarantee and collateral agreement.

You're able to see this okay, Mr. Slemko?

A.   Yes.

Q.   So you -- you have said a couple of times in some of your affidavits, and I think again today, that through this 2022 HPS facility, FA ND Chev and FA ND Sub assumed obligations to repay the entire outstanding balance of debt owed by Foundation Automotive Corp. and FAUS to HPS; is that correct?

MS. WOOD:  Objection; form.

A.   I -- sorry.  Can you repeat that.  I -- your questions are getting long.  I can't keep track of them.

Q.   (BY MR. BATES)  Understood.  And I'll -- I'll try to abbreviate it.

Do you understand that FA ND Sub and FA ND Chev are responsible for repaying all of the

Page 74

debt that Foundation owes to HPS?

A.   To the extent they have assets to pay, yes.

Q.   Looking at this Section 2.09 here, I'm going to draw your attention to subparagraphs (a), (b), and (c), but first and foremost this paragraph or this section is entitled "Maximum Liability" in bold.

Do you see that?

A.   I see that.

Q.   And it's stating here in this first sentence: "...the maximum liability of each Guarantor hereunder and under the Loan Documents shall in no event exceed the maximum amount that can be guaranteed by each guarantor under applicable federal, state, provincial, and territorial Laws relating to the insolvency of debtors."

And then jumping ahead just a little bit:  "...including the maximum amount that can be guaranteed by such Guarantor without rendering such Guarantor insolvent, leaving such Guarantor with unreasonably small capital or assets, or leaving such Guarantor unable to pay its debts as they become due..."

So this section, Mr. Slemko, is imposing caps on any dealership level guarantor's liability on the entire debt, is it not?

Page 75

MS. WOOD:  Objection; form.

A.  It appears to.

Q.  (BY MR. BATES)  And one of the ways that it does that is a guarantor cannot be responsible for more debt than any amount of debt that would render it insolvent under little Paragraph (a), right?

MS. WOOD:  Objection; form.

A.  Okay.

Q.  (BY MR. BATES)  Do you agree with that?

A.  That's what it says.

Q.  And under Paragraph (b), another way that a guarantor's liability can be capped is that it cannot be required to pay any amount of debt that would leave it with unreasonably small capital or assets.

Do you see that as well?

A.  I see that.

Q.  What does "unreasonably small capital or assets" mean to you as the chief financial officer of the entities that entered into this loan facility?

A.  On an entity that is no longer operating, it would be a de minimis amount.

Q.  What about an entity that is still operating?

A.  It would require sufficient capital to pay its liabilities.

Q.  And then, finally, Mr. Slemko, with respect

Page 76

to Paragraph (c), another manner in which a guarantor's liability is capped is it cannot be responsible for paying more debt than would leave it unable to pay its debts as they become due, right?

A.   Correct.

Q.   And so would you agree with me that those are three instances under this guarantee agreement through which a guarantor's liability is capped?

A.   Yeah.  I agree.

Q.   So is it not true, then, Mr. Slemko, that FA ND Chev and FA ND Sub could not respectively be responsible for the entire amount of debt owed by Foundation Automotive Corp. and FAUS to HPS Investment Partners?

MS. WOOD:  Objection; form.

A.   I -- I interpret it differently.

Q.   (BY MR. BATES)  How do you interpret it?

A.   Well, if that -- if FA ND Sub and FA ND Chev were sold or the assets sold for $150 million, it would pay $150 million to the -- the creditor.

It's only saying that it can't pay more than it has to pay.  That's the way I interpret that.

Q.   So essentially so long as the amount of assets is less than the total outstanding debt, your interpretation is the liability is capped, but if the

Page 77

amount of assets exceeds the amount of total debt, that guarantor liability would not be capped.  Is that what you're saying?

A.   Well, the liability would still be capped by the amount of the -- by the amount of the outstanding balance on the facility.

So the cap, the way I read it, is the liability itself or the ability of the entity to pay down a portion or all of that liability.

Q.   Based on your understanding of the actual sale of assets for both FA ND Chev and FA ND Sub, is it your understanding that their liability as guarantors would be capped under this section because of the amount of those respective asset sales?

A.   It was capped to the extent of their ability to pay down on the facility.

And, as you'll recall, all of the net proceeds, except for a small amount that was mandated to be kept in the system for liquidity compliance, was paid to the creditors, leaving the entity through the centralized cash management system enough access to capital to pay, through its affiliates, its ongoing chargeback liabilities.

Q.   When FA ND Chev and FA ND Sub entered into this guarantee agreement in June of 2022, did it

Page 78

render them insolvent?

MS. WOOD:  Objection; form.

A.    No.

Q.    (BY MR. BATES)  Why not?

A.    Because the -- the group as a whole had sufficient assets to support the liability at that time.

Q.    As of June of 2022?

A.    Correct.

Q.    As of December 2024, is it your testimony that that was no longer the case?

A.    My testimony is that strictly going off of the balance sheet, the company appears to be insolvent because its liabilities exceed its assets.

Q.    It appears to be insolvent or is insolvent?

A.    Well, we've been operating under forbearance for over two years, so I wouldn't say effectively insolvent, but I would say appearance is insolvent.

Q.    Do you recall signing an affidavit on January 12 of this year that said, quote, As of December 2024, the FA entities were balance sheet insolvent when their assets were measured against their secured obligations?

A.    (Nodding head.)

Q.    Is that a "yes"?

Page 79

A.   That's exactly what I just said.

Q.   You were mentioning some forbearance-type issues.  And I understand there were various forbearance agreements entered into between Foundation entities and its lenders following the June 2022 restructuring.

Is that accurate?

A.   Sorry.  Are we -- are we talking about the refinancing or the forbearance?

Q.   Let's just use June 2022 as our benchmark.

After that date, Foundation, through various companies and affiliate companies, entered into several forbearance agreements with its lenders, correct?

A.   After that date, yes.

Q.   Okay.  Had or -- or has HPS ever called due FA ND Chev's guarantee obligations?

A.   Yes.

Q.   How so?

A.   When they provided consent to the transaction, they required 9 -- is that -- 8 -- 18 or 19 million.  I -- the number is escaping me now -- 18 million be repaid of their credit facility.

Q.   And I assume you would say the same thing about FA ND Chev.  Because HPS required payment of

Page 80

proceeds in a certain manner, you are taking that to mean that HPS called the debt.  Fair?

A.   Not called the entire debt, but they required that amount of proceeds from that -- or those transactions be paid down; otherwise, they would not consent to the sale.

Q.   Has HPS ever made demand on FA ND Chev to repay any debt it owes as a guarantor?

A.   In one of the credit facility amendments, there was a workout plan that required proceeds from certain asset sales be applied to the credit facility. I want to say it was the fifth amendment, but I don't recall if that's the right one.  Fourth -- fourth or fifth.

Q.   And that was through an agreement between HPS and certain Foundation entities, right?

A.   Correct.

Q.   But has HPS ever demanded, outside of an agreement, that FA ND Chev repay any debt it owes as a guarantor?

A.   How -- how would they do that?  I'm not -- I'm not following.

Q.   Has HPS ever foreclosed on any assets of FA ND Chev?

A.   No.

Page 81

Q.   Has HPS ever sued FA ND Chev?

A.   No.

Q.   Same question with respect to FA ND Sub, has HPS ever foreclosed on any FA ND Sub's assets?

A.   No.

Q.   Has HPS ever sued FA ND Sub?

A.   No.

Q.   Has FA ND Chev ever received a demand letter from lawyers representing HPS to pay a certain amount of debt?

A.   Not a demand letter.

Q.   Same with respect to FA ND Chev, has it received such a demand letter?

A.   No.

Q.   Has it received -- bad question.

Has FA ND Chev ever received a letter from HPS or its lawyers demanding that certain amounts of debt be repaid to HPS?

A.   Not a letter, no.

Q.   What has it received other than this credit agreement or amendment to a credit agreement that you are discussing here?

A.   Forbearance agreements and credit facility amendments that required us to pay down proceeds from asset sales.

Page 82

Q.   Did you as chief financial officer for FAUS and its subsidiaries, did you consider the guarantor liability of FA ND Chev and FA ND Sub to be accrued or contingent?

A.   It was a guarantee.  Neither, so neither.

Q.   What do you consider it to be as a guarantee?

A.   A guarantee that if -- if in a liquidation of assets, proceeds from all sales would go to the secured lenders that were -- that that entity had guaranteed debts from.

Q.   Put what will be Deposition Exhibit 8 on the screen.

(Marked Slemko Exhibit No. 8.)

Q.   (BY MR. BATES)  Can you see this okay, Mr. Slemko?

A.   Yeah.

Q.   Have you seen this document before, sir?

A.   I have.

Q.   And this is the asset purchase agreement for the sale of the assets of FA ND Chev and FA ND Sub, right?

A.   It is.

Q.   Okay.  There is, on the second page, a -- call it Section 1, Paragraph 1, whatever you prefer. I've highlighted a couple of items here.

Page 83

Do you see my highlights?

A.   Yes.

Q.   And can you read the highlighted portion into the record, please?

A.   "Free and clear of all liabilities, liens, and encumbrances."

Q.   Okay.  So this is the agreement between FA ND Chev, FA ND Sub, and the North Dakota buyer entities for the purchase of the assets, right?

A.   Correct.

Q.   And in this agreement, there is a clause that states that FA ND Chev and FA ND Sub will be selling their assets free and clear of all liabilities, liens, and encumbrances, correct?

A.   Correct.

Q.   And there's an exception right after the highlighted piece that basically says it's free and clear unless it's an assumed liability.  Fair?

A.   Fair.

Q.   Jumping to Section 7 of this document, up there -- up there at Section 5, first, it's a clarification as to what liabilities the buyers are assuming, right?

A.   Uh-huh.  That's right.

Q.   And then in Section 7(a) there is an

Page 84

affirmative representation and warranty made by FA ND Chev and FA ND Sub that on the closing date of this agreement, the North Dakota buyers are going to take free and clear title to the assets, correct?

A.   Correct.

Q.   And what liens and encumbrances existed on FA ND Chev as of December 2024?

A.   On FA ND Chev or FA ND Chev and its assets?

Q.   On FA ND Chev and its assets.

A.   There were UCC filings, all asset filing liens on Foundation Automotive US Corp., Foundation Auto Holdings, FA ND Chev, FA ND Sub.  The all assets filings would include the equity interest of Foundation Auto Holdings in FA ND Sub and FA ND Chev and would also include every single asset owned by FA ND Sub and FA ND Chev, including desks, printers, monitors, computers, inventory on-site, lifts in the service area.  You name it, it was encumbered by UCC filings by both BMO and HPS.

Q.   I take it from that testimony there was a lot of liens and a lot of encumbrances.  Fair?

A.   Well, there -- two UCC filings, they were all assets, yep.

Q.   So the answer is yes.  And so Section 7 says with respect to all of these assets --

Page 85

A.   Uh-huh.

Q.   -- all of these liens and encumbrances are going to go away at the closing of this sale so that the buyer can get those assets without those liens and encumbrances attached, right?

A.   That's right.

You didn't ask how.

Q.   Why do you think, Mr. Slemko -- have you ever been on the buy side of a transaction?

A.   Many times.

Q.   And in those many times that you have been a buyer, why is it important for you as a buyer to acquire title to assets that you are buying free and clear of liens?

A.   So you can -- you can finance them and have liens applied to them.

Q.   And do you have any reason to believe that in this asset sale, when you were on the sell side, that that same rationale was not in play?

A.   Well, it certainly was with regard to the inventory.

Q.   I'm putting up -- Mendy, what am I on right now?  Was it 8 or 9?

(Discussion off the record.)

(Marked Slemko Exhibit No. 9.)

Page 86

Q.   (BY MR. BATES)   I'm putting up, Mr. Slemko, Deposition Exhibit 9 on our screens here.

Can you see the document I am sharing with you?

A.   I can see it, yes.

Q.   And you -- you've seen this document before, correct, sir?

A.   Yes.

Q.   You have attached --

MR. BATES:   I'm sorry?

MS. WOOD:   Justin, really quick, what was the Bates on -- on that?

Got it.   Thank you.

Q.   (BY MR. BATES)   You have, I believe, Mr. Slemko, attached this document to some declarations and affidavits that you have provided in this case.

Do you recall doing that as well?

A.   I do.

Q.   Okay.   We were just talking about the buyers getting free and clear title to the assets that they were acquiring through the terms of the asset purchase agreement.

What is your understanding of what we are looking at on the screen in Deposition Exhibit 9?

Page 87

What is it?

A.   It's a release of security interest and consent.

Q.   And it is between HPS Investment Partners, LLC and FA ND Sub, LLC, right?

A.   It is between -- sorry.  Who did you say it was between?

Q.   Yes.  Listed in the -- good -- good question.

Listed at the top as seller is FA ND Sub, LLC, right?

A.   Yes, but I don't believe that makes it a party to this agreement.

Q.   You -- you called out a bad question of mine, Mr. Slemko, so I appreciate that.

"Between" was not the right word.

The signatory to this document is HPS Investment Partners, LLC as administrative agent, right?

A.   Correct.

Q.   And the seller party, at least identified as the seller, is FA ND Sub, LLC, right?

A.   Correct.

Q.   And in the first sentence of Exhibit 9, it says:  "HPS Investment Partners, LLC, as administrative agent, has a security interest in the

Page 88

assets of seller identified above."  Right?

A.   That's right.

Q.   And could you read the highlighted sentence and that is the second paragraph into the record, please.

A.   Sure.

"Secured party hereby consents and authorizes the sale of the sold assets to buyer free and clear of its security interest.  Upon the sale of the sold assets to buyer, secured party shall be deemed to have released its security interest in all sold assets."

Q.   This document, sir, appears to be dated December 11, 2024, correct?

A.   That's correct.

Q.   And that's the same day as the closing of the sale of the Subaru dealership's assets, right?

A.   That's correct.

Q.   Was this document signed before FA ND Sub was paid at closing?

MS. WOOD:  Objection; form.

A.   I didn't sign it, so I don't know.

Q.   (BY MR. BATES)  Did you ever see this document at closing or otherwise?

A.   I saw a draft of it before closing, and I've

Page 89

seen the executed version after -- after closing.

Q.   You saw a draft of this document before the closing took place?

A.   Correct.

Q.   Mr. Slemko, doesn't this document release HPS's security interest on the sold assets at the --

MS. WOOD:  Objection; form.

Q.   (BY MR. BATES)  -- at the time that they are sold to the buyer?

MS. WOOD:  Same objection.

A.   Because HPS was -- had receipt or was to receive the mandated funds from the amendment to the credit facility that stipulated that proceeds from the Mandan dealerships, when sold, be paid to them, they would release their security interest.

This was them giving comfort to JPMorgan Chase Bank, who was the incoming lender, that those security interests would be released.

Q.   (BY MR. BATES)  This says that those security interests would be gone --

A.   That's right.

Q.   -- upon payment -- or excuse me, upon the sale of the sold assets to the buyer, correct?

A.   That's what it says.

Q.   Is it Foundation's position in this lawsuit

Page 90

that this document does not constitute a release of HPS's security interest on the proceeds that FA ND Sub received from the sale of its assets?

MS. WOOD:  Objection; form.

A.   Well, if you read one line above, in order for this sale to go through, this document needed to be provided to Chase, and it was provided to Chase because HPS was being paid in accordance with the agreement that they would be paid the net proceeds upon sale of these assets.

Q.   (BY MR. BATES)  Wasn't quite my question, Mr. Slemko.

You've reviewed and signed affidavits in this lawsuit where Foundation says it cannot be liable under the Texas Uniform Fraudulent Transfer Act because any money it got paid was subject to perfected security interest; have you not?

A.   Yes.

Q.   This document says -- I think you told me earlier -- that HPS released its security interest in all sold assets of FA ND Sub at the moment this document was signed, right?

A.   Well, I don't think that's exactly what it says.  It says they shall be deemed to have released.

Q.   You think there's a distinction between those

Page 91

two things?

A.   I don't know.  I'm not an attorney.

But I know that if you read one sentence prior to that highlighted portion, it says:  "The execution of this agreement is a condition of Chase's financing of buyer."

So the transaction doesn't happen unless this document is executed.

Q.   I agree with you.

This transaction never happens if HPS does not release its security interest in the sold assets, does it?

A.   This transaction also doesn't happen if we --

Q.   Hold on.

Is that a "yes"?

A.   Well, you're mix -- you're -- you're trying to mix up the timeline.

Prior to this document being executed, HPS executed an amendment with Foundation that required the proceeds of this sale to be paid to them.

Q.   Was that a "yes," this transaction does not happen unless HPS releases its security interest in the sold assets?

MS. WOOD:  Objection; form.

A.   This transaction doesn't happen if HPS

Page 92

doesn't sign this agreement.

The releases of the security interest did not happen on the same day.

Q.  (BY MR. BATES)  You just told me that you didn't know when this was signed, so how can you now tell me that this release didn't happen at the same time?

MS. WOOD:  Objection; form.

A.  The UCC filings themselves were released after HPS was paid.

Q.  (BY MR. BATES)  And you told me earlier you're not a lawyer, correct, Mr. Slemko?  You're not --

A.  You're not a lawyer or I'm not a lawyer?

Q.  You're not, correct?

A.  Correct.

Q.  And you're not here to provide legal testimony as to what is required to release a security interest, right?

A.  Sorry.  Repeat that.

Q.  You're not offering any legal testimony that -- about what is required to release a UCC filing or release a security interest, are you?

A.  No.

Q.  And is it still correct that you do not know when this release was signed?

Page 93

A.   Correct.

Q.   There's a December 11 date on it, correct?

A.   Correct.

Q.   But because you aren't the party that signed it, you don't know when it, in fact, was executed, right?

A.   That's right.

Q.   We would have to ask HPS about that.  Fair?

A.   Or EAGAL4 or JPMorgan Chase.

Q.   And Mr. Fitts specifically is the gentleman that signed it, right?

A.   I don't know what his signature looks like but --

Q.   That's his name underneath the signature?

(Speaking simultaneously.)

A.   Yeah.

Q.   This is Deposition Exhibit 10, Mr. Slemko.

(Marked Slemko Exhibit No. 10.)

Q.   (BY MR. BATES)  Have you seen this document before?

A.   I don't recall.

Yes, I do -- I believe I have seen this before.

Q.   This is titled "Release of Security Interests," right?

Page 94

A.   That's right.

Q.   And it also contains a purported signature from Mr. Fitts, correct?

A.   Correct.

Q.   Mr. Fitts, you understand, at least as an officer of HPS Investment Partners, LLC, right?

A.   That's right.

Q.   This document looks a little bit different than the one we were just looking at in Exhibit 9. But it lists the buying dealership as EAGAL3 LLC, right?

A.   Yes.

Q.   And then the selling dealership is FA ND Chev, right?

A.   Right.

Q.   Followed by the lender/secured party identified as HPS, correct?

A.   Correct.

Q.   Can you read the highlighted sentence into the record, please.

A.   "Upon receipt by Selling Dealership of amounts due under that asset sale/purchase agreement between Selling Dealership and Buying Dealership, Lender shall release its lien and security interest in all assets of Selling Dealership purchased by Buying

Page 95

Dealership pursuant to that asset purchase/sale agreement between the parties and your lien no longer attaches to such sold assets."

Q.   This says, Mr. Slemko, that when selling dealership is paid the amounts due under the asset purchase agreement, HPS's security interest in the assets of the selling dealership go away.

Is that accurate?

MS. WOOD:   Objection; form.

A.   It says the lender shall release its lien and security interest.   So I don't know if that means instantaneously.

Q.   (BY MR. BATES)   It says upon receipt by selling dealership of amounts due, right?   That's the timing trigger here.

A.   Oh, okay.

Q.   Would you agree or disagree with that?

A.   That that's the timing trigger?

Q.   Correct.

A.   That appears to be so.

Q.   Is it also accurate, Mr. Slemko, with respect to this document, this release, you do not know when it was signed by Mr. Fitts?

A.   I do not know.

Q.   We would have to ask Mr. Fitts that question.

Page 96

Fair?

A.   I suppose.

MR. BATES:  You guys want to break for lunch?

MS. WOOD:  Yeah.  You want to go off record?

MR. BATES:  Yes.  Let's do that.

THE VIDEOGRAPHER:  Off the record at 12:21 p.m.

(Break from 12:21 p.m. to 12:57 p.m.)

THE VIDEOGRAPHER:  We're back on the record at 12:57 p.m.

Q.   (BY MR. BATES)  Mr. Slemko, before we took a break for lunch we were talking about HPS releasing certain security interests.

What -- what do you recall the total purchase price being for the sale of the assets of the Mandan dealerships in 2024?

A.   Total, including inventory and assets, I want to say it was 35 million.  Somewhere around there.

Q.   And do you remember how much HPS was paid out of that $35 million amount, give or take?

A.   I believe it was 18 million.

Q.   Have you, Mr. Slemko, also seen some releases executed by BMO with respect to its security interest

Page 97

in certain sold assets as part of that deal?

A.   Yes, I have.

Q.   I think some of those were attached to one of the more recent affidavits that you signed if that helps refresh your recollection.

Is it also your testimony, Mr. Slemko, that in order for the North Dakota buyers to get free and clear title to the assets that they were acquiring, that BMO would also need to release its security interest in any of the sold assets?

A.   That's correct.

Q.   Do you know -- and this is not a memory test -- how much BMO was paid out of the $35 million, I'll call it, purchase price?

A.   Somewhere around 15 million, I -- I would think.

Q.   BMO and HPS are not the only entities that got paid out of the purchase price, correct?

A.   Correct.

Q.   See if I can make this a little bit easier on both of us.  I'm going to put up Deposition Exhibit 11.

(Marked Slemko Exhibit No. 11.)

Q.   (BY MR. BATES)  Can you see my screen, Mr. Slemko?

Page 98

A.    I cannot.

Q.    That's why.

How about now?

A.    I -- yes, now I see the document.

Q.    You've seen this document before, correct, sir?

A.    I have.

Q.    And what are we looking at in Deposition Exhibit 11?

A.    It's an allocation of proceeds from the transaction, sometimes referred to as a waterfall.

Q.    This says up at the top "Expected Mandan Proceeds Allocation."

Do you have any recollection of whether the document we are looking at right now actually differentiates between the final disbursement of proceeds at closing?

A.    This is the final version.  You just -- the verbiage was not updated.

Q.    So I wanted to put this up in the interest of avoiding any speculation.  We were -- we were talking about who else got paid besides BMO and HPS, and my understanding is that one of the entities that was paid from the sale was Hague Partners.

Have you heard of that name before?

Page 99

A.   Absolutely.

Q.   They were the broker for these asset sales, correct?

A.   Correct.

Q.   And I believe that they were paid, according to this document, almost smack in the middle of the page, there's a $770,000 line item for broker fees.

I'm happy to blow it up, but does it sound like that's what Hague Partners got paid for its role as a broker in this deal?

A.   That sounds right.

Q.   Did Hague Partners have any security interest in the assets of FA ND Chev or FA ND Sub?

A.   Only to the extent that -- well, no, not technically a security interest.  But the transaction doesn't close without the broker getting paid.

Q.   And I think in -- and we're not going to see it on here, but I think it's reflected in the dealership payables line item that First American Title Insurance Company was the -- I'm going -- I'm going to call them the escrow agent.

Do you think that would be the incorrect label to use for them in this transaction?

A.   That -- that -- First American Title has nothing to do with dealership payables.

Page 100

Q.   Okay.  Was -- let me ask it this way:
Question 1, what are dealership payables?

A.   We withheld an amount from the waterfall or,
you know, allocation of proceeds to pay any remaining
vendor liabilities that existed, like uniform company
lien payoffs for vehicles that were sold, that kind of
thing.

Q.   Was First American Title paid by virtue of
its role in this transaction?

A.   They were not paid.  They -- they held the
funds in trust for the transaction and I guess they
collected a small fee.

Q.   Well, we'll come back to them a little bit
later.

Did First American Title Insurance
Company have a security interest in any of the assets
of FA ND Chev or FA ND Sub?

A.   No.  But the parties to the escrow agreement
that we did with First American Title did.

MR. BATES:  I'll object as nonresponsive
to everything after "no."

Q.   (BY MR. BATES)  Mr. Slemko, we talked about
CARS earlier.  My understanding is they were the
landlord for FA ND Chev and FA ND Sub.  Is that
accurate?

Page 101

A.   That's accurate.

Q.   And CARS was paid, at least according to the waterfall we have on the screen, $1.25 million out of these sale proceeds, correct?

A.   Correct.

Q.   Did CARS have a security interest in the assets of FA ND Chev or FA ND Sub as of December 11, 2024?

A.   Security interest, no.

Q.   Are you familiar with an entity called Amynta way down here in the bottom left corner?

A.   I am and we use Amynta.  Though the -- the company that actually got paid was Global Dealer Resources.

Q.   And Global Dealer Resources, according to this line item, received about $1.5 million from the sale proceeds; is that right?

A.   That's correct.

Q.   Is Global Dealer Resources an affiliate of Foundation?

MS. WOOD:  Objection; form.

A.   Foundation owns 49 percent of Global Dealer Resources.

Q.   (BY MR. BATES)  Why did Global Dealer Resources receive $1.5 million of these sales

Page 102

proceeds?

A.   Because when we sold the business, we had to either engage the buyer to retain Global Dealer Resources as its exclusive F&I products provider or pay a formulaic amount back to Global Dealer Resources for selling that business.

Q.   Did Global Dealer Resources have a security interest in any assets of FA ND Chev or FA ND Sub?

A.   No, but they had a consent right.

Q.   Some sort of contract you're saying entitled them to receive an amount of money?

A.   That's right.

Q.   There is a line item in here as well for Foundation liquidity.

Do you see that on here, Mr. Slemko?

A.   I do.

Q.   $826,000 and some change?

A.   That's right.

Q.   What does that money represent?

A.   That is what I referred to earlier in the day as mandated cash on hand to be kept to remain in compliance with our forbearance covenants.

Q.   And who did that money get paid to out of this waterfall?

A.   It was -- under this waterfall?  Foundation

Page 103

Automotive US Corp. would have handled the funds.

Q.    I -- I think I -- I confused you, so that's my fault.

Who was the entity that received this liquidity payment in the amount of $826,000?

A.    That wasn't necessarily one recipient.  It was to maintain with the Foundation parties to pay for expenses because the company was in forbearance and did not -- was cash flow negative at the time, and so we were required to maintain a minimum amount of liquidity so that we didn't have overdrafts or have to bounce checks.

Q.    Was this liquidity required to be maintained in the child accounts for FA ND Chev and FA ND Sub or -- or was it held elsewhere?

A.    It was managed by Foundation Automotive US Corp., and it was held -- over time held and used for general working capital purposes to maintain the required liquidity mandated by our lenders.

Q.    And I -- I think I'm understanding you, but -- so FAUS got the dealership liquidity payment in the amount of $826,000?

A.    I wouldn't -- I -- I didn't say that.  Foundation Automotive US Corp. managed the funds.  So if an entity needed funds to stay out of overdraft, it

Page 104

would allocate the funds there.

Q.   What I need to understand, Mr. Slemko, is where that money went out of this waterfall.

Who -- who got it?  I understand the purpose and where it might go later for various liquidity reasons.  But I'm trying to understand, it is a line item of proceeds that's going somewhere, according to this waterfall.

And when that money comes in the door at closing, where does it end up initially?

A.   Well, at the end of the day, of that day, it would have been included in that sweep transfer that we talked about earlier.

Q.   From one of the child accounts to the FAUS account, right?

A.   From both of the child accounts.

Q.   Other than the entities that we have discussed, HPS, BMO, CARS, Global Dealer Resources, Hague Partners, potentially First American Title Insurance, who else, if anyone, received any money out of this waterfall?

A.   It -- the -- there couldn't be anybody.  If it's not on the waterfall there, there were no files. I don't -- I'm not following.

Q.   No, that -- that's -- all I wanted to confirm

Page 105

was does the waterfall show everyone that got paid essentially and I -- I follow what you're saying.

I'm going to put up Deposition Exhibit 12.

(Marked Slemko Exhibit No. 12.)

Q.   (BY MR. BATES)   Can you see my screen, Mr. Slemko?

A.   Yeah.  Yes, I can see that.

Q.   And I'm -- I'm showing you what is a first amendment to asset purchase agreement from 2019 between Foundation Automotive Corp. and Kupper Chevrolet.

Have you ever seen this document before, Mr. Slemko?

A.   Yes, I have.  However, none of the parties in this deposition are party to this agreement.

Q.   I appreciate the clarification.

I'm going to show you what is Section 3(f) of this amendment and take a moment to go ahead and read it to yourself.

A.   Did you say 3(m)?  There's no 3(m) on here.

Q.   3(f).

A.   (f).

Okay.

Q.   What does that mean to you?

Page 106

A.   I couldn't say.  I need to look at the definitions of owner, buyer, and affiliates.

Q.   Okay.  And we can -- we can do that if we need to.

Owner is Kupper Chevrolet, I will represent to you, the company selling the assets to Foundation Automotive Corp.

Any reason that that sounds wrong or incorrect?

MS. WOOD:  Objection; form.

A.   That makes this not make a lot of sense to me, but can you show me that definition?

Q.   (BY MR. BATES)  Foundation Automotive Corp. bought Kupper Chevrolet's assets, correct, back in 2019?

A.   Correct.

Q.   Okay.  So it was on the buy side of that transaction, and Kupper Chevrolet was on the sell side of that transaction.  Fair?

A.   Why would Kupper Chevrolet control Foundation Automotive Corp.?  That -- that's not -- comment doesn't make sense to me.

Q.   That wasn't my question.  We can -- we can do this a little bit differently if we need to.  I'll pull up the entire asset purchase agreement so that

Page 107

you can look at the definitions themselves.

This will be Deposition Exhibit 13.

(Marked Slemko Exhibit No. 13.)

Q.   (BY MR. BATES)   You've seen this document before, correct, sir?

A.   I have.

Q.   This lists the buyer as Foundation Automotive Corp., right?

A.   Buyer, yes.

Q.   And then Kupper Chevrolet was -- in this agreement is listed as the seller, right?

A.   Correct.

Q.   Okay.

A.   Where is the owner definition?

Q.   Right here, sir, 3(d).

So it's actually Foundation is my understanding.  That was a mis- -- misstatement by me about what that definition meant.  I -- you were correct.

A.   Okay.

Q.   So does that refresh your recollection about who is the owner in terms of this amendment?

A.   Yeah.  It's a very complex clause from seven years ago, so let me just process it.

Q.   You bet.

Page 108

A.    Okay.   The owners remain as majority owners. So Foundation remains majority owner.  Okay.  Okay.

Q.    So the owner, as I read this, is the person that controls the buyer at the relevant time period.

Are you of the same understanding?

A.    Yes.  And sorry, we said buyer was which entity?

Q.    Buyer is listed in this amendment as Foundation Automotive Corp., correct?

A.    Okay.  And I believe at closing this agreement was assigned to the two subsidiary entities, FA ND Sub, LLC and FA ND Chev, LLC.  And then they would become the buyers as a result --

Q.    That makes sense.

A.    -- of that assignment.

Q.    So now that we have that context, take a moment to review Section 3(f) here, if you need to, and let me know your understanding of what it means to you.

A.    Okay.

MS. WOOD:  I'm going to object to the form.

But go ahead, Derek.

A.    I've read this section.  Yep.

Page 109

Q.    (BY MR. BATES)   Okay.   With -- with the definitions now in hand and understood, what is your understanding of what Section 3(f) accomplishes?

MS. WOOD:   Objection; form.

A.    Basically that if Foundation Automotive Corp. is no longer the majority owner of now FA ND Sub and FA ND Chev, then the earnout would be paid according to this clause.   But what this clause doesn't specify is the circumstance we're in where we have lawsuits that have occurred and we're in kind of a state of flux.

Q.    (BY MR. BATES)   Are you testifying, Mr. Slemko, that because lawsuits were filed, any obligations that might be triggered under this paragraph do not have to be complied with?

MS. WOOD:   Objection; form.

A.    Well, on initial view on the earnout in general was that there was nonperformance by Mr. Kupper which excused the performance of the earnout.   That was the initial position that was taken.

Q.    (BY MR. BATES)   And that position was rejected in the lawsuit by the trier of fact on that issue, correct?

MS. WOOD:   Objection; form.

Page 110

A.    And is now being appealed.

Q.    (BY MR. BATES)   And so there is a subordination provision at the very end, the second line from the bottom of Paragraph 3(f).

Do you see that?

A.    Yes.

Q.    So I understand that there is a dispute between Foundation parties and BAPTKO about whether the earnout payments are due, which is on appeal.  Put that to the side for a moment.

The subordination provision says these are now payments are due but are subordinated only to the amount owed by the buyer to its lender attributed to the buyer's purchase of the dealerships.

What does that subordination provision mean in your --

A.    Sure, two things.

MS. WOOD:   Objection; form.

A.    Two things.  Where are you concluding that this is now due?

Q.    (BY MR. BATES)   How are you concluding that this is not due?

A.    The owner of the buyer is still Foundation Automotive Corp.

Q.    Foundation's position is that this earnout

Page 111

payment is not due because it is still the beneficial owner of FA ND Chev and FA ND Sub?

MS. WOOD:  Objection; form.

A.   Well, why are we looking at this section?

Q.   (BY MR. BATES)  I'm asking you, is that Foundation's position looking at this document?

MS. WOOD:  Same objection.

A.   Foundation's position is that it's still the owner of the buyers, so this clause wouldn't apply.

Q.   (BY MR. BATES)  Foundation does not own or operate either Mandan Subaru or Mandan Chevrolet at this point in time, does it?

MS. WOOD:  Objection; form.

A.   I'm sorry.  The entities which bought the assets are still owned by Foundation Automotive Corp.

Q.   (BY MR. BATES)  FA ND Chev and FA ND Sub no longer operate either of those North Dakota dealerships, do they?

A.   Correct.

Q.   That said, as Foundation's corporate representative, what you are telling me is that doesn't matter because Foundation still controls FA ND Chev and FA ND Sub, right?

MS. WOOD:  Objection; form.

A.   I'm only going by how this clause begins.

Page 112

And it says no longer remain as majority owners.

We think Foundation is still the majority owner of those entities, the buyer.

Q. (BY MR. BATES) Do you see the word "or" after the first word "affiliates"?

A. Okay.

Q. Does that change your view of what this provision says?

A. Okay. So the buyer, FA ND Sub or FA ND Chev, shall be required subject to subordination of the amount owed by the buyer to its lender.

So there's still subordination to the lender.

Can you pull up the definition of lender?

Q. Let's see if we can find it. We'll probably have to go back to Exhibit 13, which is the asset purchase agreement.

It's capitalized but not defined.

So who was the lender associated with FA ND Chev and FA ND Sub's purchase of those two dealerships from Kupper Chevrolet?

A. Well, as we already discussed, it changed over time.

Initially, it was Bank of Montreal, and

Page 113

then it became HPS who refinanced that debt.

Q.   There's a limitation here to what is being referred to on subordination piece, though, is there not?  I mean, this is saying it's subordinated to the amount owed by buyer to its lender attributed to the buyer's purchase of the dealerships.

That's not talking about family-wide corporate debt in your view, is it?

MS. WOOD:  Objection; form.

A.   I -- I don't know what the question -- question is, but are you indicating to me that this is now a secured interest that should be placed in line ahead of secured creditors, this one clause in an amendment?

Q.   (BY MR. BATES)  This is what Foundation contractually agreed to with Kupper Chevrolet as part of its asset purchase.  Did it not?

A.   Before -- before we believed that this agreement was breached by Mr. Kupper.

Q.   So -- just so I have it right, this was an agreed-to term between Foundation and Kupper Chevrolet that Foundation contends is no longer enforceable.  Fair?

MS. WOOD:  Object to the form of the question and continuing outside the bounds of this

Page 114

corporate witness deposition.

Q. (BY MR. BATES) Go ahead, Mr. Slemko, whenever you're ready.

A. That was our position at trial.

Q. And it's your position today, as you sit here, correct?

A. Well, we appealed the decision, so yes.

Q. Has Foundation ever obtained BAPTKO's consent or agreement to modify or negate that subordination provision?

MS. WOOD: Objection; form.

A. Subject to that first amendment?

Q. (BY MR. BATES) At any time.

A. I -- I -- I thought there was an additional amendment that came after that. But, otherwise, after closing, I don't recall.

Q. You've never seen anything from BAPTKO that says, I agreed to waive my rights to this earnout payment under Section 3(f).

Have you ever seen a document to that effect?

MS. WOOD: Objection; form.

A. I have person- -- no, I have not.

Q. (BY MR. BATES) At -- let me ask this this way. We talked earlier about the amounts that

Page 115

FA ND Chev and FA ND Sub had paid down on their BMO acquisition financing before the HPS restructuring.

Do you recall us talking about that earlier?

A.   I do.

Q.   And it was like 30 to 40 percent of that loan had been paid down, right?

A.   I think so.

Q.   Let me pull this back out.

Back to Exhibit 12.

So I understand your position on the lawsuit and all the other stuff.

But the sentence that says the amount owed by the buyer to its lender would here be referring to the remaining amount owed by FA ND Chev and FA ND Sub on that BMO acquisition facility, correct?

MS. WOOD:  Objection; form.

A.   That's a -- an inference.  I do not see the word "remaining."

Q.   (BY MR. BATES)  So according to you, this could be subordinate to any amount, paid down or not paid down?

A.   Correct.

Q.   Okay.  What are, Mr. Slemko, the current assets in numerical value, monetary value terms, for

Page 116

FAUS?

MS. WOOD: I'm going to object to the form of the question.

I'm also going to instruct the witness not to answer on the basis of being outside the scope of this deposition.

And, further, that is irrelevant to any portion of the case at issue here in Texas.

MR. BATES: Okay. You can object to form. Instruction not to answer can only cover some sort of privilege under the Texas rules. And so --

MS. WOOD: That's not true.

MR. BATES: -- I am not seeing any sort of privilege identified. Can you identify the privilege for me?

MS. WOOD: That is absolutely not true.

It can also, you know, prevent harassing and improper questions that are on -- on its face absolutely irrelevant, which is precisely what's happening here.

MR. BATES: That's not at all what Rule 199.5(f) says, so I'm going to fully object to your objection on that piece.

Q. (BY MR. BATES) Mr. Slemko, I presume you're going to heed your attorney's instructions and not

Page 117

answer my question.  I'll pose it to you again nonetheless.

What are FAUS's current liabilities, as you -- or current assets, as you sit here today?

MS. WOOD:  I'm going to object again. Same instructions.

Q.   (BY MR. BATES)  Will you answer that question, Mr. Slemko?

A.   Not based on the instructions that I have been given.

Q.   What are FAUS's current liabilities as you sit here today?

MS. WOOD:  Object to the form.

And further instructions not to answer.

Q.   (BY MR. BATES)  Will you answer that question, Mr. Slemko?

A.   Not based on those instructions.

MR. BATES:  I'm also going to note case law out of the Southern District of Texas, which is you cannot instruct the witness to not answer a question at a corporate representative deposition based on scope or subject matter in addition to the instructions being improper under 199.5(f).

Q.   (BY MR. BATES)  Moving on, how many employees does FAUS have as of today's date, Mr. Slemko?

Page 118

A.   Directly or indirectly?

Q.   That's a good question, I suppose.

Who is your employer?

A.   Foundation Auto Holdings, LLC.

Q.   Are you a salaried employee?

A.   I am.

Q.   Do you hold any ownership interest in Foundation Auto Holdings, LLC?

A.   I do not.

Q.   Do you hold any options to obtain ownership interest in that entity?

A.   I do not.

Q.   What about with respect to FAUS, are you a shareholder of FAUS?

A.   I am not.

Q.   Do you have the potential to become a shareholder of FAUS by virtue of any options or otherwise?

A.   I do not.

Q.   Do you, Mr. Slemko, have any equity interest or potential equity interest in any Foundation entity?

A.   I do.

Q.   Which entity?

A.   Foundation Automotive Corp.

Q.   And are you a shareholder of Foundation

Page 119

Automotive Corp.?

A. I am.

Q. Did you acquire your shares through an employment agreement, stock options?

How did that happen?

A. Sorry?

Q. How did you obtain those shares?

A. I -- I purchased them.

Q. Who is your boss?

A. The board of directors of Foundation Automotive US Corp. in the U.S. and Kevin Kutschinski in Canada.

Q. The board of directors of FAUS is staffed by four HPS employees or directors; is that right?

A. That's right.

Q. And with respect to Foundation Automotive Corp., what is Mr. Kutschinski's current role at Foundation Automotive Corp.?

A. He's a director and the chief executive officer.

Q. Is Mr. Kutschinski, does he have any role at FAUS?

A. Currently, no.

Q. Did he previously have such a role?

A. He was the -- he was a director and the chief

Page 120

executive officer.

Q. Until what time?

A. July 27, 2025. Somewhere around there. July -- end of July, 2025.

Q. And why -- or, if you know, what precipitated Mr. Kutschinski relinquishing those positions?

A. Relinquishing? He was just not involved in the day-to-day operations any longer.

Q. Did the board fire him?

MS. WOOD: Objection; form.

A. I couldn't speak to that.

Q. (BY MR. BATES) You're the chief financial officer of FAUS, right?

A. I am.

Q. You would know if the CEO was fired, correct?

MS. WOOD: Objection; form.

A. Well, I believe at the time it was a mutual decision for him to take a step back.

Q. (BY MR. BATES) To your knowledge, was Mr. Kutschinski paid any amount of money to, in your words, take a step back from FAUS?

MS. WOOD: Objection; form.

A. He was not.

Q. (BY MR. BATES) How many dealerships does FAUS currently own?

Page 121

A.    Currently, seven.

Q.    As of December 2024, how many dealerships did FAUS own?

A.    As of December 2024?  Sixteen, 20 -- I want to say 20.

Q.    Does FAUS have any plans to sell additional dealerships that it owns, as you sit here today?

A.    One more dealership is being sold, yes.

Q.    And is that a sale that's under agreement or simply being explored, as we sit here today?

A.    It's under agreement.

Q.    When is that to close?

A.    April 22.

Q.    So following the sale of that dealership, there will be six left in the portfolio, correct?

A.    Correct.

Q.    Does Foundation -- excuse me.

Does FAUS have any plans to acquire new dealerships?

A.    Not currently.

Q.    Has it explored any potential acquisitions in the last year?

A.    No.

MR. BATES:  Let's take five.

We can go off the record real quick.

Page 122

THE VIDEOGRAPHER:  Off the record, 1:41 p.m.

(Break from 1:41 p.m. to 1:51 p.m.)

THE VIDEOGRAPHER:  We're back on the record at 1:51 p.m.

Q.  (BY MR. BATES)  Mr. Slemko, we talked earlier about BAPTKO's judgment in the federal lawsuit being entered in November of 2024.

Do you recall that?

A.  I do.

Q.  And then we've been talking about the asset sale transaction that occurred later that year in December 2024.

You know what I'm talking about in terms of that asset sale?

A.  Yeah.  I -- yes, I remember.

Q.  Did it cross your mind that selling substantially all of the assets of FA ND Chev and FA ND Sub would make it more difficult for BAPTKO to collect on its judgment against those entities?

MS. WOOD:  Objection; form.

A.  It never was a consideration for me.  We had contractual obligations that superceded all other obligations to pay secured lenders.

Page 123

Q.   (BY MR. BATES)   Have you understood my questions today and to the extent you haven't asked me to rephrase them or I haven't rephrased them, Mr. Slemko?

A.   I believe so.

Q.   And do you feel like I've treated you professionally throughout today's deposition?

A.   Absolutely.

MR. BATES:   I will reserve the remainder of my time and pass the witness.

MS. WOOD:   Perfect.   All right.   I'll just dive right into it.

EXAMINATION

BY MS. WOOD:

Q.   Mr. Slemko, counsel asked questions suggesting once HPS -- we'll start with HPS, consented to the sale -- we looked at those releases.

Do you recall that?

A.   I do.

Q.   And the -- there were questions regarding HPS's consent that meant the dealership assets and proceeds became unencumbered.

Do you recall that?

A.   The assets that were transferred to the buyer were unencumbered, correct.

Page 124

Q.   The release -- for example, we'll start with the release of -- between -- or on behalf of FA ND Sub, LLC that was signed by a representative of HPS.

That release given to the buyer of that -- of those -- that dealership, the Subaru dealership, concerned the sold dealership assets themselves, correct?

A.   Correct.

Q.   And that was necessary why?

A.   The incoming buyer and buyer's lender needed those assets free of liens so they could be financed by the buyer.

Q.   So the release in the example we've been using of FA ND Sub, LLC's was the sold assets that were sold to the buyer, correct?

MR. BATES:  Objection; form.

A.   The -- the sold assets were the subject of that release, yes.

Q.   (BY MS. WOOD)  Not to the lender's rights in the consideration paid for those assets, correct?

MR. BATES:  Objection; form.

A.   Correct.

Q.   (BY MS. WOOD)  Can you re-answer?

A.   Correct.  The -- our -- our secured lenders

Page 125

would still have security interest in the proceeds of the sale of those assets.

Q.   So when the collateral, subject to security interest like we have here is sold, does HPS, as a secured lender's lien, continue in the identifiable sale proceeds?

MR. BATES:  Objection; form.

A.   It does.

Q.   (BY MS. WOOD)  And so when the two Mandan dealerships' assets were sold, HPS's lien shifted from dealership assets themselves to the sale proceeds generated by that sale, correct?

MR. BATES:  Objection; form.

A.   Correct.  They -- correct.  They had an all assets lien.

MS. WOOD:  What exhibit are we on?

MR. BATES:  I think it will be 14.

MS. WOOD:  I'm going to share my screen. Just one moment.

(Marked Slemko Exhibit No. 14.)

Q.   (BY MS. WOOD)  I'm going to show you what will be Exhibit 14 -- or Deposition Exhibit 14.

All right.  Mr. Slemko, can you see my screen?

A.   I see a -- it -- now I see a document, yes.

Q.   Okay.

Page 126

A.   Yep.

Q.   Took a second.

Have -- have you -- I'm just going to zoom out so you can see the first page.

Have you seen this document before?

A.   I have.

Q.   What is it?

A.   It's a forbearance and amendment to our credit agreement.  Well, more technically, waiver, consent, forbearance and amendment.

Q.   I'm going to highlight and we'll zoom in to the first paragraph.

And it is dated -- can you read that date out there?

A.   July 22, 2024.

Q.   And that was before the sale of the Mandan dealerships' assets, correct?

A.   Correct.

Q.   Okay.  And I want to key on -- this will be Bates label FAUS 714 to -- this will be under Section 2(b)(i).

Have you seen this -- this provision before?

A.   I have.

Q.   Take a moment to read it to yourself and then

Page 127

we'll talk about it.

A.   Okay.

Q.   So it -- the -- this is a -- essentially a consent for specified dealership sales, correct?

A.   Correct.

Q.   And explain to me the purpose of this provision.

A.   This provision is consenting to the sale of certain dealerships sometimes referenced to as a deleveraging plan in order for the company to deleverage some sale assets and -- and pay down debt and the -- the lenders, who had interest in those assets, consented to the sale of them, provided the proceeds were used to repay the obligations that were due to them.

Q.   And I want to go to -- sorry.  That -- it will be Schedule 1.  It appears that is the schedule that contains each of the dealership sales.

Do you see that there?

A.   I do.

Q.   All right.  Let's go to that.

All right.  I would like to highlight Item 14 and 15 there.

Those -- those are the two dealerships, FA ND Chev, LLC, FA ND Sub, LLC.

Page 128

They operated the two dealerships in Mandan, North Dakota, correct?

A.   Correct.

Q.   So this specific amendment related to, among other dealerships that were being sold, the two FA ND entities?

A.   Correct.

Q.   And just to tie this all up, the provision that we just looked at -- I'm going to go back to that, the -- yeah, two -- there we go.

2(b)(i), that was contingent on the consent and then the release was contingent upon receiving outstanding amounts for those dealership sales, correct?

MR. BATES:  Objection; form.

A.   Yeah.  More specifically the net cash proceeds from each specified dealership sale shall be applied to prepay the outstanding term loans, and that was a condition to get the consent.

Q.   (BY MS. WOOD)  And so when we were discussing the releases executed by HPS that were connected to the sale of the two Mandan dealerships, the purpose of that was not to re- -- the purpose of those releases was not to release the encumbrances on the proceeds, correct?

Page 129

MR. BATES: Objection; form.

A. Correct. They -- the filings would have still been on the -- any remaining assets of the dealership, including the cash accounts.

Q. (BY MS. WOOD) And the purpose of the releases were so that the buyers of the two Mandan dealerships took the sold assets free and clear, correct?

A. Correct.

MR. BATES: Objection; form.

Q. (BY MS. WOOD) Shift gears. We'll stop sharing.

All right. Mr. Slemko, you were asked about the guarantee and collateral agreement.

Do you recall those questions?

A. I do.

Q. And specifically regarding the Section 2.09.

Do you recall?

A. The maximum liability section.

Q. Correct. Okay. For our purposes, I'll reshare and go ahead and we'll zero in on the -- the language that we went over previously, where you went over with Mr. Bates.

Do you see the -- my screen?

A. I do.

Q. All right. And this is the maximum liability

Page 130

section you were referring to?

A.   Yes.

Q.   This provision addresses the guarantee obligation of the subsidiary guarantors, correct?

A.   Correct.

Q.   And can you explain what the purpose of this section is?

A.   Well, it would -- it would limit the amount that the creditor could collect from each subsidiary to its underlying value.

So in the case of a dealership that was sold and the net proceeds were 5 million, the creditor couldn't turn around and ask for 25 million from that guarantor or -- yeah, guarantor.

So but in the case of a sale that resulted in net proceeds of 5 million, that would be the maximum amount that the creditor would obtain from that guarantor, the 5 million of net proceeds.

Q.   So, in other words, it -- this specific Section 2.09, this is a -- a protection type of clause to avoid a situation where the guarantee exceeds a certain amount based off the lender's guarantee on the collateral?

MR. BATES:   Objection; form.

A.   Correct.   It would limit the guarantee to the

Page 131

net realizable value of the -- of the assets of the guarantor.

Q.   (BY MS. WOOD)  And is that different from the separate collateral grant in the same guarantee and collateral agreement?

A.   Well, the collateral grant would be that all of the collateral subject to the grant could be used in a liquidation to pay the obligation.

I don't think it caps the -- the liability.  It would -- it would just be a commitment.

Q.   And based off this agreement, the lenders held perfected security interest in the assets and the proceeds of both FA ND Chev and FA ND Sub, correct?

MR. BATES:  Objection; form.

A.   Correct.

Q.   (BY MS. WOOD)  Including deposit accounts and all proceeds from dealership asset sales?

MR. BATES:  Objection; form.

A.   Correct.

Q.   (BY MS. WOOD)  Let's talk about the Mandan dealership sale itself.

I'll stop sharing.

At the time -- so that -- that sale closed on December 11, 2024, correct?

A.   Correct.

Page 132

Q.   And at the time of closing, did the secured obligations to HPS and BMO exceed the sale proceeds generated by the dealerships?

MR. BATES:  Objection; form.

A.   They did.

Q.   (BY MS. WOOD)  So there is no access -- excess value remaining after required lender paydowns and transactional costs?

A.   Correct.

Q.   Was any portion of the proceeds released as surplus -- -plus under Section 2.09 of the guarantee?

MR. BATES:  Objection; form.

A.   There was no surplus.

Q.   (BY MS. WOOD)  So, in other words, were all proceeds fully consumed by secured debt and required transaction obligations?

MR. BATES:  Objection; form.

A.   That's correct.

Q.   (BY MS. WOOD)  All right.  Shift gears again.

All right.  Let's -- you -- let's start with your role as CFO of Foundation Automotive US Corp.

And you're also CFO of Foundation Automotive Corp., correct?

A.   Correct.

Q.   And in that role, you oversee treasury

Page 133

operations, lender compliance, and consolidated financial management?

A. Correct.

Q. Does that role permit you to ignore secured credit agreements?

A. It does not.

Q. Were the Mandan sale proceeds free cash that FAUS could use however it wanted?

A. No.

Q. What constrained the use of those proceeds?

A. The credit agreements and the amendments and the forbearance, which specified that those funds -- net proceeds be used to prepaid the term loans.

Q. And FA ND Chev, LLC and FA ND Sub, LLC were the dealerships -- or were the entities operating the two Mandan dealerships in North Dakota, correct?

A. Correct.

Q. FAUS does not directly own those two entities, correct?

A. Correct.

Q. What entity directly owns them?

A. Foundation Auto Holdings, LLC.

Q. And who owns Foundation Auto Holdings, LLC?

A. Foundation Automotive US Corp.

Q. And FA ND Chev -- FAH owns 85 percent of

Page 134

FA ND Chev, correct?

A.   Correct.  But as I specified earlier, the remaining 15 percent is economically attributable to Foundation Auto Holdings.

Q.   Got it.

And Foundation Auto Holdings also owns a hundred percent of FA ND Sub, LLC?

A.   Correct.

Q.   And when I say "the federal judgment," I mean November -- the November 7, 2024, judgment entered after the North Dakota federal trial.

Does that make sense?

A.   It does.

Q.   Did the structure we -- the ownership structure we just went through, did that exist before the federal judgment was entered?

A.   Yes.  It existed from day one, but from the time of -- it predated the purchase of the Mandan dealerships.

Q.   And when were the Mandan dealerships purchased?

A.   By the FA ND Sub and Chev LLCs in -- on June 21, 2019.

Q.   And did this -- so, in other words, this structure did not change because of the December 2024

Page 135

sale, correct?

A.   Correct.

Q.   Of the two Mandan dealerships -- the two EAGAL entities, correct?

A.   Correct.

Q.   Did the FA ND -- when I'm referring to the FA ND entities, I mean FA ND Chev, LLC and FA ND Sub, LLC, did the FA ND entities participate in the centralized treasury system that you referred to earlier?

A.   They did.

Q.   And was that a zero balance or sweep structuring?

A.   It was.

Q.   And how did it -- just walk through briefly how that worked in ordinary operations so that we have that straight.

A.   Well, in ordinary operations, the transactions of each child account occurred during the day.  And if those daily transactions result in a positive cash balance, that money is swept up into the parent account, in this case, Foundation Automotive US Corp.

But if those daily activities resulted in an overdraft balance at the end of the day or a

Page 136

negative cash balance, then the amounts were swept back out into the Foundation Automotive US Corp. account.

So Foundation Automotive US Corp. acted as a hub account, and any positive cash balances were transferred in, and then any negative cash balances were covered by the funds that were aggregated in Foundation Automotive US Corp.

And if there were any remaining funds, they would remain in that hub account. That was the original structure of the sweep -- or the zero balancing.

Q. And was this system implemented before the -- implemented before the federal judgment?

A. It was implemented initially in March of 2020. And then expanded in August 2020 to include more accounts. And then it continued to expand over time.

Q. And so it was -- the system was in -- implemented before the November 7, 2024, judgment entered against the -- against Foundation Automotive Corp. and the two FA ND entities, correct?

A. Years before, yes.

Q. And did the December 2024 sale proceeds move through that same system?

Page 137

A.   They did.

Q.   And by participating in that treasury system that you just described, did the operating dealership entities receive financial treasury benefits?

A.   They did.  All of their banking needs, lending needs, floor plan management, floor plan negotiation, treasury negotiation, fee synergies, all of that was -- was managed by Foundation Automotive US Corp.

Q.   What about -- well, actually, did the benefits -- or the -- well, yeah, the benefits that they -- you just listed, did those benefits add value to the dealership-level entities?

MR. BATES:  Objection; form.

A.   Yes, they wouldn't need to have a treasury accountant or -- or -- or floor plan manager or somebody to liaise with those banks and lenders.  That was all done centrally.

Q.   (BY MS. WOOD)  Would standalone dealerships entities have -- obtain the same scale of banking efficiency on their own?

A.   I couldn't see how.  So no.

Q.   What about downstream funding?  Was -- yeah, explain -- explain that a little bit more.

A.   Well, as I was mentioning earlier, the

Page 138

Foundation Automotive US Corp. account operated as the hub. And so when funds came into -- or out of the dealership into the hub -- I'll just refer to the Foundation Auto US Corp. account as the hub, those would appear on the entity level or child account statement as a transferred debit.

If the daily activity resulted in a negative cash balance or a cash need, then the money would come -- or the cash would come out of the hub into that entity and it would appear as a balance transfer credit.

So Foundation Auto US Corp. and the affiliates participating in all of them in this hub would be funding any deficits of any account that day.

So all of the money gets aggregated that's positive in the Foundation Auto US Corp., those come out as debits.

And then cash that is used by the dealership entities or other entities throughout the day create a negative balance that gets replaced by a balance transfer credit.

Q.   Okay.  I want to share my screen again, and we'll -- here we go.

All right.  So I believe this was a document that Mr. -- can you -- almost there -- can

Page 139

you see my screen?

A.    I can.

Q.    I think this is a document --

MS. WOOD:  And, Justin, correct me if I'm wrong.

Q.    (BY MS. WOOD)  But this was Exhibit 4, which it the -- a document produced by BMO.  And it was FA ND Chev's BMO statement for December 2024.

MS. WOOD:  Is that right, Justin, Exhibit 4?

MR. BATES:  I think that's right.  It was either 3 or 4, and I'm pretty sure it was 4.

MS. WOOD:  Yeah.  I think -- I think so.

Q.    (BY MS. WOOD)  So we went through a number earlier, you went through with Mr. Bates, the 3 -- 13.5 approximately as, you know, a wire credit.  I want to zero in on the credit that was right before that entry -- entry.

Do you see where I'm highlighting?

A.    Yes.

Q.    Can you -- but -- and like we'll go ahead and -- actually, this will streamline it much better. We'll mark this as --

MS. WOOD:  We're on Exhibit 15?

(Marked Slemko Exhibit No. 15.)

Page 140

MS. WOOD:  Or 16?  Let's do 15.

Q.  (BY MS. WOOD)  All right.  So the December --
we'll mark this as Exhibit 15.

And this is a -- do you recognize this
document?

A.  I do.

Q.  What is it?

A.  It's a transfer activity report.  It -- you
can select -- it's from the BMO online banking system.
You can select different days and different accounts
and run a transfer activity between them.

We used it primarily to reconcile
accounts.

Q.  I want to zero in on this entry right here.

What entity is -- is the entity I just
highlighted here?

A.  That's Foundation Auto Holdings.

Q.  And so this down here -- so this would be
from Foundation Auto Holdings to FA ND Chev, correct?

A.  Correct.

Q.  Okay.  And what is the date that this
transfer was made?

A.  December 11, 2024, the -- the date of the
sale of assets.

Q.  And can you explain what -- what this comment

Page 141

means?

A.   It was a -- we -- we deposited funds into the FA ND Chev account to satisfy the -- to satisfy the obligation we had to CARS for the lease amendment. There was a $1.25 million lease amendment fee that was charged in conjunction with breaking the lease when the assets were sold because the -- the buyers of the dealerships bought the properties, which resulted in us having to get out of our lease with CARS.

Q.   And what is the time where that transfer was initiated?

A.   1:35 Eastern time.

Q.   All right.  And it looks like the last action by you -- has your name listed there.

All right.  So you initiated this?

A.   I did.

Q.   All right.  We can mark this next document as Exhibit 16.

(Marked Slemko Exhibit No. 16.)

Q.   (BY MS. WOOD)  And I just want to dial in on this one first.  Same date, December 11, 2024, and an amount of 207,231.90 to First American Title.

Do you see that there?

A.   I do.

Q.   And looks like the time stamp was 1:41 p.m.

Page 142

So just a few minutes after the transfer from Foundation Auto Holdings.

Do you see that?

A.   I do.

Q.   And the following page, FAUS 1950, same situation, it was the remaining, looks like, amount for the 2 -- 1.25 million to First American, and it was initiated same date, again, another couple minutes after the transfer from Foundation Auto Holdings.

A.   Okay.

Q.   So Foundation Auto Holdings was the entity who provided the 1.25 million to support the required CARS obligation, correct?

A.   The amendment fee, yes.  The property tax proration would have come from those two dealerships. That's why if you add the numbers together they're -- they're not 1.25 million.  They're a little bit more than that.

So there was prorated property tax, I believe legal fees, and title fees associated with that, that -- that we also paid our -- out of the tenant accounts.

Q.   And so anything above the $1.25 million initial transfer from Foundation Auto Holdings came out of the sale proceeds?

Page 143

A.   Sale proceeds or -- or just the general funds of those tenant -- like the FA ND Sub and FA ND Chev were tenants, so some of it was operational.  Like property taxes were not related to the sale.

Q.   So to wrap this up, the value or the transfers flowed -- that's an example of it flowing both downstream and upstream, correct?

A.   Correct.

Q.   At the time of the closing, were the dealership assets of the two Mandan dealership asset and sale proceeds subject to liens?

MR. BATES:  Objection; form.

A.   Sorry.  Repeat that.  Were the --

Q.   (BY MS. WOOD)  Yeah.  We've been talking about BMO, HPS.

Those were the only two entities that had secured interest in the dealership proceeds, correct?

A.   Correct.

Q.   And were the proceeds from the -- that December 2024 sale available to satisfy an unsecured creditor like BAPTKO?

MR. BATES:  Objection; form.

A.   They were not.

Q.   (BY MS. WOOD)  Why not?

A.   Because of the pre-existing obligation to pay

Page 144

down secured term loans and -- and -- and floor plan loans and mortgages.

Q. We walk -- you walked through earlier briefly the waterfall document showing the application of the sale proceeds.

Do you recall that?

A. Yes.

Q. So from HPS paydown and the BMO real estate, those were the two applications of the -- of the proceeds that were to secure -- to apply to secured lenders, correct?

MR. BATES: Objection; form.

A. Correct.

Q. (BY MS. WOOD) What -- the remaining payments, including those to Hague as a broker fee and the Global Dealer Resources, as well as payment to First American Title Company, were those other payments optional at closing?

MR. BATES: Objection; form.

A. No. They were conditions of closing.

So first of all, the -- the CARS 1.25 million went through First American Title insurance company.

So those are the -- those are really the same thing other than there were some other costs that

Page 145

were also paid through First American Title insurance, like prorated property taxes, title fees, et cetera.

So the -- the bank transfers to First American -- or the wire transfers, rather, to First American Title, they don't appear on the waterfall because they were just included as a 1.25 million to CARS.

That is the amount that was due to CARS out of the proceeds of the transaction. The rest of it was contractual obligation -- contractual obligations of the tenants per the leases to pay prorated property taxes upon transfer or sale of the property.

Now, in order to get consent from the landlord to sell the dealership, which was required under the terms of the lease, we had to pay them those amounts. So we could not -- the buyer could not purchase the property or the dealership assets without that consent from CARS.

For Global Dealer Resources/Amynta, we were operating a business within a business. That finance and insurance business existed within the dealership and the broker was Global Dealer Resources, and in order to become the exclusive broker for Foundation and all of its -- Foundation Automotive US

Page 146

Corp. and all of its dealerships, Global Dealer Resources paid a prepayment to Foundation Auto Finance Holdings in order to secure those exclusive rights.

And by having those exclusive rights, if we ever sold a dealership and Global Dealer Resources was not maintained as the broker, we contractually had to pay them back the amount we received or they had remedies, including a nonconsent, of the transaction.

So in order to close on the transaction, we had to pay the amount to Global Dealer Resources.

The Hague fee -- I don't know, he -- Mr. Bates talked about a house earlier. If I sell my house and I don't pay the broker, the transaction doesn't close.

What was the -- was that all three of them?

Q.   (BY MS. WOOD)   Yeah.  I think so.  I think we hit them specific -- yeah.  Amynta.

What -- can you explain the discretionary or the -- sorry, nondiscretionary amount that would -- that stayed within Foundation as a -- a family and explain to me where -- where that comes into play?

A.   So the Foundation liquidity line was the amount that was kept within the Foundation Automotive US Corp. family in order to satisfy the covenant that

Page 147

we had with BMO in the forbearance where we were required to maintain a -- a threshold amount of liquidity and to not have any overdrafts in any of our accounts.

So in order to not or to prevent the result of one-day or one-week fluctuation that caused us to go into overdraft, out of each transaction we did, we maintained a de minimis amount of liquidity to ensure that an unforeseen payoff amount or floor plan payoff or -- a larger-than-usual expense coming through didn't put us offside with either of those covenants.

Q.   And what was the consequence if Foundation or FAUS were offside with that -- with those covenants?

A.   Well, the -- the overhanging threat was that B -- BMO would cancel the floor plan.

Q.   And what would be the consequence if BMO canceled the floor plan?

A.   We would have to sell all the dealership assets of all of the dealership entities.

Q.   And why is that?

A.   Because we wouldn't be able to pay off the floor plan loans that we had.

Q.   Just so the record is clear, what is a floor plan loan?

Page 148

A.   It's a loan that is -- is given by a floor plan lender, in this case BMO, but often, you know, you'll hear Allied or GM Financial or Truist, those entities lend against the value of the inventory, the vehicle inventory.

So a new vehicle is drafted directly from the manufacturer to the floor plan lender so as soon as that, depending on the manufacturer, either goes into production or is put on a transport, you see a loan appear on your floor plan statement for that vehicle.

In the case of a used vehicle, trades, or auction purchases, you -- you manually add those or -- or some auctions will do them for you but they're at not full value.  You don't necessarily -- you're not necessarily able to rate a loan for the amount you paid for the vehicle in the case of used vehicles.  It's often a percentage of market value or percentage of what you paid.

Q.   And taking the example of the F -- the dealership that FA ND Chev was operating, so Mandan Chevrolet, that would be through GM?

A.   The -- when we were --

Q.   Of ordering of vehicles?

A.   So, yes, GM, the manufacturer, would

Page 149

essentially send a VIN to BMO; and BMO would put that VIN in our floor system at the value that GM assigned to that vehicle.

Q. So in the hypothetical we were just discussing, if BMO would cancel the floor plan, a dealership such as Mandan Chevrolet could not order new vehicles from G -- GM directly, correct?

A. That's correct. In fact, at one point BMO made us stop ordering from Stellantis. We were -- we were told to return certain vehicles to Stellantis because we were over our floor plan limit.

Q. What is Stellantis?

A. They're the -- it's all the Dodge Chrysler Jeep Ram brands.

Q. And who is "we"? Who did BMO tell that to?

A. Foundation Automotive US Corp.

Q. Okay. All right. Did the federal judgement alter lender priority?

MR. BATES: Objection; form.

A. No.

Q. (BY MS. WOOD) Did the federal judgment change the Foundation family treasury structure?

A. No.

Q. Did the federal judgment eliminate the mandatory waterfall that we walked through?

Page 150

MR. BATES: Objection; form.

A. No.

Q. (BY MS. WOOD) Would the proceeds from the December 2024 sale been applied the same way regardless of BAPTKO's federal judgment?

A. Yes.

Q. Did FAUS or Foundation Auto Holdings receive unrestricted discretionary use of the December 2024 net proceeds?

MR. BATES: Objection; form.

A. No.

Q. (BY MS. WOOD) The -- there's been quite a bit of discussion today about Foundation versus FAUS and Foundation Auto Holdings, but I -- I want to just clear it up on the record.

FAUS is distinct from Foundation Automotive Corp., correct?

A. Correct.

Q. Foundation Automotive Corp. is a Canadian corporation, correct?

A. Correct.

Q. And it directly owns FAUS?

A. Correct.

And I might clarify, it's an Alberta corporation.

Page 151

Q.    Thank you.

FAUS is not a judgment debtor to the federal judgment, correct?

A.    Correct.

Q.    And FAUS is not -- do you -- actually, let me walk that back.

Do you recall discussing the first amendment related to the Kupper Chevrolet, Inc. asset purchase transaction?

A.    I do.

Q.    FAUS is not a party to that first amendment, correct?

A.    Correct.

Q.    And FAUS is not a party to the original asset purchase agreement involving Kupper Chevrolet, Inc., correct?

A.    Correct.

MS. WOOD:  Can we take a -- let's do a ten-minute break, let me go through my notes, and I think I'm just about done.

MR. BATES:  Sounds good.

THE VIDEOGRAPHER:  Off the record at 2:40 p.m.

(Break from 2:40 p.m. to 2:50 p.m.)

THE VIDEOGRAPHER:  We're back on the

Page 152

record at 2:50 p.m.

MS. WOOD:  I no further questions for this witness.

FURTHER EXAMINATION

BY MR. BATES:

Q.  Mr. Slemko, really quickly.

A.  Sorry, one...

Sorry, I had somebody do some printing here.  Apologies for the interruption.

Q.  All good.

I'll be fast.

The -- you were talking with Ms. Wood a little bit about the Global Dealer Resources payment.

And specifically, I think if I had it right, there was a prepayment that it had made to one of the Foundation entities to obtain these exclusive rights for payments down the road.

I -- I know I'm not getting that specific enough, so forgive me.

But is that generally the terms of that relationship when it comes to Global Dealer Resources and Foundation?

A.  Yes.  Essentially they bought the exclusive rights to that F&I business.

Q.  Who -- is Global Dealers Resources an LLC or

Page 153

a corporation?

A.   It's an LLC.

Q.   Who are its owners?

A.   I'll get the name wrong if -- there's an Amynta entity, which is why it's often referred to as Amynta.  I think it's called T-A-G something that owns 51 percent, and Foundation -- sorry -- Global Dealer Resource Holdings LLC owns 49 percent.

And that interest is -- has -- was either or is being assigned to Foundation Auto Finance Holdings, LLC.

Q.   Who is the current owner, if that assignment has not yet happened, of the ownership interest in the 49 percent entity holding the stake in Global Dealer Resources?

A.   Yeah.  I believe it's still Global Dealer Resource Holdings LLC.

Q.   And that's where I messed up.

Do any Foundation entities hold an ownership interest in Global Dealer Resources Holdings LLC?

A.   Yes.  The -- that -- Global Dealer Resource Holdings LLC and financial -- Foundation Auto Finance Holdings, LLC are both owned -- well, let me step back.

Page 154

Foundation Automotive US Corp. owns 100 percent of Foundation Auto Finance Holdings, LLC.

Foundation Auto Finance Holdings, LLC owns 100 percent of Global Dealer Resource Holdings LLC, which owns 49 percent of Global Dealer Resources, LLC.

Q.   And you had mentioned, sir, I believe, a sort of veto, right, I will call it, that Global Dealer Resources, LLC could have with respect to a transaction entered into by an entity that was obligated by -- I'm going to call it the Amynta contract.  Whatever you want to call it is fine.

Are you suggesting that with respect to the sale of the Mandan dealerships -- strike that.

Did Global Dealer Resources ever exercise any sort of veto vote with respect to the sale of the Mandan dealerships?

A.   Did they exercise that right?  No.

Q.   And 49 percent of their decision, whether to exercise that right or not, would actually be made by beneficial owners of entities controlled by FAUS, right?

MS. WOOD:  Objection; form.

A.   I -- I don't -- that decision hasn't come up,

Page 155

Case 1:20-cv-00138-DMT-CRH   Document 653-6   Filed 04/09/26   Page 156 of 212

but with 51 percent, I think they control that entity.

Q.   (BY MR. BATES)  Fair enough.

Right.  If -- if the 51 percent owner wants to take action, it can take action, but 49 percent of the decision-making authority is vested ultimately in entities that are owned by FAUS, correct?

A.   Yes.

Q.   Are you suggesting that FAUS, through these entities, at any point would have refused to allow the sale of the Mandan dealerships to occur if this payment was not made to Global Dealer Resources?

MS. WOOD:  Objection; form.

A.   That is an interesting paradox to work through since Foundation Auto US Corp. was contractually obligated to not only sell the dealerships but also pay the net proceeds to its lenders.

I will say that we had multiple discussions with all the lender's attorneys and Amynta and their attorneys, and everyone came to the conclusion the -- honestly this is money out of our lender's pockets that this had to be paid as a condition of closing.

Q.   (BY MR. BATES)  But it sounds like a pretty sweet deal to me, which is all of the sales proceeds

Page 156

346-293-7000

get to be applied, and Foundation still gets paid potentially 49 percent of any payment that Global Dealer Resources receives from this.

What am I missing there?

A.   Well, you're missing the costs of the whole dealer resources and the application of that $1.5 million to Global Dealer Resources' own credit facility.

So there were no net proceeds coming back to Foundation from that.

Q.   The sale of the Mandan dealerships also included a goodwill component, correct?

A.   When you say "also," it -- it already included goodwill.

Q.   Fair enough.

And so not only was it a sale of what I'm going to call hard assets, vehicles, et cetera, but there was also a -- built in to the sales price there was a goodwill purchase, correct?

A.   Correct.

Q.   I think that was $22 million, give or take, as part of that sale?

A.   That sounds right.

Q.   Okay.

MR. BATES:   Reserve the rest of my time,

Page 157

and no further questions from my side.

MS. WOOD:  No further questions.

THE VIDEOGRAPHER:  We are off the record at 2:59 p.m.

And this concludes today's testimony given by Derek Slemko.  The total number of media used was six and will be retained by Veritext Legal Solutions.

(The deposition concluded at 2:59 p.m.)

Veritext Legal Solutions
346-293-7000

CAUSE NO. 202544872

BAPTKO, INC.,                        §   IN THE DISTRICT COURT OF
                                     §
      Plaintiff,                     §
                                     §
V.                                   §
                                     §   HARRIS COUNTY, TEXAS
FOUNDATION AUTOMOTIVE                §
US CORP., and                        §
FOUNDATION AUTO                      §
HOLDINGS, LLC,                       §
                                     §
Defendants.                          §   151ST JUDICIAL DISTRICT

REPORTER'S CERTIFICATION
ORAL AND VIDEOTAPED DEPOSITION OF DEREK SLEMKO
MARCH 31, 2026

I, MENDY A. SCHNEIDER, a Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, DEREK SLEMKO, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That examination and signature of the witness to the deposition transcript was waived by this witness and agreement of the parties at the time of the deposition;

That the original deposition was delivered to Justin G. Bates;

That the amount of time used by each party at the

Page 159

deposition is as follows:

MS. WOOD - 00:47:34

MR. BATES - 03:23:02

That $_____ is the deposition officer's charges to the Attorney for Plaintiff,Justin G. Bates, for preparing the original deposition transcript and any copies of exhibits;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

FOR THE PLAINTIFF:

JUSTIN G. BATES

WICK PHILLIPS GOULD & MARTIN, LLP

3131 McKinney Ave., Suite 500

Dallas, Texas 75204

214.692.6200

Justin.bates@wickphillips.com

FOR THE DEFENDANTS:

KENSYE WOOD

MAX SHAFFER

LELAND SHAFFER LLP

8694 E. 28th Avenue

Denver, Colorado 80238

kensye.wood@lelandshaffer.com

That a copy of this certificate was served on all parties shown herein on _____ and filed with the Clerk pursuant to Rule 203.3.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or

Page 160

attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 1st of April 2026.

*mendy Schneider*

MENDY A. SCHNEIDER, TEXAS CSR NO. 7761

Expiration Date:  1-31-2027

Page 161

[& - 2024]

| **&** | | | **2** |
|---|---|---|---|
| **&** 2:3 160:13 | 42:13 43:14 44:4 46:4 47:17 49:5,22 60:22 89:14 94:2 98:22,23 99:9 102:7 132:24 141:23 142:21 | 56:9,11 140:16 | **2** 3:12 11:22,24 66:13 127:21 129:11 143:7 |
| **0** | | **14** 4:8 126:17 126:20,22,22 128:23 | **2.09** 74:7 75:3 131:20 133:11 |
| **09/27/2021** 31:4 | | **140** 4:10 | **2.09.** 130:16 |
| | | **142** 4:11 | **2.5** 57:13 67:8 |
| **1** | | **15** 4:10 41:10 41:16 98:15 128:23 135:3 140:24,25 141:1,3 | **20** 73:19 122:4 122:5 |
| **1** 3:10 5:3 7:17 7:18 12:6,8 62:13 83:24,24 101:2 128:17 | **11.5** 19:3 21:9 21:15 22:12,15 22:17 23:18 24:16 44:4,16 45:11 46:3 48:25 60:21 | | **20,000** 73:17 |
| | | | **2018** 9:19 66:18 |
| **1-31-2027** 161:7 | | **150** 49:18 57:24 77:19,20 | **2019** 11:20 66:19 67:15,22 106:10 107:15 135:23 |
| **1.25** 102:3 142:5 143:7,12 143:17,23 145:22 146:6 | | **151st** 1:8 5:6 159:8 | |
| | **11.6** 18:2,10,24 21:9,13,25 22:10,14 | **153** 3:5 | **2020** 137:16,16 |
| | | **159** 3:7 | **2021** 31:5,16 62:4 |
| **1.5** 102:16,25 157:7 | **11:26** 69:4,5 | **16** 3:14 4:11 141:1 142:18 142:19 | **2022** 61:11,21 62:1,2,2,3,4,10 62:13,19 63:5 63:13 65:12,25 66:6,11 67:14 68:3,4,8,13 69:9,15,25 72:12,19 74:14 78:25 79:8 80:5,10 |
| **10** 4:2 19:25 33:18 57:5 66:14,25 67:4 72:10 94:17,18 | **11:34** 69:5,7 | | |
| | **12** 4:5 67:1,5 72:11 79:20 106:4,5 116:9 | **160** 49:18 | |
| | | **16989** 161:6 | |
| | **120** 62:20 | **18** 80:21,23 97:23 | |
| **100** 41:6 42:5,6 155:2,4 | **124** 3:4 | | |
| | **126** 4:8 | **19** 80:22 | |
| **106** 4:5 | **12:21** 97:9,10 | **1950** 143:5 | |
| **108** 4:7 | **12:57** 97:10,12 | **199.5** 117:22 118:23 | **2024** 4:12 17:8 18:5 22:25 28:24 31:23 |
| **10:24** 38:5,6 | **13** 4:7 20:7 108:2,3 113:17 | | |
| **10:31** 38:6,8 | | **1:35** 142:12 | |
| **11** 3:12 4:3 17:25 18:5 20:2,5 21:6 28:24 29:14 | **13.4** 29:7,16,19 56:15,22 57:9 57:17 59:13 | **1:41** 123:2,3 142:25 | |
| | | **1:51** 123:3,5 | |
| | **13.5** 28:20 29:2 29:15 30:9 | **1st** 161:5 | |

Veritext Legal Solutions
346-293-7000

**[2024 - 9:35]**

32:23 33:8,12 33:18 42:13 43:14,19 44:1 46:4 47:17 49:5,23 60:22 79:10,21 85:7 89:14 97:18 102:8 122:2,4 123:8,13 127:15 132:24 135:10,25 137:20,24 140:8 141:23 142:21 144:20 151:4,8

**2025**   121:3,4
**202544872**   1:1 5:8 159:1
**2026**   1:13,17 5:2 159:10 161:5
**203.3.**   160:23
**207,231.90** 142:22
**208**   62:24 63:2
**21**   135:23
**214.692.6200** 2:5 160:14
**22**   122:13 127:15 157:21
**24**   69:15
**25**   131:13
**27**   3:15 12:7 31:5 121:3

**28th**   2:9 160:18
**2:40**   152:23,24
**2:50**   152:24 153:1
**2:59**   1:17 158:4 158:9

**3**

**3**   3:14 16:7,8 17:23 26:4,8 28:2 29:11,25 31:24 32:16 33:5 43:24 60:18 66:13 67:11 106:19 106:21,21,22 108:15 109:17 110:3 111:4 115:19 140:12 140:15
**30**   3:17 72:14 73:10 116:5
**31**   1:13,17 5:2 62:13 159:10
**31,500**   25:17 26:3 50:10
**3131**   2:4 160:13
**32**   3:19
**35**   97:20,22 98:13
**35,000**   50:10

**4**

**4**   3:15 27:15,17 27:19 28:18 31:24 33:5 56:13 67:11 140:6,10,12,12
**40**   67:11 68:15 68:21 72:14 73:10 116:5
**49**   102:22 154:8,14 155:5 155:20 156:4 157:2

**5**

**5**   3:17 30:19,21 84:21 131:12 131:16,18
**50**   68:16,22
**500**   2:4 160:13
**505,000**   58:8
**51**   154:7 156:1 156:3

**6**

**6**   3:3,19 32:1 32:11
**60**   14:6
**69**   3:21

**7**

**7**   3:10,21 32:22 67:2 69:12,13 84:20,25 85:24 135:10 137:20

**714**   127:20
**75204**   2:4 160:14
**770,000**   100:7
**7761**   161:7
**79.5**   62:16

**8**

**8**   3:22 80:21 83:11,13 86:23
**80,000**   73:22
**800,000**   21:6
**80238**   2:9 160:19
**826,000**   103:17 104:5,22
**83**   3:22
**85**   41:5 134:25
**86**   3:24
**8694**   2:9 160:18

**9**

**9**   3:24 80:21 86:23,25 87:2 87:25 88:23 95:9
**90**   14:6
**94**   4:2
**97**   19:10
**98**   4:3
**99,000**   19:10 29:23
**9:35**   1:17 5:2

Veritext Legal Solutions
346-293-7000

**[a.m. - affiliations]**

| a |
|---|

**a.m.** 1:17 38:5
38:6,6,8 69:4,5
69:5,7
**abbreviate**
74:23
**abbreviation**
10:1
**ability** 36:16
78:8,15
**able** 7:19 16:9
16:24 17:10
27:18 52:13
56:16 74:9
148:22 149:16
**above** 1:17
89:1 91:5
143:23
**absolutely**
100:1 117:16
117:19 124:8
**access** 16:19
24:25 57:4
58:4,5 59:17
71:7,19,23
78:21 133:6
**accomplishes**
110:3
**accordance**
91:8
**account** 17:16
17:19 19:4
20:3,4,8,9,11

20:14,16,18,19
21:7,13,14
22:14,19 23:4
23:11,14,19
24:6,6,10
25:13,13 28:3
29:15,20,21
45:13,14,16
48:7,8,10 52:1
53:1,3,11
64:10 105:15
136:19,22
137:3,5,10
139:1,4,5,14
142:3
**accountant**
11:3,9,11
138:16
**accounting**
17:12 22:24
64:23
**accounts** 19:18
19:19 20:18
24:11,12
104:14 105:14
105:16 130:4
132:16 137:17
141:10,13
143:22 148:4
**accrued** 83:3
**accurate** 15:22
19:4 28:8,13
41:4 42:18
52:13 61:22

62:11,22 63:4
66:15 80:7
96:8,21 101:25
102:1
**acknowledge**
6:7,10
**acquire** 66:16
86:13 120:3
122:18
**acquiring**
87:22 98:9
**acquisition**
66:20 72:11
73:12 116:2,15
**acquisitions**
122:21
**act** 91:15
**acted** 137:4
**action** 142:13
156:4,4 161:1
161:3
**active** 42:25
**activities**
136:24
**activity** 4:10
19:12,15 30:3
30:4 68:7
139:7 141:8,11
**actual** 24:24
78:10
**actually** 21:5
25:6 99:15
102:13 108:16
138:10 140:22

152:5 155:21
**add** 138:12
143:16 149:13
**added** 62:20
**addition**
118:22
**additional**
115:14 122:6
**addresses**
131:3
**administer**
6:11
**administered**
6:11
**administrative**
88:17,25
**adverse** 38:22
39:1
**affidavit** 12:24
12:24 79:19
**affidavits** 74:13
87:16 91:13
98:4
**affiliate** 40:25
41:21 42:1
59:9 80:12
102:19
**affiliates** 49:19
56:4 61:10
78:22 107:2
113:5 139:13
**affiliations**
5:15

[affirmative - apologize]

**affirmative** 85:1

**afraid** 27:14

**agent** 88:17,25 100:21

**aggregated** 137:7 139:15

**ago** 23:18 37:3 45:15 59:12 66:3 108:24

**agree** 42:11 43:12 44:3 48:13 76:9 77:6,9 92:9 96:17

**agreed** 23:9 114:16,21 115:18

**agreement** 3:21 3:23 4:6,7 23:8 23:8 38:21 41:10 51:2,6,7 51:8 69:15,22 70:10 74:8 77:7 78:25 81:15,19 82:21 82:21 83:19 84:7,11 85:3 87:23 88:12 91:9 92:5 93:1 95:22 96:2,6 101:18 106:10 106:16 107:25 108:11 109:11

113:18 114:19 115:9 120:4 122:9,11 127:9 130:13 132:5 132:11 152:15 159:21

**agreements** 38:17,23 80:4 80:13 82:23 134:5,11

**ahead** 58:17 75:16 106:20 109:23 114:13 115:2 130:20 140:21

**al** 5:6

**alberta** 11:9 151:24

**allied** 149:3

**allocate** 105:1

**allocation** 4:4 99:10,13 101:4

**allow** 156:9

**allowed** 51:3

**alter** 150:18

**amendment** 4:5 4:9 81:12 82:21 90:12 92:19 106:10 106:19 108:22 109:8 114:14 115:12,15 127:8,10 129:4 142:4,5 143:14

152:8,11

**amendments** 81:9 82:24 134:11

**american** 100:19,24 101:8,15,19 105:19 142:22 143:7 145:17 145:22 146:1,4 146:5

**amortization** 67:9

**amount** 18:1 19:7,8,13 24:14 28:20 32:15 44:20 59:4 66:23 75:12,17 76:5 76:13,21 77:12 77:23 78:1,1,5 78:5,14,18 81:4 82:9 97:22 101:3 103:5,11 104:5 104:10,22 111:13 113:11 114:5 116:12 116:14,21 121:20 131:8 131:17,22 142:22 143:6 146:8 147:7,10 147:20,24

148:2,8,9 149:17 159:25

**amounts** 18:19 19:17 53:20 54:6 66:10 82:17 95:22 96:5,14 115:25 129:13 137:1 146:17

**amynta** 102:10 102:12 146:20 147:18 154:5,6 155:12 156:19

**ancillary** 61:1

**angle** 9:10

**answer** 21:18 26:16 31:12 33:23 34:13 43:5 47:22 57:19 60:14,17 60:24 63:21 85:24 117:5,10 118:1,7,14,15 118:20 125:24

**anticipated** 63:21

**anybody** 105:22

**anymore** 63:7

**apologies** 71:15 153:9

**apologize** 30:10 48:18

Veritext Legal Solutions
346-293-7000

[appeal - attaches]

appeal  35:1,14 35:19,22 36:9 36:12,25 37:12 37:16 38:13 39:6,10 111:9
appealed  34:3 34:25 111:1 115:7
appear  21:7 64:16,21 139:5 139:10 146:5 149:10
appearance 79:18
appearances 2:1 5:15
appears  76:2 79:13,15 89:13 96:20 128:17
applicable 75:13
application 145:4 157:6
applications 145:9
applied  81:11 86:16 129:18 151:4 157:1
apply  112:9 145:10
appreciate  8:20 10:4,16 18:22 26:2 32:8 88:14 106:17

apprising 38:25
approach  46:9
approaching 37:4
approval  53:5
approximately 8:24 10:23 14:4 31:16 32:16 61:11 67:6 68:1 140:16
approximation 21:3
april  62:13 122:13 161:5
area  85:18
argument  37:4
arrangement 6:14 64:1 73:6
arrangements 66:2 68:19
asked  30:11 36:20 67:3 71:14 124:2,15 130:12
asking  47:10 68:8 112:5
asset  3:23 4:5,7 39:25 43:1,19 48:11,16,20,25 58:4,13 78:14 81:11 82:25 83:19 85:10,15

86:18 87:22 95:22 96:1,5 100:2 106:10 107:25 113:17 114:17 123:11 123:15 132:17 144:10 152:8 152:14
assets  18:6,12 28:9,14,16 29:3 30:13,16 33:17 42:13 43:13 44:5,9 44:10 45:24,25 46:4,7,14,19,20 46:21,22,24,24 47:2,5,7,14,18 47:19 48:3,6 49:7,11,20 50:1 58:11 75:2,20 76:14 76:18 77:19,24 78:1,11 79:6 79:14,22 81:23 82:4 83:8,20 84:9,13 85:4,8 85:9,12,23,25 86:4,13 87:21 89:1,8,10,12,17 90:6,23 91:3 91:10,21 92:12 92:23 95:25 96:3,7 97:17 97:19 98:1,8

98:10 100:13 101:16 102:7 103:8 107:6,14 112:15 116:25 118:4 123:18 124:21,24 125:7,12,15,18 125:21 126:2 126:10,11,15 127:17 128:11 128:13 130:3,7 132:1,12 141:24 142:7 144:10 146:18 148:20 157:17
assigned 109:11 150:2 154:10
assignment 109:15 154:12
associate  5:20
associated 113:20 143:20
assume  13:9 55:9 80:24
assumed  74:15 84:18
assuming  71:10 84:23
attached  1:20 86:5 87:9,15 98:3
attaches  96:3

**[attended - bank]**

| | | | |
|---|---|---|---|
| **attended** 39:16 | 134:23 135:4,6 | 112:15 119:24 | 103:5 107:14 |
| **attention** 75:4 | 139:4,12,16 | 120:1,11,16,18 | 113:17 116:8,9 |
| **attorney** 5:16 | 141:17,19 | 133:21,22 | 121:18,21 |
| 36:4,5 92:2 | 143:2,9,11,24 | 134:24 136:22 | 123:4 129:9 |
| 160:5 | 147:2 151:7,14 | 137:2,4,8,21 | 137:2 147:7 |
| **attorney's** | 154:10,23 | 138:8 139:1 | 152:6,25 |
| 117:25 | 155:2,3 156:14 | 146:25 147:24 | 154:25 157:10 |
| **attorneys** 6:6 | 159:6 | 150:16 151:16 | **background** |
| 13:3,24 14:2,7 | **automatic** | 151:19 155:1 | 64:23 |
| 14:11 39:23 | 22:23 23:1,20 | 159:5 | **bad** 17:12 |
| 156:19,20 | 23:24 24:8 | **available** | 24:20 37:7 |
| 161:1 | 52:22 | 144:20 | 62:7 66:22 |
| **attributable** | **automobiles** | **ave** 2:4 160:13 | 82:15 88:13 |
| 135:3 | 54:17,23 | **avenue** 2:9 | **balance** 19:22 |
| **attributed** | **automotive** 1:5 | 160:18 | 25:4,12 49:8 |
| 111:13 114:5 | 3:11,18 5:5,25 | **avoid** 131:21 | 52:25 53:11 |
| **auction** 149:13 | 8:6,15 9:6,12 | **avoiding** 99:21 | 64:17,21 74:16 |
| **auctions** | 9:15,22 10:2 | **aware** 14:13 | 78:6 79:13,21 |
| 149:14 | 10:12,15,20 | 27:1,9 33:10 | 136:12,21,25 |
| **august** 137:16 | 11:1 13:11 | 33:14 61:25 | 137:1 139:8,10 |
| **authority** 156:5 | 20:20 22:20 | | 139:20,21 |
| **authorize** | 25:25 31:1 | **b** | **balances** 23:4 |
| 23:25 24:21 | 34:8 36:6 | **b** 75:4 76:11 | 23:11,14 24:10 |
| **authorizes** 89:8 | 40:17 51:15,21 | 127:21 129:11 | 53:9 137:5,6 |
| **auto** 1:6 6:1 | 51:22 52:3,7 | 148:16 | **balancing** |
| 26:1,5 41:6,11 | 52:11,19 67:24 | **back** 9:9 12:6 | 137:12 |
| 41:24 42:7 | 70:2,12,13 | 20:8 28:12 | **bank** 3:14,16 |
| 50:11,13,23 | 71:1,2 74:17 | 37:22 38:7 | 16:13,21 17:7 |
| 51:16 52:5,17 | 77:13 85:11 | 43:24 46:2 | 17:8,16,17,19 |
| 52:20 53:13,25 | 104:1,16,24 | 52:9,19 53:4 | 17:19 19:4 |
| 54:7,15 55:4 | 106:11 107:7 | 56:13 59:3,11 | 20:24 22:1,11 |
| 55:12 60:13 | 107:13,21 | 60:18 66:18 | 27:22 39:21 |
| 85:12,14 119:4 | 108:7 109:9 | 67:2 69:6 | 43:25 48:7,8 |
| 119:8 134:22 | 110:5 111:24 | 97:11 101:13 | 48:10 59:7 |

Veritext Legal Solutions
346-293-7000

**[bank - better]**

66:7 90:17
113:25 146:3
**banking**  16:19
24:23 25:2,3
57:3 138:5,20
141:9
**bankruptcy**
35:7
**banks**  16:15
138:17
**baptko**  1:2 5:5
5:18,22 13:11
17:2 26:11,20
27:2,10,23
31:7,21 70:1
111:8 115:17
123:19 144:21
159:2
**baptko's**  3:17
30:25 35:12
36:14,21 37:18
115:8 123:7
151:5
**based**  54:9,16
54:23 78:10
118:9,17,22
131:22 132:11
**basically**  84:17
110:5
**basis**  15:12,14
21:2 54:17
117:5
**bates**  2:3 3:3,5
5:17,17 6:19

7:14,19 12:1
16:9 21:21
26:18 27:1,18
30:22 31:12,15
32:12 33:22
34:13,19 35:6
35:10 36:1
37:15,21,25
38:9 40:21
41:3,12 42:1
42:11,16,24
43:17,23 44:12
45:9 46:9
47:15,17 48:1
48:18,24 49:4
49:9,14 50:2,6
51:1 56:12
57:12 58:1,21
60:14 61:4
65:9 68:24
69:8,14 71:6
72:24 74:22
76:3,9 77:17
79:4 83:14
87:1,10,12,14
89:23 90:8,19
91:11 93:4,11
94:19 96:13
97:3,7,13
98:24 101:20
101:22 102:24
106:6 107:13
108:4 110:1,12
110:22 111:2

111:21 112:5
112:10,16
113:4 114:15
115:2,13,24
116:20 117:9
117:13,21,24
118:7,15,18,24
121:12,19,24
122:24 123:6
124:1,9 125:17
125:22 126:7
126:13,17
127:20 129:15
130:1,9,22
131:24 132:14
132:18 133:4
133:12,17
138:14 140:11
140:15 144:12
144:22 145:12
145:19 147:12
150:19 151:1
151:10 152:21
153:5 156:2,24
157:25 159:24
160:3,5,12
**becoming**  10:5
61:16
**beginning**  5:16
55:8 71:4
**begins**  112:25
**behalf**  5:25 6:1
125:2

**believe**  9:20
12:7,9 14:15
25:19 26:24,24
33:20,24 39:20
40:1,20,23
50:11 56:8
64:3 86:17
87:14 88:11
94:22 97:23
100:5 109:10
121:17 124:5
139:24 143:20
154:16 155:7
**believed**  114:18
**belongs**  41:11
**benchmark**
80:10
**beneficial**
112:1 155:22
**benefit**  51:25
56:7,17,19
57:10,21 58:12
59:12,16,20
60:1 70:24
71:7,11,17,25
72:4,6,6,7
**benefits**  56:21
57:1,7 58:2
60:20 138:4,11
138:11,12
**best**  23:5
**bet**  108:25
**better**  140:22

[big - calling]

big 7:20 60:1
binding 9:11
bismarck 13:7
 13:8,16 17:2
bit 7:15,22 13:9
 24:19,24 25:24
 29:10 32:23
 40:4 44:13
 50:19 58:10
 61:9 71:14
 75:17 95:8
 98:20 101:13
 107:24 138:24
 143:17 151:12
 153:13
blow 100:8
blown 7:16
bmo 3:14,16
 16:13,15,19
 23:1,5 24:21
 25:13,13 27:23
 35:17 36:13,24
 37:17 38:12,21
 39:4,21 40:15
 52:25 55:9
 61:15,21 63:1
 63:3,6,18,18
 65:15 66:7,11
 66:16 67:14,22
 67:24 68:12,14
 68:20 70:23
 72:11 73:11
 85:19 97:25
 98:9,13,17

99:22 105:18
 116:1,15 133:2
 140:7,8 141:9
 144:15 145:8
 148:1,16,17
 149:2 150:1,1
 150:5,8,15
bmo's 25:3
 40:3
board 14:22,23
 14:25 15:4
 39:18 120:10
 120:13 121:9
bob 5:21
bold 75:6
borrow 66:5
borrowed
 66:10,16,24
 67:17
borrower
 63:17,17,25
 64:1,3,7,12,15
 65:14,17,21,23
borrower's
 64:17
borrowers 65:1
 66:2 70:16,16
boss 120:9
bottom 20:25
 32:17 102:11
 111:4
bought 73:23
 107:14 112:14
 142:8 153:23

bounce 104:12
bounds 114:25
brands 150:14
breached
 114:19
break 38:1,6,10
 69:5 97:3,10
 97:14 123:3
 152:19,24
breaking 142:6
brett 15:2
bridge 62:16,20
briefly 26:7
 136:15 145:3
broker 100:2,7
 100:10,16
 145:15 146:23
 146:24 147:6
 147:13
built 73:10
 157:18
bunch 40:3
bunnell 15:2
business 9:5
 60:11 103:2,6
 146:21,21,22
 153:24
buy 67:17
 72:24 86:9
 107:17
buyer 18:7,12
 29:4 30:13,17
 49:11 84:8
 86:4,12,12

89:8,10 90:9
 90:23 92:6
 103:3 107:2
 108:7,9 109:4
 109:6,8 111:13
 111:23 113:3,9
 113:11 114:5
 116:13 124:24
 125:5,11,13,16
 146:17
buyer's 111:14
 114:6 125:11
buyers 33:17
 34:1 84:22
 85:3 87:20
 98:7 109:13
 112:9 130:6
 142:7
buying 86:13
 95:10,23,25

c

c 75:5 77:1
call 18:1 24:21
 39:24 61:10
 67:15 83:24
 98:14 100:21
 155:8,11,12
 157:17
called 80:16
 81:2,3 88:13
 102:10 154:6
calling 20:15

Veritext Legal Solutions
346-293-7000

[canada - chev]

canada 11:15 63:18,18 120:12
canadian 10:13 10:17 11:13 151:19
cancel 59:2 148:16 150:5
canceled 59:1 148:18
cap 78:7
capacity 8:8
capital 57:4,6 58:5,8 71:19 75:20 76:14,17 76:23 78:22 104:18
capitalized 113:19
capped 76:12 77:2,8,25 78:2 78:4,13,15
caps 75:24 132:9
cars 35:17 36:13,24 37:17 38:12,14,25 39:4 40:15 54:11 101:23 102:2,6 105:18 142:4,9 143:13 145:21 146:7,8 146:19

case 5:7 16:14 20:19 32:5 62:18 67:3 79:11 87:17 117:8 118:18 131:11,15 136:22 149:2 149:12,17
cash 19:17 23:15,15 24:11 24:12 52:25 53:9,10,11 57:2,8 58:20 59:7,10 78:21 103:21 104:9 129:16 130:4 134:7 136:21 137:1,5,6 139:8,8,9,18
cause 1:1,17 159:1
caused 148:6
centralized 51:13 57:2,8 57:15 58:3,13 58:20 59:10,16 78:21 136:9
centrally 138:18
ceo 121:15
certain 24:14 27:9 51:10 81:1,11,16 82:9,17 97:15

98:1 128:9 131:22 150:10
certainly 86:20
certificate 160:21
certification 3:7 159:9
certified 11:3 11:11 159:12 161:5
certify 159:13 160:24
cetera 55:9 60:6 146:2 157:17
cf0 10:5
cfo 35:11 133:21,22
chain 55:18
change 29:7 103:17 113:7 135:25 150:21
changed 61:15 113:23
chargeback 58:19,21 78:23
chargebacks 58:19 59:9
charged 59:3 142:6
charges 160:4
chartered 11:8
chase 90:17 91:7,7 94:9

chase's 92:5
checks 104:12
chev 3:18 8:16 13:12 28:4,7 28:23 29:3,20 30:12,14 31:1 33:18 34:7 40:16,25 41:5 42:12,16 49:4 49:9,16,17 50:2,11 53:23 56:7,21 57:16 58:3 60:25 61:5 65:10,16 66:1,8 67:5,21 69:21 70:1,11 70:15 72:10,19 73:9 74:14,25 77:11,18 78:11 78:24 80:25 81:7,19,24 82:1,8,12,16 83:3,20 84:8 84:12 85:2,7,8 85:8,9,12,14,16 95:14 100:13 101:17,24 102:7 103:8 104:14 109:12 110:7 112:2,16 112:23 113:9 113:21 116:1 116:14 123:18 128:25 132:13

Veritext Legal Solutions
346-293-7000

**[chev - compensated]**

134:14,25
135:1,22 136:7
141:19 142:3
144:2 149:21
**chev's** 29:15
41:16 80:17
140:8
**chevrolet** 28:9
66:14,18
106:12 107:5
107:18,20
108:10 112:11
113:22 114:16
114:21 149:22
150:6 152:8,15
**chevrolet's**
107:14
**chevy** 66:17
**chief** 9:16,17
10:10 16:18
24:4 33:7
64:11 76:18
83:1 120:19,25
121:12
**child** 19:18,18
20:3,14 24:5
25:1 29:20
51:11,24
104:14 105:14
105:16 136:19
139:5
**chronologica...**
20:25 21:10

**chronology**
22:2 29:10
33:3
**chrysler** 150:13
**circle** 59:11
**circumstance**
110:9
**civil** 1:19
**clarification**
32:8 84:22
106:17
**clarified** 65:22
**clarify** 151:24
**clarifying**
20:12
**clark's** 40:2
**classify** 48:22
**clause** 84:11
108:23 110:8,8
112:9,25
114:13 131:20
**clean** 65:24
66:22
**clear** 21:8
29:12 84:5,13
84:18 85:4
86:14 87:21
89:9 98:8
130:7 148:24
151:15
**clearly** 57:20
**clerk** 160:23
**close** 19:7 21:3
26:7 100:16

122:12 147:9
147:14
**closed** 7:12
132:23
**closer** 7:25
**closing** 33:19
85:2 86:3
89:16,20,24,25
90:1,3 99:17
105:10 109:10
115:16 133:1
144:9 145:18
145:20 156:23
**collateral** 3:21
69:15 74:7
126:3 130:13
131:23 132:4,5
132:6,7
**collateralized**
73:25
**collect** 123:20
131:9
**collected**
101:12
**colorado** 2:9
160:19
**column** 56:4
**combined**
66:25 67:12
**come** 36:17
101:13 139:9,9
139:17 143:15
155:25

**comes** 22:6
26:25 56:19
105:9 147:22
153:21
**comfort** 90:16
**coming** 17:16
19:19,23,24
21:1 148:10
157:9
**comment**
107:21 141:25
**commercial**
57:3
**commitment**
132:10
**committed**
23:10
**communicati...**
35:10,21
**companies** 10:7
80:12,12
**company** 10:11
28:8 34:14,15
34:21 35:1,2,4
35:5,6 42:17
42:24 43:9,18
44:9 60:3
79:13 100:20
101:5,16
102:13 104:8
107:6 128:10
145:17,23
**compensated**
51:23 60:7

[complained - corp]

complained
  27:9
complaining
  27:2
complaint  3:17
  30:25
completely
  45:20
complex
  108:23
compliance
  78:19 103:22
  134:1
complied
  110:15
component
  157:12
compromise
  8:1
computer  7:10
computers
  85:17
concerned
  125:7
concerning
  36:11,24 37:16
  38:13 39:5
  65:10
concerns  25:18
concluded
  158:9
concludes
  158:5

concluding
  111:19,21
conclusion
  49:15 156:21
condition  92:5
  129:19 156:23
conditions
  145:20
confirm  65:20
  105:25
conflict  14:19
confused  104:2
conjunction
  142:6
connected
  129:21
consent  3:24
  4:9 6:13 55:14
  80:20 81:6
  88:3 103:9
  115:8 124:21
  127:10 128:4
  129:12,19
  146:14,19
consented
  55:10 124:16
  128:13
consenting
  128:8
consents  89:7
consequence
  148:13,17
consider  48:16
  48:20,24 83:2

83:6
consideration
  123:22 125:21
considering
  44:16
consolidated
  19:17 134:1
consolidating
  20:4,18
constitute  91:1
constituted
  44:5
constrained
  134:10
consumed
  133:15
contained
  53:18
contains  95:2
  128:18
contends
  114:22
context  61:20
  109:16
contingent
  71:11 83:4
  129:11,12
continue  126:5
continued  4:1
  137:17
continuing
  114:25
contract  51:1
  58:25 103:10

155:12
contractual
  123:23 146:10
  146:10
contractually
  114:16 147:6
  156:15
contrast  66:12
control  107:20
  156:1
controlled
  155:22
controls  109:4
  112:22
conversations
  36:1,23 37:2,7
  37:10,17 38:11
  38:15 39:2,15
  39:22 40:6,8
converted
  46:24 47:5,18
  55:3
copies  160:7
copy  16:12
  30:24 160:21
corner  17:9
  28:1 102:11
corp  1:6 3:11
  3:18 5:6,25 8:6
  8:15 9:6,12,15
  9:22 10:2,15
  10:20 11:1
  13:11 22:20
  31:1 34:8 36:6

**[corp - credit]**

| | | | |
|---|---|---|---|
| 40:17 51:16,21 | 16:2,17 17:21 | 116:16,23 | **counsel** 5:4,14 |
| 51:22 52:3,7 | 18:25 19:1 | 121:15 122:15 | 5:17 6:4,13 |
| 52:12,19 60:13 | 22:4 25:14 | 122:16 124:25 | 35:24 124:15 |
| 67:24 70:2,12 | 30:18 32:18 | 125:8,9,16,21 | 160:10,24 |
| 70:13 71:1,2 | 33:2,8 38:24 | 125:23,25 | **counting** 63:11 |
| 74:17 77:13 | 41:9,14,15,20 | 126:12,14,14 | **county** 1:5 5:7 |
| 85:11 104:1,17 | 42:2,3,10,15,20 | 127:17,18 | 159:5 |
| 104:24 106:11 | 43:16 45:13,14 | 128:4,5 129:2 | **couple** 17:22 |
| 107:7,13,21 | 46:1,16,20 | 129:3,7,14,25 | 20:12 28:18 |
| 108:8 109:9 | 49:17 50:14 | 130:2,7,8,19 | 29:6 39:11,11 |
| 110:5 111:24 | 54:12 58:10,11 | 131:4,5,25 | 67:4 74:12 |
| 112:15 119:24 | 59:14,18 60:17 | 132:13,15,19 | 83:25 143:8 |
| 120:1,11,17,18 | 60:19 61:6 | 132:24,25 | **court** 1:2 5:6 |
| 133:21,23 | 62:13,17 63:1 | 133:9,18,23,24 | 5:12 6:3 17:3 |
| 134:24 136:23 | 63:8,22 65:8 | 134:3,16,17,19 | 31:8 32:14 |
| 137:2,4,8,22 | 66:9 69:18,20 | 134:20 135:1,2 | 33:4 70:3 |
| 138:9 139:1,4 | 70:14,18 72:16 | 135:8 136:1,2 | 159:2 |
| 139:12,16 | 74:17 77:5 | 136:4,5 137:22 | **courtroom** |
| 147:1,25 | 79:9 80:14 | 140:4 141:19 | 13:16 |
| 150:16 151:17 | 81:17 84:10,14 | 141:20 143:13 | **covenant** 23:13 |
| 151:19 155:1 | 84:15 85:4,5 | 144:7,8,17,18 | 147:25 |
| 156:14 159:6 | 87:7 88:19,22 | 145:11,13 | **covenants** |
| **corporate** 3:11 | 89:14,15,18 | 150:7,8 151:17 | 103:22 148:12 |
| 8:5,10 9:9 | 90:4,23 93:12 | 151:18,20,21 | 148:14 |
| 34:12 112:20 | 93:14,15,24 | 151:23 152:3,4 | **cover** 117:10 |
| 114:8 115:1 | 94:1,2,3 95:3,4 | 152:12,13,16 | **covered** 60:11 |
| 118:21 | 95:17,18 96:19 | 152:17 156:6 | 137:7 |
| **corporation** | 98:11,18,19 | 157:12,19,20 | **cpa** 11:9 |
| 10:13 151:20 | 99:5 100:3,4 | **cost** 59:4 | **create** 139:20 |
| 151:25 154:1 | 102:4,5,18 | **costs** 52:2 | **credit** 17:13,15 |
| **correct** 10:14 | 107:14,16 | 133:8 145:25 | 18:1,10 19:8 |
| 10:17,18,22 | 108:5,12,19 | 157:5 | 19:10,22,23 |
| 13:13 14:24 | 109:9 110:24 | **cottage** 73:23 | 20:7 22:10,14 |
| 15:7,8,23,25 | 112:19 115:6 | 74:2 | 25:5,11 28:19 |

Veritext Legal Solutions
346-293-7000

[credit - dealerships]

29:14,24 30:10 38:20 57:5 58:7,7 60:4 64:20 80:23 81:9,11 82:20 82:21,23 90:13 127:9 134:5,11 139:11,21 140:16,17 157:7

**creditor** 45:1 48:16 49:3 77:20 131:9,12 131:17 144:21

**creditors** 44:20 44:21 45:4 59:22 60:6 78:20 114:13

**credits** 21:1 22:7 27:12,16

**cross** 123:17

**csr** 1:18 161:7

**current** 116:24 118:3,4,11 120:17 154:12

**currently** 34:3 50:2 58:12 59:6 120:23 121:25 122:1 122:20

**customer** 59:1

**cut** 9:24

**d**

**d** 108:15

**daily** 15:12,14 19:12,15 21:1 23:2 30:1,4 61:3 136:20,24 139:7

**dakota** 17:2 18:6,12 28:9 28:15 29:4 30:13,17 31:8 32:13 33:17 39:5,9 49:11 70:2 71:11,18 72:1 84:8 85:3 98:7 112:17 129:2 134:16 135:11

**dallas** 2:4 160:14

**data** 55:1

**date** 18:5 21:4 21:5 31:4,14 32:22,24,25 37:4 68:3 70:5 70:7 80:11,15 85:2 94:2 118:25 127:14 141:21,23 142:21 143:8 161:7

**dated** 21:4 29:4 69:15 89:13

127:13

**day** 19:16 20:1 20:9 21:7 29:4 52:10 89:16 93:3 103:20 105:11,11 121:8,8 135:17 136:20,25 139:14,20 148:6

**days** 141:10

**de** 76:21 148:8

**deal** 59:22 98:1 100:10 156:25

**dealer** 102:13 102:15,19,22 102:24 103:3,5 103:7 105:18 145:16 146:20 146:23 147:1,5 147:10 153:13 153:21 154:7 154:14,16,20 154:22 155:4,5 155:8,16 156:11 157:3,6 157:7

**dealers** 153:25

**dealership** 28:10,15,17 50:22 53:14 54:16,17 55:12 55:25 59:25 60:8 66:17,17

71:12,18 72:1 72:2,8 75:24 95:10,13,21,23 95:23,25 96:1 96:5,7,14 100:19,25 101:2 104:21 122:8,14 124:21 125:6,7 125:7 126:11 128:4,18 129:13,17 130:4 131:11 132:17,21 138:3,13 139:3 139:19 144:10 144:10,17 146:15,18,23 147:5 148:19 148:20 149:21 150:6

**dealership's** 89:17

**dealerships** 52:10 57:1 66:20 67:17 72:21 90:14 97:18 111:14 112:18 113:22 114:6 121:24 122:2,7,19 126:10 127:17 128:9,24 129:1 129:5,22 130:6

**[dealerships - deposition]**

| | | | |
|---|---|---|---|
| 133:3 134:15 134:16 135:19 135:20 136:3 138:19 142:8 143:15 147:1 155:15,18 156:10,16 157:11 | **debtors** 75:15 **debts** 73:14 75:21 77:4 83:10 | **deemed** 89:11 91:24 **default** 23:7 60:3 | **dennis** 2:12 5:9 **denote** 4:15 **denver** 2:9 160:19 |
| **dealing** 60:6 | **december** 4:12 17:8,25 18:5 19:25 20:2,5,7 21:6 28:24 29:14 31:22 33:18 42:13 43:14,19 44:1 44:4 46:4 47:17 49:5,22 57:5 60:22 79:10,21 85:7 89:14 94:2 102:7 122:2,4 123:13 132:24 135:25 137:24 140:8 141:2,23 142:21 144:20 151:4,8 | **defendant** 31:22 | **depending** 55:1 59:2 149:8 |
| **debit** 17:14,18 19:3,11 20:5 21:15 22:12,15 22:17 23:18,25 24:22 29:6,16 29:19,24 44:4 45:11 139:6 | | **defendants** 1:8 2:7 5:25 32:5 32:15 159:8 160:16 | **deposed** 8:22 14:14 |
| | | **deficits** 139:14 | **deposing** 8:8 |
| | | **defined** 113:19 | **deposit** 23:16 132:16 |
| | | **definition** 107:12 108:14 108:18 113:14 | **deposited** 142:2 |
| **debits** 21:1 22:6 139:17 | | **definitions** 107:2 108:1 110:2 | **deposition** 1:11 1:15,20 3:10 3:13 5:3 6:7,8 6:9 7:17 8:5,11 8:18,22 11:22 12:2,14 13:22 13:25 14:2,11 14:19 16:7 26:4,7,20 27:15,18 28:2 28:18 29:11,25 30:19 32:1 34:11 43:23 60:18 69:11 83:11 87:2,25 94:17 98:21 99:8 106:3,16 108:2 115:1 117:6 118:21 124:7 126:22 158:9 159:10 |
| **debt** 49:19 59:13 61:9 62:21 63:14,17 65:12 67:4,7 67:23 68:1,11 68:13,16 69:9 70:25 74:16 75:1,25 76:5,5 76:13 77:3,12 77:24 78:1 81:2,3,8,19 82:10,18 114:1 114:8 128:11 133:15 | | **degree** 61:13 71:20 | |
| | **decent** 68:24 **decide** 59:2 **decided** 37:12 **decision** 115:7 121:18 155:20 155:25 156:5 | **deleverage** 128:11 | |
| | | **deleveraging** 128:10 | |
| | | **delivered** 159:23 | |
| | | **delta** 19:10 29:23 30:5 | |
| | **declarations** 87:16 | **demand** 81:7 82:8,11,13 | |
| | **deducted** 18:20 **deductions** 18:23 | **demanded** 81:18 | |
| **debtor** 152:2 | | **demanding** 82:17 | |

Page 14

[deposition - due]

159:17,20,22 159:23 160:1,4 160:6,9

**derek** 1:12,15 3:2 5:4 6:2,16 6:22 109:23 158:6 159:10 159:15

**described** 19:23 138:3

**desk** 7:8

**desks** 85:16

**details** 64:20

**determined** 45:1

**dial** 142:20

**difference** 17:13

**different** 21:22 22:6 46:9 63:10,10 64:13 68:18,19 74:5 95:8 132:3 141:10,10

**differentiates** 99:16

**differently** 24:19 37:9 64:11 65:6 71:14 77:16 107:24

**difficult** 123:19

**direct** 52:14 64:12,14 65:17

65:21

**directly** 59:25 119:1 134:18 134:21 149:6 150:7 151:22

**director** 120:19 120:25

**directors** 120:10,13,14

**disagree** 96:17

**disbursed** 45:17 52:9

**disbursement** 99:16

**disclose** 38:18

**disclosed** 33:16 33:25

**disclosure** 38:22

**discretion** 52:21 53:3,6,8

**discretionary** 52:24 147:19 151:8

**discuss** 17:23 25:16

**discussed** 36:8 37:7 56:25 61:7 105:18 113:23

**discussing** 82:22 129:20 150:5 152:7

**discussion** 7:13 37:11,15 65:7 86:24 151:13

**discussions** 156:19

**dispute** 21:12 26:11 70:6 111:7

**dissolve** 43:7

**distinct** 151:16

**distinction** 14:24 18:14 25:7 41:12 50:15 64:6,19 64:25 91:25

**distribute** 53:4 53:10

**district** 1:2,8 5:6,7 118:19 159:2,8

**dive** 124:12

**document** 4:15 12:3 31:2 32:9 32:19,21 51:2 69:17,18,24 83:17 84:20 87:3,6,15 88:16 89:13,19 89:23 90:2,5 91:1,6,19,22 92:8,18 94:19 95:8 96:22 99:4,5,15 100:6 106:13

108:4 112:6 115:20 126:24 127:5 139:25 140:3,7 141:5 142:17 145:4

**documents** 12:16,17,20 13:1 75:11

**dodge** 150:13

**doing** 87:18

**dollar** 19:10 67:1 72:11

**dollars** 44:10 46:24 47:3,6,6 47:9,18,19 49:19 55:3 67:5 70:25 73:1

**door** 105:9

**downstream** 138:23 144:7

**dozen** 9:3

**draft** 89:25 90:2

**drafted** 149:6

**draw** 75:4

**drawing** 18:15 41:12

**drawn** 64:25

**due** 14:19,19 56:3 75:22 77:4 80:16 95:22 96:5,14 111:9,12,20,22

Page 15

**[due - entity]**

112:1 128:15
146:8
**duly** 1:16 6:17
159:15

**e**

**e** 2:9 40:9
160:18
**eagal** 136:4
**eagal3** 95:10
**eagal4** 94:9
**ear** 71:16
**earlier** 15:24
19:23 22:21
29:25 39:18
44:1,23 48:9
50:9 58:10
69:25 91:20
93:11 101:23
103:20 105:13
115:25 116:3
123:6 135:2
136:10 138:25
140:15 145:3
147:12
**earnout** 110:7
110:17,20
111:9,25
115:18
**easier** 31:20
98:20
**eastern** 142:12
**economic** 41:13

**economically**
41:11 135:3
**edification** 7:23
54:20
**effect** 14:17
38:22 39:1
115:21
**effective** 21:4
**effectively**
79:17
**efficiency**
138:21
**efficient** 52:1
**efforts** 69:10
**either** 8:18 14:6
20:19 51:5
52:9 63:12,16
103:3 112:11
112:17 140:12
148:11 149:8
154:10
**elaborate** 11:8
**eliminate**
150:24
**employed**
160:25
**employee** 15:25
119:5
**employees** 15:9
15:13 16:3
118:24 120:14
**employer** 119:3
**employment**
10:6 120:4

**encumbered**
44:8,11,17
45:17,25 46:8
46:11,15,20,21
47:3,9,14,24
48:1,12 85:18
**encumbrance**
45:24 46:5,5
46:17,17
**encumbrances**
44:13 84:6,14
85:6,21 86:2,5
129:24
**enforceable**
114:22
**engage** 103:3
**ensure** 148:9
**entered** 32:13
33:3,10 40:18
62:9 76:19
78:24 80:4,12
123:8 135:10
135:16 137:21
155:10
**entire** 74:15
75:25 77:12
81:3 107:25
**entities** 8:18
35:18,22 36:21
39:9 44:22
50:22 51:24
53:24 54:6
55:12 56:1
66:15,24 67:7

67:13 69:16
70:22 71:12,18
72:1 76:19
79:21 80:5
81:16 84:9
98:17 99:23
105:17 109:11
112:14 113:3
123:20 129:6
134:15,19
136:4,7,8
137:22 138:4
138:13,20
139:19,19
144:16 148:20
149:4 153:16
154:19 155:22
156:6,9
**entitled** 75:6
103:10
**entity** 8:13 9:19
9:21 10:13,17
10:25 14:16
17:1,1 20:1
48:6 49:11,16
57:23 58:8,9
58:18 59:6
60:8 61:5
64:12 76:20,22
78:8,20 83:9
102:10 104:4
104:25 109:7
119:11,21,23
134:21 139:5

**[entity - extreme]**

| | | | |
|---|---|---|---|
| 139:10 141:15<br>141:15 143:11<br>154:5,14<br>155:10 156:1<br>**entries** 17:14<br>17:23<br>**entry** 19:3<br>21:24 25:5,11<br>25:15,17,18,20<br>26:3 40:16<br>140:18,18<br>141:14<br>**equity** 72:20<br>73:3,10,13,18<br>73:18 74:1<br>85:13 119:20<br>119:21<br>**escaping** 80:22<br>**escrow** 100:21<br>101:18<br>**especially** 60:1<br>**essentially** 39:3<br>77:23 106:2<br>128:3 150:1<br>153:23<br>**estate** 61:24<br>145:8<br>**et** 5:6 55:9 60:6<br>146:2 157:17<br>**evening** 20:4<br>**event** 75:11<br>**exact** 4:15<br>**exactly** 52:16<br>80:1 91:23 | **examination**<br>3:1,3,5 6:18<br>124:13 153:4<br>159:19<br>**example** 125:1<br>125:14 144:6<br>149:20<br>**exceed** 75:11<br>79:14 133:2<br>**exceeded** 50:1<br>**exceeds** 78:1<br>131:21<br>**except** 78:18<br>**exception**<br>84:16<br>**excerpt** 3:16<br>27:22<br>**excess** 57:23<br>133:6<br>**exchange** 59:21<br>**exclusive** 103:4<br>146:24 147:3,4<br>153:16,23<br>**excuse** 38:16<br>72:9 90:22<br>122:17<br>**excused** 110:19<br>**executed** 90:1<br>92:8,18,19<br>94:5 97:25<br>129:21<br>**execution** 92:5<br>**executive**<br>120:19 121:1 | **executives**<br>59:24<br>**exercise** 155:17<br>155:19,21<br>**exhibit** 3:8,10<br>3:12,14,15,17<br>3:19,21,22,24<br>4:1,2,3,5,7,8,10<br>4:11 7:17,18<br>11:22,24 12:6<br>12:8 16:7,8<br>17:23 26:4,8<br>27:15,17,19<br>28:2,18 29:11<br>29:25 30:19,21<br>32:1,11 43:24<br>56:13 60:18<br>69:12,13 83:11<br>83:13 86:25<br>87:2,25 88:23<br>94:17,18 95:9<br>98:22,23 99:9<br>106:4,5 108:2<br>108:3 113:17<br>116:9 126:16<br>126:20,22,22<br>140:6,10,24,25<br>141:3 142:18<br>142:19<br>**exhibits** 4:14<br>31:24 33:5<br>160:7<br>**exist** 135:15 | **existed** 70:21<br>85:6 101:5<br>135:17 146:22<br>**existing** 144:25<br>**expand** 137:17<br>**expanded** 71:8<br>137:16<br>**expanding**<br>71:22<br>**expected** 4:4<br>99:12<br>**expense** 148:10<br>**expenses** 52:17<br>104:8<br>**expert** 11:7<br>**expertise** 71:9<br>71:24<br>**expiration**<br>161:7<br>**expiring** 15:20<br>**explain** 11:10<br>30:4 128:6<br>131:6 138:24<br>138:24 141:25<br>147:19,22<br>**explained**<br>29:24<br>**explored** 35:6<br>122:10,21<br>**extent** 75:2<br>78:15 100:14<br>124:2<br>**extreme** 23:9 |

Veritext Legal Solutions<br>346-293-7000

**[f - faus]**

| f | | | |
|---|---|---|---|
| **f**  106:19,22,23 | 65:10,16,21 | 128:25,25 | 85:21 94:8 |
| 109:17 110:3 | 66:1,1,5,8,10 | 129:5 132:13 | 97:1 107:19 |
| 111:4 115:19 | 67:5,6,21,21 | 132:13 134:14 | 114:23 156:2 |
| 117:22 118:23 | 69:21,21 70:1 | 134:14,25 | 157:15 |
| 149:20 | 70:1,10,11,15 | 135:1,7,22 | **fairly**  66:12 |
| **f&i**  58:19,21 | 70:16,24 72:9 | 136:6,7,7,7,8 | **familiar**  17:4 |
| 103:4 153:24 | 72:10,19,19 | 137:22 140:8 | 102:10 |
| **fa**  3:18,18 8:16 | 73:9,9 74:14 | 141:19 142:3 | **family**  51:11 |
| 8:16 13:11,12 | 74:14,24,25 | 144:2,2 149:21 | 72:5 114:7 |
| 16:21 17:1 | 77:11,11,18,18 | **face**  117:18 | 147:21,25 |
| 18:6,11,25 | 78:11,11,24,24 | **facilities**  60:4 | 150:22 |
| 20:16 21:13,14 | 79:21 80:17,25 | 70:21 | **far**  40:24 |
| 22:14,18 23:19 | 81:7,19,24 | **facility**  62:16 | **fast**  153:11 |
| 28:4,7,13,14,16 | 82:1,3,4,6,8,12 | 62:19 63:3,5 | **fault**  104:3 |
| 28:23 29:3,15 | 82:16 83:3,3 | 63:14 64:20 | **faus**  10:1,5,11 |
| 29:20 30:12,14 | 83:20,20 84:8 | 65:13,14 66:1 | 10:21 14:24 |
| 31:1,1 33:11 | 84:8,12,12 | 67:14,15,22 | 15:4,10,13 |
| 33:17,18 34:7 | 85:2,2,7,8,8,9 | 70:20 71:5,6 | 16:1,15 20:21 |
| 34:7 40:16,17 | 85:12,12,14,14 | 71:22 72:11,15 | 20:22 23:19 |
| 40:25 41:5,16 | 85:16,16 88:5 | 72:18,19 73:12 | 26:11,20 29:21 |
| 41:20 42:6,12 | 88:10,21 89:19 | 74:14 76:19 | 33:7 35:11 |
| 42:16 43:12,18 | 91:2,21 95:14 | 78:6,16 80:23 | 39:19 40:25 |
| 43:25 44:6 | 100:13,13 | 81:9,11 82:23 | 41:5,21 42:5 |
| 45:12,23 46:4 | 101:17,17,24 | 90:13 116:15 | 52:13 53:4 |
| 46:13,18,23 | 101:24 102:7,7 | 157:8 | 56:9,22 57:16 |
| 47:7,20 48:11 | 103:8,8 104:14 | **fact**  47:14 94:5 | 60:21 61:3 |
| 48:15 49:4,9 | 104:14 109:12 | 110:23 150:8 | 63:15 67:23 |
| 49:16,22 50:2 | 109:12 110:6,7 | **fah**  134:25 | 74:17 77:13 |
| 50:7 53:23,23 | 112:2,2,16,16 | **fair**  43:10 | 83:1 104:21 |
| 56:7,21 57:16 | 112:23,23 | 44:18 60:15 | 105:14 117:1 |
| 58:3 60:20,25 | 113:9,9,21,21 | 64:2 65:6 | 118:25 119:13 |
| 61:5 63:14,25 | 116:1,1,14,15 | 67:18 68:10 | 119:14,17 |
| | 123:18,19 | 70:8 73:5,7 | 120:13,22 |
| | 125:3,15 | 81:2 84:18,19 | 121:13,21,24 |

Veritext Legal Solutions
346-293-7000

**[faus - follows]**

122:3,6,18
127:20 134:8
134:18 143:5
148:14 151:7
151:13,16,22
152:2,5,11,14
155:22 156:6,8
**faus's**  16:19
22:24 33:11
35:11 53:3
118:3,11
**fed**  17:25 25:6
28:19 29:13
**federal**  3:17
13:10,13 17:3
25:18 30:25
31:8 32:14
33:4 37:18
38:13 39:5,9
40:16 61:13,18
62:15 67:3
70:2 75:13
123:7 135:9,11
135:16 137:14
150:17,21,24
151:5 152:3
**fee**  25:19 50:17
55:22 101:12
138:7 142:5
143:14 145:15
147:11
**feel**  51:7 59:25
124:6

**fees**  25:23 26:5
50:20,21 51:4
51:9 52:4,14
52:18 53:12,25
55:7,11,24
59:8 60:8,11
100:7 143:20
143:20 146:2
**fifth**  81:12,14
**figure**  29:2
56:15
**file**  32:24
**filed**  5:6 110:13
160:22
**files**  105:23
**filing**  31:4
85:10 93:21
**filings**  45:4
85:10,13,19,22
93:9 130:2
**final**  25:15
99:16,18
**finally**  76:25
**finance**  58:23
58:24 60:12
86:15 146:22
147:2 154:10
154:23 155:2,3
**financed**
125:12
**finances**  65:6
**financial**  9:16
9:18 10:10
16:18 24:4

33:7 55:25
56:4 64:11,22
64:25 76:18
83:1 121:12
134:2 138:4
149:3 154:23
**financially**
161:2
**financing**  61:23
68:21 70:23
92:6 116:2
**find**  113:16
**fine**  7:21
155:13
**fire**  121:9
**fired**  121:15
**firm**  5:13
**first**  4:5 6:17
17:25 21:24
22:9 28:19
56:19 67:18
75:5,9 84:21
88:23 100:19
100:24 101:8
101:15,19
105:19 106:9
113:5 115:12
127:4,12
142:21,22
143:7 145:16
145:21,22
146:1,3,4
152:7,11

**fit**  52:15
**fitts**  15:3 94:10
95:3,5 96:23
96:25
**five**  38:1
122:24
**floor**  18:20
61:23 63:3
68:17,20 70:23
138:6,6,16
145:1 148:9,16
148:18,23,24
149:1,7,10
150:2,5,11
**flow**  104:9
**flowed**  144:6
**flowing**  144:6
**fluctuation**
148:6
**flux**  110:11
**folks**  36:8
38:12
**follow**  106:2
**followed**  22:11
95:16
**following**  43:1
43:19 44:3
63:4 70:17,22
80:5 81:22
105:24 122:14
143:5 159:14
160:10
**follows**  6:17
160:1

**[footnotes - four]**

footnotes   64:21
forbearance
  4:9 23:1,8
  79:16 80:2,4,9
  80:13 82:23
  103:22 104:8
  127:8,10
  134:12 148:1
foreclosed
  81:23 82:4
foremost   75:5
forgive   153:19
forgot   37:22
form   21:15,16
  21:23 26:13,22
  31:10 33:21
  34:10,17 35:3
  35:9,23 37:13
  40:19 41:1,8
  41:22 42:9,14
  42:19 43:15,22
  44:7 46:6
  47:12,21 48:14
  48:21 49:1,6
  49:12,24 50:4
  50:24 56:10,23
  57:18 58:15
  60:9,23 62:15
  71:3 72:22
  73:10 74:18
  76:1,7 77:15
  79:2 89:21
  90:7 91:4
  92:24 93:8

96:9 102:21
107:10 109:22
110:4,16,25
111:18 112:3
112:13,24
114:9,24
115:11,22
116:17 117:3
117:10 118:13
121:10,16,22
123:21 125:17
125:22 126:7
126:13 129:15
130:1,9 131:24
132:14,18
133:4,12,17
138:14 144:12
144:22 145:12
145:19 150:19
151:1,10
155:24 156:12
formed   9:19
  60:12
forming   10:21
formula   54:14
  54:21,22 55:2
formulaic   54:9
  103:5
foundation   1:5
  1:6 3:11,18 5:5
  5:25 6:1 8:6,15
  9:6,11,14,22
  10:2,7,12,14,19
  10:25 11:1

13:11 20:20,20
22:19 25:25
26:1,5 31:1,7
34:7 36:6,24
37:11,18 38:12
40:17 41:6,11
41:23 42:7
44:21 50:11,13
50:22,23 51:15
51:16,20,22
52:3,5,7,11,17
52:18,20 53:13
53:25 54:7,15
55:4,12 60:13
61:10 62:1
67:24 69:10,16
70:2,12,12
71:1,1 72:5
74:16 75:1
77:13 80:4,11
81:16 85:11,11
85:14 91:14
92:19 102:20
102:22 103:14
103:25 104:7
104:16,24
106:11 107:7
107:13,20
108:7,16 109:2
109:9 110:5
111:8,23
112:10,15,22
113:2 114:15
114:21,22

115:8 119:4,8
119:21,24,25
120:10,16,18
122:17 133:21
133:22 134:22
134:23,24
135:4,6 136:22
137:2,4,8,21
138:8 139:1,4
139:12,16
141:17,19
143:2,9,11,24
146:25,25
147:2,21,23,24
148:13 150:16
150:22 151:7
151:13,14,16
151:19 153:16
153:22 154:7
154:10,19,23
155:1,2,3
156:14 157:1
157:10 159:5,6
foundation's
  28:9,14 32:14
  44:15 61:21
  90:25 111:25
  112:6,8,20
foundations
  65:12
four   14:25 15:5
  15:6 39:17
  120:14

**[fourth - group]**

**fourth**  57:6 81:13,13
**fraudulent** 26:25 91:15
**free**  84:5,13,17 85:4 86:13 87:21 89:8 98:7 125:12 130:7 134:7
**frequently** 39:11
**fulfilled**  42:22
**full**  6:20 15:15 15:25 149:15
**fully**  15:21 45:17 117:22 133:15
**function**  7:15 24:7 51:19
**functions**  60:12 61:2
**fund**  66:19
**funded**  58:20 59:9
**funding**  138:23 139:14
**funds**  19:25 20:8 34:14,16 34:21 35:5 36:18 52:10 66:16,19 90:12 101:11 104:1 104:24,25 105:1 134:12

137:7,9 139:2 142:2 144:1
**further**  3:5 6:10 117:7 118:14 153:2,4 158:1,2 160:24 161:2

**g**

**g**  2:3 150:7 154:6 159:24 160:5,12
**gap**  58:25
**gears**  130:10 133:19
**general**  19:4 27:21 69:25 104:18 110:18 144:1
**generally** 153:20
**generated** 126:12 133:3
**gentleman** 94:10
**getting**  26:16 40:13 74:20 87:21 100:16 153:18
**give**  97:22 157:21
**given**  118:10 125:5 149:1 158:6 159:17

160:8
**giving**  90:16
**gleaned**  26:19
**global**  102:13 102:15,19,22 102:24 103:3,5 103:7 105:18 145:16 146:20 146:23 147:1,5 147:10 153:13 153:21,25 154:7,14,16,20 154:22 155:4,5 155:8,16 156:11 157:2,7
**gm**  149:3,22,25 150:2,7
**go**  20:6 27:12 27:12 48:15 52:5 58:17 69:1 74:4 83:8 86:3 91:6 96:7 97:5 105:5 106:19 109:23 113:17 115:2 122:25 128:16 128:21 129:9 129:10 130:20 139:23 140:21 148:7 152:19
**goes**  149:9
**going**  5:2 9:11 16:6 19:20 20:8,10 21:19

27:14 31:9 37:8,8 42:25 43:23 47:8,11 57:12,14 58:8 61:9 63:22 65:2 67:15 69:11 74:6 75:3 79:12 85:3 86:3 98:21 100:17 100:20,21 105:7 106:3,18 109:21 112:25 117:2,4,22,25 118:5,18 126:18,21 127:3,11 129:9 155:11 157:17
**good**  5:1 38:3 56:12 61:17 88:8,8 119:2 152:21 153:10
**goodwill** 157:12,14,19
**gould**  2:3 160:13
**governed**  51:2 54:15
**grant**  132:4,6,7
**gross**  56:2
**group**  39:25 59:9 71:8,23 79:5

**[grow - house]**

| | | | |
|---|---|---|---|
| **grow** 23:15,16 | **guess** 23:9 | **heard** 36:12 | **history** 52:23 |
| **guarantee** 3:21 | 36:15 43:3 | 99:25 | **hit** 22:14 29:15 |
| 38:21 69:14 | 101:11 | **heed** 117:25 | 48:7 147:18 |
| 70:10 74:7 | **guys** 37:25 97:3 | **held** 52:11 | **hold** 92:14 |
| 77:7 78:25 | **h** | 101:10 104:15 | 119:7,10 |
| 80:17 83:5,6,7 | | 104:17,17 | 154:19 |
| 130:13 131:3 | **hague** 99:24 | 132:12 | **holder** 28:3 |
| 131:21,22,25 | 100:9,12 | **help** 18:14 | **holding** 154:14 |
| 132:4 133:11 | 105:19 145:15 | 24:23 25:10 | **holdings** 1:7 |
| **guaranteed** | 147:11 | 58:24 | 6:1 20:20 |
| 57:23 61:1 | **half** 9:3 | **helped** 12:21 | 25:25 26:1,5 |
| 73:24 75:12,18 | **hand** 103:21 | **helps** 98:5 | 41:6,11,24 |
| 83:10 | 110:2 | **hereto** 1:20 | 42:7 50:12,13 |
| **guaranteeing** | **handful** 12:20 | **hereunder** | 50:23 51:16 |
| 56:18 70:11,25 | **handled** 104:1 | 75:10 | 52:5,17,20 |
| **guarantees** | **happen** 92:7,13 | **high** 64:5 | 53:13,25 54:7 |
| 64:22 | 92:22,25 93:3 | **higher** 18:19 | 54:16 55:4,12 |
| **guarantor** | 93:6 120:5 | **highlight** | 85:12,14 119:4 |
| 49:18 59:14 | **happened** 52:8 | 127:11 128:22 | 119:8 134:22 |
| 63:14,17,25 | 154:13 | **highlighted** | 134:23 135:4,6 |
| 64:7,12,19 | **happening** | 16:22 17:14,22 | 141:17,19 |
| 65:11 75:10,13 | 15:19 117:20 | 19:2 21:24 | 143:2,9,11,24 |
| 75:18,19,19,21 | **happens** 92:10 | 25:16 27:5 | 147:3 151:7,14 |
| 76:4 78:2 81:8 | **happy** 100:8 | 29:14 83:25 | 154:8,11,17,20 |
| 81:20 83:2 | **harassing** | 84:3,17 89:3 | 154:23,24 |
| 131:14,14,18 | 117:17 | 92:4 95:19 | 155:2,3,4 |
| 132:2 | **hard** 157:17 | 141:16 | 159:7 |
| **guarantor's** | **harris** 1:5 5:7 | **highlighting** | **home** 6:25 73:3 |
| 75:24 76:12 | 159:5 | 140:19 | **honest** 64:4 |
| 77:2,8 | **hashing** 69:9 | **highlights** | **honestly** 37:22 |
| **guarantors** | **head** 8:15 | 28:18 84:1 | 156:21 |
| 65:1 67:23 | 79:24 | **historically** | **house** 72:24 |
| 69:17,21 70:19 | **hear** 43:5 149:3 | 51:24 | 73:19,21,25,25 |
| 78:13 131:4 | | | 147:12,13 |

**[housekeeping - insurance]**

| | | | |
|---|---|---|---|
| **housekeeping** 8:3 11:21 | **hps's** 90:6 91:2 96:6 124:21 126:10 | **improper** 117:18 118:23 | **information** 16:19 160:8 |
| **houston** 7:1 15:9 | **hub** 52:16 137:5,10 139:2 139:3,4,9,13 | **include** 68:21 68:22 85:13,15 137:16 | **initial** 110:17 110:20 143:24 |
| **hpo** 40:13 | **hudson** 2:13 5:19 | **included** 18:21 105:12 146:6 157:12,14 | **initially** 105:10 113:25 137:15 |
| **hps** 14:13,23 15:6,9,13,25 16:3 35:17 36:13,24 37:17 38:12,21 39:5 39:14 40:15 55:9 61:16 62:9 63:1,2,6 68:13 69:16 70:13,17,22 74:14,17 75:1 77:13 80:16,25 81:2,7,15,18,23 82:1,4,6,9,17 82:18 85:19 88:4,16,24 90:11 91:8,20 92:10,19,22,25 93:10 94:8 95:6,17 97:14 97:21 98:17 99:22 105:18 114:1 116:2 120:14 124:16 124:16 125:4 126:4 129:21 133:2 144:15 145:8 | **huh** 84:24 86:1 **hundred** 68:23 73:1,19 135:7 **hypothetical** 150:4 | **includes** 160:10 **including** 57:2 58:3 68:16 71:8 75:17 85:16 97:19 130:4 132:16 145:15 147:8 | **initiated** 142:11,15 143:8 **insolvency** 75:14 **insolvent** 49:5 49:9,22 50:3 75:19 76:6 79:1,13,15,15 79:18,18,22 |
| | **i** | **incoming** 30:10 90:17 125:11 | **instance** 1:16 21:6 24:13 |
| | **identifiable** 126:5 **identified** 39:18 50:16 58:2 59:12 88:20 89:1 95:17 117:14 **identify** 117:14 **ignore** 134:4 **immediately** 49:2 68:12 **implemented** 137:13,14,15 137:20 **important** 18:17 86:12 **imposing** 75:23 **impression** 26:17 | **incorrect** 100:22 107:9 **index** 3:1,8 4:1 **indicating** 114:11 **indicator** 27:5 **indirectly** 119:1 **individual** 72:8 **individuals** 15:1 39:13,24 **industry** 55:15 **inference** 116:18 **inferring** 53:6 **influencing** 19:13 | **instances** 9:4 67:18 77:7 **instantaneous...** 96:12 **instruct** 117:4 118:20 **instructed** 36:14,15 **instruction** 117:10 **instructions** 45:18 117:25 118:6,9,14,17 118:23 **insurance** 58:23,25 |

**[insurance - know]**

100:20 101:15
105:20 145:23
146:1,22
**interact**  15:13
**interest**  3:24
32:16 41:14,17
42:7 52:2
85:13 88:2,25
89:9,11 90:6
90:15 91:2,17
91:20 92:11,22
93:2,18,22
95:24 96:6,11
97:25 98:10
99:20 100:12
100:15 101:16
102:6,9 103:8
114:12 119:7
119:11,20,21
126:1,4 128:12
132:12 144:17
154:9,13,20
**interested**
35:13,19 161:3
**interesting**
156:13
**interests**  4:2
90:18,20 94:25
97:15
**interpret**  77:16
77:17,22
**interpretation**
77:25

**interruption**
153:9
**introductory**
27:21
**inuring**  72:4
**inventory**
85:17 86:21
97:19 149:4,5
**investment**
14:13 70:13
77:13 88:4,17
88:24 95:6
**invoiced**  53:13
**invoices**  53:19
**involved**  9:5
38:15 39:14,22
40:6 121:7
**involving**
152:15
**irrelevant**
117:7,19
**issue**  110:23
117:8
**issues**  80:3
**item**  8:4 100:7
100:19 102:16
103:13 105:7
128:23
**items**  53:18
83:25

**j**

**james**  15:2

**january**  79:20
**jeep**  150:14
**jeffrey**  15:3
**job**  61:17 66:22
**john**  2:13 5:19
**joined**  10:25
**jpmorgan**
90:16 94:9
**judgement**
150:17
**judgment**  3:20
32:13 33:3,10
33:16 34:3,9
34:16,22 35:2
35:12 36:14,21
37:18 40:16
123:7,20 135:9
135:10,16
137:14,20
150:21,24
151:5 152:2,3
**judicial**  1:8 5:7
159:8
**july**  121:3,4,4
127:15
**jumping**  75:16
84:20
**june**  62:1,2,12
62:19 63:5,13
65:12,25 66:5
66:11 68:3,4,8
69:15,25 78:25
79:8 80:5,10
135:23

**justin**  2:3 5:17
87:11 140:4,9
159:24 160:5
160:12
**justin.bates**  2:5
160:15

**k**

**keep**  74:20
**kensye**  2:7 5:23
69:1 160:17
**kensye.wood**
2:10 160:19
**kept**  78:19
103:21 147:24
**kevin**  41:18,19
120:11
**key**  127:19
**kind**  51:18,18
69:8 101:6
110:10
**klein**  7:3
**know**  22:1
26:15 27:4,4
44:14 47:8,22
48:22 55:19
63:22 65:2,5
65:11,16,20
67:16 68:5
74:1 89:22
92:2,3 93:5,24
94:5,12 96:11
96:22,24 98:12
101:4 109:18

Veritext Legal Solutions
346-293-7000

**[know - liens]**

114:10 117:17
121:5,15
123:14 140:16
147:11 149:2
153:18
**knowledge**
26:18 31:6,13
64:24 121:19
**kupper** 2:12
5:21 66:17
106:11 107:5
107:14,18,20
108:10 110:19
113:22 114:16
114:19,21
152:8,15
**kutschinski**
41:18,19
120:11,21
121:6,20
**kutschinski's**
120:17

**l**

**label** 100:23
127:20
**landlord**
101:24 146:15
**language**
130:21
**large** 57:10,22
58:19
**larger** 71:7,21
71:23,23

148:10
**law** 118:19
**laws** 75:14
**lawsuit** 3:17
11:7 13:10
17:4 25:18
26:9,12,21
27:3,24 30:25
31:11 37:19
38:13 39:6,9
43:7 44:15
61:13,18 62:15
90:25 91:14
110:23 116:11
123:7
**lawsuits** 110:9
110:13
**lawyer** 93:12
93:13,13
**lawyers** 82:9
82:17
**leads** 49:14
**lease** 15:20
38:17 142:4,5
142:6,9 146:16
**leases** 146:11
**leave** 76:13
77:3
**leaving** 17:19
19:3 75:19,20
78:20
**lee** 6:22
**left** 48:7,10,15
102:11 122:15

**legal** 5:10,13
93:16,20
143:20 158:7
**leland** 2:8
160:18
**lelandshaffer....**
2:10 160:19
**lend** 149:4
**lender** 24:16,17
24:19 36:3
51:19 52:2
53:2,5,6,7 57:3
61:14,22 90:17
95:16,24 96:10
111:13 113:11
113:13,15,20
114:5 116:13
125:11 133:7
134:1 149:2,7
150:18
**lender's** 125:20
126:5 131:22
156:19,22
**lenders** 35:11
45:18 53:8
61:25 63:6,10
63:10 68:18
80:5,13 83:9
104:19 123:24
125:25 128:12
132:11 138:17
145:11 156:17
**lending** 138:6

**letter** 82:8,11
82:13,16,19
**letters** 40:14
**level** 23:11
44:22 55:25
60:13 61:3
64:5 75:24
138:13 139:5
**liabilities** 42:21
49:7,25 64:10
64:14,18 76:24
78:23 79:14
84:5,13,22
101:5 118:3,11
**liability** 49:21
56:18 57:11,23
58:19 59:8
61:1 64:16
71:11 75:6,10
75:24 76:12
77:2,8,25 78:2
78:4,8,9,12
79:6 83:3
84:18 130:18
130:25 132:10
**liable** 91:14
**liaise** 138:17
**lien** 44:8 95:24
96:2,10 101:6
126:5,10,15
**liens** 84:5,13
85:6,11,21
86:2,4,14,16
125:12 144:11

Veritext Legal Solutions
346-293-7000

[lieu - made]

lieu   6:10
lifts   85:17
limit   53:22
   131:8,25
   150:11
limitation
   114:2
line   19:21
   53:18 57:6
   64:8 91:5
   100:7,19
   102:16 103:13
   105:7 111:4
   114:12 147:23
lines   20:6 29:6
liquidation
   83:7 132:8
liquidity   23:12
   44:22 78:19
   103:14 104:5
   104:11,13,19
   104:21 105:6
   147:23 148:3,8
list   12:6,15
listed   12:8 32:6
   32:15 69:16
   88:8,9 108:11
   109:8 138:12
   142:14
lists   25:20
   95:10 108:7
litigation   38:18
litigator   43:4

little   7:15,22
   13:9 24:19,24
   25:23 29:10
   32:23 40:3
   44:13 50:19
   58:10,10 61:9
   71:14 75:16
   76:6 95:8
   98:20 101:13
   107:24 138:24
   143:17 153:13
livingston   2:12
   5:9
llc   1:7,19 6:1
   8:16,16 14:13
   16:22 17:1
   18:6,11,25
   20:20 22:18
   25:25 26:1,5
   28:4,7,13,14,16
   29:3 30:12
   33:17,18 41:7
   42:7 43:13,18
   44:6 47:20
   48:11 49:18
   50:2,7,23 52:5
   53:13,23,23,25
   54:7 55:4,13
   56:7,21 57:16
   60:20 63:14
   69:21,21 70:13
   70:15,16 88:5
   88:5,10,17,21
   88:24 95:6,10

109:12,12
119:4,8 125:3
128:25,25
134:14,14,22
134:23 135:7
136:7,8 153:25
154:2,8,11,17
154:21,23,24
155:2,3,5,6,9
159:7
llc's   46:4
   125:15
llcs   135:22
llp   2:3,8 160:13
   160:18
loan   23:7 58:23
   58:24 62:20
   64:6 75:11
   76:19 116:5
   148:25 149:1
   149:10,16
loans   129:18
   134:13 145:1,2
   148:23
located   6:23
long   9:17 10:19
   14:4 55:7
   74:20 77:23
longer   42:16
   43:18 58:9,11
   76:20 79:11
   96:2 110:6
   112:17 113:1
   114:22 121:8

look   20:24 40:3
   74:6 107:1
   108:1
looked   12:18
   13:20,21 31:23
   124:17 129:9
looking   12:1
   21:24 26:4
   28:2 29:23
   33:5 44:1
   45:12 67:2
   75:3 87:25
   95:9 99:8,15
   112:4,6
looks   25:4
   94:12 95:8
   142:13,25
   143:6
loses   35:1
lot   63:5 68:7,20
   85:20,21
   107:11
love   43:5
lu   15:2
lunch   97:4,14

m

m   39:25 106:21
   106:21
machine   1:18
machinery
   24:24
made   22:18
   29:19 33:14

[made - meet]

| | | | |
|---|---|---|---|
| 40:22 55:17 72:14 73:11 81:7 85:1 141:22 150:9 153:15 155:21 156:11 | **managed** 51:20 104:16,24 138:8 | **mandated** 23:2 78:18 90:12 103:21 104:19 | **matter** 5:5 9:1 9:5 11:21 112:22 118:22 |
| **mail** 40:9 | **management** 25:19,23 26:5 39:25 50:16,20 51:4,7,9,14,17 52:4,14,18 53:12,24 55:7 55:11,22,24 57:2,3,8,15 58:4,13 59:10 60:5,8,10 61:2 71:8,19,23 78:21 134:2 138:6 | **mandatory** 150:25 | **matters** 8:25 38:18 |
| **maintain** 23:3 23:11 24:9 44:22 52:25 53:9,10 104:7 104:10,18 148:2 | | **manner** 4:14 6:15 77:1 81:1 | **max** 2:8 160:17 |
| | | **manually** 23:3 149:13 | **maximum** 75:6 75:10,12,17 130:18,25 131:17 |
| **maintained** 104:13 147:6 148:8 | | **manufacturer** 149:7,8,25 | **maxwell** 5:24 |
| | | **march** 1:13,17 5:2 62:13 137:15 159:10 | **mckinney** 2:4 160:13 |
| **maintaining** 23:14 | **manager** 138:16 | **mark** 140:23 141:3 142:17 | **mean** 19:15 27:5 32:20 59:23 66:3 76:18 81:2 106:25 111:16 114:4 135:9 136:7 |
| **majority** 109:1 109:2 110:6 113:1,3 | **mandan** 4:4 28:9,15 72:20 90:14 97:17 99:12 112:11 112:11 126:9 127:16 129:2 129:22 130:6 132:20 134:7 134:16 135:18 135:20 136:3 144:10 149:21 150:6 155:15 155:18 156:10 157:11 | **marked** 7:18 11:24 16:8 27:17 30:21 32:11 69:13 83:13 86:25 94:18 98:23 106:5 108:3 126:20 140:25 142:19 | |
| **make** 21:8 22:5 22:9 27:8 29:11 61:18 64:6 67:19 73:2 98:20 107:11,22 123:19 135:12 | | | **means** 17:16,19 19:23 68:5 96:11 109:18 142:1 |
| | | **market** 149:18 | **meant** 28:12 108:18 124:21 |
| | | **marketing** 51:17 | **measured** 79:22 |
| **makes** 67:20 74:3 88:11 107:11 109:14 | | **marking** 7:16 | **measures** 23:9 |
| | | **martin** 2:3 160:13 | **media** 5:3 158:6 |
| **making** 67:14 67:22 156:5 | **mandate** 52:25 53:8 | **material** 38:18 38:22 39:1 | **meet** 13:3 14:1 14:4 |

Veritext Legal Solutions
346-293-7000

**[meeting - nd]**

| | | | |
|---|---|---|---|
| **meeting** 14:8 | 62:24 63:2 | **mistaken** 51:8 | 54:17 55:17,22 |
| **meetings** 40:11 | 66:13 67:1,5,8 | **mix** 92:16,17 | 59:7 60:7 |
| **member** 14:23 | 67:11 68:16,22 | **modify** 115:9 | **months** 57:13 |
| **members** 14:22 | 68:23 72:11 | **moment** 59:11 | 68:8 |
| 14:25 15:4 | 77:19,20 80:22 | 91:21 106:19 | **montreal** 66:7 |
| 39:18 | 80:23 97:20,22 | 109:17 111:10 | 113:25 |
| **memory** 98:12 | 97:23 98:13,15 | 126:19 127:25 | **morning** 5:1 |
| **mendy** 1:17,19 | 102:3,16,25 | **monetary** | **mortgage** 63:3 |
| 5:12 37:21 | 131:12,13,16 | 116:25 | 72:25 73:1,17 |
| 86:22 159:12 | 131:18 142:5 | **money** 17:16 | 73:24 |
| 161:7 | 143:7,12,17,23 | 17:19 19:19,20 | **mortgages** |
| **mentioned** | 145:22 146:6 | 19:23,24 20:2 | 68:17 145:2 |
| 35:18 50:9 | 157:7,21 | 20:7,10 24:5 | **move** 11:18 |
| 60:10 155:7 | **millions** 70:25 | 24:10,25 28:23 | 24:25 137:24 |
| **mentioning** | **mind** 26:25 | 44:5,17 45:12 | **moving** 118:24 |
| 80:2 138:25 | 30:6 37:21 | 45:16,22,22 | **multiple** 57:7 |
| **mess** 7:15 | 56:19 123:17 | 46:11,13,13,17 | 156:18 |
| **messed** 154:18 | **mine** 88:13 | 48:2,7,7,19 | **mutual** 121:17 |
| **mgmt** 25:20 | **minimis** 76:21 | 52:19 53:3 | **n** |
| **middle** 100:6 | 148:8 | 54:15 59:21 | |
| **million** 18:2,10 | **minimum** | 67:17 74:2 | **name** 5:9 6:20 |
| 19:3 21:9,9,13 | 23:11 44:22 | 91:16 103:11 | 85:18 94:14 |
| 21:15,25 22:10 | 104:10 | 103:19,23 | 99:25 142:14 |
| 22:12,14,15,17 | **minus** 49:7 | 105:3,9,20 | 154:4 |
| 23:18 24:16 | **minute** 27:16 | 121:20 136:21 | **names** 12:23 |
| 28:20 29:2,7 | 38:1 152:19 | 139:8,15 | 15:1 |
| 29:15,16,19 | **minutes** 14:6 | 156:21 | **nd** 3:18,18 8:16 |
| 30:9 32:16 | 23:18 143:1,8 | **monitors** 85:17 | 8:16 13:11,12 |
| 44:4,16 45:11 | **mis** 108:17 | **month** 33:4 | 16:21 17:1 |
| 46:3 48:25 | **missing** 55:5 | 37:3 54:8,10 | 18:6,11,25 |
| 49:18 56:9,11 | 157:4,5 | 54:14,23 56:6 | 20:16 21:13,14 |
| 56:15,22 57:9 | **misstatement** | 73:2 | 22:14,18 23:19 |
| 57:17,24 59:13 | 108:17 | **monthly** 50:22 | 28:4,7,13,14,16 |
| 60:21 62:16,20 | | 53:16,17 54:2 | 28:23 29:3,15 |

**[nd - notification]**

| | | | |
|---|---|---|---|
| 29:20 30:12,14 | 85:12,12,14,14 | 105:2 107:1,4 | **nonconsent** |
| 31:1,1 33:17 | 85:16,16 88:5 | 107:24 109:17 | 147:8 |
| 33:18 34:7,7 | 88:10,21 89:19 | 138:15 139:8 | **nondiscretion...** |
| 40:16,17,25 | 91:2,21 95:14 | **needed** 52:10 | 147:20 |
| 41:5,16,20 | 100:13,13 | 52:12,17 53:9 | **noneconomic** |
| 42:6,12,16 | 101:17,17,24 | 57:4 91:6 | 41:13,17 |
| 43:12,18,25 | 101:24 102:7,7 | 104:25 125:11 | **nonoperational** |
| 44:6 45:12,23 | 103:8,8 104:14 | **needs** 138:5,6 | 42:23 |
| 46:4,13,18,23 | 104:14 109:12 | **negate** 115:9 | **nonperforma...** |
| 47:7,20 48:11 | 109:12 110:6,7 | **negative** 104:9 | 110:18 |
| 48:15 49:4,9 | 112:2,2,16,16 | 137:1,6 139:8 | **nonresponsive** |
| 49:16,22 50:2 | 112:23,23 | 139:20 | 47:16 101:20 |
| 50:7 53:23,23 | 113:9,9,21,21 | **negotiation** | **normal** 55:15 |
| 56:7,21 57:16 | 116:1,1,14,15 | 138:7,7 | **north** 17:2 18:6 |
| 58:3 60:20,25 | 123:18,19 | **neither** 83:5,5 | 18:12 19:3 |
| 61:5 63:14,25 | 125:3,15 | 160:24 | 28:9,15 29:4 |
| 65:10,16,21 | 128:25,25 | **net** 18:13,15,21 | 30:13,16 31:8 |
| 66:1,1,5,8,10 | 129:5 132:13 | 18:24 24:14,15 | 32:13 33:16 |
| 67:5,6,21,21 | 132:13 134:14 | 29:2 78:17 | 39:5,9 49:11 |
| 69:21,21 70:1 | 134:14,25 | 91:9 129:16 | 70:2 71:11,18 |
| 70:1,10,11,15 | 135:1,7,22 | 131:12,16,18 | 71:25 84:8 |
| 70:16,24 72:9 | 136:6,7,7,7,8 | 132:1 134:13 | 85:3 98:7 |
| 72:10,19,19 | 137:22 140:8 | 151:9 156:16 | 112:17 129:2 |
| 73:9,9 74:14 | 141:19 142:3 | 157:9 | 134:16 135:11 |
| 74:14,24,25 | 144:2,2 149:21 | **never** 32:19,21 | **notable** 60:2 |
| 77:11,11,18,18 | **near** 17:9 | 55:21 92:10 | **note** 4:14 |
| 78:11,11,24,24 | **nearby** 7:1 | 115:17 123:22 | 118:18 |
| 80:17,25 81:7 | **necessarily** | **new** 122:18 | **notes** 7:7 |
| 81:19,24 82:1 | 4:15 104:6 | 149:6 150:7 | 152:19 |
| 82:3,4,6,8,12 | 149:15,16 | **nodding** 79:24 | **notice** 3:10,13 |
| 82:16 83:3,3 | **necessary** | **non** 24:8 | 8:4,18 12:2 |
| 83:20,20 84:8 | 125:10 | **nonautomatic** | **noticing** 5:16 |
| 84:8,12,12 | **need** 7:25 23:2 | 24:6 | **notification** |
| 85:2,2,7,8,8,9 | 42:22 98:9 | | 40:22 |

Veritext Legal Solutions
346-293-7000

**[notify - okay]**

notify 40:13,15
nov24 25:20
november
  32:22 33:8,12
  123:8 135:10
  135:10 137:20
number 18:19
  54:9 55:2
  60:19 66:12
  73:16 80:22
  140:14 158:6
numbered 1:17
numbers
  143:16
numerical
  116:25

**o**

oath 6:11,12
  13:16
object 21:16
  26:13,22 31:9
  34:10,17 35:9
  47:11,15
  101:20 109:21
  114:24 117:2,9
  117:22 118:5
  118:13
objection 33:21
  35:3,23 37:13
  40:19 41:1,8
  41:22 42:9,14
  42:19 43:15,22
  44:7 46:6

47:21 48:14,21
49:1,6,12,24
50:4,24 56:10
56:23 57:18
58:15 60:9,23
71:3 72:22
74:18 76:1,7
77:15 79:2
89:21 90:7,10
91:4 92:24
93:8 96:9
102:21 107:10
110:4,16,25
111:18 112:3,7
112:13,24
114:9 115:11
115:22 116:17
117:23 121:10
121:16,22
123:21 125:17
125:22 126:7
126:13 129:15
130:1,9 131:24
132:14,18
133:4,12,17
138:14 144:12
144:22 145:12
145:19 150:19
151:1,10
155:24 156:12
objections 3:13
  6:14 12:2,19
obligated
  155:11 156:15

obligation
  131:4 132:8
  142:4 143:13
  144:25 146:10
obligations
  70:11 74:15
  79:23 80:17
  110:14 123:23
  123:24 128:14
  133:2,16
  146:11
obscured 32:23
observing 5:20
obtain 119:10
  120:7 131:17
  138:20 153:16
obtained 115:8
obviously 19:7
  25:8
occasions 8:22
occur 24:22
  40:8 73:14
  156:10
occurred 22:15
  29:16 110:10
  123:12 136:19
october 11:20
  67:2
offer 11:6
offered 61:4
offering 9:4
  93:20
office 5:20 6:25
  15:10,20 16:1

16:3
officer 9:16,18
  10:10 16:18
  24:5 33:7
  64:11 76:18
  83:1 95:6
  120:20 121:1
  121:13 159:16
  160:9
officer's 160:4
offices 1:18
offside 148:11
  148:14
oh 13:5 20:7
  45:10 96:16
okay 7:20,24
  8:1,3 9:9 11:18
  11:23 12:6
  13:18 15:15,24
  16:6,9 21:11
  27:19 30:22
  32:3 50:15
  55:17 63:13,23
  65:24 67:16,21
  73:4 74:9 76:8
  80:16 83:14,23
  84:7 87:20
  96:16 101:1
  106:24 107:3
  107:17 108:13
  108:20 109:1,2
  109:2,10,20
  110:1 113:6,9
  116:24 117:9

Page 30

**[okay - paid]**

126:25 127:19
128:2 130:19
139:22 141:21
143:10 150:17
157:24
**older** 63:5
**once** 46:22 47:4
52:4 53:3
124:16
**ongoing** 78:22
**online** 24:23
25:2,3 141:9
**opened** 32:21
**operate** 112:11
112:17
**operated** 129:1
139:1
**operating**
41:10 42:17
43:17,18 51:6
51:8 58:9,11
76:20,22 79:16
134:15 138:3
146:21 149:21
**operational**
51:17 60:11
144:3
**operations**
51:18 121:8
134:1 136:16
136:18
**opposed** 25:5
**optional** 145:18

**options** 119:10
119:17 120:4
**oral** 1:11,15
37:4 159:10,16
**order** 23:3
73:22 91:5
98:7 128:10
146:14,24
147:3,9,25
148:5 150:6
**ordering**
149:24 150:9
**ordinary**
136:16,18
**original** 46:2
59:4 62:6
137:11 152:14
159:23 160:6
**originally**
11:15 61:15
62:12
**outcome** 161:3
**outside** 31:10
34:11 81:18
114:25 117:5
**outstanding**
56:5 62:24
64:21 68:12
74:16 77:24
78:5 129:13,18
**overall** 57:7
**overdraft**
104:25 136:25
148:7

**overdrafts**
104:11 148:3
**overhanging**
148:15
**oversee** 133:25
**owe** 74:1
**owed** 67:23
70:25 74:16
77:12 111:13
113:11 114:5
116:13,14
**owes** 75:1 81:8
81:19
**own** 7:22 54:20
112:10 121:25
122:3 134:18
138:21 157:7
**owned** 28:8,14
28:16 41:5
42:5 85:15
112:15 154:24
156:6
**owner** 41:16
107:2,5 108:14
108:22 109:2,3
110:6 111:23
112:2,9 113:3
154:12 156:3
**owners** 109:1,1
113:1 154:3
155:22
**ownership** 41:6
41:13 42:6
119:7,10

135:14 154:13
154:20
**owns** 102:22
122:7 134:21
134:23,25
135:6 151:22
154:6,8 155:1
155:4,5

**p**

**p.m.** 1:17 97:9
97:10,10,12
123:2,3,3,5
142:25 152:23
152:24,24
153:1 158:4,9
**pack** 25:20
**page** 3:3,9 4:1
22:6,10 28:3
83:23 100:7
127:4 143:5
**paid** 23:18,19
23:24 24:17
25:24 26:5
34:8 46:18
50:21 51:9
52:4,18 54:6
54:15 55:4
60:8 67:5,7
73:16,20,22
78:20 81:5
89:20 90:14
91:8,9,16
92:20 93:10

Page 31

[paid - persons]

| | | | |
|---|---|---|---|
| 96:5 97:21 98:13,18 99:22 99:24 100:5,9 100:16 101:8 101:10 102:2 102:13 103:23 106:1 110:7 116:1,6,21,22 121:20 125:21 143:21 146:1 147:2 149:17 149:19 156:22 157:1 | **participating** 6:7 138:2 139:13 | 132:8 144:25 146:11,16 147:7,10,13 148:22 156:16 | 72:14 73:10 102:22 116:5 134:25 135:3,7 154:7,8,14 155:2,4,5,20 156:1,3,4 157:2 |
| | **parties** 6:13 31:7,22 32:14 96:2 101:18 104:7 106:15 111:8 159:21 160:10,22,25 | **payables** 100:19,25 101:2 | |
| | | | **percentage** 41:4 149:18,19 |
| | | **paydown** 145:8 | |
| | | **paydowns** 133:7 | **percentages** 42:4 |
| **paradox** 156:13 | **partners** 14:13 70:13 77:14 88:4,17,24 95:6 99:24 100:9,12 105:19 | **paying** 56:21 72:10 77:3 | **perfect** 124:11 |
| **paragraph** 75:5 76:6,11 77:1 83:24 89:4 110:15 111:4 127:12 | | **payment** 30:12 51:3 54:2 55:11 59:21 80:25 90:22 104:5,21 112:1 115:19 145:16 153:13 156:11 157:2 | **perfected** 91:16 132:12 |
| | | | **performance** 110:19 |
| | **party** 88:12,20 89:7,10 94:4 95:16 106:16 152:11,14 159:25 | | **performed** 60:17 |
| | | | **period** 17:9 27:25 109:4 |
| **parent** 10:11 19:24 20:19 22:19 24:6 25:1 29:20 51:10 52:6 136:22 | **pass** 124:10 | **payments** 52:2 54:4 55:17,22 67:14,22 72:15 73:2,11 111:9 111:12 145:14 145:17 153:17 | **permanent** 62:19 63:5,13 65:12 66:1 |
| | **pay** 24:15 34:14,16,22 35:2,5 36:14 36:15,16,18,19 36:21 44:19 49:2 53:24 59:7 75:2,21 76:13,23 77:4 77:20,21,22 78:8,16,22 82:9,24 101:4 103:5 104:7 123:24 128:11 | | **permission** 36:21 |
| | | | **permit** 134:4 |
| **part** 15:12 16:13 22:22 26:11 27:23 98:1 114:16 157:22 | | **payoff** 18:20 148:9,10 | **person** 6:11 109:3 115:23 |
| | | **payoffs** 101:6 | **personally** 35:20 |
| | | **pc** 58:7 | |
| | | **pending** 32:7 | **personnel** 15:6 59:25 |
| **participate** 136:8 | | **percent** 41:5,6 41:10,16 42:5 42:6 67:11 | **persons** 39:17 40:5 |

Veritext Legal Solutions
346-293-7000

**[pertuz - privilege]**

**pertuz** 15:2
**phillips** 2:3
  160:13
**phone** 40:23
**physical** 16:1
**physically** 6:8
  6:24
**picture** 62:10
  63:7
**piece** 24:19
  27:21 30:2
  84:17 114:3
  117:23
**place** 36:2 37:2
  45:5 55:7 90:3
**placed** 114:12
**plaintiff** 1:3,16
  2:2 5:4,18
  159:3 160:5,12
**plan** 18:20
  61:23 63:3
  68:17,20 70:23
  81:10 128:10
  138:6,6,16
  145:1 148:9,16
  148:18,23,25
  149:2,7,10
  150:5,11
**plans** 122:6,18
**platform** 24:23
  25:2
**play** 86:19
  147:22

**please** 6:4,21
  84:4 89:5
  95:20
**plus** 133:11
**pockets** 156:22
**point** 15:21
  20:23 38:2
  52:8 62:23,25
  65:25 68:25
  112:12 150:8
  156:9
**poor** 21:22
**portfolio**
  122:15
**portion** 37:23
  78:9 84:3 92:4
  117:8 133:10
**pose** 118:1
**position** 24:18
  44:15 48:2
  90:25 110:20
  110:22 111:25
  112:6,8 115:4
  115:5 116:10
**positions** 10:6
  121:6
**positive** 23:3
  23:11,14 24:10
  24:11 52:25
  53:9,11 136:21
  137:5 139:16
**possible** 32:20
  40:7

**potential** 39:1
  119:16,21
  122:21
**potentially**
  105:19 157:2
**practice** 55:15
**pre** 67:14 68:4
  144:25
**precipitated**
  121:5
**precise** 22:2
**precisely**
  117:19
**predated**
  135:18
**prefer** 83:24
**prepaid** 134:13
**preparation**
  26:19
**prepare** 12:13
  12:21 13:21
  14:2
**prepared** 12:7
  12:11
**preparing**
  160:6
**prepay** 129:18
**prepayment**
  147:2 153:15
**present** 2:11
  5:14 6:8 7:4
  9:14 14:7
  35:24 36:2

**presume**
  117:24
**pretty** 7:16
  60:1 140:12
  156:24
**prevent** 117:17
  148:5
**previous** 57:19
**previously**
  56:25 72:10
  120:24 130:21
**price** 18:18
  97:17 98:14,18
  157:18
**primarily**
  56:17 60:25
  141:12
**primary** 57:10
  57:21 59:12
  61:22
**principal** 5:21
  73:2,2,9
**printers** 85:16
**printing** 153:8
**prior** 8:22 10:5
  10:21,24 13:6
  31:22 33:18
  61:21 62:1,1,2
  62:2,3,4 64:1
  66:2 68:12,12
  92:4,18
**priority** 150:18
**privilege**
  117:11,14,15

Page 33

[probably - question]

probably 21:22 24:20 37:3 43:3 67:10 113:16
procedure 1:19
procedures 22:24
proceed 6:5
proceeding 161:1
proceeds 4:4 18:11,13,15,16 18:21,25 24:15 29:2 44:19,24 46:8 78:18 81:1,4,10 82:24 83:8 90:13 91:2,9 92:20 99:10,13 99:17 101:4 102:4,17 103:1 105:7 124:22 126:1,6,11 128:14 129:17 129:24 131:12 131:16,18 132:13,17 133:2,10,15 134:7,10,13 137:24 143:25 144:1,11,17,19 145:5,10 146:9 151:3,9 156:16 156:25 157:9

process 24:1,3 24:4 108:24
produced 1:16 16:13 140:7
product 59:5
production 149:9
products 58:23 59:1,3 103:4
professionally 124:7
profit 56:2
program 7:11
promise 27:7 45:21
promised 23:10
properties 142:8
property 143:14,19 144:4 146:2,12 146:13,18
prorated 143:19 146:2 146:12
proration 143:15
protection 131:20
provide 9:11 39:4 93:16
provided 45:5 51:3,15,16 80:20 87:16

91:7,7 128:13 143:12
provider 103:4
providing 51:13
provincial 75:13
provision 111:3 111:11,15 113:8 115:10 127:22 128:7,8 129:8 131:3
provisions 1:20
public 11:3,11
pull 56:12 107:25 113:14 116:8
purchase 3:23 4:5,7 18:18 72:20 83:19 84:9 87:22 95:22 96:1,6 97:16 98:14,18 106:10 107:25 111:14 113:18 113:21 114:6 114:17 135:18 146:18 152:9 152:15 157:19
purchased 95:25 120:8 135:21
purchases 149:13

purported 95:2
purporting 11:6
purpose 52:12 105:5 128:6 129:22,23 130:5 131:6
purposes 22:8 45:1 104:18 130:19
pursuant 1:19 96:1 160:8,23
put 16:6 27:14 30:19 43:23 60:18 69:11 73:24 83:11 98:21 99:20 106:3 111:9 148:11 149:9 150:1
putting 86:22 87:1

**q**

qualify 47:23
question 13:25 21:17,22 24:20 26:14,23 28:12 31:10 32:7 34:11,19 37:8 37:20 43:17 45:9 46:2 47:4 47:12,22 54:18 56:12 60:15,16

Veritext Legal Solutions
346-293-7000

[question - referenced]

61:20 62:6,8 63:21 65:9 71:13 72:23 82:3,15 88:8 88:13 91:11 96:25 101:2 107:23 114:10 114:11,25 117:3 118:1,7 118:15,21 119:2

**questions** 20:12 67:4 74:20 117:18 124:2 124:15,20 130:14 153:2 158:1,2

**quick** 38:1,10 69:2 87:11 122:25

**quickly** 153:6

**quite** 45:2,9 91:11 151:12

**quotations** 4:14

**quote** 4:15 73:18 79:20

**r**

**ram** 150:14

**range** 67:1

**rate** 149:16

**rather** 146:4

**rationale** 49:25 86:19

**reach** 49:14

**reached** 53:3

**read** 4:14 37:23 78:7 84:3 89:3 91:5 92:3 95:19 106:20 109:3,24 127:13,25

**reading** 37:21

**ready** 115:3

**real** 61:24 69:1 122:25 145:8

**realizable** 132:1

**realized** 73:18

**really** 22:22 23:13 44:10 59:6 87:11 145:24 153:6

**reason** 21:12 21:20 63:11 70:6 86:17 107:8

**reasons** 61:4 105:6

**recall** 8:14,17 8:19 13:19 31:14,18,21 33:25 37:11,16 39:16,22 40:21 55:14 66:10 67:6,8 68:11 70:5,7 78:17 79:19 81:13

87:18 94:21 97:16 115:16 116:3 123:9 124:18,23 130:14,17 145:6 152:7

**receipt** 52:14 90:11 95:21 96:13

**receive** 56:8 58:12 60:20 70:24 90:12 102:25 103:11 138:4 151:7

**received** 18:11 27:23 28:24 29:3 30:12,14 45:23 46:13 48:2 56:17,21 58:3 59:20 71:18 82:8,13 82:15,16,20 91:3 102:16 104:4 105:20 147:7

**receives** 157:3

**receiving** 57:16 129:13

**recent** 52:23 98:4

**recently** 37:1

**recipient** 48:19 48:22 104:6

**recognize** 141:4

**recollection** 65:19,22,25 66:4 98:5 99:14 108:21

**reconcile** 141:12

**record** 1:20 4:15 5:2,15 6:21 7:13 38:4 38:8 65:7,24 69:1,3,7 84:4 86:24 89:4 95:20 97:6,8 97:12 122:25 123:1,5 148:24 151:15 152:22 153:1 158:3 159:17 160:11

**recorded** 1:18 5:3

**redistribute** 24:12

**redistributed** 24:17

**reduction** 56:2 56:18 57:10,22 59:13 60:25

**refer** 10:1 41:9 139:3

**referenced** 17:9 28:1 36:23 128:9

[referencing - representative]

referencing 53:19

referred 99:11 103:20 114:3 136:9 154:5

referring 9:21 13:10 20:14 35:16,17 56:11 56:14 67:16 68:3 116:14 131:1 136:6

refinanced 114:1

refinancing 80:9

reflect 22:2

reflected 4:14 26:10 55:24 100:18

refresh 98:5 108:21

refused 156:9

regard 47:10 64:8 71:21 86:20

regarding 124:20 130:16

regardless 151:5

registered 42:25

rejected 110:22

relate 12:16

related 8:25 10:7,25 129:4 144:4 152:8 160:25

relates 61:23

relating 75:14

relationship 153:21

relationships 51:19 57:3,4

release 3:24 4:2 88:2 90:5,15 91:1 92:11 93:6,17,21,22 93:25 94:24 95:24 96:10,22 98:9 125:1,2,5 125:14,19 129:12,24

released 89:11 90:18 91:20,24 93:9 133:10

releases 92:22 93:2 97:24 124:17 129:21 129:23 130:5

releasing 97:14

relevant 12:16 109:4

relinquishing 121:6,7

remain 44:21 103:21 109:1 113:1 137:10

remainder 124:9

remaining 41:10 101:4 116:14,19 130:3 133:7 135:3 137:9 143:6 145:14

remains 73:13 109:2

remedies 147:8

remember 12:17,22,23 13:20 14:21 39:14 66:23 68:1 97:21 123:16

remote 1:11,15 2:1 15:22

remotely 1:18 6:9,12 15:15

removed 20:9

render 76:5 79:1

rendered 51:10

rendering 51:23 75:18

reorganization 68:13

repaid 73:14 80:23 82:18

repay 49:20 74:15 81:8,19 128:14

repaying 74:25

repayment 70:11

repeat 21:19 37:20 74:19 93:19 144:13

rephrase 124:3

rephrased 124:3

replace 19:20 19:25 20:8

replaced 62:20 139:20

report 4:10 141:8

reporter 5:12 6:4,6 159:13

reporter's 3:7 4:14 159:9

reporting 6:9 6:15 42:21

reports 39:4

represent 16:12 27:22 28:23 30:24 32:12 47:19 48:1 103:19 107:6

representation 85:1

representative 3:11 8:5,11 9:9 35:21 36:3 112:21 118:21

[representative - role]

125:3

**represented**
46:3,23 47:6
48:11

**representing**
5:10 82:9

**represents**
18:10 29:2

**requested**
37:23

**require** 38:17
76:23

**required** 23:25
24:9,14 44:20
76:13 80:21,25
81:3,10 82:24
92:20 93:17,21
104:10,13,19
113:10 133:7
133:15 143:12
146:15 148:2

**requirements**
38:22 42:21

**research** 65:4

**reserve** 124:9
157:25

**reshare** 130:20

**resource** 154:8
154:17,22
155:4

**resources**
102:14,15,19
102:23,25
103:4,5,7

105:18 145:16
146:20,23
147:2,5,10
153:13,21,25
154:15,20
155:5,9,16
156:11 157:3,6
157:7

**respect** 61:5
64:1 70:21
76:25 82:3,12
85:25 96:21
97:25 119:13
120:16 155:9
155:14,17

**respective**
78:14

**respectively**
77:11

**response** 12:25

**responses**
12:25

**responsible**
74:25 76:4
77:3,12

**rest** 146:9
157:25

**restructuring**
61:9 69:9
70:17,22 72:12
72:15 80:6
116:2

**result** 109:13
136:20 148:6

**resulted** 131:16
136:24 139:7
142:8

**retain** 103:3

**retained** 158:7

**return** 23:10
150:10

**revealed** 55:2

**review** 109:17

**reviewed** 12:15
13:6 91:13

**reviewing**
12:22

**right** 7:5 13:12
13:16 16:1,16
17:5,9 18:7,8
20:16 22:3
23:20,21 28:1
38:21 41:4
42:4,8 43:11
43:20,21 45:24
46:15,19,25
47:1 50:17,18
53:22 54:5,24
54:25 55:10
59:7,17 60:1,2
62:16,23 63:7
65:18,21 69:23
70:4,19,20
71:21 72:12,13
72:17 73:3
76:6 77:4
81:13,16 83:21
84:9,16,23,24

86:5,6,22 88:5
88:10,15,18,21
89:1,2,17
90:21 91:22
93:18 94:6,7
94:11,25 95:1
95:6,7,11,14,15
96:14 99:15
100:11 102:17
103:9,12,18
105:15 108:8
108:11,15
112:23 114:20
116:6 120:14
120:15 121:13
124:11,12
126:23 128:21
128:22 130:12
130:25 133:19
133:20 139:24
140:9,11,17
141:2,14
142:13,15,17
150:17 153:15
155:8,19,21,23
156:3 157:23

**rights** 115:18
125:20 147:3,4
153:17,24

**road** 59:2
153:17

**robert** 2:12

**role** 10:24
100:10 101:9

**[role - see]**

120:17,21,24
133:21,25
134:4
**room** 6:8 7:5
**rpr** 1:18
**rule** 117:22
160:23
**rules** 1:19
117:11
**run** 141:11

**s**

**s** 39:25
**safe** 8:21
**sag** 39:24
**salad** 9:25
**salaried** 119:5
**sale** 29:3 30:12
43:2,19 48:2
73:15 78:11
81:6 83:20
86:3,18 89:8,9
89:17 90:23
91:3,6,10
92:20 95:22
96:1 97:17
99:24 102:4,17
122:9,14
123:12,15
124:17 126:2,6
126:11,12
127:16 128:8
128:11,13
129:17,22

131:15 132:21
132:23 133:2
134:7 136:1
137:24 141:24
143:25 144:1,4
144:11,20
145:5 146:12
151:4 155:15
155:18 156:10
157:11,16,22
**sales** 18:11
78:14 81:11
82:25 83:8
100:2 102:25
128:4,18
129:14 132:17
156:25 157:18
**samu** 39:25
**satisfy** 142:3,3
144:20 147:25
**saw** 52:15
89:25 90:2
**saying** 44:14
45:19 46:11,14
47:2 54:13
77:21 78:3
103:10 106:2
114:4
**says** 76:10
84:17 85:24
88:24 90:19,24
91:14,19,24,24
92:4 96:4,10
96:13 99:12

111:11 113:1,8
115:18 116:12
117:22
**scale** 138:20
**schaffer** 5:24
**schedule**
128:17,17
**scheduling**
14:18
**schneider** 1:18
1:19 5:12
159:12 161:7
**scope** 31:10
34:11 117:5
118:22
**screen** 7:10,16
7:20 11:23
16:6,23 30:19
69:11 83:12
87:25 98:24
102:3 106:6
126:18,23
130:23 139:22
140:1
**screens** 87:2
**seated** 7:8
**second** 30:2
45:15 83:23
89:4 111:3
127:2
**section** 74:7
75:3,6,23
78:13 83:24
84:20,21,25

85:24 106:19
109:17,24
110:3 112:4
115:19 127:21
130:16,18
131:1,7,20
133:11
**secure** 145:10
147:3
**secured** 24:15
24:17,18 45:4
79:23 83:9
89:7,10 95:16
114:12,13
123:24 125:25
126:5 133:1,15
134:4 144:17
145:1,10
**security** 3:24
4:2 88:2,25
89:9,11 90:6
90:15,18,19
91:2,17,20
92:11,22 93:2
93:17,22 94:24
95:24 96:6,11
97:15,25 98:10
100:12,15
101:16 102:6,9
103:7 126:1,3
132:12
**see** 7:19 11:23
15:12 16:9,22
16:24 17:8,10

Page 38

[see - sir]

18:3,4 19:21
20:5 23:15
25:21,22 27:18
27:25 28:3,5
28:21,22 29:6
29:8 30:22
32:3,25 33:1
56:16 57:5
74:9 75:7,8
76:15,16 83:14
84:1 87:3,5
89:23 98:20,24
99:4 100:17
103:15 106:6,8
111:5 113:4,16
116:18 126:23
126:24,24
127:4 128:19
130:23 138:22
140:1,19
142:23 143:3
149:9
seeing 67:8
117:13
seen 12:3 31:2
32:9,19,21
40:2 69:18
83:17 87:6
90:1 94:19,22
97:24 99:5
106:13 108:4
115:17,20
127:5,22

select 141:9,10
sell 58:22,22,24
73:19,21 86:18
107:18 122:6
146:15 147:12
148:19 156:15
seller 88:9,20
88:21 89:1
108:11
selling 18:12
30:16 45:23
46:14,18 84:12
95:13,21,23,25
96:4,7,14
103:6 107:6
123:17
send 52:19
150:1
senior 61:22
sense 67:19,20
74:3 107:11,22
109:14 135:12
sent 32:20
sentence 75:9
88:23 89:3
92:3 95:19
116:12
separate 51:6
132:4
september 31:5
served 8:10
160:21
service 58:25
85:18

services 51:10
51:14,23 57:15
60:5 71:19
seven 63:9,12
66:3 67:9
108:23 122:1
seventh 63:19
several 8:22
18:19 35:13
80:13
shaffer 2:8,8
160:17,18
share 14:20
126:18 139:22
shared 13:18
shareholder
119:14,17,25
shares 120:3,7
sharing 87:3
130:11 132:22
sheet 49:8
64:17 79:13,21
shift 130:10
133:19
shifted 126:10
shorthand 1:18
159:12
shortly 22:11
show 106:1,18
107:12 126:21
showed 12:19
showing 19:3
20:25 106:9
145:4

shown 160:22
shub 72:9
shut 43:1,10
side 60:11
71:16 86:9,18
107:17,18
111:10 158:1
sign 12:21
89:22 93:1
signatory 88:16
signature 1:20
3:6 40:2 64:8
94:12,14 95:2
159:19 161:6
signed 89:19
91:13,22 93:5
93:25 94:4,11
96:23 98:4
125:3
significant
15:18 59:4
signing 79:19
simply 25:12
43:1 122:10
simultaneously
45:3,7 94:15
single 85:15
sir 6:23 7:17,24
8:8 10:14
16:12,21 17:7
19:9 32:8,18
32:25 69:14,24
83:17 87:7
89:13 99:6

**[sir - specified]**

108:5,15 155:7
**sit**  50:3 115:5
  118:4,12 122:7
  122:10
**site**  85:17
**sitting**  59:19
**situation**
  131:21 143:6
**six**  63:11,12
  122:15 158:7
**sixteen**  122:4
**skating**  47:13
**slemko**  1:12,16
  3:2,10,12,14,15
  3:17,19,21,22
  3:24 4:2,3,5,7,8
  4:10,11 5:4 6:2
  6:16,20,22
  7:14,18 8:4
  11:4,16,23,24
  12:4,13 14:10
  15:16 16:7,8
  16:10 17:12,24
  18:9 22:18
  25:15 26:8
  27:17,19 28:7
  28:19 29:18
  30:20,21 32:2
  32:11 34:5,13
  38:9 40:25
  42:12 44:2
  47:10 48:5
  49:4 50:9 56:7
  57:13 60:18

61:8 67:19
69:8,13 72:25
74:10 75:23
76:25 77:10
83:13,15 86:8
86:25 87:1,15
88:14 90:5
91:12 93:12
94:17,18 96:4
96:21 97:13,24
98:6,23,25
101:22 103:15
105:2 106:5,7
106:14 108:3
110:13 115:2
116:24 117:24
118:8,16,25
119:20 123:6
124:4,15
126:20,23
130:12 140:25
142:19 153:6
158:6 159:10
159:15
**smack**  100:6
**small**  7:20
  44:20 66:12
  75:20 76:14,17
  78:18 101:12
**sold**  18:6 42:12
  43:13 45:25
  46:22 48:6
  49:10 54:10,17
  54:23 77:19,19

89:8,10,12
90:6,9,14,23
91:21 92:11,23
96:3 98:1,10
101:6 103:2
122:8 125:7,15
125:16,18
126:4,10 129:5
130:7 131:12
142:7 147:5
**solutions**  5:10
  5:13 158:8
**somebody**
  138:17 153:8
**soon**  149:8
**sorry**  13:4,5
  33:22 37:20
  39:25 45:8
  54:18,19 74:19
  80:8 87:10
  88:6 93:19
  109:6 112:14
  120:6 128:16
  144:13 147:20
  153:7,8 154:7
**sort**  11:6 16:22
  53:18 54:21
  58:13 103:10
  117:11,13
  155:7,17
**sound**  62:22
  70:4 100:9
**sounds**  38:3
  67:15 72:17

100:11 107:8
152:21 156:24
157:23
**southern**
  118:19
**speak**  13:24
  35:4 39:8
  55:20 72:2
  121:11
**speaking**  21:10
  45:3,7 49:7
  94:15
**special**  39:25
**specific**  12:17
  12:23 13:21
  17:7 22:7 27:2
  31:14 39:13
  44:25 51:17
  52:12 54:14
  55:14 57:9,22
  59:15 70:5,7
  129:4 131:19
  147:18 153:19
**specifically**  7:2
  14:21 25:19
  27:4 35:15
  36:11 39:16
  56:14 68:8,14
  71:25 72:7
  94:10 129:16
  130:16 153:14
**specified**  128:4
  129:17 134:12
  135:2

Page 40

[specify - subsequently]

| | | | |
|---|---|---|---|
| **specify** 110:8 | **static** 54:7 | **stuff** 40:3 51:18 | 109:12 110:6 |
| **speculation** 99:21 | **stating** 75:9 | 116:11 | 112:2,16,23 |
| **spoke** 44:23 | **status** 35:14 38:25 39:5 | **styled** 1:17 | 113:9 116:1,15 |
| **spoken** 14:10 14:16 | 60:2 | **sub** 3:18 8:16 13:11 16:21 | 123:19 125:3 125:15 128:25 |
| **spring** 7:3 22:25 | **stay** 104:25 | 17:1 18:6,11 18:25 20:16 | 132:13 134:14 135:7,22 136:7 |
| **staffed** 120:13 | **stayed** 147:21 | 22:14,18 23:19 | 144:2 |
| **stake** 154:14 | **stellantis** 150:9 150:10,12 | 28:13,14,16 31:1 33:17 | **sub's** 21:13,14 45:12 46:23 |
| **stamp** 142:25 | **step** 23:14 121:18,21 | 34:7 40:17 41:20 42:6 | 82:4 113:21 |
| **standalone** 138:19 | 154:24 | 43:12,18,25 44:6 45:23 | **subaru** 28:15 28:16 66:12,16 |
| **stands** 40:1 | **stephanie** 40:2 | 46:4,13,18 47:7,20 48:11 | 89:17 112:11 125:6 |
| **start** 124:16 125:1 133:20 | **stipulated** 90:13 | 48:15 49:22 50:7,12 53:23 | **subject** 53:2 91:16 113:10 |
| **state** 1:18 5:14 6:20 75:13 | **stock** 120:4 | 60:20 63:14,25 65:21 66:1,5 | 115:12 118:22 125:18 126:3 |
| 110:10 159:13 | **stop** 55:21 130:10 132:22 | 66:10 67:6,21 69:21 70:1,10 | 132:7 144:11 |
| **stated** 1:20 | 150:9 | 70:16,24 72:9 72:19 73:9 | **subordinate** 116:21 |
| **statement** 3:14 3:16 16:13,21 | **stopping** 68:24 | 74:15,24 77:11 77:18 78:11,24 | **subordinated** 111:12 114:4 |
| 17:7,8,9,17,20 20:24 22:11 | **straight** 136:17 | 82:3,6 83:3,20 84:8,12 85:2 | **subordination** 111:3,11,15 |
| 27:22,25 64:22 139:6 140:8 | **streamline** 140:22 | 85:12,14,16 88:5,10,21 | 113:10,12 114:3 115:9 |
| 149:10 | **strictly** 8:3 49:7 63:2 79:12 | 89:19 91:2,21 100:13 101:17 | **subparagraphs** 75:4 |
| **statements** 22:2 43:25 | **strike** 13:25 23:22 37:5 | 101:24 102:7 103:8 104:14 | **subpoena** 16:14 27:23 |
| 55:25 56:4 64:25 | 155:15 | | **subsequently** 61:15 |
| **states** 11:19 84:12 | **structure** 61:14 135:14,15,25 137:11 150:22 | | |
| | **structuring** 136:13 | | |

Veritext Legal Solutions
346-293-7000

**[subsidiaries - testify]**

**subsidiaries**
9:7 33:11 36:7
53:14 69:10
83:2
**subsidiary**
20:15 41:2,23
54:16 109:11
131:4,9
**substantially**
42:12 43:13
44:5 45:23
46:3,18,23
47:5,6,19
49:10 123:18
**suburb** 7:1
**sued** 31:7 70:1
82:1,6
**sufficient** 49:20
76:23 79:6
**suggesting**
124:16 155:14
156:8
**suing** 17:2
26:20 31:21
**suite** 2:4
160:13
**sum** 48:6
**summarize**
54:21
**summary** 19:5
44:18
**superceded**
123:23

**support** 51:17
79:6 143:12
**suppose** 97:2
119:2
**sure** 21:8 22:5
22:9 26:16
27:8 29:11
46:7 61:18
62:5 63:24
89:6 111:17
140:12
**surplus** 133:11
133:13
**swear** 6:4
**sweep** 20:11,17
22:22 23:2,20
23:25 24:6,9
52:1,22 105:12
136:12 137:11
**sweet** 156:25
**swept** 20:3 52:6
136:21 137:1
**sworn** 1:16
6:17 159:15
**synergies** 138:7
**system** 19:17
20:11,17 22:22
57:2,8 58:14
59:10 78:19,21
136:9 137:13
137:19,25
138:2 141:9
150:2

**t**

**t** 154:6
**take** 23:9 24:10
24:14 37:25
72:25 85:4,20
97:22 106:19
109:16 121:18
121:21 122:24
127:25 152:18
156:4,4 157:21
**taken** 1:16 5:4
13:6,8 37:2
63:18 110:21
160:10 161:2
**talk** 12:11 13:9
25:23 27:10,11
27:15 38:19
44:12 45:20
50:19 61:8
128:1 132:20
**talked** 29:10
48:8 58:9
101:22 105:13
115:25 123:6
147:12
**talking** 38:10
50:10 63:1
68:2 69:24
80:8 87:20
97:14 99:21
114:7 116:3
123:11,14
144:14 153:12

**tax** 143:14,19
**taxes** 144:4
146:2,12
**team** 71:8,23
**teams** 40:10
**technically**
100:15 127:9
**tell** 47:8 93:6
150:15
**telling** 112:21
**ten** 152:19
**tenant** 143:22
144:2
**tenants** 144:3
146:11
**tens** 70:25
**term** 11:11
20:17 26:24
30:1 62:19
63:2 68:16,16
114:21 129:18
134:13 145:1
**terms** 24:5 26:8
87:22 108:22
116:25 123:14
146:16 153:20
**territorial**
75:14
**test** 65:2 98:13
**testified** 6:17
22:21 61:12
**testify** 12:7
26:9

Veritext Legal Solutions
346-293-7000

**[testifying - top]**

| | | | |
|---|---|---|---|
| **testifying** 110:12 | 45:5 48:19 54:4,13 55:16 56:20 57:19 59:19 61:12 62:14 63:9,20 63:21 66:21,25 71:17 74:3,13 86:8 91:19,23 91:25 98:3,16 100:17,18,22 104:2,20 113:2 116:7 126:17 132:9 140:3,11 140:13,13 147:17,17 152:20 153:14 154:6 156:1 157:21 | **tie** 129:8 | 145:22 146:1,2 146:5 |
| **testimony** 9:5 9:10 11:7 13:6 13:15 15:24 18:24 20:13,23 25:17 32:18 34:15 45:15 53:2 57:14 61:19 62:14,18 67:2 79:10,12 85:20 93:17,20 98:6 158:5 159:17 160:9 | | **time** 15:15,21 15:25 16:4,4 22:25 23:13,15 23:16 31:7 44:6 49:19 52:23 62:25 65:9 67:13,23 79:7 90:8 93:7 104:9,17 109:4 112:12 113:24 115:13 121:2 121:17 124:10 132:23 133:1 135:18 137:18 142:10,12,25 144:9 157:25 159:21,25 160:9 | **titled** 94:24 |
| | | | **titles** 10:6,9 |
| | | | **today** 5:24 6:23 7:15 8:8 9:11 12:11 14:14 15:20 26:10 38:19 45:21 50:3 59:20 65:3 74:13 115:5 118:4,12 122:7,10 124:2 151:13 |
| **texas** 1:5,18,19 1:19 2:4 5:7 7:3 26:9,12 27:24 91:15 117:8,11 118:19 159:5 159:13 160:14 161:7 | | | **today's** 12:14 13:22,25 14:2 14:11 22:7 26:19 118:25 124:7 158:5 |
| | **thinking** 55:10 | **timeline** 33:2 48:8 92:17 | **together** 143:16 |
| | **third** 16:23 19:21 23:12,12 28:3 67:11 | **timelines** 69:25 | **told** 14:18 21:25 54:22 55:16,21 91:19 93:4,11 150:10 |
| **thank** 30:15 50:15 62:3 87:13 152:1 | **thought** 31:17 115:14 | **times** 8:24 9:3 39:11,12 74:12 86:10,11 | |
| **thing** 80:24 101:7 145:25 | **thousand** 73:1 | **timing** 21:1 22:7 36:10,11 37:16 96:15,18 | **tomorrow** 15:17,18 |
| | **threat** 148:15 | | |
| **things** 13:20 22:2 71:16 92:1 111:17,19 | **three** 26:10 31:7,22 32:14 35:21 36:20 39:8 40:13 67:9 77:7 147:15 | **title** 9:14 85:4 86:13 87:21 98:8 100:20,24 101:8,15,19 105:19 142:22 143:20 145:17 | **took** 36:1 38:9 90:3 97:13 127:2 130:7 |
| **think** 8:1 12:12 22:21 29:25 36:17 41:3,13 43:3,6 44:13 | **threshold** 148:2 | | **top** 8:14 16:23 17:9 18:20 19:22 20:25 28:1,3 57:6 |

Veritext Legal Solutions
346-293-7000

**[top - ultimately]**

88:9 99:12
**topics**  12:7,8,10
  12:15,16
**total**  15:4 18:18
  66:23 77:24
  78:1 97:16,19
  158:6
**totality**  9:2
**towards**  72:20
  73:11
**track**  74:20
**trades**  149:12
**traditionally**
  54:2
**transaction**
  18:13 19:13
  21:5 24:15
  44:25 52:2
  80:21 86:9
  92:7,10,13,21
  92:25 99:11
  100:15,23
  101:9,11
  107:18,19
  123:12 133:16
  146:9 147:8,9
  147:13 148:7
  152:9 155:10
**transactional**
  133:8
**transactions**
  21:4 64:6 81:5
  136:19,20

**transcript**
  159:16,20
  160:6
**transfer**  4:10
  18:1 19:22
  21:15 22:9,18
  22:22,23 25:5
  25:11 26:25
  28:20 29:6,14
  29:16,19 30:9
  44:4 45:11
  50:10 57:6,22
  58:7 59:13,15
  60:25 91:15
  105:12 139:11
  139:21 141:8
  141:11,22
  142:10 143:1,9
  143:24 146:12
**transferred**
  19:14,17 21:14
  56:8 60:21
  124:24 137:6
  139:6
**transferring**
  24:5 25:12
**transfers**  4:12
  23:2 26:10
  27:2,9 31:23
  33:4 144:6
  146:3,4
**transition**  38:1
**transport**
  149:9

**treasury**  51:13
  51:19 57:15
  58:4,13 59:17
  60:12 61:2
  133:25 136:9
  138:2,4,7,15
  150:22
**treat**  64:14,18
**treated**  65:5
  124:6
**treating**  72:4
**treatment**
  64:13
**trial**  33:15
  57:12,14 115:4
  135:11
**trier**  110:23
**trigger**  96:15
  96:18
**triggered**
  110:14
**trip**  27:7
**trucks**  54:11
**true**  22:1 30:6
  34:5,6 38:20
  50:6 66:8
  77:10 117:12
  117:16 159:17
**truist**  149:3
**trust**  101:11
**try**  9:24 74:23
**trying**  27:7
  48:5 54:4,19
  73:8 92:16

105:6
**turn**  131:13
**turned**  23:1
  24:9
**two**  25:8 33:11
  39:23 53:24
  63:10,12 66:15
  70:22 72:20
  79:17 85:22
  92:1 109:11
  111:17,19
  113:21 126:9
  128:24 129:1,5
  129:10,22
  130:6 134:16
  134:18 136:3,3
  137:22 143:15
  144:10,16
  145:9
**type**  80:2
  131:20
**types**  58:25
**typically**  25:24

**u**

**u**  39:25
**u.s.**  11:11
  120:11
**ucc**  45:4 85:10
  85:18,22 93:9
  93:21
**uh**  84:24 86:1
**ultimately**
  156:5

Page 44

**[unable - view]**

| | | | |
|---|---|---|---|
| **unable** 75:21 77:4 | **understanding** 17:15,18 18:9 | **unsecured** 144:20 | **vary** 54:8 |
| **under** 13:15 | 22:13 23:6,17 | **updated** 99:19 | **vehicle** 58:24 |

unable 75:21
77:4
under 13:15
22:23 23:1,8
52:24 64:22
65:14 66:2
68:18 69:22
75:11,13 76:6
76:11 77:7
78:13 79:16
91:15 95:22
96:5 103:25
110:14 115:19
117:11 118:23
122:9,11
127:20 133:11
146:16
underlying
131:10
underneath
94:14
understand 8:7
9:10 13:19
17:13 18:14
24:18,24 25:7
25:10,17 26:8
40:24 45:20
46:7,12 47:3
47:10 54:13
58:1 62:9
72:23 74:24
80:3 95:5
105:2,4,6
111:7 116:10

understanding
17:15,18 18:9
22:13 23:6,17
29:1,13,18
30:11 34:4
38:14 42:5
43:9 44:14
64:5,24 70:9
70:15 73:5
78:10,12 87:24
99:23 101:23
104:20 108:17
109:5,18 110:3
understood
11:14 70:8
74:22 110:2
124:1
unencumbered
124:22,25
unforeseen
148:9
uniform 91:15
101:5
unit 5:3 40:1
united 11:18
units 54:10,11
universe 13:19
unpaid 56:6
unquote 73:18
unreasonably
75:20 76:14,17
unrestricted
151:8

unsecured
144:20
updated 99:19
upstream
144:7
use 10:1 42:25
80:10 100:23
102:12 134:8
134:10 151:8
used 19:25
20:11 30:1
44:19,25 66:19
73:17 104:17
128:14 132:7
134:13 139:18
141:12 149:12
149:17 158:6
159:25
using 57:8
64:23 125:15
usual 148:10
usually 24:4

**v**

v 1:4 159:4
value 50:1
116:25,25
131:10 132:1
133:7 138:12
144:5 149:4,15
149:18 150:2
various 45:18
50:22 69:9
80:3,12 105:5

vary 54:8
vehicle 58:24
149:5,6,11,12
149:17 150:3
vehicles 54:12
55:3 101:6
149:18,24
150:7,10
157:17
vendor 101:5
verbatim 18:24
verbiage 99:19
veritext 5:10,13
158:7
version 11:13
90:1 99:18
versus 5:5
64:12 65:1
151:13
vested 156:5
veto 155:8,17
video 5:3
videographer
2:12 5:1,11 6:3
38:4,7 69:3,6
97:8,11 123:1
123:4 152:22
152:25 158:3
videotaped
1:11,15 159:10
view 59:20
110:17 113:7
114:8

**[vin - wood]**

**vin** 150:1,2
**vincent** 15:2
**virtue** 36:16
  101:8 119:17
**visible** 32:24
**visit** 16:3
**vote** 155:17

**w**

**waive** 6:14
  115:18
**waived** 1:20
  3:6 159:20
**waiver** 4:9
  127:9
**walk** 61:14
  136:15 145:3
  152:6
**walked** 145:3
  150:25
**want** 17:23
  22:5,9 25:16
  26:16 27:8,12
  29:11 37:25
  50:19 61:8,18
  66:13 81:12
  97:3,5,19
  122:4 127:19
  128:16 139:22
  140:17 141:14
  142:20 151:14
  155:12
**wanted** 23:15
  99:20 105:25

134:8
**wants** 156:3
**warranty** 85:1
**waterfall** 99:11
  101:3 102:3
  103:24,25
  105:3,8,21,23
  106:1 145:4
  146:5 150:25
**way** 14:1 21:22
  23:23 31:19
  37:6 43:6
  46:10 47:23
  53:10 54:21
  62:8 66:18
  74:5 76:11
  77:22 78:7
  101:1 102:11
  115:25 151:4
**ways** 76:3
**we've** 79:16
  123:11 125:14
  144:14
**week** 148:6
**went** 52:3 55:2
  61:10 63:9
  69:10 71:15
  105:3 130:21
  130:21 135:15
  140:14,15
  145:22
**wick** 2:3 160:13
**wickphillips....**
  2:5 160:15

**wide** 114:7
**wind** 43:7
**wire** 4:12 17:25
  25:6,11 28:19
  29:14 31:23
  33:4 140:16
  146:4
**wise** 7:24
**withheld** 101:3
**witness** 1:16
  3:2 6:2,4 31:12
  34:12 115:1
  117:4 118:20
  124:10 153:3
  159:15,18,19
  159:20
**wood** 2:7 3:4
  5:23,23 21:16
  26:13,22 31:9
  33:21 34:10,17
  35:3,9,23
  37:13 38:3
  40:19 41:1,8
  41:22 42:9,14
  42:19 43:15,22
  44:7 46:6
  47:11,21 48:14
  48:21 49:1,6
  49:12,24 50:4
  50:24 56:10,23
  57:18 58:15,17
  60:9,23 71:3
  72:22 74:18
  76:1,7 77:15

79:2 87:11
89:21 90:7,10
91:4 92:24
93:8 96:9 97:5
102:21 107:10
109:21 110:4
110:16,25
111:18 112:3,7
112:13,24
114:9,24
115:11,22
116:17 117:2
117:12,16
118:5,13
121:10,16,22
123:21 124:11
124:14 125:20
125:24 126:9
126:16,18,21
129:20 130:5
130:10 132:3
132:16,20
133:6,14,19
138:19 140:4,6
140:9,13,14,24
141:1,2 142:20
144:14,24
145:14 147:17
150:21 151:3
151:12 152:18
153:2,12
155:24 156:12
158:2 160:2,17

Veritext Legal Solutions
346-293-7000

**[woodlands - zoom]**

| | |
|---|---|
| **woodlands** 1:19 | 66:3,3 67:11 67:20 72:6 77:9 83:16 94:16 97:5 106:8 108:23 123:16 129:10 129:16 131:14 138:11,23 140:13 144:14 147:17,18 154:16 |
| **word** 9:24 42:25 54:5 55:10 88:15 113:4,5 116:19 | |
| **words** 121:21 131:19 133:14 135:24 | |
| **work** 10:19 15:9,13,15 24:4 64:6 156:13 | **year** 10:23 39:12 67:3,9 79:20 122:22 123:12 |
| **worked** 10:24 16:1 54:21 136:16 | **years** 66:3 67:10 79:17 108:24 137:23 |
| **working** 57:5 58:8 104:18 | **yep** 85:23 109:24 127:1 |
| **workout** 81:10 | **younger** 5:20 |
| **works** 73:6 | |
| **worth** 57:16 58:6 | **z** |
| **wrap** 144:5 | **zero** 130:20 136:12 137:11 140:17 141:14 |
| **written** 51:2 | |
| **wrong** 40:14 50:12 63:23 67:16 107:8 140:5 154:4 | **zoom** 7:11,15 7:22,24 40:10 40:11 127:4,11 |
| **y** | |
| **yeah** 13:14 20:17 40:12 54:12 62:7 63:12,12 64:3 | |

Page 47

Texas Rules of Civil Procedure

Part II, Section 9, Evidence and Discovery

Rule 203

203.1 Signature and Changes.

(a) Deposition transcript to be provided to witness. The deposition officer must provide the original deposition transcript to the witness for examination and signature. If the witness is represented by an attorney at the deposition, the deposition officer must provide the transcript to the attorney instead of the witness.

(b) Changes by witness; signature. The witness may change responses as reflected in the deposition transcript by indicating the desired changes, in writing, on a separate sheet of paper, together with a statement of the reasons for making the changes. No erasures or obliterations of any kind may be made to the original deposition transcript. The witness must then sign the transcript under oath and return it to the deposition officer. If the witness does not return the transcript to the deposition officer within 20 days of the date the transcript was provided to the witness or the

witness's attorney, the witness may be deemed to have waived the right to make the changes.

(c) Exceptions. The requirements of presentation and signature under this subdivision do not apply:

(1) if the witness and all parties waive the signature requirement;

(2) to depositions on written questions; or

(3) to non-stenographic recordings of oral depositions.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.